**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**At Charleston**

**SAMUEL GEORGE KAPOURALES**

         **Plaintiff,**                      **Civil Action   2:26-cv-11111**

                                                  **COMPLAINT FOR REFUND OF TAXES**

**UNITED STATES OF AMERICA**               **DEMAND FOR JURY TRIAL**

         **Defendant.**

## COMPLAINT

COMES NOW the Plaintiff, SAMUEL GEORGE KAPOURALES, by his undersigned counsel, and as a basis for his complaint alleges as follows:

### I. PARTIES

1.    The Plaintiff, SAMUEL GEORGE KAPOURALES (hereinafter "Plaintiff"), is a citizen of the United States and a resident of West Virginia with his principal residence in Williamson, Mingo County, West Virginia.

2.    The Defendant is the United States of America.

### II. JURISDICTION AND VENUE

3.    This is a suit arising under the laws of the Internal Revenue Code for the refund of taxes (assessable penalties) improperly assessed against and collected from the Plaintiff.

4.    Jurisdiction is conferred upon this Court by virtue of 28 U.S.C § 1346(a)(1).

5.    Venue in this District is proper under 28 U.S.C. § 1391(e).

6.    Plaintiff timely filed claims for refunds for Trust Fund Recovery Penalties he contends were improperly assessed against and collected from him.  The Internal Revenue Service

("IRS") failed to respond within six (6) months of the filing of the claim.  Therefore, this suit is timely under 26 U.S.C. § 6511(a) and 26 U.S.C. § 6532(a)(1) and jurisdiction is proper under 26 U.S.C §7422.

### III. <u>FACTS COMMON TO ALL CLAIMS</u>

7.      Plaintiff incorporates by reference the averments of paragraphs 1 through 6 of his Complaint as though the same were set forth fully herein.

8.      The Williamson Memorial Hospital (sometimes referred to as the "Hospital") was a small, rural access, acute care hospital in Mingo County, West Virginia.  It was the only hospital in the County.

9.      Prior to April of 2018, the Hospital was owned by Community Health Systems, but was, upon information and belief, in financial distress.

10.      Concerned about the potential loss of critical healthcare services and jobs in the Williamson, West Virginia area, three local community leaders, including, Plaintiff, organized Mingo Health Partners, LLC ("MHP") on April 12, 2018, and completed the acquisition of Williamson Memorial Hospital on or about June 1, 2018.  At all times relevant to this Complaint, MHP was the parent company of Williamson Memorial Hospital, LLC.

11.      Charles Hatfield was the managing member of MHP.  At all times relevant to this Complaint, Mr. Hatfield served as Chief Executive Officer ("CEO") of Williamson Memorial Hospital and his wife, Sabrina Hafield, served as Chief Financial Officer ("CFO").

12.      Plaintiff was also a member of MHP and served on the Hospital's Board of Directors.  He was not an officer or executive of the Hospital and had no control over payroll operations or the payment of other obligations.

2

13.    Diane Varney served as the Hospital's accounting manager and was responsible for processing payroll and accounts payable.

14.    At all times relevant to this Complaint, Charles and Sabrina Hatfield exercised exclusive authority over which obligations of the Hospital would be paid, in what amounts, and when.  Mr. Hatfield directed Ms. Varney regarding which invoices to pay and which to defer, and Ms. Varney had no independent discretion to issue checks without Mr. Hatfield's approval.

15.    After MHP acquired the Hospital, the Hospital's cash flow declined.  When there were insufficient funds to pay vendors, Ms. Varney discussed the matter with Mr. Hatfield.  When there were insufficient funds to cover the payroll, Mr. Hatfield asked Plaintiff to provide funds to meet payroll.

16.    At some point in 2018 or 2019, Mr. Hatfield removed Ms. Varney's authority to issue checks and centralized check issuances under his own control.  Thereafter, Mr. Hatfield alone issued checks.

17.    During this time, Mr. Hatfield made the decision to shift payroll processing from ADP to Meditech.  Payroll was fully funded through April 2019 when ADP was used.  After the transition to Meditech, Mr. Hatfield began funding only the net payroll amount and stopped remitting required payroll tax withholdings to the government.

18.    Neither Mr. Hatfield, Mrs. Hatfield, nor Ms. Varney disclosed to Plaintiff that only net payroll was being funded or that payroll tax obligations were going unpaid.

19.    In accordance with Mr. Hatfield's request, Plaintiff made multiple advances and loans of his personal funds to the Hospital for the specific purpose of ensuring that payroll was met and Hospital employees were paid.  Plaintiff reasonably believed that the funds he provided

were sufficient to cover gross payroll, including all payroll tax withholdings and related obligations.

20.     Although Plaintiff occasionally co-signed checks, all decisions as to which checks to issue and in what amounts were made by Mr. Hatfield and Mrs. Hatfield in their roles as CEO and CFO.  Plaintiff had no knowledge that payroll tax withholdings were not being remitted as required.  Indeed, Mr. Hatfield instructed Ms. Varney not to tell Plaintiff that Mr. Hatfield was only placing enough funds in the Hospital's payroll account to cover net payroll and was not paying withholdings to the appropriate entities.

21.     During the relevant period, a signature stamp bearing Plaintiff signature was kept at the Hospital solely for the convenience of office staff in the rare event that management was unavailable to sign checks.  The stamp's existence did not give Plaintiff the authority over payroll decisions or control over which obligations were paid.

22.     Mr. Hatfield and Mrs. Hatfield did not provide budget or financial information to the Hospital's Board of Directors during this period, preventing Plaintiff from discovering that trust fund taxes were not being paid.

23.     On October 21, 2019, Williamson Memorial Hospital filed for bankruptcy.

24.     Upon information and belief, shortly after the bankruptcy filing, Harold Preston, with the authorization of the bankruptcy court, was appointed to the role Interim CEO of the Hospital and assumed management responsibilities, including payroll.  In that role, he submitted monthly operating reports to the bankruptcy court, many of which represented that all employees were timely paid, and that all tax returns had been filed and taxes paid.  In such reports, Mr. Preston declared under 28 U.S.C. §1746 that he was the responsible party and that the monthly operating reports were true and accurate to the best of his knowledge.   Plaintiff provided no further funds

4

for payment of payroll and had no further role in any Hospital operations after the filing of bankruptcy and the appointment by the bankruptcy court of an Interim CEO.

25.     On June 9, 2022, the IRS sent a *Proposed Assessment of Trust Fund Recovery Penalty* to the Plaintiff outlining penalties it intended to assess against him pursuant to Internal Revenue Code ("Code") Section 6672 as follows:

| Tax Period | Penalty |
|---|---|
| Ended September 30, 2019 | $302,178.33 |
| Ended December 31, 2019 | $175,074.19 |
| Ended March 31, 2020 | $211,251.62 |

26.     On August 5, 2022, Plaintiff timely filed a Formal Written Trust Fund Penalty Protest for the proposed penalties for the periods ending September 30, 2019, December 31, 2019, and March 31, 2020.  In his protest, Plaintiff asserted that he was not a responsible party with respect to responsibility for ensuring withholding taxes were paid and that any such failure, if any, on his part was not willful. At the request of the IRS, Mr. Kapourales submitted additional documentation in support of his protest by letter dated November 15, 2022.

27.     On October 27, 2023, the IRS determined that Plaintiff was not responsible for the period ending September 30, 2019, but found Plaintiff responsible for the periods ending December 31, 2019 and March 31, 2020, which, curiously, covers a majority of the time after the Hospital filed bankruptcy and was under the control of an Interim CEO.

28.     On November 9, 2023, the IRS assessed a Trust Fund Recovery Penalty on the taxpayer for the periods ending December 31, 2019 and March 31, 2020.

29.     The IRS's assessment of penalties was based on its erroneous determination that Plaintiff was a "responsible person" and that Plaintiff willingly failed to turn over employee taxes.

Plaintiff was not a "responsible person", and Plaintiff's actions were not willful as defined pursuant to § 6672.

30.　　On or about December 11, 2023, the IRS withheld amounts owed to Plaintiff as a refund on his 2022 personal (1040) tax liability and applied it to the full amounts of the penalties assessed for the tax quarters ending December 31, 2019 and March 31, 2020.

31.　　On November 20, 2024, within two years of the payment of the proposed penalty, Plaintiff filed with the IRS Forms 843, *Claim for Refund and Request for Abatement*, for tax quarters ending December 31, 2019 and March 31, 2020, requesting refund of the payments made and abatement of the full penalties assessed.  Plaintiff provided detailed statements in his Forms 843 setting forth his grounds for a refund.   Redacted Forms 843 are attached hereto as Exhibit A.

32.　　On June 5, 2025, the IRS notified the Plaintiff that additional time was needed to consider his claim for refund, but took no action in denying or allowing the refund claim.  As of the filing of this Complaint, Plaintiff has received no further communications from the IRS on the status of his refund claim.

33.　　More than six months have passed since Plaintiff has filed his claim for refund, and the IRS has failed to allow or disallow the claim.

## IV.  FIRST CLAIM FOR RELIEF
## TRUST FUND RECOVERY PENALTY FOR PERIOD ENDING DECEMBER 31, 2019

34.　　Plaintiff incorporates by reference the averments of paragraphs 1 through 33 of his Complaint as though they were set forth fully herein.

35.　　On November 9, 2023, The IRS assessed against Plaintiff § 6672 penalties in the amount of $175,074.19 for the tax period ending December 31, 2019.

36.　　The penalties were assessed based on the IRS's erroneous determination that Plaintiff was a "responsible person" and willfully failed to turn over employee taxes.

37.     Under applicable law, Plaintiff was not a "responsible person" and did not willfully fail to turn over employee taxes.

38.     The action of the Defendant, through its agents, in assessing and collecting the penalties referred to above was arbitrary, discriminatory, erroneous, and illegal.

39.     Plaintiff is entitled to a refund of the amounts transferred and applied to the penalties assessed for the tax period ending December 31, 2019 in the amount of $175,074.19.

40.     Plaintiff is the sole owner of his claim against the Defendant and has made no assignment of said claim.

## V.  SECOND CLAIM FOR RELIEF
## TRUST FUND RECOVERY PENALTY FOR PERIOD ENDING MARCH 31, 2020

41.     Plaintiff incorporates by reference the averments of paragraphs 1 through 40 of his Complaint as though they were set forth fully herein.

42.     On November 9, 2023, The IRS assessed against Plaintiff § 6672 penalties in the amount of $211,251.62 for the tax period ending March 31, 2020.

43.     The penalties were assessed based on the IRS's erroneous determination that Plaintiff was a "responsible person" and willfully failed to turn over employee taxes.

44.     Under applicable law, Plaintiff was not a "responsible person" and did not willfully fail to turn over employee taxes.

45.     The action of the Defendant, through its agents, in assessing and collecting the penalties referred to above was arbitrary, discriminatory, erroneous, and illegal.

46.     Plaintiff is entitled to a refund of the amounts transferred and applied to the penalties assessed for the tax period ending March 31, 2020, in the amount of $211,251.62.

47.     Plaintiff is the sole owner of his claim against the Defendant and has made no assignment of said claim.

WHEREFORE, Plaintiff prays for judgment against the Defendant in the total amount of $386,325.81 together with interest, costs, and attorney fees and for such other and further relief as the Court deems just and equitable.

## VI. JURY DEMAND

Plaintiff demands a Trial by Jury on all issues.

DATED this 17th day of February, 2026.

**SAMUEL GEORGE KAPOURALES**
**BY COUNSEL:**


__/s/John D. Hoblitzell, III_____
John D. Hoblitzell, III (WVSB# 9346)
Mary Kathryn Kay (WVSB # 14639)
KAY CASTO & CHANEY PLLC
P.O. Box 2031
Charleston, West Virginia 25327
(304) 345-8900 (Telephone)
(304) 345—8900 (Facsimile)
jdhoblitzell@kaycasto.com
mkay@kaycasto.com

# EXHIBIT A

CERTIFIED MAIL 7589 0790 9276 7195 7174 30

CERTIFIED MAIL 7589 0790 9276 7195 7174 30

Form **843**
(Rev. August 2011)
Department of the Treasury
Internal Revenue Service

## Claim for Refund and Request for Abatement

▶ **See separate instructions.**

OMB No. 1545-0024

**Use Form 843 if your claim or request involves:**

(a) a refund of one of the taxes (other than income taxes or an employer's claim for FICA tax, RRTA tax, or income tax withholding) or a fee, shown on line 3,

(b) an abatement of FUTA tax or certain excise taxes, or

(c) a refund or abatement of interest, penalties, or additions to tax for one of the reasons shown on line 5a.

**Do not use Form 843 if your claim or request involves:**

(a) an overpayment of income taxes or an employer's claim for FICA tax, RRTA tax, or income tax withholding (use the appropriate amended tax return),

(b) a refund of excise taxes based on the nontaxable use or sale of fuels, or

(c) an overpayment of excise taxes reported on Form(s) 11-C, 720, 730, or 2290.

| Name(s) SAM & ▮▮▮▮▮ KAPOURALES | Your social security number ▮▮▮▮▮ |
|---|---|
| Address (number, street, and room or suite no.) ▮▮▮▮▮ | Spouse's social security number ▮▮▮▮▮ |
| City or town, state, and ZIP code ▮▮▮▮▮ | Employer identification number (EIN) |
| Name and address shown on return if different from above | Daytime telephone number ▮▮▮▮▮ |

**1** **Period.** Prepare a separate Form 843 for each tax period or fee year.
From OCTOBER 1, 2019 to DECEMBER 31 2019

**2** **Amount** to be refunded or abated:
$ 175,074.19

**3** **Type of tax or fee.** Indicate the type of tax or fee to be refunded or abated or to which the interest, penalty, or addition to tax is related.

☒ Employment ☐ Estate ☐ Gift ☐ Excise ☐ Income ☐ Fee

**4** **Type of penalty.** If the claim or request involves a penalty, enter the Internal Revenue Code section on which the penalty is based (see instructions). IRC section: 6672

**5a** **Interest, penalties, and additions to tax.** Check the box that indicates your reason for the request for refund or abatement. (If none apply, go to line 6.)

☐ Interest was assessed as a result of IRS errors or delays.

☐ A penalty or addition to tax was the result of erroneous written advice from the IRS.

☒ Reasonable cause or other reason allowed under the law (other than erroneous written advice) can be shown for not assessing a penalty or addition to tax.

**b** Date(s) of payment(s) ▶ DECEMBER 11, 2023

**6** **Original return.** Indicate the type of fee or return, if any, filed to which the tax, interest, penalty, or addition to tax relates.

☐ 706 ☐ 709 ☐ 940 ☒ 941 ☐ 943 ☐ 945
☐ 990-PF ☐ 1040 ☐ 1120 ☐ 4720 ☐ Other (specify) ▶

**7** **Explanation.** Explain why you believe this claim or request should be allowed and show the computation of the amount shown on line 2. If you need more space, attach additional sheets.

SEE ATTACHED SCHEDULES

**Signature.** If you are filing Form 843 to request a refund or abatement relating to a joint return, both you and your spouse must sign the claim. Claims filed by corporations must be signed by a corporate officer authorized to sign, and the officer's title must be shown.

Under penalties of perjury, I declare that I have examined this claim, including accompanying schedules and statements, and, to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| Signature (Title, if applicable. Claims by corporations must be signed by an officer.) | Date 10-29-2024 |
|---|---|
| Signature (spouse) ▮▮▮▮▮ | Date 10-29-2024 |

| **Paid Preparer Use Only** | Print/Type preparer's name JULIUS G. JESSIE | Preparer's signature *Julius G. Jessie* | Date 10-29-2024 | Check ☐ if self-employed | PTIN ▮▮▮▮▮ |
|---|---|---|---|---|---|
| | Firm's name ▶ JESSIE & JESSIE, A.C. | | | Firm's EIN ▶ | |
| | Firm's address ▶ ▮▮▮▮▮ | | | Phone no. ▮▮▮▮▮ | |

For Privacy Act and Paperwork Reduction Act Notice, see separate instructions.

ISA

Form **843** (Rev. 8-2011)

Sam Kapourales

███████████

Form 843 Line 7 Explanation For Claim
Period October 1, 2019 to December 31, 2019

The taxpayer is filing this claim based on the following facts:

The Internal Revenue Service on November 9, 2023 assessed a Trust Fund Recovery Penalty on the taxpayer for the period ending December 31,2019 .

The Internal Revenue Service applied $175,074.19 of the taxpayer's 2021 income tax Form 1040 overpayment to the Trust Fund Recovery Penalty on December 11, 2023.

The taxpayer is filing the Form 843 for the period ending December 31, 2019  within two (2) years from the date the Trust Fund Penalty was paid.

The Taxpayer filed a protest with the Internal Revenue Service with arguments and evidence against the Trust Fund Recovery Penalty. The protest included the periods ending September 30, 2019, December 31, 2019, March 31, 2020. ( We have attached a copy of the protest).

The facts stated in the appeals protest:
Sworn testimony from the accounting manager for Williamson Memorial Hospital LLC confirmed CEO Charles Hatfield had sole discretion as to who to pay, what to pay, and when to pay and the taxpayer never told her which invoices to pay.

Exhibit A

The taxpayer made multiple advances or loans from his personal funds to Williamson Memorial Hospital LLC specifically to cover payroll and make sure employees were paid. The taxpayer's understanding was the advances or loans were for the gross payroll amount. The taxpayer did not have the responsibility to sign every check he did have the authority to do so. The taxpayer's signature stamp was available for the convenience of office staff in the rare situation when management was not available to sign the check. Please note, the signature stamp was present during the period the Internal Revenue Service did not find the taxpayer a responsible party.

On October 21, 2019, a new interim CEO was appointed, and he took over the management of Williamson Memorial Hospital LLC which included the payment of the payroll including the payment of the payroll taxes. The new CEO was also responsible for the financial reporting to the United States Bankruptcy Court. The appointment of the new CEO removed the taxpayer of almost all of his management responsibilities. The taxpayer now had less involvement in the management of the company compared to the period ended September 30, 2019 which the taxpayer was determined to not be a responsible party. The taxpayer also made loans to Williamson Memorial Hospital LLC during the period ending December 31, 2019 for the gross payroll to be paid for the amount of $510,000.00. This transaction was documented on the Official Form 425C Monthly Operating Report for Small Business Under Chapter 11. The report was signed by the appointed CEO. The taxpayer did not sign the report as a result of his responsibilities being limited after the new CEO appointment.

Exhibit A

The Internal Revenue Service agreed with the facts in the taxpayer's arguments and evidence stated in the protest and determined the taxpayer should not be held personally liable for the non-payment of The Trust Fund Recovery Penalty for the period ending September 30, 2019.

The Internal Revenue Service did not reach the same conclusion for the period ending December 31, 2019 and held the taxpayer personally liable for that period even though the facts support the taxpayer's involvement in the company's management was considerably limited after the new CEO was appointed.

The Internal Revenue Service stated in Notice 5124 dated October 27, 2023, the taxpayer should **NOT** be held personally liable for the non-payment of the trust fund liabilities for the tax period ending September 30, 2019 based on the evidence and arguments reviewed by them in the taxpayer's protest. However, the Internal Revenue Service proceeded to hold the taxpayer personally liable for the trust fund liabilities for the period ending December 31, 2019.
The taxpayer's duties and responsibilities were less demanding and less involved for that period as they were for the period ending September 30, 2019. The taxpayer has not been provided an explanation as to why the Internal Revenue Service concluded different results for the period ending December 31, 2019.

 More importantly, the taxpayer has not been provided additional evidence and arguments by the Internal Revenue Service to support the varying conclusions in the tax period ending December 31, 2019 from their conclusion reached for the tax period ending September 30,2019.

The taxpayer's Claim for Refund (Form 843) is based on facts and evidence supported and presented in the taxpayer's protest. The protest includes court cases and language in Code Section 6672 that supports the taxpayer's argument for not being a responsible party. The taxpayer's determination of being a responsible party under Code Section 6672 has already been determined by the Internal Revenue Service.

In the Internal Revenue Service's  Letter Number 5124 dated October 27, 2023 (Copy Attached) which stated, we considered your protest along with your evidence and arguments against the Trust Fund Recovery Penalty (TFRP) assessment. We determined that the IRS should **NOT** hold you personally liable for the non-payment of the trust fund liabilities for the tax period shown above (09/2019). The same facts considered in the IRS's decision for the period 09/2019 never changed in the period 12/2019 except the taxpayer's responsibilities became less involved as a result of the appointment of the new CEO. Thus the taxpayer is not personally liable for the period ending 12/31/2019 based on the Internal Revenue Service's own reasoning for the period ending 09/2019.


We respectfully request the taxpayer's claim for refund be approved based on the above facts.

Exhibit A

Sam Kapourales

████████████

Form 843

Attachments

Articles Of Organization Mingo Health Partners, LLC naming Charles W. Hatfield as the Manager Member.

Page from deposition of the accounting manager for Williamson Memorial Hospital sworn testimony the taxpayer never told her which invoices to pay. Charlie Hatfield was the only one who told her which invoices to pay.

Letter 1153 IRS proposing assessments for the Trust Fund Recovery Penalty for periods 09/30/2019-12/31/2019-03/31/2020

Form 425C Operating Report prepared by the interim CEO for the bankruptcy court reporting employees were paid on time and all taxes were paid for the period ending December 31, 2019. The report also reported loans to Williamson Memorial Hospital LLC in the amount of $510,000.00 from the taxpayer for the purpose of paying the gross amount of payroll during the period ending December 31, 2019.

Letter 5124 Taxpayer determined to not be held personally liable for period 09/2019.

Letter 1536  Taxpayer determined to be held personally liable Periods 12/2019 and 03/2020.

Form 2749 IRS Notice of Tax Due period ended 12/31/2019 for $175,074.19.

Form 2749 IRS Notice of Tax Due period ended 03/31/2020 for $ 211,251.62.

IRS Notice CP49 Taxpayer's income tax overpayment used to pay other tax liability.

Copy of Taxpayer's protest (Which the Internal Revenue Service agreed with for the Period 09/30/2019)

Exhibit A

04/12/2018 THU 11:35   FAX 304 522 0162 Farrell, White & Legg                    ☒003/011

<table>
<tr><td>

**WEST VIRGINIA**
**ARTICLES OF ORGANIZATION**
**OF LIMITED LIABILITY COMPANY**
Form LLD-1
Rev. 12/2017

</td></tr>
</table>

RECEIVED

18 APR 12 AM 11:

West Virginia Secretary of State
Business & Licensing Division
Tel: (304)558-8000
Fax: (304)558-8381
Website: www.wvsos.gov

**FILED**

APR 12 2018

IN THE OFFICE OF
WV SECRETARY OF STATE

SECRETARY OF STATE
STATE OF WV

**FILE ONE ORIGINAL**
(Two if you want a filed stamped
copy returned to you.)

**FILING FEE: $100**
* Fee Waived for Veteran-owned organization

Control # 9ALWM

* * * * * We acting as organizers according to West Virginia Code §31B-2-202, adopt the following * * * * *
Articles of Organization for a West Virginia Limited Liability Company.

1. The name of the West Virginia limited liability company
shall be: [The name must contain one of the required terms such as "limited
liability company" or abbreviations such as "LLC" or "PLLC" - see instructions
for a list of acceptable terms.]

Mingo Health Partners, LLC

☒ CHECK BOX to indicate you've included one of the REQUIRED CORPORATE NAME ENDINGS (See instructions for name endings).

2. The company will be a:  ☒ LLC

☐ Professional LLC* for the profession of: _____
*(See Section 2. of the attached instructions for list of accepted professions.)

☐ Professional business organization: CHECK BOX indicating you have attached the state licensing board Verification of Eligibility (Form VOE) to these Articles if your profession meets the requirements as defined by Chapter 30 of WV Code. Your application will be rejected if the VOE is not attached.

3. The address of the principal office of the company will be:

| | |
|---|---|
| Street: | 52 West 2nd Avenue |
| City: | Williamson | State: | WV | Zip Code: 25661 |

Located in the County of (required): County: Mingo

The mailing address of the above location, if different, will be:

Street:

City: _____ State: _____ Zip Code: _____

4. The address of the initial designated (physical) office of the company in West Virginia, if any, will be:

| | |
|---|---|
| Street: | 52 West 2nd Avenue |
| City: | Williamson | State: | WV | Zip Code: 25661 |

Located in the County of: County: Mingo

The mailing address of the above location, if different, will be:

Street:

City: _____ State: _____ Zip Code: _____

5. The name and address of the person (agent) to whom notice of process may be sent, if any, will be:

| | |
|---|---|
| Name: | Charles W. Hatfield |
| Street: | 52 West 2nd Avenue |
| City: | Williamson | State: | WV | Zip Code: 25661 |

460712
S

Exhibit A

04/12/2018 THU 11:35   FAX 304 522 9162 Farrell, White & Legg                      @004/011

WEST VIRGINIA ARTICLES OF ORGANIZATION OF LIMITED LIABILITY COMPANY                    Page 2

6. E-mail address where business correspondence may be received: charliehatfield@suddenlinkmail.com

7. Website address of the business, if any (ex: yourdomainname.com): n/a

8. Do you own or operate **more than one**
   **business in West Virginia?**   ☐ Yes * Answer a. and b. below.   ☐ No   ☒ Decline to answer
   If "Yes"... a.  How many businesses? _____   b. Located in how many West Virginia counties? _____

9. The name(s) and address(es) of the organizer(s) is (You must list **at least ONE organizer**.):

| Name | No. & Street Address | City | State | Zip Code |
|------|---------------------|------|-------|----------|
| Charles W. Hatfield | ███████████████ | ████████ | █████ | 25661 |

10. The company will be:        ☒ an AT-WILL company, conducting business for an indefinite period.
    (required)                  ☐ a TERM company, conducting business for the term of _____ years.

11. a. List the name(s) and address(es) of the **MEMBER(S)** of the company (**required**; Note: The application will be rejected if
       member information is not provided below. Attach additional pages if necessary):

| Member Name | No. & Street Address | City | State | Zip Code |
|-------------|---------------------|------|-------|----------|
| Charles W. Hatfield | █████████████ | ████████ | █████ | 25661 |
| Sam Kapourales | █████████████ | ████████ | █████ | 25661 |
| Doug Reynolds | █████████████ | ████████ | █████ | 25729 |

    b. The company will be –        ☒ MEMBER-MANAGED [All **member** information must be entered under 11a. above.]
       **CHECK ONE (required):**    ☐ MANAGER-MANAGED [All **manager** information must be entered in the spaces below
                                       if selecting this management structure. Attach additional pages if necessary.]

| Member Name | No. & Street Address | City | State | Zip Code |
|-------------|---------------------|------|-------|----------|
| Charles W. Hatfield | █████████████ | ████████ | █████ | 25661 |

12. All or specified members of a limited liability    ☒ No – All debts, obligations and liabilities are those of the company.
    company are liable in their capacity as            ☐ Yes – Those persons who are liable in their capacity as members for all debts,
    members for all or specified debts, obliga-              obligations or liability of the company have consented in writing to the
    tions or liabilities of the company (**required**):      adoption of the provision or to be bound by the provision.

13. The **purpose(s)** for which **this limited liability company** is formed is as follows:
    [Describe the type(s) of business activity which will be conducted, for example, "real estate," "construction of residential and commercial
    buildings," "commercial painting," "professional practice of law" (see Section 2. for acceptable "professional" business activities). Purpose
    may conclude with words "...including the transaction of any or all lawful business for which corporations may be incorporated in West
    Virginia."]
    To operate health care entity(ies) including but not limited to hospital/hospital services and all transactions and/or

    lawful business purposes which a LLC may be organized and incorporated in West Virginia

Exhibit A

04/12/2018 THU 11:35  FAX 304 522 9162 Farrell, White & Legg                                    ☒005/011

WEST VIRGINIA ARTICLES OF ORGANIZATION OF LIMITED LIABILITY COMPANY                    Page 3

14. Is the business a Scrap Metal Dealer?

☐ Yes (If "Yes," you must go to the Scrap Metal Dealer Registration Form (Form SMD-1) and proceed to Section 15.)

☒ No (proceed to Section 15.)

15. Other provisions which may be set forth in the operating agreement or matters not inconsistent with law.
(See instructions for further information; use extra pages if necessary.)

16. The number of pages attached and included in these Articles is: 9

17. The requested effective date is
(Requested date is same and by earlier, than filing may not less than 90 days after filing in next pdf.)

☒ the date and time of filing in the Secretary of State's Office.

☐ the following date:                              and time:

18. Is the organization a "veteran-owned" organization?

Effective JULY 1, 2016, to meet the requirements for a "veteran-owned" organization, the entity filing the registration must meet the following criteria per West Virginia Code §59-1-2a:

1. A "veteran" must be honorably discharged or under honorable mental state, and
2. A "veteran-owned business" means a business that meets one of the following criteria:
   • is at least fifty-one percent (51%) unconditionally owned by one or more veterans; or
   • in the case of a publicly owned business, at least fifty-one percent (51%) of the stock is unconditionally owned by one or more veterans.

☐ Yes (If "Yes," attach Form DD214) ⟹ ☐ CHECK BOX indicates you have attached Veterans Affairs Form DD214
☒ No

You may obtain a copy          National Personnel Records Center
of your Veterans Affairs       Military Personnel Records
Form DD214 by                  1 Archives Drive
contacting:                    St. Louis, MO 63138
                               Toll free: 1-86-NARA-NARA or 1-866-272-6272
                               Phone: 314-801-0800
                               www.archives.gov/veterans/military-service-records

For WV Code §31-1J(f), effective July 1, 2016, the registration fee is waived for entities that meet the requirements as a "veteran-owned" organization. The attached instructions to determine if the organization qualifies for this waiver. In addition, a "veteran-owned" entity will have its initial annual report fees waived AFTER the organization's initial formation (see WV Code §31A-2a-p).

19. Contact and Signature Information * (See below an important Legal Notice Regarding Signature)

a. Contact person to reach in case there is a problem with filing: Tamela J. White, counsel   Phone: +1 (304) 523-9100

b. Print or type name of signer: Charles W. Hatfield              Title/Capacity of signer: Organizer and Managing Member

c. Signature:  Charles W. Hatfield              Date: 4/12/18

*Important Legal Notice Regarding Signature: Per West Virginia Code §31B-4-409, Liability for false statement in filed record. If a record authorized or required to be filed under this chapter contains a false statement, one who suffers loss by reliance on the statement may recover damages for the loss from a person who signed the record or caused another to sign it on the person's behalf and knew the statement to be false at the time the record was signed.

Important Notice: This form is a public document. Please do NOT provide any personal, identifiable information on this form such as social security number, bank account numbers, credit card numbers, tax identification or driver's license numbers.

[ Reset Form ]    [ Print Form ]

Exhibit A

Case 2:26-cv-11111    Document 71    Filed 02/17/26    Page 19 of 254    PageID #: 3567

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DEPOSITION OF ALICE... WILLIAMSON MEMORIAL HOSPITAL

DIANE VARNEY
07/13/2022

Page 89

1  Q.  Which ones could you not make payments from?
2  A.  I didn't -- I didn't do the payments.  I mean,
3  the schedule was done knowing there was money in the
4  bank to do those payments.
5  Q.  Okay.  Well, which accounts did you actually
6  have authority to make transactions is what I meant?
7  A.  I don't make -- I don't move money in the bank
8  accounts.  I had no authority to do anything in the bank
9  accounts.
10  Q.  Okay.  But you could view them, you just
11  couldn't make any transactions.
12  A.  Right.  Right.
13  Q.  Okay.  Thanks for clarifying that.
14      Did you meet with Sam Kapourales
15  routinely to review aged accounts receivable?
16  A.  Not receivables.  Payables.
17  Q.  Payables.  Right.
18  A.  I recall three different times that there
19  was -- actually he wanted to look at them at the
20  accounts payable aging to see what was owed.
21  Q.  Do you remember when those times were, what
22  dates?
23  A.  No.
24  Q.  And you were asked a lot about employee

Page 90

1  payroll and net versus gross, and I understand that net
2  payments were made for a period.
3      Were the gross payments ever made up
4  like in the previous week or payroll period, or only net
5  payments made for the period that Charlie Hatfield was
6  CEO?
7  A.  He said we had ADP up until April of 2019, and
8  when we went to MEDITECH that's when the net amount of
9  the payroll was funded.
10  Q.  Okay.  And I think you testified earlier you
11  didn't have any issues with the net or gross when ADP
12  took over -- or when ADP was in charge; right?
13  A.  Right.
14  Q.  So Charlie was CEO from -- well, his last day
15  was sometime in October 2019; right?
16  A.  Yes.
17  Q.  Do you remember when he started?
18  A.  Not the exact date, no.
19  Q.  But the bottom line from when he started to
20  April 2019, there were no issues with the net or gross
21  payments; right?
22  A.  Correct.
23  Q.  Okay.  So it would have been only been from
24  May 2019 through October 2019 when he left Williamson

Page 91

1  Memorial Hospital?
2  A.  It may have started in April, because in the
3  transition from going into MEDITECH -- leaving ADP and
4  going into MEDITECH was during that time period.  It was
5  the month of April.
6  Q.  And again, apologies for skipping around here
7  but a follow-up on Sam Kapourales and when you all
8  reviewed the accounts payable.
9      Did Sam ever tell you which invoices to
10  pay?
11  A.  Not -- no, not specifically, no.
12  Q.  So your testimony is that Charlie Hatfield was
13  the only one who told you which invoices to pay and not
14  to pay?
15  A.  Yes.
16  Q.  I know you've testified earlier about the Mid
17  Mountain payments.  Do you have any evidence that the
18  payments made to Mid Mountain were not somehow related
19  to reimbursements for Williamson Memorial Hospital?
20  A.  There were some when they used their credit
21  card, the Mid Mountain credit card, yes, we reimbursed
22  them.
23  Q.  Okay.  Do you have any evidence of
24  reimbursements to Charlie or Sabrina Hatfield that were

Page 92

1  not related to Williamson Memorial Hospital?
2  A.  Those were the ones I couldn't identify.  I
3  had no backup for.
4  Q.  Do you remember how many charges or the amount
5  of those charges, what they would have been?
6  A.  There was -- I remember a check for almost
7  $26,000 to a vendor I never heard of.
8  Q.  Do you remember the name of the vendor?
9  A.  No.
10  Q.  Was there anything submitted related to that
11  payment?
12  A.  No.
13  Q.  And I wanted to talk to you about the monthly
14  closing of the books.  You testified earlier that you
15  gave Charlie some financial documents at the end of
16  every month; right?
17  A.  Yes.
18  Q.  How did you deliver those documents to him?
19  Were they hand delivered or emailed?
20  A.  Hand delivered.
21  Q.  So hard copies?
22  A.  Yes.
23  Q.  Did you ever email those to Charlie or anyone
24  else?

Exhibit A

**Department of the Treasury**
**Internal Revenue Service**
**[Operating Division / Program Name]**
1100 MAIN ST - STE 103
WHEELING, WV 26003

Date: July 9, 2021

Taxpayer ID number (last 4 digits):
████

Business name and address:
WILLIAMSON MEMORIAL HOSPITAL LLC
% HEALTH MANAGEMENT ASSOC INC MBR
859 ALDERSON ST
WILLIAMSON, WV 25661-3215-595

SAM KAPOURALES

Person to contact:
NICHOLAS BALAKOS

Employee ID number:
████

Contact numbers:
Telephone: (304) 238-2946
Fax: (304) 232-9438

Dear: MR SAM KAPOURALES,

**Why we're sending you this letter**
We're proposing to assess a Trust Fund Recovery Penalty against you as a personal liability because we haven't received full payment of the federal employment or excise tax liability due from the business shown above.

You're required to collect, account for, and pay withheld trust fund taxes for the business, which include:
- Employment taxes you withheld (or should have withheld) from the employees' wages.
- Excise taxes you collected (or should have collected) from customers.

We listed the proposed penalties, equal to the unpaid trust fund taxes the business still owes, at the end of this letter for your review.

**If you agree with the proposed assessment**
If you agree with the amounts shown, sign and return Part 1 of the enclosed Form 2751, Proposed Assessment of Trust Fund Recovery Penalty.

**If you don't agree with the proposed assessment**
If you don't agree with the amounts shown, you can contact the person shown above to try to resolve the matter informally or you can appeal the proposed assessment.

**If you want to try to resolve the matter informally**
If you have additional information to support your case and want to try to resolve the matter informally, contact the person shown above **within 10 days** from the date of this letter. Contacting us won't extend the deadline for your appeal rights. You can ask if your case is eligible for Fast Track Mediation. See Publication 3605, Fast Track Mediation  - A Process for Prompt Resolution of Tax Issues.

**If you want to appeal this determination**
You have the right to appeal this action by filing a written protest, which may be forwarded to the IRS Independent Office of Appeals (Appeals). To keep your appeal rights, you need to provide your **written appeal within 60 days** from the date of this letter (75 days if this letter is addressed to you outside the U.S.). **Send your written appeal to the attention of the contact person shown at the top of this letter.** The proposed penalty amounts you're protesting determine how you should file your appeal.

Letter 1153 (Rev. 12-2021)
Catalog Number 40545C

Exhibit A

| For each period you're protesting, if the proposed penalty amount is: | You should: |
|---|---|
| $25,000 or less | Send a small case request |
| More than $25,000 | Send a formal written protest |

You can send one small case request or protest for all the periods listed on the Form 2751, but if the penalty for any one period is more than $25,000, you must file a formal written protest. Include any information you want the settlement or Appeals officer to consider. Providing more information will help us process your request quickly.

**A small case request must include:**

- A copy of this letter, or your name, address, taxpayer identification number, and any information that will help us identify your file.
- A statement that you want an Appeals conference.
- A list of the penalties you disagree with and an explanation of why you disagree. Your explanation should address responsibility and willfulness in paying the trust fund taxes. Willfulness means an action was intentional, deliberate, or voluntary and not an accident or mistake. Therefore, you should explain your duties and responsibilities, including your duty and authority to collect, account for, and pay the trust fund taxes. If you disagree with how we calculated the penalty, you should list the dates and amounts of payments you believe we didn't consider or any computation errors you believe we made.

**A formal written protest must include:**

- Your name, address, and taxpayer identification number.
- A statement that you want an Appeals conference.
- A copy of this letter, or the date and number of this letter.
- The tax periods involved (see Form 2751).
- A list of the penalties you disagree with.
- **Facts signed under penalties of perjury** explaining why you disagree.
  - Include specific dates, names, amounts, and locations that support your position. Your explanation should address responsibility and willfulness in paying the trust fund taxes. Willfulness means an action was intentional, deliberate, or voluntary and not an accident or mistake. Therefore, you should explain your duties and responsibilities, including your duty and authority to collect, account for, and pay the trust fund taxes. If you disagree with how we calculated the penalty, you should list the dates and amounts of payments you believe we didn't consider or any computation errors you believe we made.
  - If you rely on a law or other authority to support your arguments, explain what it is and how it applies.
  - **Add the following declaration to your statement and sign it:** "Under penalties of perjury, I declare that I have examined the facts presented in this statement and any accompanying information, and, to the best of my knowledge and belief, they are true, correct, and complete."

**Representation**
You can represent yourself at your Appeals conference or have someone qualified to practice before us represent you, such as an attorney, certified public accountant, or enrolled agent. If your representative attends a conference without you, we must have a completed Form 2848, Power of Attorney and Declaration of Representative, for them to receive confidential tax information, or Form 8821, Tax Information Authorization, for them to inspect confidential tax information.

Exhibit A

If your representative prepares and signs the protest for you, they must substitute a declaration statement stating that:
- They submitted the protest and accompanying documents.
- They know personally that the facts stated in the protest and accompanying documents are true and correct.

**Consideration by the courts**
If your appeal doesn't result in your favor, we'll send you a bill. If you still disagree with us, you may then take your case to the United States Court of Federal Claims or to the appropriate United States District Court by following the procedures below. These courts have no connection with the IRS. Before you can file a claim with these courts, you must pay a portion of the tax liability and file a claim for refund, as described below.

**Special bond to delay collection actions for any period as soon as you file a claim for refund**
To ask that we delay collection of the penalty for any period, when you file a claim for refund for that period, you must do the following **within 30 days** from the date of the official notice of assessment and demand (the first bill) for that period:
- Pay the tax for one employee for each period of liability that you want to contest (if we based the penalty on unpaid employment taxes) or pay the tax for one transaction for each period that you want to contest (if we based the penalty on unpaid excise tax).
- File a claim for a refund of the amounts you paid using Forms 843, Claim for Refund and Request for Abatement.
- Post a bond with the IRS for one and one-half times the amount of the remaining penalty after you've made the required payments listed in the first item. Visit **www.irs.gov/irm/part5/irm_05-006-001** for information regarding collateral agreements.

If the IRS denies your claim when you post this bond, you have **30 days** to file suit in the appropriate U.S. District Court or the U.S. Court of Federal Claims before the IRS can apply the bond to your penalty and the accrued interest.

**Claim for refund with no special bond**
If you don't file a special bond as described above, you can still file a claim for refund following the same steps, except you don't have to take the actions within 30 days after the date of the official notice of assessment and demand for the period.

If we don't act on your refund claim within 6 months from the date you filed it, you can file a suit for refund. You can also file a suit for refund within 2 years after we disallow your claim.

If we find that the collection of this penalty is in jeopardy, we can take immediate action to collect it without regard to the 60-day period for sending a protest.

For more information about filing a suit, you can contact the Clerk of the appropriate local District Court or:
Clerk of the United States Court of Federal Claims
717 Madison Place NW
Washington, D.C. 20439

**If we don't hear from you**
If we don't hear from you **within 60 days** from the date of this letter (or 75 days if this letter is addressed to you outside the U.S.), we'll assess the penalty and begin collection action.

Letter 1153 (Rev. 12-2021)
Catalog Number 40545C

Exhibit A

**Taxpayer Advocate Service**

The Taxpayer Advocate Service (TAS) is an independent organization within the IRS that helps taxpayers and protect taxpayers' rights. TAS can offer you help if your tax problem is causing a financial difficulty, you've tried but been unable to resolve your issue with the IRS, or you believe an IRS system, process, or procedures isn't working as it should. If you qualify for TAS assistance, which is always free, TAS will do everything possible to help you. To learn more, visit **www.taxpayeradvocate.irs.gov** or call 877-777-4778.

**Additional information**

- You can reply to this letter by mail, fax or telephone using the contact information shown at the top of this letter. If you send a written response, include a copy of this letter or information to identify your account, your telephone number and the best hours to reach you. If you fax a response, you can use a fax machine or online fax service. Several online fax services use the internet to send files from your computer or smart device to a fax number.
- Find tax forms and publications by visiting **www.irs.gov/forms** or calling 800-TAX-FORM (800-829-3676).
- Keep this letter for your records.

If you have questions, you can call the contact person shown above.

Sincerely,

NICHOLAS BALAKOS
Revenue Officer

Enclosures:
Publication 1
Form 2751
Envelope

| Form / Tax period ending | Trust fund penalty | Form / Tax period ending | Trust fund penalty |
|---|---|---|---|
| 941 / 09-30-2019 | $302,178.33 | 941 / 12-31-2019 | $175,074.19 |
| 941 / 03-31-2020 | $211,251.62 | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**Letter 1153 (Rev. 12-2021)**
Catalog Number 40545C

<span style="color:red">Exhibit A</span>

| Form / Tax period ending | Trust fund penalty | Form / Tax period ending | Trust fund penalty |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**Letter 1153 (Rev. 12-2021)**
Catalog Number 40545C

Exhibit A

**Fill in this information to identify the case:**

Debtor Name  Williamson Memorial Hospital, LLC

United States Bankruptcy Court for the: Southern District of West Virginia

Case number: 19-20469

☐ Check if this is an
amended filing

Official Form 425C

## Monthly Operating Report for Small Business Under Chapter 11                    12/17

Month:  Oct November                                    Date report filed: 01/09/2020
                                                                        MM / DD / YYYY

Line of business: Hospital                              NAISC code: _____

In accordance with title 28, section 1746, of the United States Code, I declare under penalty of perjury
that I have examined the following small business monthly operating report and the accompanying
attachments and, to the best of my knowledge, these documents are true, correct, and complete.

Responsible party:          Harold E. Preston Jr

Original signature of responsible party   *Jens Preston*

Printed name of responsible party   Harold E. Preston Jr

### 1. Questionnaire

Answer all questions on behalf of the debtor for the period covered by this report, unless otherwise indicated.

If you answer *No* to any of the questions in lines 1-9, attach an explanation and label it *Exhibit A.*

|  |  | Yes | No | N/A |
|---|---|:---:|:---:|:---:|
| 1 | Did the business operate during the entire reporting period? | ☑ | ☐ | ☐ |
| 2 | Do you plan to continue to operate the business next month? | ☑ | ☐ | ☐ |
| 3 | Have you paid all of your bills on time? | ☑ | ☐ | ☐ |
| 4 | Did you pay your employees on time? | ☑ | ☐ | ☐ |
| 5 | Have you deposited all the receipts for your business into debtor in possession (DIP) accounts? | ☑ | ☐ | ☐ |
| 6 | Have you timely filed your tax returns and paid all of your taxes? | ☑ | ☐ | ☐ |
| 7 | Have you timely filed all other required government filings? | ☑ | ☐ | ☐ |
| 8 | Are you current on your quarterly fee payments to the U.S. Trustee or Bankruptcy Administrator? | ☑ | ☐ | ☐ |
| 9 | Have you timely paid all of your insurance premiums? | ☑ | ☐ | ☐ |

If you answer *Yes* to any of the questions in lines 10-18, attach an explanation and label it *Exhibit B.*

|  |  | Yes | No | N/A |
|---|---|:---:|:---:|:---:|
| 10 | Do you have any bank accounts open other than the DIP accounts? | ☐ | ☑ | ☐ |
| 11 | Have you sold any assets other than inventory? | ☐ | ☑ | ☐ |
| 12 | Have you sold or transferred any assets or provided services to anyone related to the DIP in any way? | ☐ | ☑ | ☐ |
| 13 | Did any insurance company cancel your policy? | ☐ | ☑ | ☐ |
| 14 | Did you have any unusual or significant unanticipated expenses? | ☐ | ☑ | ☐ |
| 15 | Have you borrowed money from anyone or has anyone made any payments on your behalf? | ☑ | ☐ | ☐ |
| 16 | Has anyone made an investment in your business? | ☐ | ☑ | ☐ |

Official Form 425C              Monthly Operating Report for Small Business Under Chapter 11              page 1

<span style="color:red">Exhibit A</span>

Debtor Name  Williamson Memorial Hospital, LLC _____        Case number  19-20469 _____

17. Have you paid any bills you owed before you filed bankruptcy?     ☑ ☐ ☐
18. Have you allowed any checks to clear the bank that were issued before you filed bankruptcy?     ☑ ☐ ☐

## 2. Summary of Cash Activity for All Accounts

19. **Total opening balance of all accounts**
    This amount must equal what you reported as the cash on hand at the end of the month in the previous month. If this is your first report, report the total cash on hand as of the date of the filing of this case.          $ 13,908.45

20. **Total cash receipts**
    Attach a listing of all cash received for the month and label it *Exhibit C*. Include all cash received even if you have not deposited it at the bank, collections on receivables, credit card deposits, cash received from other parties or loans, gifts, or payments made by other parties on your behalf. Do not attach bank statements in lieu of *Exhibit C*.

    Report the total from *Exhibit C* here.          $ 1,162,769.0

21. **Total cash disbursements**
    Attach a listing of all payments you made in the month and label it *Exhibit D*. List the date paid, payee, purpose, and amount. Include all cash payments, debit card transactions, checks issued even if they have not cleared the bank, outstanding checks issued before the bankruptcy was filed that were allowed to clear this month, and payments made by other parties on your behalf. Do not attach bank statements in lieu of *Exhibit D*.

    Report the total from *Exhibit D* here.          − $ 1,066,967.8

22. **Net cash flow**
    Subtract line 21 from line 20 and report the result here.
    This amount may be different from what you may have calculated as *net profit*.          + $ 95,801.52

23. **Cash on hand at the end of the month**
    Add line 22 + line 19. Report the result here.          = $ 109,709.97
    Report this figure as the *cash on hand at the beginning of the month* on your next operating report.
    This amount may not match your bank account balance because you may have outstanding checks that have not cleared the bank or deposits in transit.

## 3. Unpaid Bills

Attach a list of all debts (including taxes) which you have incurred since the date you filed bankruptcy but have not paid. Label it *Exhibit E*. Include the date the debt was incurred, who is owed the money, the purpose of the debt, and when the debt is due. Report the total from *Exhibit E* here.

24. **Total payables**          $ 103,107.00
    *(Exhibit E)*

Exhibit A

Debtor Name   Williamson Memorial Hospital, LLC                     Case number   19-20469

### 4. Money Owed to You

Attach a list of all amounts owed to you by your customers for work you have done or merchandise you
have sold. Include amounts owed to you both before, and after you filed bankruptcy. Label it *Exhibit F*.
Identify who owes you money, how much is owed, and when payment is due. Report the total from
*Exhibit F* here.

25. Total receivables                                                                $ 4,905,127.0
    *(Exhibit F)*

### 5. Employees

26. What was the number of employees when the case was filed?                         154
27. What is the number of employees as of the date of this monthly report?            101

### 6. Professional Fees

28. How much have you paid this month in professional fees related to this bankruptcy case?        $ 0.00
29. How much have you paid in professional fees related to this bankruptcy case since the case was filed?   $ 0.00
30. How much have you paid this month in other professional fees?                                  $ 0.00
31. How much have you paid in total other professional fees since filing the case?                 $ 0.00

### 7. Projections

Compare your actual cash receipts and disbursements to what you projected in the previous month.
Projected figures in the first month should match those provided at the initial debtor interview, if any.

|  | Column A | | Column B | | Column C |
|---|---|---|---|---|---|
|  | Projected | − | Actual | = | Difference |
|  | Copy lines 35-37 from the previous month's report. |  | Copy lines 20-22 of this report. |  | Subtract Column B from Column A. |
| 32. Cash receipts | $ | − | $ 1,162,769.0 | = | $ |
| 33. Cash disbursements | $ | − | $ 1,066,967.0 | = | $ |
| 34. Net cash flow | $ | = | $ 95,801.00 | = | $ |

35. Total projected cash receipts for the next month:                                $ 944,696.00
36. Total projected cash disbursements for the next month:                         − $ 1,037,045.0
37. Total projected net cash flow for the next month:                              = $ -92,349.00

Exhibit A

Debtor Name  Williamson Memorial Hospital, LLC _____    Case number 19-20469 _____

| ⬛ | **8. Additional Information** |

If available, check the box to the left and attach copies of the following documents.

- ☑ 38.  Bank statements for each open account (redact all but the last 4 digits of account numbers).

- ☑ 39.  Bank reconciliation reports for each account.

- ☑ 40.  Financial reports such as an income statement (profit & loss) and/or balance sheet.

- ☑ 41.  Budget, projection, or forecast reports.

- ☑ 42.  Project, job costing, or work-in-progress reports.

Exhibit A

Case 2:19-bk-20469    Doc 165    Filed 01/10/20    Entered 01/10/20 09:55:09    Desc Main
Document    Page 5 of 98

<u>Addendum to Question 15 of the October- November Monthly Operating Report</u>

1. On October 25 15, 2019 Debtor Borrowed $350,000 from the principals of its parent Mingo Health Partners LLC.

2. On November 15, 2019 Debtor Borrowed $160,000 from the principals of its parent Mingo Health Partners LLC.

Exhibit A

Date   10/31/19        Page    31

BASIC BUSINESS CHECKING                    (Continued)

### Deposits

| Date | Description | Amount |
|------|-------------|--------|
| 10/03 | DDA REGULAR DEPOSIT | 5,600.00 |
| 10/03 | DDA REGULAR DEPOSIT | 10,355.13 |
| 10/09 | DDA REGULAR DEPOSIT | 6,000.00 |
| 10/09 | DDA REGULAR DEPOSIT | 32,000.00 |
| 10/09 | DDA REGULAR DEPOSIT | 141,000.00 |
| 10/11 | DDA REGULAR DEPOSIT | 3,000.00 |
| 10/11 | DDA REGULAR DEPOSIT | 8,000.00 |
| 10/24 | DDA REGULAR DEPOSIT | 36,000.00 |
| 10/24 | DDA REGULAR DEPOSIT | 165,000.00 |
| 10/30 | DDA REGULAR DEPOSIT | 68,733.11 |

-------------------------------------------------------------------------------------

### Withdrawals

| Date | Description | Amount |
|------|-------------|--------|
| 10/07 | ACH DEBIT  JOHN HANCOCK 9406915392      10/07/19 ID #-0140720 TRACE #-028000086657088 | 4,293.90 |
| 10/09 | ACH PROC FILE FEE | 7.50 |
| 10/09 | ACH PROC FILE FEE | 80.00 |
| 10/09 | REG SALARY WILLIAMSON MEMO 02-0550433      10/09/19 ID #- TRACE #-000000000000001 | 12,152.23 |
| 10/09 | REG SALARY WILLIAMSON MEMO 55-0592845      10/09/19 ID #- TRACE #-000000000000001 | 170,291.49 |
| 10/10 | ACH DEBIT  JOHN HANCOCK 9406915392      10/10/19 ID #-0140720 TRACE #-028000080970756 | 3,576.13 |
| 10/24 | ACH PROC FILE FEE | 7.00 |
| 10/24 | ACH FILE PROC FEE | 82.50 |
| 10/24 | REG SALARY WILLIAMSON MEMO 02-0550433      10/24/19 ID #- TRACE #-000000000000001 | 10,741.85 |
| 10/24 | REG SALARY WILLIAMSON MEMO 55-0592845      10/24/19 ID #- TRACE #-000000000000001 | 183,005.78 |
| 10/31 | USATAXPYMT IRS 3387702000      10/31/19 ID #-270970450951542 TRACE #-061036010022445 | 65,499.98 |
| 10/31 | NET SERVICE CHARGE | 5.00 |
| 10/31 | MAINTENANCE FEE | 15.00- |

Exhibit A

Date   11/29/19          Page   26

BASIC BUSINESS CHECKING                    (Continued)

### Withdrawals

| Date | Description | Amount |
|------|-------------|--------|
| 11/07 | REG SALARY WILLIAMSON MEMO | 138,462.73 |
| | 55-0592845          11/07/19 | |
| | ID #- | |
| | TRACE #-000000000000001 | |
| 11/13 | ACH PROC FILE FEE | .05 |
| 11/18 | USATAXPYMT IRS | 61,408.71 |
| | 3387702000          11/18/19 | |
| | ID #-270972201071763 | |
| | TRACE #-061036010006844 | |
| 11/21 | ACH PROC FILE FEE | 65.00 |
| 11/21 | REG SALARY WILLIAMSON MEMO | 129,694.60 |
| | 55-0592845          11/21/19 | |
| | ID #- | |
| | TRACE #-000000000000001 | |
| 11/30 | NET SERVICE CHARGE | 5.00 |
| 11/30 | MAINTENANCE FEE | 15.00- |
| 11/30 | BALANCE CREDIT/ADJ. IN S/C | 10.00- |

--------------------------------------------------------------------

### Summary By Check Number

| Date | Check No. | Amount | Date | Check No. | Amount |
|------|-----------|--------|------|-----------|--------|
| 11/15 | | 254.20 | 11/13 | 130 | 1,504.46 |
| 11/26 | | 917.42 | 11/14 | 131 | 3,326.54 |
| 11/22 | 8* | 407.56 | 11/13 | 132 | 3,663.18 |
| 11/13 | 22* | 2,584.28 | 11/14 | 134* | 2,278.41 |
| 11/14 | 23 | 1,384.62 | 11/15 | 135 | 3,214.12 |
| 11/13 | 33* | 1,726.34 | 11/13 | 136 | 2,533.57 |
| 11/12 | 38* | 3,270.80 | 11/15 | 137 | 2,190.94 |
| 11/01 | 116* | 689.29 | 11/13 | 139* | 3,409.88 |
| 11/04 | 118* | 1,631.38 | 11/13 | 140 | 1,892.28 |
| 11/15 | 121* | 584.43 | 11/14 | 141 | 1,674.87 |
| 11/13 | 122 | 1,082.67 | 11/14 | 142 | 1,934.36 |
| 11/08 | 123 | .65.97 | 11/22 | 144* | 1,798.09 |
| 11/19 | 125* | 1,798.09 | 11/25 | 145 | 237.65 |
| 11/15 | 127* | 560.70 | 11/22 | 147* | 1,244.36 |
| 11/18 | 128 | 1,230.91 | 11/22 | 149* | 214.13 |
| 11/08 | 129 | 439.57 | | | |

*Indicates Break In Check Number Sequence

--------------------------------------------------------------------

### Daily Balance Information

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 11/01 | 5,341.43 | 11/12 | 38,079.39 | 11/19 | 14,573.90 |
| 11/04 | 3,710.05 | 11/13 | 19,682.68 | 11/21 | 6,814.30 |
| 11/06 | 21,710.05 | 11/14 | 84,083.88 | 11/22 | 3,150.16 |
| 11/07 | 7,587.85 | 11/15 | 77,279.49 | 11/25 | 2,912.51 |
| 11/08 | 41,350.19 | 11/18 | 14,639.87 | 11/26 | 1,995.09 |

Exhibit A

**Fill in this information to identify the case:**

Debtor Name: Williamson Memorial Hospita, LLC

United States Bankruptcy Court for the: Southern District of West Virginia

Case number: 19-20469

☐ Check if this is an
amended filing

---

Official Form 425C

## Monthly Operating Report for Small Business Under Chapter 11                12/17

Month: __December__                                     Date report filed: __01/09/2020__
                                                                            MM / DD / YYYY

Line of business: __Hospital__                          NAISC code: _____

In accordance with title 28, section 1746, of the United States Code, I declare under penalty of perjury
that I have examined the following small business monthly operating report and the accompanying
attachments and, to the best of my knowledge, these documents are true, correct, and complete.

Responsible party:                  Harold E. Preston Jr

Original signature of responsible party     *Gene Preston*

Printed name of responsible party   Harold E. Preston Jr

### 1. Questionnaire

Answer all questions on behalf of the debtor for the period covered by this report, unless otherwise indicated.

| | Yes | No | N/A |
|---|---|---|---|
| If you answer *No* to any of the questions in lines 1-9, attach an explanation and label it *Exhibit A.* | | | |
| 1. Did the business operate during the entire reporting period? | ☑ | ☐ | ☐ |
| 2. Do you plan to continue to operate the business next month? | ☑ | ☐ | ☐ |
| 3. Have you paid all of your bills on time? | ☑ | ☐ | ☐ |
| 4. Did you pay your employees on time? | ☑ | ☐ | ☐ |
| 5. Have you deposited all the receipts for your business into debtor in possession (DIP) accounts? | ☑ | ☐ | ☐ |
| 6. Have you timely filed your tax returns and paid all of your taxes? | ☑ | ☐ | ☐ |
| 7. Have you timely filed all other required government filings? | ☑ | ☐ | ☐ |
| 8. Are you current on your quarterly fee payments to the U.S. Trustee or Bankruptcy Administrator? | ☑ | ☐ | ☐ |
| 9. Have you timely paid all of your insurance premiums? | ☑ | ☐ | ☐ |
| If you answer *Yes* to any of the questions in lines 10-18, attach an explanation and label it *Exhibit B.* | | | |
| 10. Do you have any bank accounts open other than the DIP accounts? | ☑ | ☐ | ☐ |
| 11. Have you sold any assets other than inventory? | ☑ | ☐ | ☐ |
| 12. Have you sold or transferred any assets or provided services to anyone related to the DIP in any way? | ☑ | ☐ | ☐ |
| 13. Did any insurance company cancel your policy? | ☑ | ☐ | ☐ |
| 14. Did you have any unusual or significant unanticipated expenses? | ☑ | ☐ | ☐ |
| 15. Have you borrowed money from anyone or has anyone made any payments on your behalf? | ☑ | ☐ | ☐ |
| 16. Has anyone made an investment in your business? | ☐ | ☑ | ☐ |

Exhibit A

Debtor Name  Williamson Memorial Hospital, LLC                    Case number  19-20469

17. Have you paid any bills you owed before you filed bankruptcy?                ☐ ☑ ☐

18. Have you allowed any checks to clear the bank that were issued before you filed bankruptcy?        ☐ ☑ ☐

## 2. Summary of Cash Activity for All Accounts

19. **Total opening balance of all accounts**
This amount must equal what you reported as the cash on hand at the end of the month in the previous month. If this is your first report, report the total cash on hand as of the date of the filing of this case.            $ 109,709.97

20. **Total cash receipts**
Attach a listing of all cash received for the month and label it *Exhibit C.* Include all cash received even if you have not deposited it at the bank, collections on receivables, credit card deposits, cash received from other parties, or loans, gifts, or payments made by other parties on your behalf. Do not attach bank statements in lieu of *Exhibit C.*

Report the total from *Exhibit C* here.            $ 944,696.21

21. **Total cash disbursements**
Attach a listing of all payments you made in the month and label it *Exhibit D.* List the date paid, payee, purpose, and amount. Include all cash payments, debit card transactions, checks issued even if they have not cleared the bank, outstanding checks issued before the bankruptcy was filed that were allowed to clear this month, and payments made by other parties on your behalf. Do not attach bank statements in lieu of *Exhibit D.*

Report the total from *Exhibit D* here.            – $ 1,037,045.

22. **Net cash flow**
Subtract line 21 from line 20 and report the result here.
This amount may be different from what you may have calculated as *net profit.*            + $ -92,349.24

23. **Cash on hand at the end of the month**
Add line 22 + line 19. Report the result here.

Report this figure as the *cash on hand at the beginning of the month* on your next operating report.            = $ 17,360.73

This amount may not match your bank account balance because you may have outstanding checks or deposits in transit.

## 3. Unpaid Bills

Attach a list of all debts (including taxes) which you have incurred since the date you filed bankruptcy but have not paid. Label it *Exhibit E.* Include the date the debt was incurred, who is owed the money, the purpose of the debt, and when the debt is due. Report the total from *Exhibit E* here.

24. **Total payables**            $ 167,097.00
    *(Exhibit E)*

Exhibit A

Debtor Name  Williamson Memorial Hospita, LLC                    Case number  19-20469

---

### 4. Money Owed to You

Attach a list of all amounts owed to you by your customers for work you have done or merchandise you have sold. Include amounts owed to you both before, and after you filed bankruptcy. Label it *Exhibit F*. Identify who owes you money, how much is owed, and when payment is due. Report the total from *Exhibit F* here.

25. Total receivables                                                                $ 4,905,127.0

   *(Exhibit F)*

---

### 5. Employees

26. What was the number of employees when the case was filed?                     154

27. What is the number of employees as of the date of this monthly report?        101

---

### 6. Professional Fees

28. How much have you paid this month in professional fees related to this bankruptcy case?          $ 174,000.00

29. How much have you paid in professional fees related to this bankruptcy case since the case was filed?    $ 174,000.00

30. How much have you paid this month in other professional fees?                 $ 174,000.00

31. How much have you paid in total other professional fees since filing the case?    $ 174,000.00

---

### 7. Projections

Compare your actual cash receipts and disbursements to what you projected in the previous month. Projected figures in the first month should match those provided at the initial debtor interview, if any.

| | Column A | | Column B | | Column C |
|---|---|---|---|---|---|
| | Projected | − | Actual | = | Difference |
| | Copy lines 35-37 from the previous month's report. | | Copy lines 20-22 of this report. | | Subtract Column B from Column A. |
| 32. Cash receipts | $ 1,162,769.C | − | $ 944,696.00 | = | $ 218,073.00 |
| 33. Cash disbursements | $ 1,066,967.C | − | $ 1,037,045.4 | = | $ 29,922.00 |
| 34. Net cash flow | $ 95,801.00 | | $ 17,360.00 | = | $ 78,441.00 |

35. Total projected cash receipts for the next month:                 $ 660,000.00

36. Total projected cash disbursements for the next month:         − $ 660,000.00

37. Total projected net cash flow for the next month:              = $    0.00

---

Exhibit A

Debtor Name  Williamson Memorial Hospita, LLC _____          Case number  19-20469 _____

---

**8. Additional Information**

If available, check the box to the left and attach copies of the following documents.

☑ 38.  Bank statements for each open account (redact all but the last 4 digits of account numbers).

☑ 39.  Bank reconciliation reports for each account.

☑ 40.  Financial reports such as an income statement (profit & loss) and/or balance sheet.

☑ 41.  Budget, projection, or forecast reports.

☑ 42.  Project, job costing, or work-in-progress reports.

Exhibit A

                                          Date  12/31/19        Page    20

BASIC BUSINESS CHECKING                (Continued)

                              Withdrawals
Date      Description                          Amount
12/02     ACH PROC FILE FEE                       .40
12/02     REG SALARY WILLIAMSON MEMO         6,168.31
          02-0550433        12/02/19
          ID #-
          TRACE #-000000000000001
12/05     ACH FILE PROC FEE                     70.00
12/05     USATAXPYMT IRS                     58,951.52
          3387702000        12/05/19
          ID #-270973900866453
          TRACE #-061036010009668
12/05     REG SALARY WILLIAMSON MEMO       155,806.08
          55-0592845        12/05/19
          ID #-
          TRACE #-000000000000001
12/09     ACH DEBIT  JOHN HANCOCK             954.13
          9406915392        12/09/19
          ID #-0140720
          TRACE #-028000083157160
12/20     ACH FILE ORIGINATION FEE              .05
12/20     ACH PROC FILE FEE                   10.00
12/20     ACH PROC FILE FEE                   10.00
12/20     ACH FILE ORIGINATION FEE            79.00
12/20     REG SALARY WILLIAMSON MEMO         200.00
          02-0550433        12/20/19
          ID #-
          TRACE #-000000000000001
12/20     REG SALARY WILLIAMSON MEMO       154,375.70
          55-0592845        12/20/19
          ID #-
          TRACE #-000000000000001
12/27     ACH DEBIT  JOHN HANCOCK              30.35
          9406915392        12/27/19
          ID #-0140720
          TRACE #-028000083551345
12/31     NET SERVICE CHARGE                   5.00
12/31     MAINTENANCE FEE                     15.00-
12/31      DR ITEM FEES IN S/C                  .80-
12/31      BALANCE CREDIT/ADJ. IN S/C         10.80-

-----------------------------------------------------------------------

                    Summary By Check Number
Date     Check No.        Amount   Date   Check No.        Amount
12/10                   1,877.84   12/02      25         1,235.89
12/13                   8,000.00   12/11      25*        3,500.93
12/16                   1,100.30   12/23     124*          205.73
12/30                   1,332.00   12/06     146*          579.22
12/10        24*        3,555.91   12/03     150*        1,504.46
         *Indicates Break In Check Number Sequence

Exhibit A



**Department of the Treasury
Internal Revenue Service
Independent Office of Appeals**
150 Court Street, Room 312
New Haven, CT 06510-2022

Date: 10/27/2023

Person to contact:
Name: ███████ ██████
████████████████ ██ ██████
Phone: 203-492-8695
Fax: 866-921-8562
Hours: 7:00-3:30
Re:
Trust Fund Recovery Penalty
Tax periods ended:
09/2019
For trust funds due from:
WILLIAMSON MEMORIAL
HOSPITAL LLC
Employer ID number:
█████████

SAM KAPOURALES

████████████████████████████

Dear Sam Kapourales:

We considered your protest along with your evidence and arguments against the Trust Fund Recovery Penalty (TFRP) assessment.

We determined that the IRS should not hold you personally liable for the non-payment of the trust fund liabilities for the tax periods shown above. We are returning your case file to Collection with a non-assertion determination.

Please note, the Department of Justice can reopen this case before the assessment limitation period expires if it decides to join all potentially responsible persons in a refund suit.

If you have questions, you can call me at the phone number above.

Thank you for your cooperation.

Sincerely,

Eric S Feinman
Appeals Team Manager

Enclosures:
IRS Appeals Survey

cc: John D Hoblitzell III Esq

**Letter 5124 (Rev. 10-2021)**
Catalog Number 60932V

<span style="color:red">Exhibit A</span>



**Department of the Treasury
Internal Revenue Service
Independent Office of Appeals**
150 Court Street, Room 312
New Haven, CT 06510-2022

Date: 10/27/2023

Person to contact:
Name: ▆▆▆▆▆▆▆▆▆
Employee ID Number: ▆▆▆▆
Phone: 203-492-8695
Fax: 866-921-8562
Hours: 7:00-3:30
Employer ID number:
▆▆▆▆▆▆

For trust funds due from:
WILLIAMSON MEMORIAL
HOSPITAL LLC
Tax periods ended:
12/2019 03/2020
Re:
Trust Fund Recovery Penalty

SAM KAPOURALES

▆▆▆▆▆▆▆▆▆▆▆▆▆

Dear Sam Kapourales:

We're sorry that we couldn't reach an agreement with you about the proposed assessment of the Trust Fund Recovery Penalty. We're returning your case to the Collection function for assessment of the liability. At this point, you have the following options:

**Pay the full amount due now to avoid interest charges.**
- Make your check payable to the United States Treasury.
- Indicate that the payment is for trust fund only and the amount to a[...]
- Provide the name and Employer Identification Number (EIN) of the[...]

If you don't pay the full amount due now, we will bill you.

**Pay some of the amount due and file a claim for refund.**
- Pay the tax for one employee for each period (quarter) of liability th[...] the amount of the penalty on unpaid employment taxes; OR pay the[...] that you wish to contest, if we've based the amount of the penalty o[...]
- File a claim for a refund of the amounts you paid using Forms 843, [...] *for Abatement.*

**Pay some of the amount due, file a claim for refund, and post a bon[...]**
- Pay the tax for one employee for each period (quarter) of liability th[...] based the amount of the penalty on unpaid employment taxes; OR pay the tax for one transaction for each period that you wish to contest, if we've based the amount of the penalty on unpaid excise tax.
- File a claim for a refund of the amounts you paid using Forms 843, *Claim for Refund and Request for Abatement.*
- Post a bond with us for one and one half times the amount of the remaining penalty after you have made the partial payment. You must post the bond within 30 days of receiving your bill.

If you post a bond with us, we will not take collection action while the Appeals Office considers your claim.

*[handwritten note:]* SAME FACTS AS PERIOD 9/2019. WHICH WAS DETERMINED TO BE NO PERSONAL LIABILITY

**Letter 1536 (Rev. 10-2021)**
Catalog Number 27412G

<span style="color:red">Exhibit A</span>

**Consideration by the Courts**
You can take your case to the United States Court of Federal Claims or to the United States District Court. These courts have no connection with the IRS.

If we deny your claim when you've posted the bond, you'll have 30 days to file suit before we can apply the bond to your trust fund recovery penalty and the interest accruing on this debt.

If we haven't acted on a claim for refund within 6 months from the date you filed it, you can file a suit for refund. You can also file a suit for refund within 2 years after we disallow your claim.

For any unpaid section 6672 liabilities (Trust Fund Recovery Penalty) that arise from periods beginning or transactions occurring after December 31, 1998, we must stop most of our collection activities if you file a proper lawsuit seeking a refund of your disallowed claim. While we cannot collect the unpaid portion of your liability by levy, the filing of a lawsuit extends the time we have to collect this liability under sections 6331(i)(5) and 6672(c)(4).

For further information about filing a suit, you can contact the Clerk of your District Court or the Clerk of the United States Court of Federal Claims, 717 Madison Place, N.W., Washington, D.C. 20005.

Sincerely,

Eric S Feinman
Appeals Team Manager

Enclosures:
IRS Appeals Survey

cc: John D Hoblitzell III
Esq.

Letter 1536 (Rev. 10-2021)
Catalog Number 27412G

Exhibit A

**Department of the Treasury**
**Internal Revenue Service**
**Director**

1973 N. Rulon White Blvd.
Ogden, UT 84201

Document Locator Number

84251-313-11008-23

| MFT | Tax Period | Assessment Date | Trans Code |
|-----|-----------|-----------------|-----------|
| 55 | 201912 | 11/09/2023 | 370 |

IDRS Number:
Notice Date: 11/09/2023
Name Control: KAPO

▶

Taxpayer
Identifying
Number

Taxpayer

SAM KAPOURALES

Form Number: 2749

Plan/Report Number:

Tax Period Ended: 12/31/2019

### Notice of Tax Due on Federal Tax Return

This is a notice of tax due on your tax return identified above. Please pay the amount shown as Balance Due when you receive this notice. Make your check payable to the **United States Treasury** and send it with a copy of this notice to the address shown above. If the balance due as shown below is incorrect because you made a recent payment, please send us the amount you believe you owe and an explanation of the difference.

The balance due may include penalty and interest. If you have any questions concerning the balance due or penalty and interest computation call us at 800-829-0115 (Business filers) or 800-829-8374 (Individual filers).

| 31. Reference | 32. TC | 33. Assessment | 34. Adjustment or Credit | 35. Balance Due |
|---------------|--------|----------------|--------------------------|-----------------|
| 11/09/2023 ADD'L TAX | 290 | 0.00 | | |

| 36. Reference Code: see enclosed notice | | | | |
|---|---|---|---|---|
| 960 | 175,074.19 | | | 175,074.19 |

see enclosed notice

**DUPLICATE—*(Keep for your records)***

Form **3552** (Rev. 11-2022)(Part 4)
Catalog Number 49356T

Exhibit A

**Department of the Treasury**
**Internal Revenue Service**
**Director**

1973 N. Rulon White Blvd.
Ogden, UT 84201

Document Locator Number

84251-313-11009-23

| MFT | Tax Period | Assessment Date | Trans Code |
|-----|-----------|-----------------|------------|
| 55 | 202003 | 11/09/2023 | 370 |

Taxpayer

SAM KAPOURALES

IDRS Number: ▉▉▉▉▉
Notice Date: 11/09/2023
Name Control: KAPO

Taxpayer Identifying Number ▶ ▉▉▉▉▉▉

Form Number: 2749

Plan/Report Number:

Tax Period Ended: 03/31/2020

### Notice of Tax Due on Federal Tax Return

This is a notice of tax due on your tax return identified above. Please pay the amount shown as Balance Due when you receive this notice. Make your check payable to the United States Treasury and send it with a copy of this notice to the address shown above. If the balance due as shown below is incorrect because you made a recent payment, please send us the amount you believe you owe and an explanation of the difference.

The balance due may include penalty and interest. If you have any questions concerning the balance due or penalty and interest computation call us at 800-829-0115 (Business filers) or 800-829-8374 (Individual filers).

| 31. Reference | 32. TC | 33. Assessment | 34. Adjustment or Credit | 35. Balance Due |
|---------------|--------|----------------|--------------------------|-----------------|
| 11/09/2023 ADD'L TAX | 290 | 0.00 | | |

36. Reference Code: see enclosed notice

960          211,251.62                  211,251.62

see enclosed notice

**DUPLICATE—*(Keep for your records)***

Form **3552** (Rev. 11-2022)(Part 4)
Catalog Number 49356T

<span style="color:red">Exhibit A</span>



Department of the Treasury
Internal Revenue Service
Cincinnati, OH 45999-0025



| | |
|---|---|
| Notice | CP49 |
| Tax Year | 2021 |
| Notice date | December 11, 2023 |
| Social Security number | |
| To contact us | 800-829-8374 |
| Your Caller ID | 560627 |
| Page 1 of 1 | 9H |



021111.546004.510200.12354 1 AB 0.537 372



SAM KAPOURALES

021111

## We applied $386,325.81 of your 2021 overpayment to an unpaid balance

# Refund due: $23,796.97

We applied your 2021 Form 1040 overpayment
to an amount owed for other tax years.

As a result, your refund has been reduced
to $23,796.97.

### Summary

| | |
|---|---|
| Overpayment for 2021 | -$410,055.08 |
| Interest we owe you | -67.70 |
| Amount applied to civil penalty owed for December 31, 2019 | 175,074.19 |
| Amount applied to civil penalty owed for March 31, 2020 | 211,251.62 |
| **Refund due** | $23,796.97 |

## What you need to do

**Your refund**
- If you haven't already received a refund check for $23,796.97, you should receive it within 2-3 weeks as long as you don't owe other tax or debt we're required to collect.

## Additional information

- Visit www.irs.gov/cp49
- For tax forms, instructions, and publications, visit www.irs.gov/forms-pubs or call 800-TAX-FORM (800-829-3676).
- You can contact us by mail at the address at the top of this notice. Be sure to include your Social Security number, the tax year, and the form number you are writing about.
- Keep this notice for your records.

We're required to send a copy of this notice to both you and your spouse. Each copy contains the information you are authorized to receive. **Please note:** Only one refund will be issued.

If you need assistance, please don't hesitate to contact us.

Exhibit A



Department of the Treasury
Internal Revenue Service
Cincinnati, OH 45999-0025

| Notice | CP49 |
|---|---|
| Tax Year | 2021 |
| Notice date | December 11, 2023 |
| Social Security number | |
| To contact us | 800-829-8374 |
| Page 1 of 2 | 9H |



021110.546004.610200.12354 1 AB 0.537 372
|dı|ılı|ıılı|lıl|ılıı|ıılıı|ıılı|ıll|ılıı|ıl|ılıı|ılı|lıı|ılı

  APOURALES

021110

We applied $386,325.81 of your 2021 overpayment to an unpaid balance.

# Refund due: $23,796.97

We applied your 2021 Form 1040 overpayment
to an amount owed for other tax years.

As a result, your refund has been reduced
to $23,796.97.

## Summary

| | |
|---|---|
| Overpayment for 2021 | -$410,055.08 |
| Interest we owe you | -67.70 |
| Amount applied to civil penalty owed for December 31, 2019 | 175,074.19 |
| Amount applied to civil penalty owed for March 31, 2020 | 211,251.62 |
| Refund due | $23,796.97 |

## What you need to do

**Your refund**

- If you haven't already received a refund check for $23,796.97, you should receive it within 2-3 weeks as long as you don't owe other tax or debt we're required to collect.

## Protection from your spouse's debt

When you file a joint tax return, you may be able to prevent some or all of your overpayment from paying liabilities for which your spouse (or former spouse) is responsible. For example, if some or all of your overpayment from a joint return has been (or will be) applied to pay your spouse's past-due income taxes, health coverage -shared responsibility payment, or other debt (child support, spousal support, student loans), you may be entitled to relief as an injured spouse. If you're eligible, you may be entitled to a refund for your share of an overpayment that's been (or will be) applied to your spouse's debt. For more information, or to submit a claim, go to www.irs.gov and download the Injured Spouse Allocation (Form 8379) or call 800-829-3676 to request a copy.

## Additional information

- Visit www.irs.gov/cp49
- For tax forms, instructions, and publications, visit www.irs.gov/forms-pubs or call 800-TAX-FORM (800-829-3676).

Continued on back...

Exhibit A

| Notice | CP49 |
|---|---|
| Tax Year | 2021 |
| Notice date | December 11, 2023 |
| Social Security number | |
| Page 2 of 2 | 9H |

**Additional information — continued**

- You can contact us by mail at the address at the top of this notice. Be sure to include your Social Security number, the tax year, and the form number you are writing about.
- Keep this notice for your records.

We're required to send a copy of this notice to both you and your spouse. Each copy contains the information you are authorized to receive. **Please note:** Only one refund will be issued.

If you need assistance, please don't hesitate to contact us.

Exhibit A



1500 Chase Tower • 707 Virginia Street East • Charleston, WV 25301
Mailing Address: P.O. Box 2031 • Charleston, WV 25327
Telephone (304) 345-8900 • Fax (304) 345-8909
*www.kaycasto.com*

Email: jdhoblitzell@kaycasto.com
Direct Dial No. (304) 391-8803

August 5, 2022

**Via facsimile and regular mail: (304) 232-9438**
Nicholas Balakos
Contact ID██████████
Department of the Treasury
Internal Revenue Service
1100 Main Street, Suite 103
Wheeling, WV 26003

Re:     **Sam Kapourales**
        ████████████
        **Williamson Memorial Hospital, LLC**
        **Formal Written Protest**

Dear Mr. Balakos:

This firm represents Sam Kapourales in connection with the Proposed Assessment of Trust Fund Recovery Penalty set forth in your letter of June 9, 2022 ("Proposed Assessment"). A Form 2848 Power of Attorney and Declaration of Representative is enclosed herewith designating Craig M. Kay and me as Mr. Kapourales' attorneys.

Mr. Kapourales is formally protesting the Proposed Assessment of $688,504.14 set forth in the Proposed Assessment for the following tax periods and hereby formally requests an Appeals Conference:

| Form Number | Period Ending | Proposed Penalty |
|---|---|---|
| 941 | 9/30/2019 | $302,178.33 |
| 941 | 12/31/2019 | $175,074.19 |
| 941 | 3/31/2020 | $211,251.62 |

The Williamson Memorial Hospital was a small, rural access, acute care hospital in Mingo County, West Virginia. It was the only hospital in the County. At times relevant to this matter, the parent company of Williamson Memorial Hospital, LLC was Mingo Health Partners, LLC, ("MHP") of which Mr. Kapourales was a member. MHP was organized on April 12, 2018. Charles Hatfield was the managing

Exhibit A

Sam Kapourales

Williamson Memorial Hospital, LLC
Formal Written Protest



**KAY
CASTO
&CHANEY** PLLC
*Attorneys at Law*

member of MHP.[1]   MHP completed the acquisition of the hospital on or about June 1, 2018.   While Mr. Kapourales was a member of the Hospital Board, he was not an officer or executive.

At the times relevant to this matter, Mr. Kapourales, had no control over payroll. The Hospital's CEO was Charles Hatfield, and its CFO was his wife, Sabrina Hatfield.   Several weeks ago, in the case if *Robert Johns v. Charles Hatfield, individually and as administrator of the Estate of Sabrina Hatfield*, Civil Action No. 21-C-105, pending in the Circuit Court of Mingo County, West Virginia, Diane Varney was deposed. Ms. Varney was the accounting manager for Williamson Memorial Hospital and was in charge of payroll and the accounts payable function.  Her testimony confirms that Mr. Hatfield had sole discretion as to who to pay, what to pay, and when to pay.  Relevant testimony includes:[2]

- Pg. 12:    Mr. and Mrs. Hatfield become CEO and CFO, respectively, of the hospital, in September or October, 2018.
- Pg. 14:    Within six to seven months of the Hatfields taking over responsibility for management of the hospital, the cash flow decreased.
- Pg. 17:    When there were insufficient funds available to pay vendors, Ms. Varney would discuss that with Charlie Hatfield.
- Pg. 18-20: When there was not enough money to cover payroll, Mr. Hatfield would ask Mr. Kapourales to "help fund it."  Mr. Hatfield was asking for funds to cover net payroll.
- Pg. 22:    Mr. and Ms. Hatfield were aware that quarterlies were not paid.
- Pg. 23:    Charlie Hatfield decided who got paid and when they got paid.
- Pg. 28:    Ms. Varney never discussed the net versus gross payroll issue with Mr. Kapourales when he was asked to make help cover payroll.  She never discussed the matter with him and does not know if he knew that Mr. Hatfield was only paying net payroll.
- Pg. 57:    Ms. Varney testifies multiple times that Mr. Hatfield had sole decision-making authority over what to pay and when.
- Pg. 57-58: Mr. Hatfield decided to shift payroll handling from ADP to in-house.
- Pg. 71:    Mr. Hatfield had sole decision making over who to pay and when: (Question: "Is there any bill that we've talked about that wasn't paid for any other reason other than Mr. Hatfield said not to pay it and he made that decision and you didn't otherwise have the money or the authority to pay it or override it?" Answer: "That's correct.")
- Pg. 98-90: Payroll was funded through April of 2019 when the hospital utilized ADP. After that, the hospital went to Meditech and Mr. Hatfield decided to fund only net payroll.

---

[1] *See* MHP Articles of Organization, enclosed.
[2] *See* Transcript of Varney Deposition, enclosed.

Exhibit A

Sam Kapourales

Williamson Memorial Hospital, LLC
Formal Written Protest



- Pg. 91:    Mr. Hatfield was the only person that told her what invoices to pay and what not to pay.

Mr. Kapourlaes made multiple advances or loans of his personal funds specifically to cover payroll and make sure employees were paid. He believed that, in making these advances, that they included funds specifically to cover payroll withholding and tax obligations. *See* IRS Form 4180 Report of Interview, pg. 4; "Charley [sic] Hatfield, CEO of the Hospital told me that . . . we didn't have enough to make the payroll, that we should be getting a check in any day. I would ask him how much we needed. He would give me a figure and I would send him a check. *I was convinced that included the payroll taxes. . .*" (Italics added). According to Ms. Varney's testimony, no one told Mr. Kapourales that Mr. Hatfield was only asking for the net payroll and she was unaware whether he knew this. Even after the filing of the Hospital's bankruptcy, Mr. Kapourales was loaning money to the Hospital specifically to ensure payroll was made. The January 2020 Monthly Operating Report filed in the Hospital's bankruptcy states that between October 2019 and January 27, 2020, the members of Mingo Health Partners contributed over $1,000,000 in cash to the continued operations of the Hospital.[3]

Shortly after the Hospital filed bankruptcy on October 21, 2019, a new Interim CEO was appointed, and he took over management responsibilities – including payment of payroll. In that capacity, he submitted monthly operating reports to the bankruptcy court, which all stated that all employees were timely paid and that all tax returns were timely filed and taxes paid. Bank records also show payment of taxes during this period. (October – December). The reports indicate that taxes were not timely filed in January, February, and March (specifically sales and use tax).[4]

To impose liability under Section 6672 one must both be a responsible party and much have willfully failed to ensure withholding taxes were paid. *See Johnson v. U.S.*, 833 F.Supp. 579 (S.D. W.Va. 1993). Factors to consider include participating in day-to-day management, control over payroll, authority to disburse corporate funds, check signing authority, drawing of corporate salary, holding of corporate officer or directorship, stock ownership, signing of corporate tax returns, business training, and power to hire and fire. *Id.* (citing *O'Connor v. U.S.*, 956 F.2d 48, 51 (4th Cir. 1992). Titular authority is insufficient to presume responsible person status. *See Gillam v. U.S.*, 1996 WL 627408, *4 (S.D. W. Va. 1996). Further, signing checks alone does not indicate one is a responsible party, especially in this case as the checks provided by the IRS in its July 14, 2022 fax appear to have been "signed" using a stamp. *See Wright v. United States*, 809 F.2d 4215, 428 (7th Cir. 1987) ("We emphasize that merely because a corporate officer has check-signing

---

[3] *See* Jan. 1, 2020, 4th Emergency Motion of Debtor for Order Authorizing Debtor to Obtain Post Petition Financing, enclosed, along with January 2020 Monthly Operating Report.
[4] *See* select portions of Monthly Operating Reports from October 2019 through March 2020.

Exhibit A

Sam Kapourales

Williamson Memorial Hospital, LLC
Formal Written Protest



responsibilities and his corporation is in financial trouble, it does not follow that he can be held liable for any and all failure to pay withholding taxes.")

Additionally, the responsible party must have acted willfully. "Generally, willfully means a voluntary, conscious and intentional decision to prefer other creditors over the Government." *Gillam*, *7. A personal acts willfully when they pay creditors other than the government and "either knows or recklessly disregards the fact that taxes are due to the government." *Id.* In *Gillam*, unlike here, the responsible party knowingly and intentionally paid other creditors when he knew taxes were due the government.

The evidence from the sworn, under oath deposition testimony of the Hospital's accounts payable/payroll manager is that Mr. Hatfield had sole decision-making authority over who got paid and when. Further, Mr. Kapourales made multiple loans specifically to cover payroll and believed that the amounts he provided were for gross payroll. Hospital management never advised him they were seeking only the net payroll and not then remitting quarterly payments to the government. While he co-signed checks, the evidence indicates that the decision to issue the checks were made by Mr. Hatfield and his wife in their roles as CEO and CFO and also that he had no knowledge or reason to know that withholdings were not being paid as he believed his loans to cover payroll included withholdings.

Based on the foregoing, Mr. Kapourales should not be considered a responsible person who willfully failed to ensure withholding taxes were paid. Mr. Kapourales, therefore, protests the Proposed Assessment and requests an appeals conference.

Thank you for your attention to this request. If you have any additional questions or concerns or if you need additional information, please do not hesitate to contact us.

Very Truly Yours,

John D. Hoblitzell III

JDH/
enclosures
Cc (w/enclosures)
    Sam Kapourales (via email)

**[Declaration on Following Page]**

Exhibit A

Sam Kapourales

▮▮▮▮▮▮▮
Williamson Memorial Hospital, LLC
Formal Written Protest



Under penalties of perjury, I declare that I have examined the facts presented in this statement and any accompanying information, and, to the best of my knowledge and belief, they are true, correct, and accurate.

_____          8 / 3 / 2020
Sam Kapourales                                        Date

Exhibit A

**Department of the Treasury**
**Internal Revenue Service**
**[Operating Division / Program Name]**
IRS   1100 MAIN ST · STE 103
WHEELING, WV 26003

Date: July 9, 2022

Taxpayer ID number (last 4 digits):

Business name and address:
WILLIAMSON MEMORIAL HOSPITAL LLC
% HEALTH MANAGEMENT ASSOC INC MBR
859 ALDERSON ST
WILLIAMSON, WV 25661-3215-595

SAM KAPOURALES

Person to contact:
NICHOLAS BALAKOS

Employee ID number:

Contact numbers:
Telephone: (304) 238-2946
Fax: (304) 232-9438

Dear: MR SAM KAPOURALES,

**Why we're sending you this letter**
We're proposing to assess a Trust Fund Recovery Penalty against you as a personal liability because we haven't received full payment of the federal employment or excise tax liability due from the business shown above.

You're required to collect, account for, and pay withheld trust fund taxes for the business, which include:
   • Employment taxes you withheld (or should have withheld) from the employees' wages.
   • Excise taxes you collected (or should have collected) from customers.

We listed the proposed penalties, equal to the unpaid trust fund taxes the business still owes, at the end of this letter for your review.

**If you agree with the proposed assessment**
If you agree with the amounts shown, sign and return Part 1 of the enclosed Form 2751, Proposed Assessment of Trust Fund Recovery Penalty.

**If you don't agree with the proposed assessment**
If you don't agree with the amounts shown, you can contact the person shown above to try to resolve the matter informally or you can appeal the proposed assessment.

**If you want to try to resolve the matter informally**
If you have additional information to support your case and want to try to resolve the matter informally, contact the person shown above **within 10 days** from the date of this letter. Contacting us won't extend the deadline for your appeal rights. You can ask if your case is eligible for Fast Track Mediation. See Publication 3605, Fast Track Mediation  - A Process for Prompt Resolution of Tax Issues.

**If you want to appeal this determination**
You have the right to appeal this action by filing a written protest, which may be forwarded to the IRS Independent Office of Appeals (Appeals). To keep your appeal rights, you need to provide your **written appeal within 60 days** from the date of this letter (75 days if this letter is addressed to you outside the U.S.). **Send your written appeal to the attention of the contact person shown at the top of this letter.** The proposed penalty amounts you're protesting determine how you should file your appeal.

Letter 1153 (Rev. 12-2021)
Catalog Number 40545C

<span style="color:red">Exhibit A</span>

| For each period you're protesting, if the proposed penalty amount is: | You should: |
|---|---|
| $25,000 or less | Send a small case request |
| More than $25,000 | Send a formal written protest |

You can send one small case request or protest for all the periods listed on the Form 2751, but if the penalty for any one period is more than $25,000, you must file a formal written protest. Include any information you want the settlement or Appeals officer to consider. Providing more information will help us process your request quickly.

**A small case request must include:**

- A copy of this letter, or your name, address, taxpayer identification number, and any information that will help us identify your file.
- A statement that you want an Appeals conference.
- A list of the penalties you disagree with and an explanation of why you disagree. Your explanation should address responsibility and willfulness in paying the trust fund taxes. Willfulness means an action was intentional, deliberate, or voluntary and not an accident or mistake. Therefore, you should explain your duties and responsibilities, including your duty and authority to collect, account for, and pay the trust fund taxes. If you disagree with how we calculated the penalty, you should list the dates and amounts of payments you believe we didn't consider or any computation errors you believe we made.

**A formal written protest must include:**

- Your name, address, and taxpayer identification number.
- A statement that you want an Appeals conference.
- A copy of this letter, or the date and number of this letter.
- The tax periods involved (see Form 2751).
- A list of the penalties you disagree with.
- **Facts signed under penalties of perjury** explaining why you disagree.
  - o Include specific dates, names, amounts, and locations that support your position. Your explanation should address responsibility and willfulness in paying the trust fund taxes. Willfulness means an action was intentional, deliberate, or voluntary and not an accident or mistake. Therefore, you should explain your duties and responsibilities, including your duty and authority to collect, account for, and pay the trust fund taxes. If you disagree with how we calculated the penalty, you should list the dates and amounts of payments you believe we didn't consider or any computation errors you believe we made.
  - o If you rely on a law or other authority to support your arguments, explain what it is and how it applies.
  - o **Add the following declaration to your statement and sign it:** "Under penalties of perjury, I declare that I have examined the facts presented in this statement and any accompanying information, and, to the best of my knowledge and belief, they are true, correct, and complete."

**Representation**

You can represent yourself at your Appeals conference or have someone qualified to practice before us represent you, such as an attorney, certified public accountant, or enrolled agent. If your representative attends a conference without you, we must have a completed Form 2848, Power of Attorney and Declaration of Representative, for them to receive confidential tax information, or Form 8821, Tax Information Authorization, for them to inspect confidential tax information.

Letter 1153 (Rev. 12-2021)
Catalog Number 40545C

<span style="color:red">Exhibit A</span>

If your representative prepares and signs the protest for you, they must substitute a declaration statement stating that:

- They submitted the protest and accompanying documents.
- They know personally that the facts stated in the protest and accompanying documents are true and correct.

**Consideration by the courts**
If your appeal doesn't result in your favor, we'll send you a bill. If you still disagree with us, you may then take your case to the United States Court of Federal Claims or to the appropriate United States District Court by following the procedures below. These courts have no connection with the IRS. Before you can file a claim with these courts, you must pay a portion of the tax liability and file a claim for refund, as described below.

**Special bond to delay collection actions for any period as soon as you file a claim for refund**
To ask that we delay collection of the penalty for any period, when you file a claim for refund for that period, you must do the following **within 30 days** from the date of the official notice of assessment and demand (the first bill) for that period:

- Pay the tax for one employee for each period of liability that you want to contest (if we based the penalty on unpaid employment taxes) or pay the tax for one transaction for each period that you want to contest (if we based the penalty on unpaid excise tax).
- File a claim for a refund of the amounts you paid using Forms 843, Claim for Refund and Request for Abatement.
- Post a bond with the IRS for one and one-half times the amount of the remaining penalty after you've made the required payments listed in the first item. Visit **www.irs.gov/irm/part5/irm_05-006-001** for information regarding collateral agreements.

If the IRS denies your claim when you post this bond, you have **30 days** to file suit in the appropriate U.S. District Court or the U.S. Court of Federal Claims before the IRS can apply the bond to your penalty and the accrued interest.

**Claim for refund with no special bond**
If you don't file a special bond as described above, you can still file a claim for refund following the same steps, except you don't have to take the actions within 30 days after the date of the official notice of assessment and demand for the period.

If we don't act on your refund claim within 6 months from the date you filed it, you can file a suit for refund. You can also file a suit for refund within 2 years after we disallow your claim.

If we find that the collection of this penalty is in jeopardy, we can take immediate action to collect it without regard to the 60-day period for sending a protest.

For more information about filing a suit, you can contact the Clerk of the appropriate local District Court or:

    Clerk of the United States Court of Federal Claims
    717 Madison Place NW
    Washington, D.C. 20439

**If we don't hear from you**
If we don't hear from you **within 60 days** from the date of this letter (or 75 days if this letter is addressed to you outside the U.S.), we'll assess the penalty and begin collection action.

**Taxpayer Advocate Service**

The Taxpayer Advocate Service (TAS) is an independent organization within the IRS that helps taxpayers and protect taxpayers' rights. TAS can offer you help if your tax problem is causing a financial difficulty, you've tried but been unable to resolve your issue with the IRS, or you believe an IRS system, process, or procedures isn't working as it should. If you qualify for TAS assistance, which is always free, TAS will do everything possible to help you. To learn more, visit **www.taxpayeradvocate.irs.gov** or call 877-777-4778.

**Additional information**

- You can reply to this letter by mail, fax or telephone using the contact information shown at the top of this letter. If you send a written response, include a copy of this letter or information to identify your account, your telephone number and the best hours to reach you. If you fax a response, you can use a fax machine or online fax service. Several online fax services use the internet to send files from your computer or smart device to a fax number.
- Find tax forms and publications by visiting **www.irs.gov/forms** or calling 800-TAX-FORM (800-829-3676).
- Keep this letter for your records.

If you have questions, you can call the contact person shown above.

Sincerely,

NICHOLAS BALAKOS
Revenue Officer

Enclosures:
Publication 1
Form 2751
Envelope

| Form / Tax period ending | Trust fund penalty | Form / Tax period ending | Trust fund penalty |
|---|---|---|---|
| 941 / 09-30-2019 | $302,178.33 | 941 / 12-31-2019 | $175,074.19 |
| 941 / 03-31-2020 | $211,251.62 | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Letter 1153 (Rev. 12-2021)
Catalog Number 40545C

Exhibit A

| Form / Tax period ending | Trust fund penalty | Form / Tax period ending | Trust fund penalty |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**Letter 1153 (Rev. 12-2021)**
Catalog Number 40545C

<span style="color:red">Exhibit A</span>

| Form **2751**<br>(April 2021) | Department of the Treasury - Internal Revenue Service<br>**Proposed Assessment of Trust Fund Recovery Penalty**<br>(Sec. 6672, Internal Revenue Code, or corresponding provisions of prior internal revenue laws) |
|---|---|

**Report of Business Taxpayer's Unpaid Tax Liability**

Name and address of business

WILLIAMSON MEMORIAL HOSPITAL LLC
% HEALTH MANAGEMENT ASSOC INC MBR
859 ALDERSON ST
WILLIAMSON, WV 25661-3215-595

| Tax Return Form Number | Tax Period Ended | Date Return Filed | Date Tax Assessed | Identifying Number | Amount Outstanding | Penalty |
|---|---|---|---|---|---|---|
| 941 | 09/30/2019 | 05/18/2020 | 09/07/2020 | ■■■■ | $621,329.75 | $302,178.33 |
| 941 | 12/31/2019 | 05/18/2020 | 09/07/2020 | | $250,839.01 | $175,074.19 |
| 941 | 03/31/2020 | 05/18/2020 | 09/07/2020 | | $265,010.82 | $211,251.62 |
| Totals | | | | | $1,137,179.58 | $688,504.14 |

**Agreement to Assessment and Collection of Trust Fund Recovery Penalty**

Name, address, and taxpayer identification number of responsible party
SAM KAPOURALES
■■■■■■■■■■■■■■■

I consent to the assessment and collection of the penalty shown for each period, which is equal either to the amount of federal employment taxes withheld from employees' wages or to the amount of federal excise taxes collected from patrons or members, and which was not paid over to the Government by the business named above. Signing this form does not extinguish my right to appeal the proposed assessment.

| Signature of responsible party | Date |
|---|---|
| | |

Catalog Number 21955U                    www.irs.gov                    Form **2751** (Rev. 4-2021)
Part 1—Sign and return this copy to Internal Revenue Service

Exhibit A

| Form **2751**<br>(April 2021) | Department of the Treasury - Internal Revenue Service<br>**Proposed Assessment of Trust Fund Recovery Penalty**<br>*(Sec. 6672, Internal Revenue Code, or corresponding provisions of prior internal revenue laws)* |
|---|---|

**Report of Business Taxpayer's Unpaid Tax Liability**

Name and address of business

WILLIAMSON MEMORIAL HOSPITAL LLC
% HEALTH MANAGEMENT ASSOC INC MBR
859 ALDERSON ST
WILLIAMSON, WV 25661-3215-595

| Tax Return<br>Form Number | Tax Period<br>Ended | Date Return<br>Filed | Date Tax<br>Assessed | Identifying<br>Number | Amount<br>Outstanding | Penalty |
|---|---|---|---|---|---|---|
| 941 | 09/30/2019 | 05/18/2020 | 09/07/2020 | ███ | $621,329.75 | $302,178.33 |
| 941 | 12/31/2019 | 05/18/2020 | 09/07/2020 | | $250,839.01 | $175,074.19 |
| 941 | 03/31/2020 | 05/18/2020 | 09/07/2020 | | $265,010.82 | $211,251.62 |
| Totals | | | | | $1,137,179.58 | $688,504.14 |

**Agreement to Assessment and Collection of Trust Fund Recovery Penalty**

Name, address, and taxpayer identification number of responsible party
SAM KAPOURALES

███

I consent to the assessment and collection of the penalty shown for each period, which is equal either to the amount of federal employment taxes withheld from employees' wages or to the amount of federal excise taxes collected from patrons or members, and which was not paid over to the Government by the business named above. Signing this form does not extinguish my right to appeal the proposed assessment.

| Signature of responsible party | Date |
|---|---|
| | |

Catalog Number 21955U     www.irs.gov     Form **2751** (Rev. 4-2021)
**Part 2—Keep this copy for your records**

Exhibit A

# Your Rights as a Taxpayer

**IRS**

**Publication 1**

This publication explains your rights as a taxpayer and the processes for examination, appeal, collection, and refunds. Also available in Spanish.

# The Taxpayer Bill of Rights

## 1. The Right to Be Informed

Taxpayers have the right to know what they need to do to comply with the tax laws. They are entitled to clear explanations of the laws and IRS procedures in all tax forms, instructions, publications, notices, and correspondence. They have the right to be informed of IRS decisions about their tax accounts and to receive clear explanations of the outcomes.

## 2. The Right to Quality Service

Taxpayers have the right to receive prompt, courteous, and professional assistance in their dealings with the IRS, to be spoken to in a way they can easily understand, to receive clear and easily understandable communications from the IRS, and to speak to a supervisor about inadequate service.

## 3. The Right to Pay No More than the Correct Amount of Tax

Taxpayers have the right to pay only the amount of tax legally due, including interest and penalties, and to have the IRS apply all tax payments properly.

## 4. The Right to Challenge the IRS's Position and Be Heard

Taxpayers have the right to raise objections and provide additional documentation in response to formal IRS actions or proposed actions, to expect that the IRS will consider their timely objections and documentation promptly and fairly, and to receive a response if the IRS does not agree with their position.

## 5. The Right to Appeal an IRS Decision in an Independent Forum

Taxpayers are entitled to a fair and impartial administrative appeal of most IRS decisions, including many penalties, and have the right to receive a written response regarding the Office of Appeals' decision. Taxpayers generally have the right to take their cases to court.

## 6. The Right to Finality

Taxpayers have the right to know the maximum amount of time they have to challenge the IRS's position as well as the maximum amount of time the IRS has to audit a particular tax year or collect a tax debt. Taxpayers have the right to know when the IRS has finished an audit.

## 7. The Right to Privacy

Taxpayers have the right to expect that any IRS inquiry, examination, or enforcement action will comply with the law and be no more intrusive than necessary, and will respect all due process rights, including search and seizure protections, and will provide, where applicable, a collection due process hearing.

## 8. The Right to Confidentiality

Taxpayers have the right to expect that any information they provide to the IRS will not be disclosed unless authorized by the taxpayer or by law. Taxpayers have the right to expect appropriate action will be taken against employees, return preparers, and others who wrongfully use or disclose taxpayer return information.

## 9. The Right to Retain Representation

Taxpayers have the right to retain an authorized representative of their choice to represent them in their dealings with the IRS. Taxpayers have the right to seek assistance from a Low Income Taxpayer Clinic if they cannot afford representation.

## 10. The Right to a Fair and Just Tax System

Taxpayers have the right to expect the tax system to consider facts and circumstances that might affect their underlying liabilities, ability to pay, or ability to provide information timely. Taxpayers have the right to receive assistance from the Taxpayer Advocate Service if they are experiencing financial difficulty or if the IRS has not resolved their tax issues properly and timely through its normal channels.

| **The IRS Mission** | Provide America's taxpayers top-quality service by helping them understand and meet their tax responsibilities and enforce the law with integrity and fairness to all. |

Publication 1 (Rev. 9-2017) Catalog Number 64731W  Department of the Treasury  Internal Revenue Service  www.irs.gov

Exhibit A

| Form **2848** | **Power of Attorney** | OMB No. 1545-0150 |
|---|---|---|

Form **2848**
(Rev. January 2021)
Department of the Treasury
Internal Revenue Service

**Power of Attorney
and Declaration of Representative**

▶ Go to *www.irs.gov/Form2848* for instructions and the latest information.

OMB No. 1545-0150

For IRS Use Only

Received by:
Name _____
Telephone _____
Function _____
Date ____ / ____ / ____

| **Part I** | **Power of Attorney** |
|---|---|

**Caution:** A separate Form 2848 must be completed for each taxpayer. Form 2848 will not be honored for any purpose other than representation before the IRS.

**1    Taxpayer information.** Taxpayer must sign and date this form on page 2, line 7.

Taxpayer name and address

Sam Kapourales

▮▮▮▮▮▮▮▮▮▮▮▮▮

hereby appoints the following representative(s) as attorney(s)-in-fact:

Taxpayer identification number(s)

Daytime telephone number        Plan number (if applicable)

**2    Representative(s)** must sign and date this form on page 2, Part II.

Name and address

Craig M. Kay, Esquire

PO Box 2031
Charleston, WV 25327

Check if to be sent copies of notices and communications ☑

CAF No. _____▮▮▮▮▮▮▮____
PTIN _____▮▮▮▮▮▮▮____
Telephone No. _____(304) 345-8900
Fax No. _____(304) 345-8909
Check if new: Address ☐   Telephone No. ☐   Fax No. ☐

Name and address

John D. Hoblitzell III, Esquire

PO Box 2031
Charleston, WV 25327

Check if to be sent copies of notices and communications ☑

CAF No. _____▮▮▮▮▮▮▮____
PTIN _____▮▮▮▮▮▮▮____
Telephone No. _____(304) 345-8900
Fax No. _____(304) 345-8909
Check if new: Address ☐   Telephone No. ☐   Fax No. ☐

Name and address

(Note: IRS sends notices and communications to only two representatives.)

CAF No. _____
PTIN _____
Telephone No. _____
Fax No. _____
Check if new: Address ☐   Telephone No. ☐   Fax No. ☐

Name and address

(Note: IRS sends notices and communications to only two representatives.)

CAF No. _____
PTIN _____
Telephone No. _____
Fax No. _____
Check if new: Address ☐   Telephone No. ☐   Fax No. ☐

to represent the taxpayer before the Internal Revenue Service and perform the following acts:

**3    Acts authorized (you are required to complete line 3).** Except for the acts described in line 5b, I authorize my representative(s) to receive and inspect my confidential tax information and to perform acts I can perform with respect to the tax matters described below. For example, my representative(s) shall have the authority to sign any agreements, consents, or similar documents (see instructions for line 5a for authorizing a representative to sign a return).

| Description of Matter (Income, Employment, Payroll, Excise, Estate, Gift, Whistleblower, Practitioner Discipline, PLR, FOIA, Civil Penalty, Sec. 4980H Shared Responsibility Payment, etc.) (see instructions) | Tax Form Number (1040, 941, 720, etc.) (if applicable) | Year(s) or Period(s) (if applicable) (see instructions) |
|---|---|---|
| Trust Fund Recovery Penalty | 941 | 2019/09; 2019/12; 2022/03 |

**4    Specific use not recorded on the Centralized Authorization File (CAF).** If the power of attorney is for a specific use not recorded on CAF, check this box. See *Line 4. Specific Use Not Recorded on CAF* in the instructions . . . . . . . . . . . . . . . ▶ ☐

**5a   Additional acts authorized.** In addition to the acts listed on line 3 above, I authorize my representative(s) to perform the following acts (see instructions for line 5a for more information): ☐ Access my IRS records via an Intermediate Service Provider;
☐ Authorize disclosure to third parties;    ☐ Substitute or add representative(s);    ☐ Sign a return; _____
_____
_____

☐ Other acts authorized: _____
_____

<span style="color:red">Exhibit A</span>

Form 2848 (Rev. 1-2021)                                                                 Page **2**

b **Specific acts not authorized.** My representative(s) is (are) not authorized to endorse or otherwise negotiate any check (including directing or accepting payment by any means, electronic or otherwise, into an account owned or controlled by the representative(s) or any firm or other entity with whom the representative(s) is (are) associated) issued by the government in respect of a federal tax liability.

List any other specific deletions to the acts otherwise authorized in this power of attorney (see instructions for line 5b): _____

6 **Retention/revocation of prior power(s) of attorney.** The filing of this power of attorney automatically revokes all earlier power(s) of attorney on file with the Internal Revenue Service for the same matters and years or periods covered by this form. If you do not want to revoke a prior power of attorney, check here . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

**YOU MUST ATTACH A COPY OF ANY POWER OF ATTORNEY YOU WANT TO REMAIN IN EFFECT.**

7 **Taxpayer declaration and signature.** If a tax matter concerns a year in which a joint return was filed, each spouse must file a separate power of attorney even if they are appointing the same representative(s). If signed by a corporate officer, partner, guardian, tax matters partner, partnership representative (or designated individual, if applicable), executor, receiver, administrator, trustee, or individual other than the taxpayer, I certify I have the legal authority to execute this form on behalf of the taxpayer.

▶ **IF NOT COMPLETED, SIGNED, AND DATED, THE IRS WILL RETURN THIS POWER OF ATTORNEY TO THE TAXPAYER.**

| | | |
|---|---|---|
| _(signature)_ | 7/29/22 | |
| Signature | Date | Title (if applicable) |
| Sam Kapouralas | | |
| Print name | Print name of taxpayer from line 1 if other than individual | |

**Part II    Declaration of Representative**

Under penalties of perjury, by my signature below I declare that:

• I am not currently suspended or disbarred from practice, or ineligible for practice, before the Internal Revenue Service;
• I am subject to regulations in Circular 230 (31 CFR, Subtitle A, Part 10), as amended, governing practice before the Internal Revenue Service;
• I am authorized to represent the taxpayer identified in Part I for the matter(s) specified there; and
• I am one of the following:

a Attorney—a member in good standing of the bar of the highest court of the jurisdiction shown below.
b Certified Public Accountant—a holder of an active license to practice as a certified public accountant in the jurisdiction shown below.
c Enrolled Agent—enrolled as an agent by the IRS per the requirements of Circular 230.
d Officer—a bona fide officer of the taxpayer organization.
e Full-Time Employee—a full-time employee of the taxpayer.
f Family Member—a member of the taxpayer's immediate family (spouse, parent, child, grandparent, grandchild, step-parent, step-child, brother, or sister).
g Enrolled Actuary—enrolled as an actuary by the Joint Board for the Enrollment of Actuaries under 29 U.S.C. 1242 (the authority to practice before the IRS is limited by section 10.3(d) of Circular 230).
h Unenrolled Return Preparer—Authority to practice before the IRS is limited. An unenrolled return preparer may represent, provided the preparer (1) prepared and signed the return or claim for refund (or prepared if there is no signature space on the form); (2) was eligible to sign the return or claim for refund; (3) has a valid PTIN; and (4) possesses the required Annual Filing Season Program Record of Completion(s). *See Special Rules and Requirements for Unenrolled Return Preparers in the instructions for additional information.*
k Qualifying Student or Law Graduate—receives permission to represent taxpayers before the IRS by virtue of his/her status as a law, business, or accounting student, or law graduate working in a LITC or STCP. See instructions for Part II for additional information and requirements.
r Enrolled Retirement Plan Agent—enrolled as a retirement plan agent under the requirements of Circular 230 (the authority to practice before the Internal Revenue Service is limited by section 10.3(e)).

▶ **IF THIS DECLARATION OF REPRESENTATIVE IS NOT COMPLETED, SIGNED, AND DATED, THE IRS WILL RETURN THE POWER OF ATTORNEY. REPRESENTATIVES MUST SIGN IN THE ORDER LISTED IN PART I, LINE 2.**

Note: For designations d–f, enter your title, position, or relationship to the taxpayer in the "Licensing jurisdiction" column.

| Designation— Insert above letter (a–r) | Licensing jurisdiction (State) or other licensing authority (if applicable) | Bar, license, certification, registration, or enrollment number (if applicable) | Signature | Date |
|---|---|---|---|---|
| a | WV | 4695 | _(signature)_ | 7/29/22 |
| a | WV | 9346 | _(signature)_ | 7/29/22 |
| | | | | |
| | | | | |

Form **2848** (Rev. 1-2021)

Exhibit A

04/12/2018 THU 11:38  FAX 304 522 9162 Farrell, White & Legg    @002/011

# FARRELL, WHITE & LEGG PLLC

ATTORNEYS AND COUNSELLORS
914 FIFTH AVENUE
POST OFFICE BOX 6457
HUNTINGTON, WEST VIRGINIA 25772-6457
WWW.FARRELL3.COM

MICHAEL J. FARRELL, 1,3
JOSEPH M. FARRELL, Jr, 1,3
TAMELA J. WHITE 2,3,7
ERIK W. LEGG 1,1,3
BERNARD E. VALLEJOS 1,5
MICIAH FARRELL WOODYARD 1
SAMANTHA THOMAS-BUSH 1,3
AUSTIN T. LEWIS 1
JAMES BEN SHEPARD 1,1

TELEPHONE (304) 522-9180
FACSIMILE (304) 522-9162

April 12, 2018

FILE #: 1324.0001

WV Secretary of State
Business & Licensing Division
1615 Washington Street East
Charleston, WV 25311
Fax: 304-558-8381

Re:    Miago Health Partners, LLC
West Virginia Articles of Organization of LLC

To whom it may concern:

Enclosed please find the **West Virginia Articles of Organization of LLC** in regards to the above referenced matter. Should you need anything else please contact our office.

Very truly yours,

Tamela J. White

TJW/vls

Enclosures



DEPOSITION
EXHIBIT 3
Hatfield
5/3/22

1 Admitted in West Virginia  2 Admitted in Ohio  3 Admitted in Kentucky

Exhibit A

06/12/2018 THU 11:35   FAX 304 522 9162 Farrell, White & Legg                    @009/011



West Virginia Secretary of State
Business & Licensing Division
Tel: (304)558-8000
Fax: (304)558-8381
Website: www.wvsos.gov
E-mail: efilings@wvsos.gov
Rev. 11/2017

## Customer Order Request

**SUBMIT THIS COMPLETED FORM WITH YOUR FILING.**

**Order Processing Requested\*:**       **\* \* \* Expedite Processing Requires Additional Fees \* \* \***

☐ Standard Processing\*\*          ☐ 24-HOUR Expedite\*\*\*       ■ 2-HOUR Expedite          ☐ 1-HOUR Expedite
(Avg. processing turnaround          (additional $25.00 fee included)    (additional $250.00 fee included)      (additional $500.00 fee included)
5-10 business days)

\*"Processing" indicates the filing will be completed and registered in the Secretary of State registration database.
\*\*Standard Processing applications received by E-MAIL or FAX must include the e-Payment Authorization form with credit card information.
\*\*\*NOTE: Orders filed in person through any Secretary of State office location requesting the filing be processed will be assessed a 24-HOUR Expedite fee of $25.00 per order.

Name of Entity:  Mingo Health Partners, LLC

Return filing to:  Farrell, White & Legg, P.O. Box 6457, Huntington, WV 25772
(Return Address)

Contact Name: Tamela J White                    Phone:     +1 (304) 522-9100

**Return Delivery Options:** Email or Fax options do not receive a copy via mail; must be ordered separately.

■ Email to:  tjw@farrell3.com          ☐ Fax to: _____

☐ Hold for Pick Up      ☐ Mail to Return Address above      ☐ FedEx: Acct # _____

☐ Other (explain below):                  ☐ UPS: Acct # _____

Order Description (include items being ordered and fee breakdown):

Certified copy of Articles of Organization (2 hour expedited)

\* PLEASE NOTE: Original paperwork is kept by this office. Include a copy of the original filing if
you want a file stamped copy returned to you at no extra charge. Certified copy requests are an
additional $15 and certified copy being requested.          Total Amount: _____

**Payment Method:**

☐ Check/Money Order\*      ■ Credit Card (Must attach e-Payment Authorization request form including payment information.)
☐ Cash (Do Not mail cash)    ☐ Pre-paid Acct #: _____  Attach signed pre-paid slip.

**Exhibit A**

04/12/2018 THU 11:34  FAX 304 522 9162 Farrell, White & Legg                    ☒001/011

# FARRELL, WHITE & LEGG PLLC

Attorneys and Counsellors
914 Fifth Avenue
Post Office Box 6457
Huntington, West Virginia 25772-6457

TELEPHONE: (304) 522-9100                                        FAX: (304) 522-9162

## *TELECOPY TRANSMITTAL SHEET

DATE: April 12, 2018

TO:  WV Secretary of State                          FAX NUMBER:  304-558-8381
     Business & Licensing Division

FROM:   Tamela J. White, Esq.

NO. OF PAGES (INCLUDING THIS PAGE):  ~ 11 ~

RE:   Mingo Health Partners, LLC

FILE NO.:   1324.0001

SPECIAL INSTRUCTIONS/COVER MESSAGE:  Please see attached correspondence.

HARD COPY:      ☐ WILL FOLLOW or  X WILL NOT FOLLOW
BY:             ☐MAIL     ☐OVERNIGHT     ☐OTHER

**IF YOU HAVE ANY PROBLEMS WITH THE
RECEPTION OF THE FOLLOWING PAGES,
PLEASE CALL VALERIE L. SCHEIDLER AT
(304) 781-1812.**

* This communication is intended for the sole use of the individual or entity named above. This fax may contain information subject to State and Federal protections, including the protections of the Privacy Standards under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). Any use, duplication or publication of this communication by a person or entity other than as named above is strictly prohibited. If you received this communication by mistake, please notify the sender immediately by telephone and return it by mail to Farrell, White & Legg PLLC at the above address at our expense.

{F1371003.1 }

Exhibit A



# State of West Virginia

## Certificate

*I, Mac Warner, Secretary of State of the*
*State of West Virginia, hereby certify that*

**MINGO HEALTH PARTNERS, LLC**

**Control Number: 9ALWM**

has filed its "Articles of Organization" in my office according to the provisions of West Virginia Code §§31B-2-203 and 206. I hereby declare the organization to be registered as a limited liability company from its effective date of April 12, 2018 until the expiration of the term or termination of the company.

Therefore, I hereby issue this

## CERTIFICATE OF A LIMITED LIABILITY COMPANY



*Given under my hand and the*
*Great Seal of the State of*
*West Virginia on this day of*
*April 12, 2018*

*Mac Warner*

Secretary of State

Exhibit A

04/12/2018 THU 11:35   FAX 304 522 9162 Farrell, White & Legg                    ☒003/011

RECEIVED

**WEST VIRGINIA
ARTICLES OF ORGANIZATION
OF LIMITED LIABILITY COMPANY**
Form LLD-1
Rev. 12/2017

FILED

APR 12 2018

**FILE ONE ORIGINAL**
(Two if you want a filed stamped
copy returned to you.)

**FILING FEE: $100**
      * Fee Waived for Veteran-owned organization

18 APR 12  AM II:
West Virginia Secretary of State
Business & Licensing Division
Tel: (304)558-8000
Fax: (304)558-8381
Website: www.wvsos.gov

SECRETARY OF STATE
STATE OF WV

IN THE OFFICE OF
WV SECRETARY OF STATE

Control # 9ALWM

* * * * We acting as organizers according to West Virginia Code §31B-2-202, adopt the following * * * *
Articles of Organization for a West Virginia Limited Liability Company.

1. The name of the West Virginia limited liability company
shall be: [The name must contain one of the required terms such as "limited
liability company" or abbreviations such as "LLC" or "PLLC" - see instructions
for a list of acceptable terms.]

Mingo Health Partners, LLC

☒ CHECK BOX to indicate you've included one of the REQUIRED CORPORATE NAME ENDINGS (See instructions for name endings).

2. The company          ☒ LLC      ☐ Professional LLC* for the profession of:
   will be a:                      (See Section 2 of the attached instructions for list of accepted professions.)

                        ☐ Professional business organizations: CHECK BOX indicating you have attached the state licensing board
                          Verification of Eligibility (Form VOE) to these Articles if your profession meets the requirements as defined by
                          Chapter 30 of WV Code. Your application will be rejected if the VOE is not attached.

3. The address of the principal office
   of the company will be:

   Street: ██████████████

   City: ██████████        State: WV     Zip Code: ████████

   Located in the County of (required):

   County: ██████████

   The mailing address of the above
   location, if different, will be:

   Street:

   City:                   State:         Zip Code:

4. The address of the initial designated
   (physical) office of the company in
   West Virginia, if any, will be:

   Street: ██████████████

   City: ██████████        State: WV     Zip Code: ████████

   Located in the County of:

   County: ██████████

   The mailing address of the above
   location, if different, will be:

   Street:

   City:                   State:         Zip Code:

5. The name and address of the person
   (agent) to whom notice of process
   may be sent, if any, will be:

   Name: Charles W. Hatfield

   Street: ██████████████

   City: ██████████        State: WV     Zip Code: ████████

460712
s

Exhibit A

04/12/2018 THU 11:35  FAX 304 522 9162 Farrell, White & Legg                    ☒0006/011

**WEST VIRGINIA ARTICLES OF ORGANIZATION OF LIMITED LIABILITY COMPANY**                    Page 2

6. E-mail address where business correspondence may be received: charliehatfield@suddenlinkmail.com

7. Website address of the business, if any (ex: yourdomainname.com): n/a

8. Do you own or operate more than one business in West Virginia?    ☐ Yes * Answer a. and b. below.    ☐ No    ☒ Decline to answer

   If "Yes"... a. How many businesses? _____    b. Located in how many West Virginia counties? _____

9. The name(s) and address(es) of the organizer(s) is (You must list at least ONE organizer.):

| Name | No. & Street Address | City | State | Zip Code |
|------|----------------------|------|-------|----------|
| Charles W. Hatfield | ███████████ | ████████ | WV | ████████ |

10. The company will be:    ☒ an AT-WILL company, conducting business for an indefinite period.
    (required)            ☐ a TERM company, conducting business for the term of _____ years.

11. a. List the name(s) and address(es) of the MEMBER(S) of the company (required; Note: The application will be rejected if member information is not provided below. Attach additional pages if necessary):

| Member Name | No. & Street Address | City | State | Zip Code |
|-------------|----------------------|------|-------|----------|
| Charles W. Hatfield | █████████ | █████ | WV | █████ |
| Sam Kapourales | | | WV | █████ |
| Doug Reynolds | | | WV | █████ |

b. The company will be –    ☒ MEMBER-MANAGED [All member information must be entered under 11a. above.]
   CHECK ONE (required):    ☐ MANAGER-MANAGED [All manager information must be entered in the spaces below
                              If selecting this management structure, Attach additional pages if necessary.]

| Manager Name | No. & Street Address | City | State | Zip Code |
|--------------|----------------------|------|-------|----------|
| Charles W. Hatfield | ███████████ | ████████ | WV | ████████ |

12. All or specified members of a limited liability    ☒ No – All debts, obligations and liabilities are those of the company.
    company are liable in their capacity as          ☐ Yes – Those persons who are liable in their capacity as members for all debts,
    members for all or specified debts, obliga-          obligations or liability of the company have consented in writing to the
    tions or liabilities of the company (required):      adoption of this provision or to be bound by the provision.

13. The purpose(s) for which this limited liability company is formed is as follows:
    [Describe the type(s) of business activity which will be conducted, for example, "real estate," "construction of residential and commercial buildings," "commercial painting," "professional practice of law" (see Section 2. for acceptable "professional" business activities). Purpose may conclude with words "...including the transaction of any or all lawful business for which corporations may be incorporated in West Virginia."]

    To operate health care entity(ies) including but not limited to hospital/hospital services and all transactions and/or

    lawful business purposes which a LLC may be organized and incorporated in West Virginia

Exhibit A

04/12/2018 THU 11:39  FAX 304 522 9162  Farrell, White & Legg                    ☒005/011

WEST VIRGINIA ARTICLES OF ORGANIZATION OF LIMITED LIABILITY COMPANY                Page 3

14. Is the business a Scrap Metal Dealer?

☐ Yes (If "Yes," you must complete the Scrap Metal Dealer Registration Form (Form SMD-1) and proceed to Section 15.)

☒ No (Proceed to Section 15.)

15. Other provisions which may be set forth in the operating agreement or as may not inconsistent with law:
(See instructions for further information; use extra pages if necessary.)

16. The number of pages attached and included in these Articles is: 9

17. The requested effective date is
(Requested date is same as or later than filing may
have change, but date is less filing, be as of Date.)

☐ the date and time of filing in the Secretary of State's Office.

☐ the following date: _____ and time: _____

18. Is the organization a "veteran-owned" organization?

Effective JULY 1, 2015, to meet the requirements for a "veteran-owned" organization, the entity filing the registration must meet the following criteria per West Virginia Code §59-1-2a:

1. A "veteran" must be honorably discharged or under honorable condition, and
2. A "veteran-owned business" means a business that meets one of the following criteria:
   • is at least fifty-one percent (51%) unconditionally owned by one or more veterans; or
   • in the case of a publicly owned business, at least fifty-one percent (51%) of the stock is unconditionally owned by one or more veterans.

☐ Yes (If "Yes," attach Form SMD1.)  ➡  ☐ CHECK BOX indicates you have attached Veterans Affairs Form DD214

☒ No

You may obtain a copy
of your Veterans Affairs
Form DD214 by
contacting:

National Personnel Records Center
Military Personnel Records
1 Archives Drive
St. Louis, MO 63138
Toll free: 1-86-NARA-NARA or 1-866-272-6272
Phone: 314-801-0800
www.archives.gov/veterans/military-service-records

For WV Code 59-1-2(f) effective July 1, 2015, the registration fee is waived for entities that meet the requirements as a "veteran-owned" organization. Its attached forms indicate to determine if the organization qualifies for this waiver. In addition, a "veteran-owned" entity will have to self-assess each year of a Annual Report fee waived AFTER the organization's initial formation per WV Code 59-1-2a(e).

19. Contact and Signature Information (See below for proper Legal Notice Regarding Signature):

a. Contact person for each in case there is a problem with filing: Tamela J. White, counsel    Phone: +1 (304) 829-9100

b. Print or type name of signer: Charles W. Hatfield                Title/Capacity of Signer: Organizer and Managing Member

c. Signature: _____    Date: 4/12/18

*Important Legal Notice Regarding Signature: Per West Virginia Code §11B-4-409, liability for false statement is filed record. It's record indicated or required in is filed under this chapter provides a false statement, one who suffers loss by reliance on the statement may recover damages for the loss from a person who signed the record or caused another to sign it on the person's behalf and knew the statement to be false at the time the record was signed.

Important Note: This form is a public document. Please do NOT provide any personal identifiable information on this form such as social security number, bank account number, credit card number, the identification or driver's license number, etc.

[ Reset Form ]    [ Print Form ]

Exhibit A

*ROBERT L. JOHNS vs.*

*CHARLES HATFIELD*

*DIANE VARNEY*

*07/13/2022*



# Realtime Reporters

*"Because your time matters"*

713 LeeStreet
Charleston, WV 25301

(304) 344-8463
schedulerealtime@gmail.com

Realtimereporters.net

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 1

```
 1        IN THE CIRCUIT COURT OF MINGO COUNTY,
 2                   WEST VIRGINIA
 3
 4   ROBERT L. JOHNS, TRUSTEE,
 5        Plaintiff,
 6
 7   v.                      CIVIL ACTION NO. 21-C-105
 8
 9
10   CHARLES HATFIELD, individually,
     and as administrator of the
11   ESTATE OF SABRINA HATFIELD,
12        Defendants.
13
14
15        The deposition of DIANE VARNEY, taken upon
     oral examination, pursuant to notice and pursuant to the
16   West Virginia Rules of Civil Procedure, before Jaime L.
     Centifanti, Registered Professional Reporter and Notary
17   Public in and for the State of West Virginia, on
     Wednesday, July 13, 2022, at 2:20 p.m., at the
18   Mountaineer Hotel conference room, located at 31 East
     Second Avenue, Williamson, West Virginia.
19
20
21           REALTIME REPORTERS, LLC
             Jaime L. Centifanti, RPR
22              713 Lee Street
             Charleston, WV 25301
23             (304) 344-8463
             www.realtimereporters.net
24
```

Page 3

```
 1                 EXAMINATION INDEX
 2
 3   DIANE VARNEY
 4       BY MR. GEORGE . . . . . . . . . . . . . . . .   5
         BY MR. PARSONS . . . . . . . . . . . . . . .  86
 5       RE BY MR. GEORGE . . . . . . . . . . . . . .109
         RE BY MR. PARSONS . . . . . . . . . . . . . . 110
 6
 7
 8
 9
10
11
12
13
14
15
16                      DIANE VARNEY
17
18
19
20
21
22
23
24
```

Page 2

```
 1   APPEARANCES:
 2   On behalf of the Plaintiff:
 3       Shawn P. George, Esquire
         sgeorge@gandllaw.com
 4       GEORGE & LORENSEN PLLC
         1526 Kanawha Boulevard, East
 5       Charleston, West Virginia  25311
         304.343.5555
 6
 7
     On behalf of the Defendants:
 8
         Colton C. Parsons, Esquire
 9       colton.parsons@steptoe-johnson.com
         STEPTOE & JOHNSON, PLLC
10       707 Virginia Street, East, 17th Floor
         Post Office Box 1588
11       Charleston, West Virginia  25326
         304.353.8000
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1                  EXHIBIT INDEX
 2
 3                                                MAR
     Deposition Exhibit Number
 4   16    Email chain                            25
 5   17    Email chain                            47
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Realtime Reporters, LLC
schedulerealtime@gmail.com 304-344-8463

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 5

1              DIANE VARNEY,
2 was called as a witness by the Plaintiff, pursuant to
3 notice, and having been first duly sworn, testified as
4 follows:
5              EXAMINATION
6 BY MR. GEORGE:
7    Q.   Would you state your full name, please.
8    A.   It's Diane Varney.
9    Q.   Ms. Varney, first of all, thank you for your
10 patience.  We're sorry that we're delayed in getting
11 started with you and we appreciate you working with us.
12         We've got an air conditioner on in this
13 room, so if we can try each to keep our voices up so
14 that the court reporter can hear everything, that would
15 be terrific.
16         Have you ever been deposed before?
17    A.   Yes.
18    Q.   Okay.  A few ground rules, hopefully to make
19 this go faster, easier, smoother.
20         First, if you do not understand one of
21 my questions, please tell me that and I'll be more than
22 happy to repeat it or rephrase it until you understand
23 it and can answer it.
24         Will you agree to do that for me?

Page 6

1    A.   Yes.
2    Q.   Second, make sure, please, to make all of your
3 answers verbal so that the court reporter accurately
4 takes down -- because sometimes witnesses will nod or
5 shake their head, or they'll say, "Uh-huh" or "Huh-uh,"
6 and it's -- we want to make sure that the record is
7 completely accurate.
8         Would you do that for me?
9    A.   Yes.
10    Q.   The third thing is, is that if you answer one
11 of my questions, I'm going to assume that you both heard
12 it and understood it; is that fair?
13    A.   Yes.
14    Q.   All right.  And the fourth is, at any time for
15 any reason you need to take a break, please tell us and
16 we will accommodate you.
17    A.   Thank you.
18    Q.   You're welcome.
19         Can you give me a little bit of
20 information about your background?  Were you born in
21 Mingo County?
22    A.   No.  Actually, I was born in Allentown,
23 Pennsylvania.
24    Q.   Okay.  So when did you come to this part of

Page 7

1 the world?
2    A.   In 1981.
3    Q.   And what was the reason for --
4    A.   My husband was born and raised back here and
5 he wanted to come back home.
6    Q.   What is your educational level?
7    A.   I have a -- I did graduate from high school,
8 and I had just one accounting class in college and
9 that's all.
10    Q.   Did you complete college, or --
11    A.   No.
12    Q.   And can you just give us a summary of your
13 employment after high school?
14    A.   The majority of my jobs was either in payroll
15 or accounts payable.
16    Q.   And approximately when would you have started
17 in that line of work?
18    A.   In 1975.
19    Q.   And in terms of all of the employment that
20 you've had in payroll or accounts payable, what's the
21 highest level of job that you attained at any
22 organization?
23    A.   It would have been at Williamson Memorial
24 Hospital.  I was the accounting manager.

Page 8

1    Q.   Now, we took Mr. Hatfield's deposition, and he
2 referred to you as the controller.  Is that the same
3 thing in your mind as the accounts manager?
4    A.   No.  To me, no.
5    Q.   Tell me in your mind the difference between a
6 controller and an accounts manager.
7    A.   I think it's a higher level than what I was --
8 that I had the education for.
9    Q.   Okay.  So is it fair that a controller has a
10 broader scope of duties than you had as an accounts
11 manager?
12    A.   I would think so, yes.
13    Q.   And so the only portion of the accounting
14 function at Williamson Memorial that you were involved
15 in, as I understand it, is payroll and accounts payable?
16    A.   Those were the two positions that I took care
17 of and managed with the clerks.
18    Q.   Now, when did you start with -- employment at
19 Williamson Memorial?
20    A.   In 1983.
21    Q.   When did your employment there cease?
22    A.   It was December 31st, 2020.
23    Q.   And what was the reason it stopped then?
24    A.   Well, by that time, the hospital was closed

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 9

1 and they had finished going through the closing process.
2    Q.   And in terms of the closing process, did you
3 work with either of the gentlemen who are seated here to
4 my left?
5    A.   With Gene a little bit, yes.
6    Q.   Have you ever discussed with Mr. Preston any
7 issues or problems - and we're going to get into certain
8 of those when I ask you further questions - that existed
9 before Mr. Hatfield and Mrs. Hatfield were no longer
10 employed at Williamson?
11    A.   Only if asked.  I didn't volunteer information
12 unless I was asked.
13    Q.   Did Mr. Preston ever ask you about the
14 performance of the jobs by either Mr. Hatfield or
15 Mrs. Hatfield?
16    A.   Yes.
17    Q.   What did he ask you?
18    A.   A lot of it had to do with checks being cut
19 that didn't make sense, had no backup for.  Things in
20 that area.
21    Q.   So was this something that Mr. Preston
22 discovered on reviewing the check register and asked you
23 about?
24    A.   I don't know how he knew about it.

Page 10

1    Q.   Did he ask you that to see if you knew
2 anything about it?
3    A.   I don't recall a specific conversation.  It's
4 just a lot of my conversations were with Loretta Simon.
5    Q.   Because she was the chief operating officer
6 during that portion of the hospital's life?
7    A.   Yes.
8    Q.   And we will get to those discussions in a
9 little bit.
10         Have you ever met or spoken to Bob
11 Johns, the bankruptcy trustee?
12    A.   I'm sure I have.  I don't really remember
13 names.
14    Q.   And you have spoken to me on one or two
15 occasions; correct?
16    A.   Yes.
17    Q.   And I called you to see whether you would be
18 willing to be deposed; right?
19    A.   Yes.
20    Q.   And I explained to you generally what this
21 litigation was about.
22    A.   Yes.
23    Q.   And in a nutshell, it's that I have been hired
24 by the bankruptcy trustee to pursue claims against

Page 11

1 Mr. and Mrs. Hatfield, her estate, for acts and failures
2 to act while they were the CFO, CEO, and board chair of
3 Williamson Memorial Hospital; correct?
4    A.   Yes.
5    Q.   Okay.  In any of our conversations, did I
6 suggest to you or did anyone from my office suggest to
7 you that you should say or not say anything?
8    A.   No.
9    Q.   Okay.  Did we attempt to pressure you in any
10 way, shape, or form to either be here or to give any
11 specific kinds of answers?
12    A.   No.
13    Q.   Are you here of your own free will, under oath
14 to tell what you know as it relates to your areas at
15 Williamson Memorial Hospital from June 1 of 2018 until
16 when your employment stopped as it relates to the
17 Hatfields, and then be able to address how the hospital
18 ran before Mingo Health Partners bought it?
19    A.   Yes.
20    Q.   Okay.  Now, to whom did you report?  When CHS
21 owned the hospital, who was your direct report?
22    A.   It was to the CFO.
23    Q.   And at that time was it Kevin Weeks?
24    A.   No.  Yes.

Page 12

1    Q.   And he was an employee of CHS?
2    A.   Yes.
3    Q.   And did he stay on for a period of time after
4 Mingo Health Partners bought Williamson Memorial
5 Hospital?
6    A.   I'm not sure if he actually did stay for a
7 little while.  I really don't remember.
8    Q.   At some point soon after the sale, you don't
9 remember him there; is that fair?
10    A.   Yes.
11    Q.   And was there a period of time where there was
12 no CFO?
13    A.   You know, no.  There had to be somebody there.
14    Q.   You just don't recall who.
15    A.   I just don't recall who.
16    Q.   Do you recall that in September or October of
17 2018, Mr. Hatfield became the CEO of the hospital?
18    A.   Yes.
19    Q.   Do you recall that shortly after that, his
20 wife, Sabrina, became the CFO of the hospital?
21    A.   Yes.
22    Q.   And did you report directly to her?
23    A.   Not necessarily, no.
24    Q.   Why was your reporting relationship different

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 13

1  under the new ownership than it had been with CHS?
2      A.  Her focus was more on the patient side.
3      Q.  And was that the patient record side?
4      A.  More of the financials, of bills, and getting
5  out for the patients so that cash could be coming in.
6      Q.  Is that the revenue cycle part that we hear a
7  lot about?
8      A.  Yes.
9      Q.  And you were not involved in that?
10     A.  No.
11     Q.  But whether that function went well or didn't
12  go well, is it fair to say that that impacted the money
13  that you had available to pay accounts payable and to
14  meet your payroll obligations?
15     A.  Yes.
16     Q.  During the time in which CHS owned Williamson
17  Memorial Hospital, did it ever fail to meet a payroll?
18     A.  No.
19     Q.  Did it ever withhold monies from employees'
20  checks and fail to remit those to either the government
21  or to the various providers of services that were either
22  health care, retirement, life insurance, et cetera?
23     A.  No.
24     Q.  Were you, during the CHS ownership, provided

Page 14

1  the money and resources you needed to do your job?
2      A.  Yes.
3      Q.  Did that change after Mingo Health Partners
4  bought Williamson Memorial Hospital?
5      A.  Not at first.
6      Q.  When did it change?
7      A.  Probably within six, seven months.
8      Q.  Please describe the change.
9      A.  Cash flow became much less.  Vendors weren't
10  getting paid on time.
11     Q.  Let me break each one of those up, please.
12          When CHS owned the hospital, was there a
13  usual range of cash flow that was made available to you
14  to meet the obligations on a monthly basis?
15     A.  What they would do with accounts payable is on
16  a daily basis as checks are presented to the bank, they
17  would fund that bank account to match that dollar
18  amount, and then it would wash out and always be zero at
19  the end of the day.
20     Q.  Is it fair for me to conclude that you had
21  access to that account?
22     A.  No.
23     Q.  Who had access to it?
24     A.  With CHS?

Page 15

1      Q.  Yes.
2      A.  The corporate office did all of the
3  transactions.
4      Q.  How were you made aware of what money you had
5  available to do your job?
6      A.  I -- I had access to look at the accounts but
7  that's all.
8      Q.  That's what I meant.  I mean, I don't mean
9  that you could write from it, but you could see if you
10  had money.
11     A.  Right.
12     Q.  And that was a CHS account, as you've
13  described, and you could at least look at it and see on
14  a daily basis what it had in it.
15     A.  Yes.
16     Q.  Okay.  And then once you were satisfied that
17  it had enough money in it in the prior day to meet your
18  obligations, how is it that you got access, if you did,
19  to the checkbook to write the checks that met the
20  obligations?
21     A.  CHS had a schedule they kept according to
22  which vendors got paid in which week, the types of
23  vendors whether it was utilities or contracts, and we
24  would be given a schedule from the corporate office to

Page 16

1  use that schedule and whatever was on our accounts
2  payable aging, that's how we requested checks.
3      Q.  Did you also -- were you also aware of a
4  budget?
5      A.  Yes.  There was always a budget.
6      Q.  And I would assume that the schedule that you
7  just described kind of fits into and works in
8  conjunction with the budget?
9      A.  Pretty much so, yes.
10     Q.  Purpose of which is you can have an orderly
11  administration of the office.
12     A.  Yes.
13     Q.  Try to avoid surprises.
14     A.  Yes.
15     Q.  Be prepared for the needs to be met, meet the
16  accounts payable, and the funding obligations for the
17  employees; correct?
18     A.  Yes.
19     Q.  And as I've heard you describe it, it worked
20  very well and never failed.
21     A.  No, never failed.
22     Q.  So within the first six months after Mingo
23  Health Partners buys Williamson Memorial Hospital,
24  you're having problems with getting access to sufficient

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 17

1  cash to pay vendors and employees; correct?
2     A.  Yes.
3     Q.  What did you do when that situation first
4  arose?
5     A.  I would ask Charlie to move funds from the
6  general account which is where all the payments from
7  insurance companies would come in, to move enough money
8  over to cover checks that we intended to cut.
9     Q.  And did you still have visual access to the
10  general account to see what monies were there?
11    A.  Yes.
12    Q.  And when you looked at that general account
13  during this time frame, was there enough money there to
14  pay the payroll and the accounts payable?
15    A.  Not always.
16    Q.  So when the money wasn't there, what did you
17  then do?
18    A.  Couldn't cut checks.
19    Q.  So did you get calls from vendors?
20    A.  Yes.  The accounts payable clerk got many
21  calls.
22    Q.  And they reported those calls to you?
23    A.  No.  She would tell me about it, and then I
24  would discuss with Charlie.

Page 18

1     Q.  Did you lose vendors for nonpayment?
2     A.  Yes.  Some of the smaller vendors, yes.
3     Q.  And did -- were you able to make arrangements
4  with the larger vendors always?
5     A.  We would -- my accounts payable clerk would
6  get a dollar amount that they were asking for, and she
7  would email Charlie, and most of the time she would copy
8  me on the emails.
9     Q.  Okay.  The name of that person, please.
10    A.  Annette Chafin.
11    Q.  And would you describe with what regularity
12  these kinds of communications took place once the
13  problems began?
14    A.  Every day.
15    Q.  And was Mr. Hatfield able to address them
16  every day?
17    A.  Sometimes yes.
18    Q.  Sometimes no?
19    A.  Sometimes no.
20    Q.  What about employee payroll?
21    A.  Payroll was -- we were told to process
22  payroll, and if the money wasn't there, then Charlie
23  would get with Sam Kapourales to help fund it.
24    Q.  In the same time frame that we're talking

Page 19

1  about, within the first six months after the
2  transaction, were there such problems with payroll?
3     A.  Yes.
4     Q.  Now, I want to focus a little bit on what it
5  means to process payroll.
6         Would you describe in your own words
7  what that means?
8     A.  Take the hours of the employees, run it
9  through the system to have all their deductions taken
10  out, and come up with a net amount for each employee.
11    Q.  What about the gross amounts, the difference
12  between what the employee actually received and what was
13  payable either to the State or federal government for
14  withholding, for unemployment, for pension
15  contributions, life insurance, health care, how was that
16  funded or not funded?
17    A.  It wasn't.
18    Q.  All right.  So let me make sure I understand.
19  And, again, I'm not here to put any words in your mouth,
20  but when Mr. Hatfield would go to Mr. Kapourales to ask
21  for money so that the payroll could be processed, was he
22  asking for the net amount - only the amount the employee
23  would get - or their gross amount so that it would
24  reflect all of the other monies that needed to be paid?

Page 20

1     A.  It was only the net amount.
2     Q.  Did that concern you?
3     A.  Yes.
4     Q.  How did you express that concern?
5     A.  All I could do was -- I mean, my payroll clerk
6  would email Charlie the net amount of the payroll, plus
7  what was to be the amount for the 401(k) every pay
8  period, but only the net amount was supplied.
9     Q.  Is there any question in your mind that
10  Charlie Hatfield understood when he was quote/unquote
11  funding the payroll that he was not funding anything
12  more than the net amount that went to the employees?
13        MR. PARSONS:  Object to form.
14  Foundation.
15    Q.  Based on the communications that you had with
16  Annette and that she had with Mr. Hatfield -- and we'll
17  get to the ones you had with him later, but is there any
18  doubt in your mind he knew he was only funding the net?
19        MR. PARSONS:  Same objection.  You can
20  answer.
21        I'll object.  Might be your first one,
22  but you can answer.
23    A.  Okay.  Mitzi Stanley was my payroll clerk, and
24  she would copy me on emails stating how much was needed

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 21

1  for the payroll and the 401(k).
2      Q.  So would she give the gross amount?
3      A.  No, it was the net amount.
4      Q.  Okay.  But in addition -- what I'm trying to
5  figure out is, are you aware of any basis that
6  Mr. Hatfield could truthfully claim he didn't know that
7  he needed to fund more than the net amount?
8      A.  There's no way he wouldn't have known due to
9  the deductions that were taken out of the employees'
10  paychecks.
11      Q.  And would you detail what those deductions
12  were for the record?
13      A.  Health insurance is one of them.  401(k).
14  There's all kinds of other insurances.  Life insurance.
15      Q.  When it came time to pay what I'm going to
16  call quarterlies, did you have any responsibility for
17  that as the accounts payable person?
18      A.  The payroll clerk, which is Mitzi, would be
19  the one that would pull that together, but I've never
20  had -- until later filed those reports.
21      Q.  When do you recall first filing those reports?
22      A.  It was after the hospital closed.
23      Q.  So during the time that the Hatfields were
24  there in their positions, Ms. Stanley did that?

Page 22

1      A.  She would have been the person to do that,
2  yes.
3      Q.  Okay.  Now, did she have the authority to
4  submit those without approval from the CFO or
5  Mr. Hatfield?
6      A.  She should have had approval, yes.
7      Q.  From both of them?
8      A.  Either one.
9      Q.  And, to your knowledge, did she ever file them
10  without such approval?
11      A.  They never got filed.
12      Q.  They never even filed them.
13      A.  No.
14      Q.  And why weren't they filed?
15      A.  There was no funding for it.
16      Q.  So am I hearing you correctly that the
17  quarterlies were never filed, so there was no approval
18  to go get because there wasn't any money to pay them?
19      A.  Right.
20      Q.  And Mr. and Mrs. Hatfield were aware of this?
21      A.  They should have been.
22      Q.  From Mrs. Stanley?
23      A.  They should, yes.
24      Q.  So if you didn't have a budget, how did you

Page 23

1  manage?
2      A.  Just day by day.
3      Q.  And if you didn't have money, how did you
4  manage?
5      A.  There came a point where Charlie decided who
6  got paid and when they got paid.
7      Q.  So he took over your function of -- in that
8  regard?
9      A.  Yes.
10      Q.  Approximately when was that?
11      A.  I don't have an exact date.  It's probably
12  maybe March of 2019.  It could have been earlier.
13      Q.  Do you have any understanding about whether
14  there was an event or a specific reason that he did that
15  at that time?
16      A.  It's just where so many vendors were calling
17  asking for money, and maybe he felt like he could handle
18  a little better being the CEO, that he could bargain
19  with them to maybe give them a little more time to pay.
20      Q.  So in your role then, did you essentially keep
21  him informed of vendors, the status of their payments or
22  nonpayment, and periodically give him that information
23  so he could decide who he was going to pay?
24      A.  My accounts payable clerk sent emails to him

Page 24

1  all the time telling who she had -- who had contacted
2  her and what was owed and I had some -- some of that
3  contact, too.
4      Q.  And then did Mr. Hatfield, either by email or
5  in person say, "This is who we're going to pay," or did
6  you not hear back from him; he simply took care of the
7  payment function himself?
8      A.  As long as we were able to cut checks from our
9  system, things were okay.  But once those checks started
10  bouncing, then vendors refused our checks and either
11  wanted a cashier's check or a wire.
12      Q.  Do you recall approximately when that
13  occurred?
14      A.  Not long after he started taking over when
15  payments were going to be made.
16      Q.  And as I understand your testimony, he took
17  over that function, you believe, no later than March of
18  '19.
19      A.  Somewhere around there, yes.
20      Q.  And so by May 1, vendors were not accepting
21  Williamson Memorial checks.  They needed to be bank
22  checks or immediately available wired funds.
23          MR. PARSONS:  Object to form and
24  foundation.  You can answer.

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 25

1   Q.  Is that right?
2   A.  I'm sorry, can you repeat that?
3   Q.  Sure.
4       What I heard you say was shortly after
5   Mr. Hatfield took over the accounts payable function,
6   vendors refused to take a Williamson Memorial Hospital
7   check because they were bouncing; is that correct?
8   A.  Yes.
9   Q.  And then the vendors demanded either payment
10  of a bank check, a certified check drawn that the funds
11  are there, or by a wire; is that correct?
12  A.  Yes.
13  Q.  And you were aware of that as was Mr. Hatfield
14  at that time; correct?
15  A.  Yes.
16  Q.  You had discussions with him about those
17  events; correct?
18  A.  Yes.
19  Q.  So was there -- do you know the source of the
20  funding that was being used to pay the vendors?
21  A.  It was from the patients' insurance payments.
22      VARNEY DEPOSITION EXHIBIT NO. 16
23      (Email chain was marked for
24      identification as Varney Deposition

Page 26

1       Exhibit No. 16.)
2   Q.  I'm going to show you an exhibit that's been
3   marked for identification as 16, and ask you if you're
4   familiar with that.  It's a series of emails, and I'm
5   most interested in the one that's in the middle of the
6   page that's from you to Mr. Hatfield.
7       Do you see that, September 27 of '18?
8   A.  Yes.
9   Q.  Okay.  So you're writing to him at that time
10  because he was the CEO?
11  A.  Yes.
12  Q.  And you're telling him that only $43,331.77
13  has been wire transferred into the account at Williamson
14  Memorial; correct?  And then it looks like a frowny
15  face.
16  A.  Uh-huh.
17  Q.  If that's a "yes," you need to say "Yes."
18  A.  Yes.
19  Q.  Okay.  All right.  How much money was
20  expected?
21  A.  We're not sure.
22  Q.  Okay.  Is it true or not true that the amounts
23  received by Williamson Memorial in payment for services
24  rendered rarely matched the needs the hospital had to

Page 27

1   continue operating on a daily basis?
2   A.  Yes.
3   Q.  Mr. Hatfield would tell you that a certain
4   amount of money was going to be coming in, and you would
5   be on the lookout for that money; correct?
6   A.  I didn't always know exactly how much.  The
7   transfers did come from CHS were patient money that came
8   in, and they would transfer it to our general account.
9   Q.  And is it fair to say that on a routine basis,
10  those amounts for CHS were less than Mr. Hatfield
11  represented to the people in your office that Williamson
12  should be expecting?
13  A.  I don't know how he would know exactly how
14  much we are expecting except for CHS telling him.
15  Q.  Okay.  Do you know what conversations
16  Mr. Hatfield may have had with members of the board in
17  terms of what money was supposed to be coming in?
18  A.  No.
19  Q.  You were not a member of the board, nor in a
20  position at the hospital where you attended board
21  meetings; correct?
22  A.  I did not attend board meetings.
23  Q.  Did you ever have discussions with either
24  Mr. Kapourales or Mr. Reynolds or anybody else on the

Page 28

1   board other than Mr. Hatfield, about the problems that
2   you were confronted with trying to do your job as the
3   accounts payable and payroll manager?
4   A.  Sam Kapourales would come up to the hospital
5   periodically and ask to see the accounts payable aging,
6   and he would look over it and ask, you know, "Certain
7   vendors what do they, you know, do for us, are they a
8   supply vendor, are they a contractor, whatever," and
9   then he would look at some of the smaller amounts, and
10  he said -- he would say, "Why don't you pay these small
11  ones?  Why don't you pay these?  Why are there so many
12  small ones on here, why don't you pay those?"
13      I would not reply.  I would just kind of
14  glance over at Charlie because he was there, and he
15  would look at it and then that would be the end of the
16  meeting and I would just go back to my office.
17  Q.  In those meetings, or at any other times, did
18  Mr. Kapourales know, to your knowledge, that the gross
19  amount of the payroll, the difference between the net
20  and the gross, was not being escrowed and was not being
21  paid?
22  A.  I don't know if he knew.
23  Q.  You never discussed that with him?
24  A.  No.

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 29

1    Q.   You never heard him discuss that in your
2 presence, nor Mr. Hatfield discuss it with him in your
3 presence?
4    A.   No.
5    Q.   Now, going back to Exhibit 16.  After you
6 write on September 27th, 2018 to Mr. Hatfield that only
7 $43,331.77 came in, he then writes back; correct?  A
8 message.  Do you see that?  "This is unacceptable"?
9    A.   Oh, yes.
10    Q.   Okay.  Read that into the record, if you
11 would, please.
12    A.   "This is unacceptable.  No way can I operate
13 this hospital on such low rate of return."
14    Q.   Did you have any disagreement with that
15 statement?
16    A.   No.
17    Q.   Did you respond to it in anyway?
18    A.   No.
19    Q.   It didn't really require a response from you,
20 did it?
21    A.   No.
22    Q.   And then the email goes to Mr. Kapourales to
23 tell him that the collection was only -- or the payment
24 was only $43,331.77, and his response as read here is

Page 30

1 what?
2    A.   "That's awful."
3    Q.   So can you tell me from any source what the
4 plan was at Williamson Memorial Hospital to deal with
5 this awful situation?
6    A.   No.
7    Q.   So you've got a situation where you have no
8 budget; correct?
9    A.   Correct.
10    Q.   Insufficient money in the revenue cycle to pay
11 your expenses; correct?
12    A.   Correct.
13    Q.   And you have federal, state, and employee
14 obligations that are being taken from employee checks
15 but not being funded.
16    A.   Correct.
17    Q.   Did that concern you?
18    A.   Yes.
19    Q.   Who, if anybody, did you speak to about it, or
20 was it simply you just went to your office, put your
21 head down, tried to do your job because there wasn't
22 anything you could do about it?
23    A.   It's basically what I did.  I did what I could
24 with what I had to work with.

Page 31

1    Q.   Now, did there -- did there come a time during
2 which Mr. Hatfield was in charge of the accounts
3 payable, that he wrote checks on payables that you
4 didn't have paperwork for?
5    A.   Yes.
6    Q.   And do you remember when the earliest of those
7 occasions occurred approximately?
8    A.   Maybe June or July.  Could have been earlier.
9    Q.   And that would have been of '19?
10    A.   Of '19, yes.
11    Q.   And what, if anything, did you do or say when
12 you saw that he had written such a check?
13    A.   I would ask if he could give me backup so that
14 we could process it through our accounts payable system
15 and get it off our aging if necessary.
16    Q.   And did he provide that paperwork?
17    A.   Not always, no.
18    Q.   So you, in effect, had transactions on your
19 register that you had no backup for and could not
20 explain.
21    A.   Yes.
22    Q.   And did you look behind in any of those
23 instances to whom the checks were payable?
24    A.   There were made to Mid Mountain Properties.

Page 32

1    Q.   Do you have any understanding as to who Mid
2 Mountain Properties is or was?
3    A.   It's Charlie's personal property.  Personal
4 company, I'm sorry.
5    Q.   Is it in the business of real estate?
6    A.   Yes.
7    Q.   Did you get at any time any explanation from
8 Mr. Hatfield why he wrote those checks?
9    A.   There were times where our clinics had to have
10 utilities paid or phone bills because they were going to
11 be shut down for nonpayment and we needed to keep the
12 clinics going, and they would use the Mid Mountain
13 Property credit card to make those payments on
14 occasions.
15    Q.   So what would have been the difficulty, then,
16 if you know, of simply providing you the utility bills,
17 the credit card statements so that you could reconcile?
18    A.   I didn't see a problem.
19    Q.   But that never happened?
20    A.   No.
21    Q.   Are you certain that's what the money was used
22 for?
23    A.   Not always, no.
24    Q.   Were there other transactions of a similar

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 33

1 kind involving what you could characterize as personal
2 interests of Mr. Hatfield where checks were written from
3 funds that were Williamson Memorial Hospital funds?
4     A.   Yes.
5     Q.   Can you give us examples of those?
6     A.   Reed's Painting.
7     Q.   And is that a local -- I'm not familiar with
8 that.  Is that --
9     A.   It's a local vendor.
10    Q.   And was any support or backup supplied to you
11 that connected that invoice, that bill, that service
12 with something for Williamson Memorial Hospital?
13    A.   My accounts payable clerk couldn't match up
14 the dollar amount to what we had on our aging for Reed's
15 Painting.  And she called the company to ask for
16 invoices.  And at first they were not willing to give
17 them to us.  They said they're not for the hospital.
18 They're for Mid Mountain Properties.
19    Q.   And so you were never able to connect that
20 work with anything that was done for the benefit of
21 Williamson Memorial Hospital; is that correct?
22    A.   That's correct.
23    Q.   Now, when you say the amounts were different,
24 can you give me any order of magnitude?

Page 34

1     A.   It's just the grand total, we could not tie
2 that to anything we had on our aging, and it's one lump
3 sum so we didn't know what invoices would have been paid
4 for the hospital to make things tie back to what the
5 check is for.
6     Q.   Okay.  Did you ever have any discussions with
7 Sabrina Hatfield about these things as the CFO?  I know
8 you said she was focused on the patient side, the
9 revenue cycle side, but did you have any discussions
10 with her about this?
11    A.   The only time I've talked to her about
12 anything was getting -- trying to get back up for the
13 credit card they used to pay at the clinics to keep them
14 going.
15    Q.   And were you successful or unsuccessful
16 getting that?
17    A.   Most of the time unsuccessful.
18    Q.   Now, do you know a gentleman by the name of
19 Greg Gibbs?
20    A.   Yes.
21    Q.   Do you understand him to be an independent
22 CPA/accountant out of Charleston, West Virginia?
23    A.   Yes.
24    Q.   Did you -- did you have any interaction with

Page 35

1 Mr. Gibbs at any point with respect to Williamson
2 Memorial Hospital?
3     A.   Not a whole lot that I -- I really don't
4 recall a whole lot with him.
5     Q.   So -- and you just maybe can help me with this
6 because I'm not familiar with it.
7          If somebody wanted the general ledger
8 for Williamson Memorial Hospital in the spring of 2019,
9 where would they go to get it and who would they ask
10 for?
11    A.   They could get that from me.
12    Q.   Did Mr. Gibbs ever ask you for the general
13 ledger?
14    A.   I don't recall.
15    Q.   Do you know whether Mr. Gibbs ever received
16 the general ledger?
17    A.   I don't know.
18    Q.   Do you know whether -- do you know what
19 Mr. Gibbs was asked to do?
20    A.   No.
21    Q.   Do you know whether Mr. Gibbs was able to do
22 what he was asked to do?
23    A.   I don't know.
24    Q.   Did you ever see monthly financial statements

Page 36

1 for the hospital after the transaction?
2     A.   Yes.
3     Q.   Okay.  Who prepared those?
4     A.   I was the one that would close the books and
5 then run financials.
6     Q.   Just so we're clear, when you ran financials,
7 would it be month end or quarter end?
8     A.   Month end.
9     Q.   And what financials would you create then?
10 Would you do a P and L?
11    A.   I'd do a P and L.  I'd do a balance sheet, and
12 run the general ledger.
13    Q.   Did you do any specific aging reports?
14    A.   Only if they asked, but most of the time, no.
15    Q.   So from June 1 of '18 through the end of
16 October of '19, which is when the Hatfields' employment
17 ceased, in October of '19, did you prepare these
18 financial reports monthly?
19    A.   I did.  When we switched to MEDITECH, there
20 was a problem getting the general ledger beginning
21 balances correct.
22    Q.   When do you recall the MEDITECH switch?
23    A.   It was May of 2019.
24    Q.   Because it had to be effective June 1.

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 37

1    A.   Yes.  We had to be off CHS's systems by June 1
2 of 2019.
3    Q.   And when you say there was a problem getting
4 the balances, can you describe that for me?
5    A.   For some reason, there was a process that
6 MEDITECH would take CHS's general ledger ending balances
7 and try to load them up into MEDITECH, and I don't know
8 why it was such a problem, but they -- it took a long
9 time.
10    Q.   Were they able to solve it before the end of
11 October of '19?
12    A.   I'm not sure if they even had it solved then.
13    Q.   Was the problem, as you understood it, with
14 MEDITECH and its programming, or the information
15 MEDITECH was or was not getting from Williamson
16 Memorial?
17    A.   No, it was just MEDITECH's -- how they were
18 going to load it.
19    Q.   So you don't recall a situation where you or
20 anybody else at the hospital was asked for additional
21 information so that they could load it.
22    A.   No.
23    Q.   Did the revenue cycle problems and the
24 receipts that we've talked about with Williamson

Page 38

1 Memorial, did that improve at all during the time that
2 the Hatfields were there?
3    A.   No.
4    Q.   Constant ongoing problems; fair?
5    A.   Yes.
6    Q.   Mrs. Hatfield was unable to do anything about
7 it; is that right?
8    A.   I guess.
9    Q.   You're unaware -- even though she was working
10 on that side of it, it didn't change?
11    A.   No, it did not change.
12    Q.   Now, you have an accounts payable, payroll
13 experience going on almost 40 years; right?
14    A.   Yes.
15    Q.   You've been around a lot of CFOs in your life.
16    A.   Yes.
17    Q.   Was Mrs. Hatfield qualified, in your view, in
18 any way, shape, or form to be the CFO of Williamson
19 Memorial Hospital?
20    A.   I have no idea what her background was.
21    Q.   Okay.  In terms of how she performed her work,
22 do you have any information about whether she was able
23 to do her job?
24    A.   As far as hospital background, I didn't think

Page 39

1 she had any.  I just assumed that she thought that she
2 could do it because of her business background.
3    Q.   Did that turn out to be true?
4    A.   She wasn't -- I don't -- hospital accounting
5 is totally different from any accounting I've ever done.
6    Q.   Explain that, please.
7    A.   There's a lot of rules and regulations with
8 State and federal.  It's just -- the basics are there,
9 but there's a little more to it.
10    Q.   It's kind of an art and science of its own.
11    A.   Yes.
12    Q.   And she never had any of that prior experience
13 to your knowledge.
14    A.   To my knowledge, I don't think so.
15    Q.   Did you ever question why she was the CFO?
16    A.   No.
17    Q.   Privately to yourself?
18    A.   No.
19    Q.   Okay.  You just figured that's what the owners
20 wanted.
21    A.   Yes.
22    Q.   Did you ever question Mr. Hatfield's
23 qualifications or capability as the CEO to yourself?
24    A.   No.

Page 40

1    Q.   You just figured he was one of the owners
2 along with Mr. Reynolds and Mr. Kapourales, they own the
3 hospital, that was their decision.
4    A.   Correct.
5    Q.   And it wasn't your place to challenge or
6 question that.
7    A.   Correct.
8    Q.   Just kind of went to your office.
9    A.   Correct.
10    Q.   Kept your head down, did your work, and went
11 home.
12    A.   Yes.  Yes.
13    Q.   Took care of your husband.
14    A.   Yes.
15    Q.   So I want to go back to the monthly closing of
16 the books that you say that you were able to do until
17 you ran into that little bit of that problem with the
18 MEDITECH, no prior balances.
19    A.   Correct.
20    Q.   To whom did you give those records?
21    A.   They would go to Charlie.
22    Q.   Do you know what he did with them?
23    A.   No.
24    Q.   Do you know whether the folks on the board

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 41

1 ever were given what you did?
2    A.   I don't know.
3    Q.   Okay.  I can tell you that while I do not have
4 every single minute of every single meeting, the minutes
5 that I do have do not contain a P and L, a balance
6 sheet, a general ledger, a schedule of accounts payable,
7 an aging, or the things that you described that you did
8 monthly.
9         Do you know of anybody who got those
10 other than Mr. Hatfield?
11    A.   No.
12    Q.   In any of your conversations or communications
13 with Mr. Hatfield, did he ever tell you he gave those to
14 somebody else?
15    A.   No.
16    Q.   Do you still have what you created?
17    A.   Personally, no.
18    Q.   Okay.  If I -- if you wanted to find it, where
19 would you go to find it?
20    A.   To the hospital.
21    Q.   Okay.  Where do you think it would be in
22 whatever records exist for what's now closed?
23    A.   Wherever they put them in storage.
24    Q.   Okay.  In your work, did you deal with Sandy

Page 42

1 Runyon?
2    A.   Yes.
3    Q.   What was your interface with her?
4    A.   When we were trying to get contracts with the
5 insurance companies, patient insurance companies, and
6 trying to gather information, she would ask me, "Okay,
7 did this money come through with this name, this
8 insurance name," and I would research it and try to help
9 her out that way.
10        She was over the clinics, so if she had
11 any questions about, you know, "How much do we owe,
12 they're going to shut down the telephones if we don't
13 get them paid," you know, "Can you help me out," things
14 like that.
15    Q.   So was she the one that you dealt with on
16 those occasions that you described earlier where the
17 clinics would be unable to continue unless money
18 appeared to pay what they owed the certain suppliers and
19 vendors?
20    A.   Yes.
21    Q.   Now, did there come a time where she went over
22 to the hospital side?
23    A.   I believe so.
24    Q.   Do you have an idea about when that would have

Page 43

1 been?
2    A.   I'm not sure of the exact time, no.
3    Q.   Do you have an understanding of what she came
4 in to do?
5    A.   I was thinking she would help out Sabrina with
6 trying to get MEDITECH going.
7    Q.   On the clinic side before Ms. Runyon came
8 over, was she involved in the billing over there?
9    A.   I'm not sure if she actually did any of the
10 billing.
11    Q.   Do you know anything about her work,
12 knowledge, experience, education, training to do that
13 kind of work?
14    A.   I don't know her total background, no.
15    Q.   And were you able to tell me approximately
16 when you think she came over?
17    A.   I really don't remember.
18    Q.   Was she able to help Mrs. Hatfield?
19    A.   I don't know.
20    Q.   Did the result that you saw in terms of cash
21 in the account change after she came over?
22    A.   No.
23    Q.   Now, did you hear from any source that there
24 was revenue that the hospital should have been received,

Page 44

1 should have been paid, should have collected, that was
2 either never billed, never billed correctly, never
3 billed timely so that it was never collected?
4    A.   I'm sure that's happened.
5    Q.   Okay.  Did anybody attempt to quantify how
6 much money was lost in any of those ways?
7    A.   No.  I wasn't involved in that.
8    Q.   Okay.  What you do know is that the comparison
9 between when CHS operated the hospital and when Mingo
10 Health Partners operated the hospital was very, very
11 different and very stark.
12    A.   Yes.
13    Q.   You had all the money and resources you needed
14 when CHS owned it to do your job and your work
15 completely and correctly; right?
16    A.   Yes.
17    Q.   And you didn't have any of those things to do
18 it when Mingo Health Partners took over; right?
19    A.   Not all the time.
20    Q.   All right.  And then it was that ongoing
21 problem that you described.
22    A.   Yes.
23    Q.   Do you have -- and I'm going to give you --
24 because you would have dealt with this, and we're going

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 45

1 to go to some of the exhibits, but I asked you earlier
2 about vendors who ceased providing services for
3 nonpayment. Do you remember that?
4    A.  Yes.
5    Q.  CHS was one such vendor; correct?
6    A.  Yes.
7    Q.  And approximately when did they leave?  In the
8 fall of 2018?
9    A.  No. It wasn't till May of -- I think May of
10 '19.
11    Q.  Okay. Do you know how much they were owed?
12    A.  I don't remember the exact. I know it was a
13 lot.
14    Q.  There's some proofs of claim that are in the
15 stack of documents in front of you that we'll get to in
16 a moment.
17        The next revenue recognition firm that
18 was hired that I understand came to work for maybe two
19 months, if that, was an outfit called HRG, Health
20 Resources Group or something similar to that.
21        Are you familiar with that name?
22    A.  Yes.
23    Q.  Okay. Do you know why they stopped providing
24 services?

Page 46

1    A.  Because they didn't get paid their fees.
2    Q.  And if you had the money, you would have paid
3 the fee; correct?
4    A.  Yes.
5    Q.  But that was money that you didn't have and
6 that was money that otherwise Mr. Hatfield didn't say
7 should be paid to them; correct?
8    A.  Yes.
9    Q.  The next revenue cycle firm was called
10 Ensemble. Do you remember them?
11    A.  Yes.
12    Q.  And they would have provided work for
13 approximately, plus or minus, four months. Does that
14 sound right?
15    A.  Yes.
16    Q.  And why did they stop work?
17    A.  Same reason.
18    Q.  Would the same reason be nonpayment of funds
19 for services rendered?
20    A.  Yes.
21    Q.  And, again, Mr. Hatfield controlled whether
22 they got paid or not, and he decided not to pay them.
23    A.  Correct.
24    Q.  And then the next group that came in was AVEC.

Page 47

1    Do you remember them?
2    A.  I barely remember them.
3    Q.  Okay. Do you know what happened with them?
4    A.  Not really.
5    Q.  All right. And then the group that came in
6 after them was Accordias. Do you remember them?
7    A.  I remember Accordias.
8    Q.  Do you remember why AVEC left?
9    A.  Probably the same reason. For nonpayment.
10    Q.  And every time that you get a new revenue
11 cycle vendor in, is there a lag then in terms of how
12 things can be done and processed?
13    A.  Yes.
14    Q.  And how does that impact cash flow?
15    A.  You have no cash flow.
16    Q.  So it makes the bad situation that you
17 described worse.
18    A.  Yes.
19    Q.  And as I'm going through this, there were CHS,
20 1; HRG, 2; Ensemble, 3; AVEC, 4; to Accordias 5 in
21 approximately 18 months.
22    A.  Yes.
23        VARNEY DEPOSITION EXHIBIT NO. 17
24        (Email chain was marked for

Page 48

1        identification as Varney Deposition
2        Exhibit No. 17.)
3    Q.  I want to show you another exhibit that I've
4 had marked as 17, and ask you if you can identify that.
5 Do you see your email?
6    A.  Yes.
7    Q.  And that's to Mr. Hatfield and then to Brandon
8 Barker?
9    A.  Yes.
10    Q.  Was Mr. Barker in the information technology
11 department at the hospital?
12    A.  Yes.
13    Q.  Why did you send this email to those two
14 gentlemen?
15        And for the record, this is dated June
16 6th of 2019; is that correct?
17    A.  Yes.
18    Q.  Okay.
19    A.  This was during the time that MEDITECH was
20 taking over.
21    Q.  All right. Okay. Did you get what you
22 requested?
23    A.  I don't remember. I probably did, but I don't
24 remember.

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 49

1  Q.  Okay.  And were these reports that you could
2  see but you couldn't print; is that right?  "I have
3  access to the CHS general ledger."  I'm assuming the GL
4  is general ledger.  If it's not, correct me.
5  A.  That is correct.
6  Q.  "But cannot print at this time."
7      Then you say, "I need to know that if I
8  use it, the system will process the information."
9  A.  Okay.
10  Q.  Do you remember this?
11  A.  Yes.
12  Q.  What can you tell us about it?
13  A.  At this time, it -- CHS was shutting down the
14  system and not letting us close.  May.  And that is
15  during the transition from MEDITECH, but I needed the
16  information from CHS to have a complete closing so that
17  the general ledger balances could be loaded up into
18  MEDITECH to start fresh with MEDITECH.
19  Q.  Did you get it, the information?
20  A.  Not right away, no.
21  Q.  Do you know when, if ever, you got it?
22  A.  I think eventually I did get it because by --
23  I'm thinking I was able to finish the closing.
24  Q.  Do you know how delayed it was?

Page 50

1  A.  A lot longer than what normal was.
2  Q.  Okay.  Did you view what CHS was doing was
3  kind of trying to hold the information hostage so that
4  they would be paid some of the money they were owed?
5  A.  I believe that's what was happening.
6  Q.  Did they get any money --
7  A.  They --
8  Q.  -- to your knowledge?
9  A.  -- they did get a couple payments, but at this
10  time, no.
11  Q.  Okay.  On a monthly basis -- I understand this
12  is not going to be precise.  I'm not asking for a
13  precise number, but how much per month were your
14  accounts payable growing month after month when you
15  didn't have the money to pay the bills?
16  A.  More than $100,000.
17  Q.  Does that include or exclude the monies that
18  were never remitted or paid that were withheld from the
19  employee checks?
20  A.  Now, that would exclude.
21  Q.  So payroll was biweekly?
22  A.  Yes.
23  Q.  So there were two pay periods normally a
24  month?

Page 51

1  A.  Yes.
2  Q.  What was the size of the payroll each --
3  roughly each payroll period?
4  A.  Only the net amounts come to mind and that's
5  like $200,000.
6  Q.  And is the gross amount -- would you gross it
7  up another 25 percent to cover all the rest of it?
8  A.  At least.
9  Q.  I don't want to overstate it.  I don't want
10  anybody to claim that I'm exaggerating here.
11      So at least $50,000 every two weeks
12  wasn't being paid but was being taken from the employee
13  paychecks.
14  A.  Yes.
15  Q.  So in the course of a year, you've got 24 pay
16  periods which will be a $1,200,000.
17  A.  Yeah.
18  Q.  For just that amount; correct?
19  A.  Yes.
20  Q.  Did anybody tell the employees this was
21  happening?
22  A.  I did not tell the employees.
23  Q.  Is there a reason you didn't tell anybody, any
24  of the employees?

Page 52

1  A.  I think the HR department knew about it, and I
2  don't know if my payroll clerks said anything, but it
3  seemed word got out.
4  Q.  Who was in charge of HR?
5  A.  Billie Whitt.  It's a female.
6  Q.  I-E?
7  A.  I-E.
8  Q.  W-H-I-T-T?
9  A.  Yes.
10  Q.  Did you have specific discussion with her, or
11  are you confident your payroll clerk had those
12  discussions?
13  A.  I'm not sure my payroll clerk talked to Billie
14  Whitt about it, but employees were complaining to HR.
15  Q.  And what was the nature of those complaints?
16  A.  A lot of it had to do with their health
17  insurance not being covered.
18  Q.  So they understood that maybe they needed some
19  kind of a prescription filled or something and they went
20  to do it and they were told "You don't have coverage for
21  this"?
22  A.  That's correct.
23  Q.  As a part of the month end financials that you
24  described to me doing every month, how did you reflect

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 53

1 this growing employee related nonpayment?
2     A.  Well, the process of the payroll, everything
3 goes through the general ledger so there were liability
4 accounts building and never relieved.
5     Q.  So if one were to look at the general ledger,
6 one would be able to see those liability accounts and go
7 on the one that relates to the employee gross-up, if you
8 will, and see that balance increasing every two weeks.
9     A.  Yes.
10     Q.  And you gave those to Mr. Hatfield.
11     A.  If he asked for them, yes.
12     Q.  Well, was there ever a month that you can
13 remember doing them and not giving them to anybody?
14     A.  Not necessarily, no.
15     Q.  As the CEO of the hospital, did you expect him
16 to want to know the financial condition of the
17 institution?
18     A.  As a CEO, I would think he would want them,
19 yes.
20     Q.  And in order to meet his obligation as the CEO
21 to the board, he would need that information; would he
22 not?
23     A.  I would think so, yes.
24     Q.  But your testimony is you have no idea, other

Page 54

1 than Mr. Hatfield, who oversaw those reports.
2     A.  No.
3     Q.  Correct?
4     A.  That's correct.
5     Q.  Did you process payroll for Mr. Hatfield and
6 Mrs. Hatfield?
7     A.  Yes, they were on our payroll.
8     Q.  Did they get paid?
9     A.  Yes.
10     Q.  Did they get paid the same way as everyone
11 else got paid?
12     A.  Yes.
13     Q.  Was there any difference about any of their
14 withholding or benefits?
15     A.  No, no difference between them or any other
16 employee.
17     Q.  So everybody got paid their net salary,
18 including the CFO and CEO, the Hatfields, but in terms
19 of the gross, everybody was treated the same.
20     A.  Yes.
21     Q.  Now, did there come a time when you learned
22 that the hospital was going to file for protection under
23 the bankruptcy laws?
24     A.  Yes.

Page 55

1     Q.  Do you remember how you found that out?
2     A.  I'm not sure exactly who told me.
3     Q.  Okay.  You continued to work during the
4 bankruptcy proceeding?
5     A.  Yes.
6     Q.  After the Hatfields were gone?
7     A.  Yes.
8     Q.  Did you work with Mr. Preston as we talked
9 about earlier?
10     A.  Yes.
11     Q.  Did you ever see any of the claims register
12 that was filed in the bankruptcy court that set forth
13 the amount of claims that were being asserted against
14 Williamson Memorial Hospital in bankruptcy?
15     A.  Did I see the claims?
16     Q.  Claims register.
17     A.  Claims register?
18     Q.  Right.
19     A.  I'm not sure.
20     Q.  Okay.  I'm going to show you what was marked
21 earlier as Exhibit 1 for identification, which is -- the
22 front, first page and the last page of the claims
23 register that I printed off a day or two ago that shows
24 approximately 133 claims that total in excess of 15

Page 56

1 million dollars.  If you'll go to the next page in the
2 middle of it, you'll see the figures that I'm referring
3 to.
4     A.  Okay.
5     Q.  Do you see those?
6     A.  Yes.
7     Q.  Okay.  Now, did anybody tell you at any time
8 that was the magnitude of claims that were filed
9 against Williamson Memorial Hospital by various
10 governmental agencies, private companies, individuals,
11 et cetera?
12     A.  I did not actually see this list.
13     Q.  Can you recall roughly what your general
14 ledger with your liability accounts showed at the end of
15 October of 2019 were the liabilities that were owed and
16 unpaid by the hospital?
17     A.  I don't know the exact amount.
18     Q.  Can you give me a ballpark?
19     A.  I would be afraid to even guess.
20     Q.  Okay.  I mean, was it in excess of 10 million
21 dollars?
22     A.  Being what has not been paid, yes, I would say
23 at least.
24     Q.  So the next thing that I want to show you was

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 57

1  marked as Exhibit 2 earlier, and I want to take you to
2  the last page of it because it's from the IRS, and it's
3  an assessment for almost $605,000 for unpaid FICA and
4  FUTA.  Do you see that?
5      A.  Yes.
6      Q.  All right.  Now, I understand that there are
7  dates there that post date times that the Hatfields were
8  there.  All right?
9      A.  Yes.
10     Q.  So I'm not asking you about those, but I am
11 curious because earlier what I thought I heard you say
12 is they never paid the quarterlies.
13     A.  The -- we were with a company, ADP, in the
14 beginning, and we were with ADP up until it was time for
15 MEDITECH to take over.  And during that time, taxes were
16 paid and filed by ADP.
17     Q.  So let me stop you there, see if this is a
18 fair statement.  My understanding of ADP is you have to
19 prefund everything with them in their account before
20 they'll cut the checks and release them.
21     A.  Yes.
22     Q.  And so the employees couldn't get even their
23 net pay unless ADP had also been paid all of the
24 gross-up.

Page 58

1      A.  That's correct.
2      Q.  Whose decision was it to leave ADP?
3      A.  I guess Charlie's.  I don't know.
4      Q.  It wasn't your decision?
5      A.  No.
6      Q.  Okay.  Nobody ever came to you with a
7  complaint about ADP, did they?
8      A.  No.
9      Q.  Did you have any complaints about ADP?
10     A.  No.
11     Q.  Did they do a good job?
12     A.  Absolutely.
13     Q.  But it's fair to say that if ADP had
14 continued, the entire amount, the grossed-up amount,
15 would have have been paid to ADP before any
16 employee could have gotten its net check.
17     A.  It's correct.
18     Q.  So ADP then paid the balance to whether it was
19 the federal government, whether it was to the health
20 insurer, whether it was to the pension, or 401(k),
21 whatever, life insurance, whatever it was.
22     A.  ADP made sure that all of the federal and
23 State taxes were paid.  They were in charge of the
24 taxes.  As far as the insurances, that was up to the

Page 59

1  owners.
2      Q.  Okay.  So the gross-up, then, for ADP wouldn't
3  even reflect the money that the owners held back from
4  the employees for anything other than the federal tax
5  and State taxes.
6      A.  That's correct.
7      Q.  Was that ever disclosed to anybody, to your
8  knowledge?
9      A.  I mean, as far as like who?
10     Q.  Like any employee who was having their check
11 deducted for the amounts that were not being paid for
12 that purpose.
13     A.  We had no problem with ADP ever.
14     Q.  Right.  Because they didn't handle that part
15 of it; right?
16     A.  Right.
17     Q.  Okay.  So what I'm saying is you had no
18 problem with ADP because their function wasn't to
19 address the personal benefits side of the employee
20 checks.
21     A.  Correct.
22     Q.  It was just to deal with the net amount and
23 paying the difference that was owed in taxes to the
24 federal and State authorities.

Page 60

1      A.  Yes.
2      Q.  I'm going to show you what's been marked as
3  Exhibit 3, which relates to ERISA's Proof of Claim, and
4  this is in the amount of over $703,000, and I want to
5  ask you:  Do you have a recollection that that amount of
6  money was owed to the various employee plans that had
7  been withheld but not paid?
8      A.  Yes.
9      Q.  Okay.  Is that one of your what I will call
10 liability portions of the general ledger?
11     A.  Yes.
12     Q.  Okay.  And was that ledger likewise available
13 to Mrs. Hatfield and Mr. Hatfield?
14     A.  Yes.
15     Q.  And from time to time, to your knowledge, did
16 they, in fact, access it?
17     A.  I don't know if they ever accessed the actual
18 general ledger, but they could get a detailed of the P
19 and L which would show it also.
20     Q.  Exhibit 4, again, just shows unpaid State
21 taxes.  I understand it's a different period than when
22 the Hatfields were there.
23        My question to you is:  Do you know, as
24 of the time that they left, approximately how much was

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 61

1  unpaid to the State of West Virginia?
2           And it sounds to me like it would have
3  been from when MEDITECH took over until the end of
4  October?
5      A.  That would be correct.  To come up with a
6  dollar amount, I'm not sure.
7      Q.  Do you have a sense about what the percentage
8  was roughly that the State of West Virginia got on the
9  employee payroll?
10     A.  I don't know that.
11     Q.  And there's a $608,000 plus claim for the U.S.
12 Department of Health and Human Services.  It's Exhibit
13 5.  Do you know what that's for?
14     A.  No, I don't know what this is for.
15     Q.  Okay.  I want you to go, if you would, to page
16 2 of it, number 8, okay, and see what it says on the
17 line there.
18     A.  Medicare overpayments.
19     Q.  What does that mean to you?
20     A.  Just means we owe back Medicare for funds that
21 they had paid on employees -- employees, I'm sorry --
22 patients that needed to be refunded.
23     Q.  In other words, in summary money that
24 Williamson Memorial was not entitled to keep but had

Page 62

1  been paid.
2      A.  Correct.
3      Q.  Did you have a ledger for that?
4      A.  I don't know if this was on the books.
5      Q.  Are you familiar with a vendor OVP Health,
6  Inc.?
7      A.  Yes.
8      Q.  Tell me what you know about them, please.
9      A.  I don't remember their exact function.  I know
10 they deal with -- right now with drug abuse, trying to
11 help patients get over drug abuse.
12     Q.  Okay.  I'll represent to you that Ms. Simon
13 said that they provided services in the Williamson
14 Memorial ER under a contract.  Does that ring any bells,
15 refresh your recollection at all?
16     A.  I don't know exactly what they did.
17     Q.  Okay.  Well, here's as Exhibit 7 is the Proof
18 of Claim that they filed for a $1,575,000 for
19 professional services provided that were not paid.
20          Were they part of your ledger system?
21     A.  They should have been.  If they invoiced us,
22 yes, they would be part of the accounts payable.
23     Q.  Okay.  You're just not sure what invoicing you
24 can recollect.

Page 63

1      A.  It's just not coming to me.
2      Q.  That's fine.
3           I would like you to look at Exhibit 8,
4  which I'm going to hand you now, and that's a Proof of
5  Claim from the Cleveland Clinic for over 1.9 million
6  dollars for unpaid medical bills for an individual whose
7  initials are RH, allegedly for -- and if you go to the
8  end of the last two pages of this, it's for medical
9  expenses and related costs to charges for a lung
10 transplant -- or a double lung transplant.
11          Are you familiar with this?
12     A.  I remember an employee's spouse having to have
13 it -- have a procedure done, I remember, but I don't
14 remember the name of the --
15     Q.  And I don't want --
16     A.  -- the individual.
17     Q.  And to be clear, I am not interested in the
18 name of the individual at this point, but what I am
19 interested in is:  Did you get, as the accounts payable
20 clerk, mailings, notices - however defined - from the
21 health insurance carrier about cancellation of coverage
22 for the employees and their dependents for failure to
23 pay premiums?
24     A.  Yes, I did get -- we did get notices of

Page 64

1  nonpayment and phone calls.
2      Q.  Do you recall in what period these began?
3      A.  There were different times where our coverage
4  was canceled.  For some reason, August of 2019 sticks in
5  my head about that.  There was another time in maybe
6  October of 2019 that it was completely gone.
7      Q.  So when you received -- did you receive these
8  notices, or were you -- did they come into your office?
9      A.  We would get -- I'm not sure if they came by
10 email or if they came by mail, but we were -- my
11 department was contacted asking for payment.
12     Q.  And when you received those notifications,
13 however they came, what did you do with them?
14     A.  Well, Charlie was informed that we had them,
15 and -- either by email or actually taking the invoices
16 to him.
17     Q.  Immediately?
18     A.  Yes.
19     Q.  Because, again, this is a serious problem for
20 employees and their dependents if they don't have health
21 coverage; right?
22     A.  Right.
23     Q.  And do you have anything to dispute the
24 insurance company's position that "There is no coverage

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 65

1 for this procedure because of failure to pay premium on
2 a canceled policy"?
3     A.  Well, at the time -- like I said, there was
4 different time periods where the insurance would be no
5 good, and then with a payment, maybe not all of the
6 payment, it would get reinstated.
7     Q.  But from a certain date; correct?
8     A.  Yes.
9     Q.  So do you know who the health care insurer
10 was?
11    A.  We had different onces.  EBSO was the one -- I
12 believe is what we had.
13    Q.  At this time?
14    A.  Yes.
15    Q.  Can you recall any others?
16    A.  It started out with Blue Cross at first, but
17 they were extremely high, and I know they looked for
18 cheaper coverage, you know, for what we needed for the
19 number of employees we had.
20    Q.  Okay.  And just so we're clear, is the "they"
21 Mr. Hatfield for Mingo Health Partners or was this
22 somebody else?
23    A.  I think in the beginning it was -- I'm
24 thinking Charlie did have the Blue Cross, but then

Page 66

1 changed due to the premiums being so high.
2     Q.  Did the coverage change; do you know?
3     A.  It didn't change that much, no.
4     Q.  So Mr. Hatfield changed the carriers from Blue
5 Cross, as you understand it, to this EBSO?
6     A.  Yeah.  Yes.
7     Q.  Do you remember any other carrier, health
8 insurance carrier?
9     A.  No.
10    Q.  And you believe it would have been EBSO who
11 was the carrier in this time frame.
12    A.  It could have been, yes.
13    Q.  Now, to your knowledge, was this amount or any
14 amount ever paid to the Cleveland Clinic in satisfaction
15 with this claim?
16    A.  Not that I'm aware of.
17    Q.  So as far as you know, it is still a liability
18 of the hospital in the Chapter 7 liquidation proceeding.
19    A.  I would think so, yes.
20    Q.  I am going to show you what was marked as
21 Exhibit 9 earlier today which is a Proof of Claim of the
22 Metropolitan Life Insurance Company for $129,300.13 for
23 unpaid group life insurance premiums.  Do you see that?
24    A.  Yes.

Page 67

1     Q.  Was this part of your ledger liability system?
2     A.  It would have been, yes.
3     Q.  And did this follow the same group and not get
4 paid for the same reasons as the other individual
5 employee benefits for which the funds were withheld but
6 not paid?
7     A.  Yes.
8     Q.  And do you know whether there were any
9 cancellations of this coverage?
10    A.  Yes.
11    Q.  Okay.  And the reason I say that, if you would
12 be kind enough to go to page 4 of that exhibit, you can
13 see about a little more than half of the way from left
14 to right, there's a Payment column and a Date Payment
15 Received column.
16    A.  Yes.
17    Q.  And then you can see that there's a billing
18 date for the premium, and then a date that the payment
19 is received, and then you can match up the amount billed
20 with the amount paid; right?
21    A.  Yes.
22    Q.  And then after you go down, more than ten
23 lines, you'll see as of February 15th of '19, there's
24 $3,709.63 that's billed that is not paid.

Page 68

1     A.  Yes.
2     Q.  Correct?
3         And then there's other monthly amounts
4 not in the right orders, but it goes from February to
5 April, back to March, then forward to June and back to
6 April, June then to May, but none of those get paid down
7 through August the 15th of 2019; correct?
8     A.  Yes.
9     Q.  All right.  So do you know whether this
10 insurance for employees was canceled any time between
11 March of '19 and August of '19 when at least this
12 document reflects continued billings but no payments?
13        And I should say February of '19 to
14 August of '19.  I'm sorry.
15    A.  Yes, it was canceled.
16    Q.  Okay.  And was it subsequently reinstated?
17    A.  I'm not sure if this one was.
18    Q.  Do you know whether there were any claims that
19 should have been paid during this six to seven-month
20 period that were not paid because it was canceled?
21    A.  I was not aware of any.
22    Q.  If there were, you're not aware of them.
23    A.  No, I'm not aware.
24    Q.  And then you can see that effective -- it

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

**Page 69**

1 actually goes back, it changes out just so you know, and
2 I just want you to explain this to me because it came up
3 earlier.
4        All of those look to be EE paid.  Do you
5 see that as employee paid?
6    A.  Yes.
7    Q.  And then it starts after that to a
8 significantly greater amount in the first entry,
9 September 26th of 18, $11,459.72 billed as the employer
10 amount; correct?
11    A.  Yes.
12    Q.  All right.  So it's not an increase in
13 premiums.  It's simply an allocation between what the
14 employee should pay and what the employer should pay.
15    A.  Yes.
16    Q.  And that's how it was billed differently.
17    A.  Yes.
18    Q.  And then you see for the employer portion the
19 same kind of hollow space, if you will, different dates
20 involved, from -- beginning in December 12 of '18 going
21 all the way down, again, through June -- excuse me,
22 August the 15 of '19, and no payment of any kind until
23 the end of September; right?
24    A.  Yes, that's correct.

**Page 70**

1    Q.  Which not completely but roughly corresponds
2 to what we've got above.
3    A.  Yes.
4    Q.  I'm going to show you what's been marked as
5 Exhibit 10 for identification which is a Proof of Claim
6 of the Pikeville Medical Center for medical services
7 provided to people for whom Williamson Memorial Hospital
8 was responsible, and this runs from November of 2018 to
9 October of 2019 in the amount of $218,788.52.  Do you
10 recall this one?
11    A.  No.
12    Q.  Would this be in your ledger or should it be?
13    A.  The employees' bills that were on the ledger
14 were small.  They were not any significant size like
15 this.
16    Q.  Would you go to page 4 of the exhibit, please,
17 and then to page 5.
18        So page 5, last second -- third column
19 from the right shows total charges; correct?
20    A.  Yes.
21    Q.  And that aggregates to 219,000 and change;
22 correct?
23    A.  Yes.
24    Q.  And I agree with you there are some small

**Page 71**

1 ones, but there's one for over 49,000, another one for
2 13,000 plus, another one for 25,000 plus, and another
3 one for 107,000 plus; right?
4    A.  Yes.
5    Q.  Okay.  Do you have any question or reason to
6 dispute that those were charges that were legitimate and
7 should have been paid?
8    A.  I have no dispute.
9    Q.  Okay.  Then if you go to the prior page, it
10 shows you the allocation of those between the hospital
11 and the physician and then DME.  Do you see that?
12    A.  Yes.
13    Q.  Okay.  Were these bills unpaid for the same
14 reasons that you talked about with respect to the other
15 bills?
16    A.  Yes.
17    Q.  Is there any bill that we've talked about that
18 wasn't paid for any reason other than Mr. Hatfield said
19 not to pay it and he made that decision and you didn't
20 otherwise have the money or the authority to pay it or
21 override it?
22    A.  That's correct.
23    Q.  I want to show you -- I mentioned to you some
24 bills from CHS.  I'll show you what was marked earlier

**Page 72**

1 as Exhibit 11 for identification, which is a CHS bill
2 for $775,406.39 for managed care directed payment
3 program.  Do you see that?
4    A.  Yes.
5    Q.  Is this part of your liability ledger system?
6    A.  Yes.
7    Q.  Did you understand that this money was owed
8 for what period of time?
9    A.  From June 1st of 2018.  Should have gone
10 through June 1st of 2019.
11    Q.  Under that TSA agreement.
12    A.  Yes.
13    Q.  And was this not paid for the same reasons?
14    A.  Yes.
15    Q.  Mr. Hatfield controlled this as well?
16    A.  Yes.
17    Q.  You had no authority to do anything about it?
18    A.  No.
19    Q.  And you have no idea whether the board of
20 directors was ever aware of this either.
21    A.  No.  I have no idea.
22    Q.  I'll take you to Exhibit 12 for
23 identification.
24        This is another CHS bill, but it's a

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 73

1  different entity Proof of Claim. CHSPSC, LLC. Are you
2  familiar with that outfit?
3      A.  I've seen the initials before.
4      Q.  Okay. This one is for $670,463.91 for
5  quote/unquote transition services. Do you see that?
6      A.  Yes.
7      Q.  And this was the contract of June 1, 2018 to
8  June 1 of 2019; correct?
9      A.  Yes.
10     Q.  This was part of your liability ledger system?
11     A.  Yes.
12     Q.  Okay. You were unable to pay this because you
13  didn't have the money, nor did you have the authority;
14  correct?
15     A.  Correct.
16     Q.  That, again, was all controlled by
17  Mr. Hatfield and he made the decision not to pay.
18     A.  Yes.
19     Q.  Any reason for you to question or challenge
20  the legitimacy of this bill?
21     A.  No.
22     Q.  Any reason for you to question or challenge
23  the legitimacy of any of the other bills that I've shown
24  you so far in the exhibits?

Page 74

1      A.  No.
2      Q.  Next I'm going to show you what was marked as
3  Exhibit 13 for identification. Remember we spoke
4  earlier about HRG?
5      A.  Yes.
6      Q.  Do you see this is a Proof of Claim for
7  Healthcare Resource Group, Inc. Do you understand that
8  to be HRG?
9      A.  Yes.
10     Q.  This Proof of Claim is for contract services
11  for revenue recognition for $135,834.01; right?
12     A.  Yes.
13     Q.  Okay. Do you have any reason to question the
14  legitimacy of this charge or bill?
15     A.  No.
16     Q.  Do you believe it was owed?
17     A.  Yes.
18     Q.  You didn't have the money to pay it; correct?
19     A.  Correct.
20     Q.  You didn't have the authority to pay it.
21     A.  That's correct.
22     Q.  That, again, resided solely and completely
23  with Mr. Hatfield and he made the decision not to pay
24  it.

Page 75

1      A.  Yes.
2      Q.  Now, HRG, as I understand it, provided their
3  services in the fall of 2018; correct?
4      A.  Yes.
5      Q.  So this was something that was outstanding,
6  essentially, throughout the entirety -- except for the
7  first month or two, the entirety of the Mingo Health
8  Partners ownership of hospital?
9      A.  Yes.
10     Q.  And do you believe that it's this nonpayment
11  that resulted in HRG saying, "We're unwilling to
12  continue to provide services"?
13     A.  Yes.
14     Q.  And you received by email, phone call, U.S.
15  mail, whatever, multiple notifications of them
16  requesting payment, demands for payment, and you just
17  gave those to Mr. Hatfield.
18     A.  Yes.
19     Q.  Next is Exhibit 14. This is a Proof of Claim
20  for AVEC. It's for contract services in the amount of
21  $83,846.08.
22         Do you recognize this consistent with
23  what we just talked about with HRG, that it's for a
24  different time period for revenue recognition cycling

Page 76

1  activities?
2      A.  Yes.
3      Q.  If I asked you the identical questions about
4  it that I've asked you for the earlier ones, would your
5  answers be the same?
6      A.  Yes.
7      Q.  I'm going to show you Exhibit 15. This is a
8  Proof of Claim filed by MEDITECH for nonpayment of
9  contract services. It's $251,532.26. The invoices
10  referenced are from May through October of 2019. Do you
11  see that?
12     A.  Yes.
13     Q.  And then it makes reference to software access
14  and services performed per contractual agreement. Did I
15  read that correctly?
16     A.  Yes.
17     Q.  So if I asked you the same questions about
18  this one that I asked you about the other ones, would
19  your answers be the same?
20     A.  Yes.
21     Q.  Okay. Notwithstanding this nonpayment of
22  these amounts beginning in May of 2019, which is before
23  the go hard quote/unquote for the MEDITECH system, did
24  MEDITECH ever refuse to provide their service?

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 77

1    A.  I had a problem with the person that I dealt
2  with setting up the GL getting back to me.  I don't know
3  if anybody else had the same problem.
4    Q.  And do you know whether this $250,000 plus
5  amount that was owed for nonpayment over the contract,
6  whether that impacted MEDITECH's willingness to continue
7  to provide the services that Williamson needed?
8    A.  I'm not sure if that's the reason why I didn't
9  get the callbacks that I needed.
10    Q.  Okay.  But it's in this same time frame; is it
11  not?
12    A.  Yes.
13    Q.  We looked at the earlier emails where you're
14  writing on June the 6th of 2019 saying, "Hey, I've got
15  to have these general ledger balances and these other
16  things so I can get this set up right"; correct?
17    A.  Correct.
18    Q.  And now you've got MEDITECH, their May bill
19  hadn't been paid; right?
20    A.  Right.
21    Q.  Not a very long walk from one to the other, is
22  it?
23    A.  No.
24    Q.  Do you recall telling -- strike that.  Let me

Page 78

1  ask it this different way.  Foundational question.
2         From time to time when the Hatfields
3  were in charge of the hospital as CFO and CEO, did you
4  have discussions with Loretta Simon or anybody else
5  regarding your concerns with their management?
6    A.  With Loretta, yes.
7    Q.  Okay.  Do you remember telling Loretta at any
8  time that when patient billing was not happening, that
9  you knew Mrs. Hatfield didn't know the hospital
10  business?
11    A.  Correct.
12    Q.  Was it a true statement when you made it?
13    A.  Yes.
14    Q.  Is it a true statement today?
15    A.  Yes.
16    Q.  When I say a "charge master list," do you know
17  what that is?
18    A.  It's a list of charges for medical procedures
19  and supplies used when a patient comes to the hospital.
20    Q.  Is it possible to bill correctly without a
21  complete charge master list?
22    A.  It's very hard.
23    Q.  And Medicare and Medicaid pay particular
24  attention to those codes; do they not?

Page 79

1    A.  Yes, they do.
2    Q.  And those codes are oftentimes the source of
3  claims or challenges to claims by CMS.
4    A.  Yes.
5    Q.  Right?
6    A.  Yes.
7    Q.  So you better have a complete, accurate list,
8  and they better be completely and accurately applied;
9  right?
10    A.  Correct.
11    Q.  Or the consequences are significant.
12    A.  Yes.
13    Q.  So at any time before the Hatfields were no
14  longer affiliated with Williamson Memorial Hospital, was
15  there a complete charge master list, to your knowledge?
16    A.  Not to my knowledge, no.
17    Q.  And did that impact the billing?
18    A.  Yes.
19    Q.  Significantly?
20    A.  I would say yes.
21    Q.  Okay.  And just describe how so briefly in
22  your own words.
23    A.  Well, if you don't know how to charge for the
24  supplies and procedures that were done and used, then

Page 80

1  you can't send out a clean bill to be processed.
2    Q.  And the person in charge of that charge master
3  function was the CFO, Mrs. Hatfield; correct?
4    A.  Yes.
5    Q.  Now, I am not interested in asking you legal
6  conclusions, okay, but I'm going to ask you some basic
7  factual questions that relate to the claims that have
8  been made in the lawsuit.  All right?
9    A.  Okay.
10    Q.  Among the claims that are made in the lawsuit
11  is that Mr. Hatfield and Mrs. Hatfield were not
12  qualified to be the CFO and the CEO of Williamson
13  Memorial Hospital.  Do you have any information to
14  dispute that?
15    A.  No.
16    Q.  Do you agree with those statements?
17    A.  I do agree with that.
18    Q.  The next is, is that as the CFO and the CEO,
19  each of them had duties and obligations to the hospital,
20  its patients, its employees, and staff.  Do you have any
21  basis to dispute that?
22    A.  No.
23    Q.  Is it consistent in your mind with such an
24  obligation for Mrs. Hatfield to fail to get the complete

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 81

1  charge master list?
2      A.  I'm sorry, say that again.
3      Q.  Yeah.
4          Is it consistent with that duty for
5  Mrs. Hatfield to fail to get the complete charge master
6  list?
7      A.  Yes.
8          MR. PARSONS:  Object to form.
9          MR. GEORGE:  I'm sorry?
10         MR. PARSONS:  I'm not sure that the
11 court reporter heard your answer over the objection.
12         THE WITNESS:  I said yes.
13     Q.  Okay.  Anybody performing that duty in your
14 view would have made sure that charge master list was
15 complete because of how vital it was to the billing
16 function; correct?
17     A.  Correct.
18     Q.  And if you can't bill, you can't collect, can
19 you?
20     A.  No.
21     Q.  And if you don't bill timely, sometimes you
22 can't collect at all, can you?
23     A.  That's correct.
24     Q.  And sitting here at any time, did you ever

Page 82

1  attempt to calculate how much money was lost because of
2  an incomplete charge master list and a failure to timely
3  bill?
4      A.  No, I did not.
5      Q.  One of the other things that's alleged in the
6  lawsuit is that Mr. and Mrs. Hatfield breached their
7  fiduciary duty, and in layman's terms that means they
8  owed their highest duty of loyalty - that's what
9  fiduciary duty is - to Williamson Memorial Hospital, and
10 that includes the patients, the employees, and the
11 staff.
12         Is Mr. Hatfield taking charge of the
13 accounts payable and not paying the employee amounts for
14 their benefits consistent with such a duty in your mind?
15     A.  Yes.
16     Q.  Okay.  So what I'm trying to say is, did he
17 violate that duty by failing to pay those amounts?
18     A.  Yes.
19         MR. PARSONS:  Objection.  Asked and
20 answered.
21     Q.  Any doubt in your mind about that?
22     A.  No.
23     Q.  There's also what's known as a duty of
24 loyalty.  Same question with respect to Mr. Hatfield

Page 83

1  withholding that money, taking it from the employee
2  paychecks, and failing to pay it to those benefit
3  providers.  Is that consistent with a duty of loyalty to
4  you?
5      A.  Yes.
6      Q.  So do you believe that doing -- that
7  Mr. Hatfield was correct in doing that?
8      A.  No.
9      Q.  He never should have done that, should he?
10     A.  No.
11     Q.  And, further, he should have disclosed to
12 people that he was jeopardizing their benefits and their
13 coverages; correct?
14     A.  Correct.
15     Q.  And, to your knowledge, he didn't do that
16 either.
17     A.  No.
18     Q.  Nor did the CFO, Mrs. Hatfield.
19     A.  No.
20     Q.  The employees, if they found out at all, had
21 to find out when they tried to access their benefits and
22 were denied.
23     A.  Correct.
24     Q.  With respect to Mr. Hatfield submitting to you

Page 84

1  a ledger or register that showed he had written checks
2  on the account without any backup, is that appropriate?
3      A.  No.
4      Q.  Is that good faith?
5      A.  No.
6      Q.  Does that meet a duty of loyalty?
7      A.  No.
8      Q.  Does that meet a duty -- a fiduciary duty to
9  the institution, the patients?
10     A.  No.
11         MR. PARSONS:  Object to a legal
12 conclusion.
13     Q.  Have you ever been involved in any legitimate
14 enterprise that would do such a thing?
15     A.  No.
16     Q.  And when you asked for the backup for it and
17 it wasn't provided, did you have an even greater
18 heightened level of concern?
19     A.  Yes.
20     Q.  But you couldn't do anything about it based on
21 the position that you were in; right?
22     A.  Correct.
23     Q.  So are you aware of any excuse for these acts
24 and failures to act by Mrs. Hatfield and Mr. Hatfield?

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 85

```
 1      A.  No.
 2      Q.  Is there any doubt in your mind that the
 3  things that we've talked about that they did, they
 4  shouldn't have done?
 5          MR. PARSONS:  Object to form.
 6      Q.  Any doubt about that they shouldn't have done
 7  them?
 8      A.  It shouldn't have been done.
 9          MR. PARSONS:  Objection.
10      Q.  Any doubt in your mind that the things they
11  didn't do, like paying the benefit holders, other
12  things that we've talked about - I'm not going to go
13  through them all - what they didn't do, they should have
14  done?  They should have paid those things?
15      A.  Yes.
16      Q.  They should have provided you the receipts.
17      A.  Yes.
18      Q.  They shouldn't have used Williamson money to
19  pay either Williamson people to do Mountain -- whatever
20  the real estate company is -- what are they called, Mid
21  Mountain?
22      A.  Yes.
23      Q.  All right.  Or to take Williamson money and to
24  pay it to Mid Mountain; correct?
```

Page 86

```
 1      A.  Yes.
 2          MR. GEORGE:  Hold on.  Let me see if
 3  I've got any other questions.
 4          (A recess was taken after which the
 5          following proceedings continued as
 6          follows.)
 7          EXAMINATION
 8  BY MR. PARSONS:
 9      Q.  Ms. Varney, my name is Colton Parsons.  I
10  represent Defendant Hatfield and the estate of Sabrina
11  Hatfield in this matter.  I'm going to unfortunately
12  have to jump around a lot with you following up on the
13  questions you were asked by Mr. George.
14          I understand you worked for Williamson
15  Memorial Hospital while CHS owned the hospital; right?
16      A.  Yes.
17      Q.  And they sold the hospital around June 2018;
18  correct?
19      A.  Yes.
20      Q.  And Mingo Health Partners bought the hospital;
21  right?
22      A.  Yes.
23      Q.  When CHS sold the hospital, was it well known
24  in the community that CHS was in -- that Williamson
```

Page 87

```
 1  Memorial Hospital was in financial distress?
 2      A.  Yes.
 3      Q.  How long had it been in financial distress?
 4      A.  Many years.
 5      Q.  And you testified earlier about some of the
 6  payments that were made from corporate by CHS.  Do you
 7  remember that?
 8      A.  Yes.
 9      Q.  Do you know in your role if the income from
10  Williamson Memorial Hospital alone was sufficient to
11  support the hospital when CHS owned it?
12      A.  No.
13      Q.  Okay.  So --
14          MR. GEORGE:  May I have a clarification?
15  Is that "No, it wasn't," or "No, you don't know" based
16  on the way you phrased the question?
17      A.  I don't think that the hospital would have a
18  profit.
19      Q.  Yeah, and that's what I'm getting at and I do
20  appreciate the clarification.
21          What I'm getting at is whether it was a
22  viable, standalone entity if CHS wasn't propping it up
23  with corporate money.
24      A.  Correct.
```

Page 88

```
 1      Q.  Do you think it was a viable entity without
 2  CHS propping it up?
 3      A.  No.
 4      Q.  So your testimony is that when Charlie
 5  Hatfield took over the hospital when Mingo Health
 6  Partners bought it, it was not a viable entity on its
 7  own.
 8      A.  I would say not.
 9      Q.  And I want to make one clarification, and this
10  just may be my confusion from earlier.
11          Did you have access to all the bank
12  accounts at Williamson Memorial Hospital?
13      A.  I only could see them.  I could not do
14  transactions.
15      Q.  But you could see all the transactions and all
16  accounts; right?
17      A.  Yes.
18      Q.  Which accounts did you not do transactions
19  with?
20      A.  There was the general account, there was a
21  payroll account, and accounts payable, and those are the
22  only three, and those were the ones I had access to.
23      Q.  Okay.
24      A.  To look at only.
```

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 89

1    Q.  Which ones could you not make payments from?
2    A.  I didn't -- I didn't do the payments.  I mean,
3  the schedule was done knowing there was money in the
4  bank to do those payments.
5    Q.  Okay.  Well, which accounts did you actually
6  have authority to make transactions is what I meant?
7    A.  I don't make -- I don't move money in the bank
8  accounts.  I had no authority to do anything in the bank
9  accounts.
10    Q.  Okay.  But you could view them, you just
11  couldn't make any transactions.
12    A.  Right.  Right.
13    Q.  Okay.  Thanks for clarifying that.
14        Did you meet with Sam Kapourales
15  routinely to review aged accounts receivable?
16    A.  Not receivables.  Payables.
17    Q.  Payables.  Right.
18    A.  I recall three different times that there
19  was -- actually he wanted to look at them at the
20  accounts payable aging to see what was owed.
21    Q.  Do you remember when those times were, what
22  dates?
23    A.  No.
24    Q.  And you were asked a lot about employee

Page 90

1  payroll and net versus gross, and I understand that net
2  payments were made for a period.
3        Were the gross payments ever made up
4  like in the previous week or payroll period, or only net
5  payments made for the period that Charlie Hatfield was
6  CEO?
7    A.  He said we had ADP up until April of 2019, and
8  when we went to MEDITECH that's when the net amount of
9  the payroll was funded.
10    Q.  Okay.  And I think you testified earlier you
11  didn't have any issues with the net or gross when ADP
12  took over -- or when ADP was in charge; right?
13    A.  Right.
14    Q.  So Charlie was CEO from -- well, his last day
15  was sometime in October 2019; right?
16    A.  Yes.  -
17    Q.  Do you remember when he started?
18    A.  Not the exact date, no.
19    Q.  But the bottom line from when he started to
20  April 2019, there were no issues with the net or gross
21  payments; right?
22    A.  Correct.
23    Q.  Okay.  So it would have been only been from
24  May 2019 through October 2019 when he left Williamson

Page 91

1  Memorial Hospital?
2    A.  It may have started in April, because in the
3  transition from going into MEDITECH -- leaving ADP and
4  going into MEDITECH was during that time period.  It was
5  the month of April.
6    Q.  And, again, apologies for skipping around here
7  but a follow-up on Sam Kapourales and when you-all
8  reviewed the accounts payable.
9        Did Sam ever tell you which invoices to
10  pay?
11    A.  Not -- no, not specifically, no.
12    Q.  So your testimony is that Charlie Hatfield was
13  the only one who told you which invoices to pay and not
14  to pay?
15    A.  Yes.
16    Q.  I know you've testified earlier about the Mid
17  Mountain payments.  Do you have any evidence that the
18  payments made to Mid Mountain were not somehow related
19  to reimbursements for Williamson Memorial Hospital?
20    A.  There were some when they used their credit
21  card, the Mid Mountain credit card, yes, we reimbursed
22  them.
23    Q.  Okay.  Do you have any evidence of
24  reimbursements to Charlie or Sabrina Hatfield that were

Page 92

1  not related to Williamson Memorial Hospital?
2    A.  Those were the ones I couldn't identify.  I
3  had no backup for.
4    Q.  Do you remember how many charges or the amount
5  of those charges, what they would have been?
6    A.  There was -- I remember a check for almost
7  $26,000 to a vendor I never heard of.
8    Q.  Do you remember the name of the vendor?
9    A.  No.
10    Q.  Was there anything submitted related to that
11  payment?
12    A.  No.
13    Q.  And I wanted to talk to you about the monthly
14  closing of the books.  You testified earlier that you
15  gave Charlie some financial documents at the end of
16  every month; right?
17    A.  Yes.
18    Q.  How did you deliver those documents to him?
19  Were they hand delivered or emailed?
20    A.  Hand delivered.
21    Q.  So hard copies?
22    A.  Yes.
23    Q.  Did you ever email those to Charlie or anyone
24  else?

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 93

1    A.  I don't recall e-mailing them, no, unless it
2  was just a one page.  Could have been emailed.
3    Q.  When you created those documents, where did
4  you save them?
5    A.  It was part of the system we were using.
6    Q.  Some kind of document management system?
7    A.  Yeah.  It's -- you can recall any document you
8  want for any time period with the system -- CHS's system
9  or with MEDITECH.
10    Q.  Okay.  So those documents would have been
11  created on one of those --
12    A.  Yes.
13    Q.  -- softwares?
14    A.  Yes.
15    Q.  Were you ever instructed not to provide those
16  financial documents at the end of every month to anyone
17  else?
18    A.  No.
19    Q.  Did anyone ever come to you and request those
20  financial documents at the end of the month?
21    A.  Only after Charlie left and Gene came on the
22  scene.
23    Q.  Well, and what I'm getting at is:  Did Charlie
24  ever instruct you not to provide those financial records

Page 94

1  to anyone?
2    A.  No.
3    Q.  Do you remember the billing arrangement with
4  CHS?  And what I mean by that is, how was CHS paid?
5  Were they paid hourly or were they paid based on
6  collections?
7    A.  I think there was a flat amount that was due
8  every month.  I don't think it was -- I'm not sure
9  exactly how the contract read, but the -- each monthly
10  payment was similar.
11    Q.  Okay.  So that would seem to indicate it was a
12  flat fee; right?
13    A.  Yes.
14    Q.  What about HRG, same question with them.  How
15  were they paid?
16    A.  I believe that was based on either collections
17  or it could have been a flat amount plus collections.  I
18  don't know.  I don't remember the contract detail.
19    Q.  And I'm not asking you to speculate.  Just to
20  the extent you can remember.
21         Same question with Ensemble.  How were
22  they paid?
23    A.  They would have been paid basically the same
24  thing as HRG.

Page 95

1    Q.  Would you have any reason to dispute that
2  Ensemble was paid based on their collection amount?
3    A.  Like I said, I don't remember the exact
4  content of the contract.
5    Q.  What about AVEC, how were they paid?
6    A.  AVEC I barely remember.
7    Q.  Oh, yeah.  I forgot about that.
8         Accordias you remember.  How were they
9  paid?
10    A.  Probably the same way as the rest of them.
11    Q.  Yeah.
12    A.  They all -- most of those companies are
13  usually based either on a fee plus collections -- a
14  certain percentage of collections.
15    Q.  I remember you testified a little about how
16  CHS withheld some information you needed to finish
17  closing some financials.
18         Where did the information ultimately
19  come from that allowed you to complete the closing?
20    A.  They eventually released it.  CHS.
21    Q.  Did Charlie Hatfield get them to release that
22  information?
23    A.  I don't know.
24    Q.  Okay.  You don't know.  You just got the

Page 96

1  information --
2    A.  Right.
3    Q.  And we talked a lot -- well, Mr. George
4  questioned you on the general ledger and a lot of things
5  associated with that.
6         You estimated that there were in excess
7  of ten thousand -- or ten million dollars of invoices on
8  that -- or, yeah, on that ledger.
9         Do you know what percentage of those
10  charges would have been incurred during Charlie
11  Hatfield's tenure as CEO?
12    A.  I don't know.  I would say when payments were
13  less and less and when cash was not available, then it
14  would grow.
15    Q.  Okay.
16    A.  The liabilities.
17    Q.  Do you think all -- the entire ten million was
18  attributable to invoices not paid while Charlie was CEO?
19    A.  I would say the time when bills for
20  patients did not get processed so that we could have
21  incoming cash, that's what attributed to it.  So, yes,
22  it would have been during their time.
23    Q.  Okay.  So your testimony is that there's no
24  invoices on that ledger that were before -- or incurred

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 97

1 by Williamson Memorial Hospital before or after Charlie
2 Hatfield's tenure?
3     A.  I mean, I can't tell you exact dates, but once
4 the CHS was in charge, things got paid on time.  And
5 when they bought -- when Charlie's company bought the
6 hospital, they incurred whatever was left on the
7 accounts payable system.
8     Q.  So there was probably something --
9     A.  There was some, yes.
10    Q.  And that's what I was getting at.  I figured
11 there had to be at least something left over.
12    A.  Yes.
13    Q.  Do you remember how much that was?
14    A.  No.
15    Q.  What about after Charlie left in October 2019,
16 were there invoices that did not get paid after October
17 2019?
18    A.  Many.
19    A.  Many.
20       So that -- some of that ten million is
21 attributable to after Charlie Hatfield's tenure?
22    A.  Yes.
23    Q.  Do you -- and I'm asking the same question.
24 You probably don't remember how much of the ten million

Page 98

1 would have occurred after October 2019?
2     A.  No, I have no idea.
3     Q.  There was some testimony earlier about
4 switching health insurance carriers from Blue Cross to
5 EVSO (sic)?
6     A.  I can't remember if --
7     Q.  Sorry EBSO.
8     A.  Yes, EBSO.
9        There were different brokers that he was
10 dealing with, I believe, trying to get good prices, and
11 there could have been something in between that, but
12 EBSO was the last one.
13    Q.  Do you remember the date of that switch?
14    A.  No, I don't know.
15    Q.  As I understand it, the Blue Cross premiums
16 were pretty substantial.  Were they in the neighborhood
17 of $700,000?
18    A.  They were, I remember, at least $300,000 a
19 month.
20    Q.  300,000 a month?
21    A.  Uh-huh.
22    Q.  Wow.  Okay.
23       And was EBSO a cheaper alternative to
24 Blue Cross?

Page 99

1     A.  Yes.
2     Q.  And I know maybe you might not know the
3 specifics of the policies, but did EBSO provide similar
4 coverage?
5     A.  I would say similar.
6     Q.  Was it as good?
7     A.  I never had a problem with it.
8     Q.  Okay.  There were also questions related to
9 the charge master.  And forgive my ignorance again with
10 the charge master.
11       Was there a charge master in place with
12 CHS?
13    A.  Yes.
14    Q.  Okay.  The charge master worked with CHS;
15 right?
16    A.  Yes.
17    Q.  And how long did you-all continue to use CHS's
18 charge master after the sale?
19    A.  I would say up until we transitioned over to
20 MEDITECH which would have been by May 2019.
21    Q.  So it's kind of the same timeline we were
22 talking about earlier with ADP, in that there were no
23 issues with the charge master until the MEDITECH switch;
24 right?

Page 100

1     A.  Right.
2     Q.  And let me back up and talk to you again after
3 Charlie Hatfield departed in October 2019.
4        Did the hospital become a viable entity
5 on its own?
6     A.  No.
7     Q.  It was still losing money every month?
8     A.  Yes.
9     Q.  So when Charlie left, do you remember how much
10 money that Williamson Memorial was losing every month?
11    A.  I don't recall.
12    Q.  Was it a similar amount after Charlie left?
13    A.  It probably was, yes.
14    Q.  And it was a similar amount after he left even
15 though Williamson Memorial Hospital had bankruptcy
16 protections from creditors?
17    A.  I would say, you know, as time went on, it
18 probably grew because nothing was being paid.  Vendors
19 were still being used.
20    Q.  Nothing was being paid during the Chapter 11
21 bankruptcy?
22    A.  What they would allow us to pay.
23    Q.  And who was in charge of payments when
24 Williamson Memorial Hospital was in Chapter 11

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 101

1 bankruptcy?
2    A.  I would consult with Loretta and Loretta would
3 consult with the lawyers, bankruptcy lawyers.
4    Q.  So it wasn't Gene Preston who approved or
5 disproved invoices?
6    A.  No.  No.
7    Q.  And the hospital eventually had to convert to
8 a Chapter 7; correct?
9    A.  Yes.
10    Q.  Do you understand what a Chapter 7 bankruptcy
11 is?
12    A.  Not really.
13    Q.  Yeah, that's completely fair.  So Chapter 7 is
14 typically referred to as a liquidation.
15        When did Williamson Memorial actually
16 shut down and close its doors?
17    A.  It was either April the 20th or 21st of 2020.
18    Q.  And you stayed on with Williamson Memorial
19 Hospital until when?
20    A.  December 31st of 2020.
21    Q.  So you were present at Williamson Memorial
22 Hospital during the Chapter 11 bankruptcy when
23 Williamson Memorial Hospital received some -- I'm going
24 to say an influx of cash from basically loans from

Page 102

1 outside entities?
2    A.  I was there.
3    Q.  Did you --
4    A.  If that happened.  I don't understand
5 exactly --
6    Q.  Okay, yeah.
7        Well, I understand that there was
8 some -- and I'm trying to avoid some of the bankruptcy
9 terminology, but I understand there was -- even during
10 the bankruptcy - some cash that was provided by the
11 owners of Williamson Memorial Hospital to keep it
12 afloat.  Do you remember any of that?
13    A.  Not really.  I really don't.
14    Q.  So even with that extra cash, even with the --
15 you know, the creditors being basically subdued for a
16 while, Williamson Memorial Hospital continued to lose
17 money every month and the ledger continued to accrue
18 unpaid invoices; correct?
19    A.  Yes.
20    Q.  Do you think Charlie Hatfield and Sabrina
21 Hatfield worked hard while they were CFO and CEO of the
22 hospital?
23    A.  They did work hard.
24    Q.  Do you think they gave it their best effort?

Page 103

1    A.  I do believe that.
2    Q.  Your testimony earlier was maybe that they
3 didn't make some of the best business judgments, but do
4 you think there was any malice or malfeasance by either
5 Hatfield?
6        MR. GEORGE:  Note my objection to form,
7 including legal terms here.  Her testimony speaks for
8 itself.  Go ahead and answer if you know.
9    A.  I believe that once they -- that they could
10 see the hospital wasn't doing well, and then with the
11 inconsistency of not giving me information for checks
12 that were cut, I think they were getting to a point of
13 desperation to try to keep things going to the best they
14 knew how.
15    Q.  Yeah.
16        They ultimately wanted the hospital to
17 succeed and remain a pillar of the community, though;
18 right?
19    A.  Yes.
20    Q.  And when Charlie and the other Mingo Health
21 Partners took over the hospital, you understand that was
22 an attempt to save the hospital, right, from closure?
23    A.  Yes.
24    Q.  I just want to confirm.  You did not attend

Page 104

1 any of the board of directors meetings for Williamson
2 Memorial Hospital, did you?
3    A.  No, I did not attend any of them.
4    Q.  Okay.  When CHS was an entity that owned the
5 hospital, did you attend any of the board meetings?
6    A.  No.
7    Q.  Let me back up to another question about HRG,
8 one of the billers and coders.
9        Do you think they did a good job on the
10 billing and coding?
11    A.  I wouldn't know.  The only thing I would see
12 for their efforts would be cash coming in.
13    Q.  Right.
14        So you didn't have any direct
15 involvement with billing and coding necessarily?
16    A.  No.  No.
17    Q.  Your focus was more on the accounts payable
18 side, not what was coming in?
19    A.  I kept track of what was coming in only
20 because I had access to view the bank accounts to know
21 whether or not payments could be made.
22    Q.  Do you believe that Williamson Memorial
23 Hospital was adequately staffed in the financial
24 departments of the hospital?

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 105

1    A.  I believe they should have had an outside
2  person to oversee some things, just to make sure things
3  were being done properly.
4    Q.  Was Greg Gibbs supposed to be overseeing some
5  things from an accounting standpoint?
6    A.  He may have been.  I mean, he pretty much did
7  it from afar.
8    Q.  Yeah.
9        But he was supposed to be doing that?
10   A.  I don't know if that's what his main objective
11  was, but ...
12   Q.  And I understand your testimony earlier, there
13  were -- you know, you kind of minded your own business,
14  you went to work, put your head down, and you didn't
15  stir the pot on anything.  I can tell that about you
16  already.
17        But did -- you know, throughout the
18  hospital, did you hear from any other employees or
19  specifically department heads that Sabrina Hatfield and
20  Charlie Hatfield were mismanaging the hospital?
21   A.  Not so much mismanaging.  It's that they --
22  they didn't have the background to run a hospital.
23   Q.  Okay.  You didn't hear anything specific on
24  mismanagement?

Page 106

1    A.  Not specifically mismanagement.
2    Q.  Sorry I keep having to jump around.
3        Did Ensemble ultimately help you-all
4  create a charge master after MEDITECH had taken -- the
5  MEDITECH software had been switched to?
6    A.  I don't know.  Something had to be created so
7  they could create bills.  So whether they were the ones
8  that actually did that, I'm not sure.
9    Q.  So your testimony is at some point, the charge
10  master was completed; right?
11   A.  I don't know that.
12   Q.  You don't know that for sure.
13   A.  No.
14   Q.  But you're assuming that since you started
15  using the MEDITECH software.
16   A.  I couldn't assume that because I wasn't part
17  of that.
18   Q.  Okay.  You didn't have any involvement on the
19  charge master.
20   A.  No.
21   Q.  Okay.  What kind of education and experience
22  do you think that Charlie Hatfield should have had to be
23  CEO?
24   A.  Well, it would have been good if he actually

Page 107

1  had worked in a hospital setting in finance.
2    Q.  Do you think -- what about Sabrina Hatfield,
3  what kind of education and experience do you think she
4  was lacking?
5    A.  I didn't work a lot with Sabrina.  Most of my
6  involvement was with Charlie.
7    Q.  Okay.  Well, I just want to clarify then what
8  we talked about earlier.  You testified that Sabrina was
9  lacking in education and experience.  What did you base
10  that on?
11   A.  Just the knowledge that came with being a CFO
12  of a hospital.  Understanding all the contracts,
13  insurance contracts.
14   Q.  So you weren't basing that opinion on your own
15  interactions with her, or were you basing that on
16  interactions -- let me ask you that first.
17        Were you basing that opinion on your own
18  interactions with her?
19   A.  Like I said, most of my interaction was with
20  Charlie.  It was from the fact that when MEDITECH took
21  over and being able to pull together the accounts
22  receivable piece of it, you know, the billing, the
23  patient billing piece of it, that's where I think some
24  of the knowledge was lacking.

Page 108

1    Q.  What specific instances can you recall where
2  Sabrina Hatfield's education and experience were
3  lacking?
4    A.  Well, someone said that she looked on the
5  internet to figure out how to code a bill for a patient.
6  That's something you go to school for.
7    Q.  Anything else you can think of?  Any other
8  specifics?
9    A.  That's the only one that stands out.
10   Q.  What about specifics on Charlie Hatfield, what
11  about -- what instances/specifics can you give that
12  Charlie did not have the education or experience
13  necessary to be CEO?
14   A.  Well, just his own acknowledgement that
15  hospitals -- running a hospital is hard.
16   Q.  Yeah.
17        And, yeah, I think that's not disputed
18  that running a hospital is hard.  I mean, CHS runs many
19  hospitals and they weren't profitable with Williamson
20  Memorial Hospital, were they?
21   A.  No, they weren't.
22   Q.  You understand CHS was a hospital conglomerate
23  group that owns many hospitals; right?
24   A.  Right.

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 109

1    Q.   And they couldn't even turn a profit with
2  Williamson Memorial Hospital?
3    A.   That's correct.
4    Q.   And Gene Preston, when he took over, he
5  couldn't turn a profit with Williamson Memorial
6  Hospital, could he?
7    A.   No.
8    Q.   The hospital ultimately had to close its doors
9  because the ledger continued to increase and invoices
10 continued to pile up; right?
11   A.   Yes.
12        MR. PARSONS:  That's all the questions I
13 have.  I appreciate your time and patience with us.
14        MR. GEORGE:  I just have one.  I'll come
15 around.  Stay right where you are.
16        RE-EXAMINATION
17 BY MR. GEORGE:
18   Q.   When we were talking about ADP, my
19 recollection is that you said they were never involved
20 on the employee benefits part of the payment, only on
21 the governmental part of the taxes; is that right?
22   A.   Yes.
23   Q.   So follow up to that.  When Mr. Parsons asked
24 you about there were no issues when ADP was paying

Page 110

1  payroll, that was only in reference to making sure that
2  the federal and State taxes were paid on the gross
3  amount, not the employee benefits part; correct?
4    A.   Correct.
5        MR. GEORGE:  That's all I have.
6        MR. PARSONS:  I'm sorry.  One follow-up.
7  I just want to try to get you nailed down on a date.
8        RE-EXAMINATION
9  BY MR. PARSONS:
10   Q.   When do you think the issues of withholding
11 started with Mr. Hatfield?
12   A.   I believe it was when MEDITECH took over and
13 that we transitioned during the month of April of 2019.
14   Q.   So it would have been in line with when the
15 ADP situation and the -- yeah, the ADP situation; right?
16   A.   Yes.
17   Q.   Okay.
18        MR. PARSONS:  That's all I have.
19        MR. GEORGE:  Okay.  Let me -- this
20 doesn't need to be on the record.
21        THE WITNESS:  I'm okay with what I said.
22        MR. GEORGE:  Okay.  So you will waive
23 the signature?
24        THE WITNESS:  Yes.

Page 111

1        COURT REPORTER:  Did you both want an
2  e-tran?
3        MR. PARSONS:  E-tran is fine with us.
4        MR. GEORGE:  That's fine with me.
5  (Deposition concluded at 4:51 p.m.)
6  (Having indicated she would like to read
7  her deposition before filing, further
8  this deponent saith not.)
9
10        --oOo--
11
12
13
14
15
16
17        DIANE VARNEY

Page 112

1  STATE OF WEST VIRGINIA
2  COUNTY OF CABELL, to wit;
3
4        I, Jaime L. Centifanti, a Notary Public within and
   for the County and State aforesaid, duly commissioned
5  and qualified, do hereby certify that the foregoing
   deposition of DIANE VARNEY, was duly taken by me and
6  before me at the time and place and for the purpose
   specified in the caption hereof, the said witness having
7  been by me first duly sworn.
8
   I do further certify that the said deposition
9  was correctly taken by me in shorthand notes, and that
   the same were accurately written out in full and reduced
10 to typewriting to the best of my ability, and that the
   witness did request to read her transcript.
11
12      I further certify that I am neither attorney or
   counsel for, nor related to or employed by, any of the
13 parties to the action in which this deposition is taken,
   and further I am not a relative or employee of any
14 attorney or counsel employed by the parties, or
   financially interested in the action, and that the
15 attached transcript meets the requirements set forth
   within article twenty-seven, chapter forty-seven of the
16 West Virginia Code.
17
   My commission expires February 19, 2023.
18
19      Given under my hand and seal this _____ day
20
21
22
23 Jaime L. Centifanti, RPR, Notary Public
24

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 113

1           ERRATA SHEET
2

        I, DIANE VARNEY, do hereby certify that the
3  foregoing is a true and correct transcript of my
   deposition with the exception of the following
4  corrections:
5  PAGE  LINE  CORRECTION
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15

16           _____
             DEPONENT'S SIGNATURE
17 STATE OF _____,
   COUNTY OF _____,
18
19     Sworn to before me, _____,
   Notary Public, this _____ day of _____, 2022.
20
21           _____
                    NOTARY PUBLIC
22
23
24

Exhibit A

Frank W. Volk
United States District Judge

**Dated: April 24th, 2020**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

In re:

    Williamson Memorial Hospital, LLC,               Case No. 19-20469
                                             Chapter 11
                **Debtor in Possession**        Judge Frank Volk

### FINAL ORDER GRANTING 4th EMERGENCY MOTION OF DEBTOR-IN-POSSESSION FOR FINAL ORDERS AUTHORIZING DEBTOR TO (A) OBTAIN SECURED PRIMING POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364; (B) AUTHORIZE TO USE CASH COLLATERAL AND OTHER COLLATERAL PURSUANT TO 11 U.S.C. §§ 105, 361, 362 AND 363; (C) SCHEDULING FINAL HEARING, PURSUANT TO RULES 4001(b), 4001(c) AND 9014; AND (D) GRANTING RELATED RELIEF

      Based upon the foregoing, and upon the record made before this Court at the final hearing, and good and sufficient cause appearing therefore, it is hereby ordered and adjudged that:

      1.    Motion Granted. The *4th Emergency Motion Of Debtor-In-Possession For Final Orders Authorizing Debtor To (A) Obtain Secured Priming Post-Petition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364; (B) Authorize To Use Cash Collateral And Other Collateral Pursuant To 11 U.S.C. §§ 105, 361, 362 and 363; (C) Scheduling Final Hearing, Pursuant To Rules 4001(B), 4001(C) and 9014; and (D) Granting Related Relief* [DN# 151] (the "Motion") is granted on a final basis to the extent provided in this Order. No party voiced any objections to the relief sought in the Motion or the entry of this Order.

      2.    Authorization to enter into Debtor-In-Possession Financing. The Debtor is authorized to borrow up to the aggregate amount of $200,000.00 (the "DIP Loan") pursuant to this

Exhibit A

Order from Doug Reynolds, Sam Kapourales and Charles Hatfield (collectively the "DIP Lender").

3.    The Debtor is authorized and directed to perform all acts as the DIP Lender may reasonably require as evidence of and for the protection of the obligations arising under the DIP Loan and/or this Order (collectively, the "DIP Loan Obligations") or which may be otherwise deemed necessary by the DIP Lender to effectuate the terms and conditions of this Order.

4.    DIP Liens. The DIP Loan shall be secured by the liens (the "DIP Liens"), effective upon entry of this Order without any further action required, on all the accounts receivable of the Debtor (the "DIP Collateral").

5.    DIP Lender's Superpriority Claim. Pursuant to Section 364(c)(1), the DIP Loan shall constitute an allowed claim ("Superpriority DIP Claim") against the Debtor, with priority over any and all administrative expenses, diminution claims, adequate protection claims and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including all administrative expenses of the kind specified in Sections 364, 503(b) and 507(b), and over any and all administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113, or 1114, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, and which Superpriority DIP Claim shall be payable from and have recourse to all pre- and post-petition property of the Debtor and all proceeds thereof. The Superpriority DIP Claim and the DIP Liens shall continue even if Debtor's Chapter 11 case is converted to a case under Chapter 7 of the Bankruptcy Code, and shall maintain their priority as provided in this Order until all DIP Loan Obligations have been indefeasibly paid, in full, in cash, or otherwise satisfied with the consent of the DIP Lender.  Notwithstanding the foregoing, the rights of the DIP Lender hereunder are

Exhibit A

subordinate to the liens and rights of Pikeville Medical Center, Inc., as lender to Debtor pursuant to the terms set forth in the *Final Order granting the 6th Motion of Debtor-in-Possession for an Order Authorizing Debtor to (A) Obtain Secured Priming Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364; (B) Authorize Debtor to Use Cash Collateral and Grant Protection to Secured Lenders Pursuant to 11 U.S.C. §§ 105, 361, 362 and 363; (C) Schedule Final Hearing Pursuant to Rules 4001(b), 4001(c) and 9014; and (D) Grant Related Relief*.

6.      The terms for the use of the DIP Collateral, respectively, set forth in this Order are fair and reasonable, reflect the Debtor's prudent exercise of business judgment and constitutes reasonably equivalent value and fair consideration for the use of such collateral, subject to the restrictions set forth in this Order. No creditor has sought, or is entitled to, any adequate protection as a result of the Court's grant of the Motion.

7.      **No Additional Filings Required for Perfection.** All DIP Liens and any other liens in favor of the DIP Lender pursuant to this Order are valid, enforceable, and perfected, effective as of the Petition Date, and (notwithstanding any provisions of any agreement, lease, instrument, document, the Uniform Commercial Code, or any other relevant law or regulation of any jurisdiction) no further notice, filing, or other act shall be required to effect such perfection, and all DIP Liens on any deposit accounts or securities accounts shall pursuant to this Order be, and they hereby are, deemed to confer "control" for purposes of Sections 46-8-106, 9-104, and 9-106 of the Uniform Commercial Code in the various states that are the respective "jurisdictions" (as that term is used in respect of "control" in Articles 8 and 9 of the Uniform Commercial Code) of the depositary banks or securities intermediaries applicable thereto as in effect as of the date hereof in favor of the DIP Lender. A certified copy of this Order may, in the discretion of the DIP Lender,

Exhibit A

be filed with or recorded in any filing or recording office and all filing offices are hereby authorized and directed to accept such certified copy of this Order for filing and recording.

8.    Jurisdiction. The Court shall retain exclusive jurisdiction to interpret and enforce this Order and the terms of the DIP Loan.

9.    The provisions of this Order are effective as of the date and time of the conclusion of the final hearing upon the relief sought by the Motion.

10.    The DIP Lender must file a motion seeking relief from the automatic stay with this Court prior to seeking to enforce the DIP Liens.

Approved for Entry:

 /s/ Joe M. Supple
Joe M. Supple
Supple Law Office PLLC
801 Viand Street
Point Pleasant, WV 25550
304-675-6249
Joe.Supple@supplelawoffice.com

        and


 /s/ Glenn B. Rose
Glenn B. Rose, TN Bar No. 10598
Bass, Berry & Sims PLC
150 Third Avenue South, Suite 2800
Nashville, TN 37201
Telephone (615) 742-6273
Facsimile (615) 742-6293
grose@bassberry.com

Counsel for Debtor

Exhibit A

Case 2:19-bk-20469    Doc 357-1    Filed 04/24/20    Entered 04/27/20 08:49:19    Desc
Order Mailing: Notice Recipients    Page 1 of 1

# Notice Recipients

District/Off: 0425–2          User: jjr                              Date Created: 4/27/2020
Case: 2:19–bk–20469          Form ID: pdf001                        Total: 47

**Recipients submitted to the BNC (Bankruptcy Noticing Center) without an address:**

| | | |
|---|---|---|
| acc | Arnett Carbis Toothman LLP | |
| consult | Steve Curnutte and Tortola Advisors | |
| aty | Hunton Andrews Kurth LLP | |
| aty | Hunton Andrews Kurth, LLP | |

TOTAL: 4

**Recipients of Notice of Electronic Filing:**

| | | |
|---|---|---|
| ust | United States Trustee | ustpregion04.ct.ecf@usdoj.gov |
| aty | Arthur M. Standish | art.standish@steptoe-johnson.com |
| aty | Bert Ketchum | Bert@Greeneketchum.com |
| aty | Carrie Goodwin Fenwick | cgf@goodwingoodwin.com |
| aty | Colton Chase Parsons | colton.parsons@steptoe–johnson.com |
| aty | Elizabeth A Amandus | eamandus@jacksonkelly.com |
| aty | Eric M. Wilson | eric.m.wilson@wv.gov |
| aty | Gary O. Kinder | gary.o.kinder@usdoj.gov |
| aty | Glenn Benton Rose | grose@bassberry.com |
| aty | Joe M. Supple | info@supplelawoffice.com |
| aty | Joel Patrick Jones, Jr. | joeljones@campbellwoods.com |
| aty | Michael B. Hissam | mhissam@hfdrlaw.com |
| aty | Sarah Ellis | sarah.ellis@steptoe–johnson.com |
| aty | Sarah Ann Walling | saw@jenkinsfenstermaker.com |
| aty | Susan N. Goodman | sgoodman@pivothealthaz.com |
| aty | W. Bradley Sorrells | wbs@ramlaw.com |

TOTAL: 16

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**

| | | |
|---|---|---|
| db | WILLIAMSON MEMORIAL HOSPITAL, LLC | 859 ALDERSON STREET    Williamson, WV 25661 |
| cr | West Virginia State Tax Department | Bankruptcy Unit    P.O. Box 766    Charleston, WV 25323–0766 |
| cr | Trevor R. Pincock | Lukins & Annis, P.S.    1600 Washington Trust Financial Center    717 W. Sprague Ave    Spokane, WA 99201–2015 |
| cr | First National Bank of Williamson | Attn: David Robinette    P. O. Box 950    Williamson, WV 25661 |
| crcm | Official Committee of Unsecured Creditors | Goodwin & Goodwin, LLP    300 Summer Street    Suite 1500    Charleston, WV 25301 UNITED STATES |
| intp | Charles W. Hatfield | P.O. Box 1315    Williamson, WV 25661 |
| intp | NFS Leasing, Inc. | 900 Cummings Center    Suite 226–U    Beverly, MA 01915 |
| ombh | Susan N. Goodman | Pivot Health Law, LLC    PO Box 69734    Oro Valley, AZ 85737 |
| cr | Heather Lynn Pope | Greene, Ketchum, Bailey & Tweel LLP    P.O. Box 2389    Huntington, WV 25724 |
| intp | Pikeville Medical Center | PO Box 2917    Pikeville, KY 41502 |
| aty | Bass, Berry & Sims PLC | 150 Third Avenue South, Suite 2800    Nashville, TN 37201 |
| aty | Goodwin & Goodwin | P.O. Box 2107    Charleston, WV 25328 |
| aty | Supple Law Office, PLLC | 801 Viand Street    Pt. Pleasant, WV 25550 |
| aty | Christine E. Devine | Mirick, O'Connell, DeMallie & Lougee, LL    100 Front Street    Worcester, MA 01608–1477 |
| aty | David L. Bissett | U.S. Trustees Office    300 Virginia St. East    Room 2025    Charleston, WV 25301 |
| aty | Henry P. Long, III | Hunton Andrews Kurth LLP    951 East Byrd Street    Richmond, VA 23219 |
| aty | Jason W. Harbour | Hunton Andrews Kurth LLP    951 East Byrd Street    Richmond, VA 23219 |
| aty | John F. Leaberry | Law Office of John Leaberry    167 Patrick Street    Lewisburg, WV 24901 |
| aty | John M. Craig | Law Firm of Russell R. Johnson III, PLC    2258 Wheatlands Drive    Manakin–Sabot, VA 23103 |
| aty | Larry A. Bailey | 419 Eleventh Street    Post Office Box 2389    Huntington, WV 25724 |
| aty | Max Gottlieb | HISSAM FORMAN DONOVAN RITCHIE PLLC    Charleston, WV 25309 |
| aty | Paul W. Carey | Mirick, O'Connell, DeMallie & Lougee, LL    100 Front Street    Worcester, MA 01608–1488 |
| aty | Russell R. Johnson, III | Law Firm of Russell R. Johnson III, PLC    2258 Wheatlands Drive    Manakin–Sabot, VA 23103 |
| aty | Ryan McCune Donovan | HISSAM FORMAN DONOVAN RITCHIE PLLC    P.O. Box 3983    Charleston, WV 25309 |
| aty | Stephen L. Thompson | Barth & Thompson    PO Box 129    Charleston, WV 25321 |
| smg | United States Attorney | Southern District WV    P.O. Box 1713    Charleston, WV 25326–1713 |
| smg | WV Department of Tax & Revenue | Bankruptcy Unit    P.O. Box 766    Charleston, WV 25323–0766 |

TOTAL: 27

Exhibit A

Fill in this information to identify the case:

Debtor Name    Williamson Memorial Hospital, LLC

United States Bankruptcy Court for the: Southern District of West Virginia

Case number:    19-20469

☐ Check if this is an
amended filing

Official Form 425C

## Monthly Operating Report for Small Business Under Chapter 11    12/17

Month:    Oct November

Line of business:    Hospital

Date report filed:    01/09/2020
MM / DD / YYYY

NAISC code: _____

In accordance with title 28, section 1746, of the United States Code, I declare under penalty of perjury that I have examined the following small business monthly operating report and the accompanying attachments and, to the best of my knowledge, these documents are true, correct, and complete.

Responsible party:    Harold E. Preston Jr

Original signature of responsible party    _Jens Preston_

Printed name of responsible party    Harold E. Preston Jr

### 1. Questionnaire

Answer all questions on behalf of the debtor for the period covered by this report, unless otherwise indicated.

| | | Yes | No | N/A |
|---|---|---|---|---|
| | **If you answer *No* to any of the questions in lines 1-9, attach an explanation and label it *Exhibit A.*** | | | |
| 1 | Did the business operate during the entire reporting period? | ☑ | ☐ | ☐ |
| 2. | Do you plan to continue to operate the business next month? | ☑ | ☐ | ☐ |
| 3. | Have you paid all of your bills on time? | ☑ | ☐ | ☐ |
| 4. | Did you pay your employees on time? | ☑ | ☐ | ☐ |
| 5. | Have you deposited all the receipts for your business into debtor in possession (DIP) accounts? | ☑ | ☐ | ☐ |
| 6. | Have you timely filed your tax returns and paid all of your taxes? | ☑ | ☐ | ☐ |
| 7. | Have you timely filed all other required government filings? | ☑ | ☐ | ☐ |
| 8. | Are you current on your quarterly fee payments to the U.S. Trustee or Bankruptcy Administrator? | ☑ | ☐ | ☐ |
| 9. | Have you timely paid all of your insurance premiums? | ☑ | ☐ | ☐ |
| | **If you answer *Yes* to any of the questions in lines 10-18, attach an explanation and label it *Exhibit B.*** | | | |
| 10. | Do you have any bank accounts open other than the DIP accounts? | ☐ | ☑ | ☐ |
| 11. | Have you sold any assets other than inventory? | ☐ | ☑ | ☐ |
| 12. | Have you sold or transferred any assets or provided services to anyone related to the DIP in any way? | ☐ | ☑ | ☐ |
| 13. | Did any insurance company cancel your policy? | ☐ | ☑ | ☐ |
| 14. | Did you have any unusual or significant unanticipated expenses? | ☐ | ☑ | ☐ |
| 15. | Have you borrowed money from anyone or has anyone made any payments on your behalf? | ☑ | ☐ | ☐ |
| 16. | Has anyone made an investment in your business? | ☐ | ☑ | ☐ |

Exhibit A

Debtor Name  Williamson Memorial Hospital, LLC _____    Case number  19-20469

| | ☑ | ☐ | ☐ |
|---|---|---|---|
| 17. Have you paid any bills you owed before you filed bankruptcy? | ☑ | ☐ | ☐ |
| 18. Have you allowed any checks to clear the bank that were issued before you filed bankruptcy? | ☑ | ☐ | ☐ |

## 2. Summary of Cash Activity for All Accounts

**19. Total opening balance of all accounts**

This amount must equal what you reported as the cash on hand at the end of the month in the previous month. If this is your first report, report the total cash on hand as of the date of the filing of this case.

$ 13,908.45

**20. Total cash receipts**

Attach a listing of all cash received for the month and label it *Exhibit C*. Include all cash received even if you have not deposited it at the bank, collections on receivables, credit card deposits, cash received from other parties, or loans, gifts, or payments made by other parties on your behalf. Do not attach bank statements in lieu of *Exhibit C*.

Report the total from *Exhibit C* here.

$ 1,162,769.0

**21. Total cash disbursements**

Attach a listing of all payments you made in the month and label it *Exhibit D*. List the date paid, payee, purpose, and amount. Include all cash payments, debit card transactions, checks issued even if they have not cleared the bank, outstanding checks issued before the bankruptcy was filed that were allowed to clear this month, and payments made by other parties on your behalf. Do not attach bank statements in lieu of *Exhibit D*.

Report the total from *Exhibit D* here.

– $ 1,066,967.8

**22. Net cash flow**

Subtract line 21 from line 20 and report the result here.
This amount may be different from what you may have calculated as *net profit*.

+ $ 95,801.52

**23. Cash on hand at the end of the month**

Add line 22 + line 19. Report the result here.

Report this figure as the *cash on hand at the beginning of the month* on your next operating report.

This amount may not match your bank account balance because you may have outstanding checks that have not cleared the bank or deposits in transit.

= $ 109,709.97

## 3. Unpaid Bills

Attach a list of all debts (including taxes) which you have incurred since the date you filed bankruptcy but have not paid. Label it *Exhibit E*. Include the date the debt was incurred, who is owed the money, the purpose of the debt, and when the debt is due. Report the total from *Exhibit E* here.

**24. Total payables**

*(Exhibit E)*

$ 103,107.00

Exhibit A

Case 2:19-bk-20469    Doc 165    Filed 01/10/20    Entered 01/10/20 09:55:09    Desc Main
Document    Page 3 of 98

Debtor Name  Williamson Memorial Hospital, LLC                    Case number  19-20469

### 4. Money Owed to You

Attach a list of all amounts owed to you by your customers for work you have done or merchandise you
have sold. Include amounts owed to you both before, and after you filed bankruptcy. Label it *Exhibit F*.
Identify who owes you money, how much is owed, and when payment is due. Report the total from
*Exhibit F* here.

25. Total receivables                                                              $  4,905,127.0
    *(Exhibit F)*

### 5. Employees

26. What was the number of employees when the case was filed?                              154
27. What is the number of employees as of the date of this monthly report?                 101

### 6. Professional Fees

28. How much have you paid this month in professional fees related to this bankruptcy case?         $  0.00
29. How much have you paid in professional fees related to this bankruptcy case since the case was filed?   $  0.00
30. How much have you paid this month in other professional fees?                          $  0.00
31. How much have you paid in total other professional fees since filing the case?          $  0.00

### 7. Projections

Compare your actual cash receipts and disbursements to what you projected in the previous month.
Projected figures in the first month should match those provided at the initial debtor interview, if any.

| | Column A | | Column B | | Column C |
|---|---|---|---|---|---|
| | Projected | — | Actual | = | Difference |
| | Copy lines 35-37 from the previous month's report. | | Copy lines 20-22 of this report. | | Subtract Column B from Column A. |
| 32. Cash receipts | $ | — | $ 1,162,769.0 | = | $ |
| 33. Cash disbursements | $ | — | $ 1,066,967.0 | = | $ |
| 34. Net cash flow | $ | — | $ 95,801.00 | = | $ |

35. Total projected cash receipts for the next month:                              $  944,696.00
36. Total projected cash disbursements for the next month:                      −  $  1,037,045.0
37. Total projected net cash flow for the next month:                            =  $  −92,349.00

<span style="color:red">Exhibit A</span>

Debtor Name  Williamson Memorial Hospital, LLC _____          Case number  19-20469 _____

| | 8. Additional Information |
|---|---|

If available, check the box to the left and attach copies of the following documents.

☑  38.  Bank statements for each open account (redact all but the last 4 digits of account numbers).

☑  39.  Bank reconciliation reports for each account.

☑  40.  Financial reports such as an income statement (profit & loss) and/or balance sheet.

☑  41.  Budget, projection, or forecast reports.

☑  42.  Project, job costing, or work-in-progress reports.

Exhibit A

<u>Addendum to Question 15 of the October- November Monthly Operating Report</u>

1. On October 25 15, 2019 Debtor Borrowed $350,000 from the principals of its parent Mingo Health Partners LLC.

2. On November 15, 2019 Debtor Borrowed $160,000 from the principals of its parent Mingo Health Partners LLC.

Exhibit A

Date  10/31/19        Page    31

BASIC BUSINESS CHECKING                    (Continued)

## Deposits

| Date | Description | Amount |
|------|-------------|--------|
| 10/03 | DDA REGULAR DEPOSIT | 5,600.00 |
| 10/03 | DDA REGULAR DEPOSIT | 10,355.13 |
| 10/09 | DDA REGULAR DEPOSIT | 6,000.00 |
| 10/09 | DDA REGULAR DEPOSIT | 32,000.00 |
| 10/09 | DDA REGULAR DEPOSIT | 141,000.00 |
| 10/11 | DDA REGULAR DEPOSIT | 3,000.00 |
| 10/11 | DDA REGULAR DEPOSIT | 8,000.00 |
| 10/24 | DDA REGULAR DEPOSIT | 36,000.00 |
| 10/24 | DDA REGULAR DEPOSIT | 165,000.00 |
| 10/30 | DDA REGULAR DEPOSIT | 68,733.11 |

-----------------------------------------------------------------------------

## Withdrawals

| Date | Description | Amount |
|------|-------------|--------|
| 10/07 | ACH DEBIT   JOHN HANCOCK | 4,293.90 |
|       | 9406915392        10/07/19 | |
|       | ID #-0140720 | |
|       | TRACE #-028000086657088 | |
| 10/09 | ACH PROC FILE FEE | 7.50 |
| 10/09 | ACH PROC FILE FEE | 80.00 |
| 10/09 | REG SALARY WILLIAMSON MEMO | 12,152.23 |
|       | 02-0550433        10/09/19 | |
|       | ID #- | |
|       | TRACE #-000000000000001 | |
| 10/09 | REG SALARY WILLIAMSON MEMO | 170,291.49 |
|       | 55-0592845        10/09/19 | |
|       | ID #- | |
|       | TRACE #-000000000000001 | |
| 10/10 | ACH DEBIT   JOHN HANCOCK | 3,576.13 |
|       | 9406915392        10/10/19 | |
|       | ID #-0140720 | |
|       | TRACE #-028000080970756 | |
| 10/24 | ACH PROC FILE FEE | 7.00 |
| 10/24 | ACH FILE PROC FEE | 82.50 |
| 10/24 | REG SALARY WILLIAMSON MEMO | 10,741.85 |
|       | 02-0550433        10/24/19 | |
|       | ID #- | |
|       | TRACE #-000000000000001 | |
| 10/24 | REG SALARY WILLIAMSON MEMO | 183,005.78 |
|       | 55-0592845        10/24/19 | |
|       | ID #- | |
|       | TRACE #-000000000000001 | |
| 10/31 | USATAXPYMT IRS | 65,499.98 |
|       | 3387702000        10/31/19 | |
|       | ID #-270970450951542 | |
|       | TRACE #-061036010022445 | |
| 10/31 | NET SERVICE CHARGE | 5.00 |
| 10/31 | MAINTENANCE FEE | 15.00- |

Exhibit A

Date  11/29/19      Page    26

BASIC BUSINESS CHECKING                    (Continued)

## Withdrawals

| Date | Description | Amount |
|------|-------------|--------|
| 11/07 | REG SALARY WILLIAMSON MEMO | 138,462.73 |
|       | 55-0592845          11/07/19 | |
|       | ID #- | |
|       | TRACE #-000000000000001 | |
| 11/13 | ACH PROC FILE FEE | .05 |
| 11/18 | USATAXPYMT IRS | 61,408.71 |
|       | 3387702000          11/18/19 | |
|       | ID #-270972201071763 | |
|       | TRACE #-061036010006844 | |
| 11/21 | ACH PROC FILE FEE | 65.00 |
| 11/21 | REG SALARY WILLIAMSON MEMO | 129,694.60 |
|       | 55-0592845          11/21/19 | |
|       | ID #- | |
|       | TRACE #-000000000000001 | |
| 11/30 | NET SERVICE CHARGE | 5.00 |
| 11/30 | MAINTENANCE FEE | 15.00- |
| 11/30 |  BALANCE CREDIT/ADJ. IN S/C | 10.00- |

----------------------------------------------------------------------

## Summary By Check Number

| Date | Check No. | Amount | Date | Check No. | Amount |
|------|-----------|--------|------|-----------|--------|
| 11/15 |       | 254.20 | 11/13 | 130 | 1,504.46 |
| 11/26 |       | 917.42 | 11/14 | 131 | 3,326.54 |
| 11/22 | 8*    | 407.56 | 11/13 | 132 | 3,663.18 |
| 11/13 | 22*   | 2,584.28 | 11/14 | 134* | 2,278.41 |
| 11/14 | 23    | 1,384.62 | 11/15 | 135 | 3,214.12 |
| 11/13 | 33*   | 1,726.34 | 11/13 | 136 | 2,533.57 |
| 11/12 | 38*   | 3,270.80 | 11/15 | 137 | 2,190.94 |
| 11/01 | 116*  | 689.29 | 11/13 | 139* | 3,409.88 |
| 11/04 | 118*  | 1,631.38 | 11/13 | 140 | 1,892.28 |
| 11/15 | 121*  | 584.43 | 11/14 | 141 | 1,674.87 |
| 11/13 | 122   | 1,082.67 | 11/14 | 142 | 1,934.36 |
| 11/08 | 123   | 1,798.09 | 11/22 | 144* | 1,798.09 |
| 11/19 | 125*  | .65.97 | 11/25 | 145 | 237.65 |
| 11/15 | 127*  | 560.70 | 11/22 | 147* | 1,244.36 |
| 11/18 | 128   | 1,230.91 | 11/22 | 149* | 214.13 |
| 11/08 | 129   | 439.57 | | | |

 *Indicates Break In Check Number Sequence

----------------------------------------------------------------------

## Daily Balance Information

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 11/01 | 5,341.43 | 11/12 | 38,079.39 | 11/19 | 14,573.90 |
| 11/04 | 3,710.05 | 11/13 | 19,682.68 | 11/21 | 6,814.30 |
| 11/06 | 21,710.05 | 11/14 | 84,083.88 | 11/22 | 3,150.16 |
| 11/07 | 7,587.85 | 11/15 | 77,279.49 | 11/25 | 2,912.51 |
| 11/08 | 41,350.19 | 11/18 | 14,639.87 | 11/26 | 1,995.09 |

Exhibit A

Case 2:19-bk-20469    Doc 166    Filed 01/10/20    Entered 01/10/20 09:57:30    Desc Main
Document    Page 1 of 37

Fill in this information to identify the case:

Debtor Name: Williamson Memorial Hospita, LLC

United States Bankruptcy Court for the: Southern District of West Virginia

Case number: 19-20469

☐ Check if this is an amended filing

**Official Form 425C**

## Monthly Operating Report for Small Business Under Chapter 11    12/17

Month: December    Date report filed: 01/09/2020 MM / DD / YYYY

Line of business: Hospital    NAISC code:

In accordance with title 28, section 1746, of the United States Code, I declare under penalty of perjury that I have examined the following small business monthly operating report and the accompanying attachments and, to the best of my knowledge, these documents are true, correct, and complete.

Responsible party:    Harold E. Preston Jr

Original signature of responsible party    *Gene Preston*

Printed name of responsible party    Harold E. Preston Jr

### 1. Questionnaire

Answer all questions on behalf of the debtor for the period covered by this report, unless otherwise indicated.

If you answer *No* to any of the questions in lines 1-9, attach an explanation and label it *Exhibit A*.

| | | Yes | No | N/A |
|---|---|---|---|---|
| 1. | Did the business operate during the entire reporting period? | ☑ | ☐ | ☐ |
| 2. | Do you plan to continue to operate the business next month? | ☑ | ☐ | ☐ |
| 3. | Have you paid all of your bills on time? | ☑ | ☐ | ☐ |
| 4. | Did you pay your employees on time? | ☑ | ☐ | ☐ |
| 5. | Have you deposited all the receipts for your business into debtor in possession (DIP) accounts? | ☑ | ☐ | ☐ |
| 6. | Have you timely filed your tax returns and paid all of your taxes? | ☑ | ☐ | ☐ |
| 7. | Have you timely filed all other required government filings? | ☑ | ☐ | ☐ |
| 8. | Are you current on your quarterly fee payments to the U.S. Trustee or Bankruptcy Administrator? | ☑ | ☐ | ☐ |
| 9. | Have you timely paid all of your insurance premiums? | ☑ | ☐ | ☐ |

If you answer *Yes* to any of the questions in lines 10-18, attach an explanation and label it *Exhibit B*.

| | | Yes | No | N/A |
|---|---|---|---|---|
| 10. | Do you have any bank accounts open other than the DIP accounts? | ☑ | ☐ | ☐ |
| 11. | Have you sold any assets other than inventory? | ☑ | ☐ | ☐ |
| 12. | Have you sold or transferred any assets or provided services to anyone related to the DIP in any way? | ☑ | ☐ | ☐ |
| 13. | Did any insurance company cancel your policy? | ☑ | ☐ | ☐ |
| 14. | Did you have any unusual or significant unanticipated expenses? | ☑ | ☐ | ☐ |
| 15. | Have you borrowed money from anyone or has anyone made any payments on your behalf? | ☐ | ☑ | ☐ |
| 16. | Has anyone made an investment in your business? | | | |

Exhibit A

Debtor Name  Williamson Memorial Hospital, LLC                    Case number  19-20469

17. Have you paid any bills you owed before you filed bankruptcy?          ☐  ☑  ☐
18. Have you allowed any checks to clear the bank that were issued before you filed bankruptcy?   ☐  ☑  ☐

## 2. Summary of Cash Activity for All Accounts

19. **Total opening balance of all accounts**                                   $ 109,709.97
    This amount must equal what you reported as the cash on hand at the end of the month in the previous
    month. If this is your first report, report the total cash on hand as of the date of the filing of this case.

20. **Total cash receipts**
    Attach a listing of all cash received for the month and label it *Exhibit C*. Include all
    cash received even if you have not deposited it at the bank, collections on
    receivables, credit card deposits, cash received from other parties, or loans, gifts, or
    payments made by other parties on your behalf. Do not attach bank statements in
    lieu of *Exhibit C*.

    Report the total from *Exhibit C* here.                             $ 944,696.21

21. **Total cash disbursements**
    Attach a listing of all payments you made in the month and label it *Exhibit D*. List the
    date paid, payee, purpose, and amount. Include all cash payments, debit card
    transactions, checks issued even if they have not cleared the bank, outstanding
    checks issued before the bankruptcy was filed that were allowed to clear this month,
    and payments made by other parties on your behalf. Do not attach bank statements
    in lieu of *Exhibit D*.                                             – $ 1,037,045.4

    Report the total from *Exhibit D* here.

22. **Net cash flow**                                                   + $ -92,349.24
    Subtract line 21 from line 20 and report the result here.
    This amount may be different from what you may have calculated as *net profit*.

23. **Cash on hand at the end of the month**                            = $ 17,360.73
    Add line 22 + line 19. Report the result here.

    Report this figure as the *cash on hand at the beginning of the month* on your next operating report.

    This amount may not match your bank account balance because you may have outstanding checks that
    have not cleared the bank or deposits in transit.

## 3. Unpaid Bills

Attach a list of all debts (including taxes) which you have incurred since the date you filed bankruptcy but
have not paid. Label it *Exhibit E*. Include the date the debt was incurred, who is owed the money, the
purpose of the debt, and when the debt is due. Report the total from *Exhibit E* here.

24. **Total payables**                                                  $ 167,097.00
    *(Exhibit E)*

Exhibit A

Case 2:19-bk-20469　　Doc 166　　Filed 01/10/20　　Entered 01/10/20 09:57:30　　Desc Main
Document　　　Page 3 of 37

Debtor Name  Williamson Memorial Hospita, LLC　　　　　　　Case number  19-20469

### 4. Money Owed to You

Attach a list of all amounts owed to you by your customers for work you have done or merchandise you have sold. Include amounts owed to you both before, and after you filed bankruptcy. Label it *Exhibit F*. Identify who owes you money, how much is owed, and when payment is due. Report the total from *Exhibit F* here.

| | |
|---|---|
| 25. Total receivables | $ 4,905,127.0 |
| *(Exhibit F)* | |

### 5. Employees

| | |
|---|---|
| 26. What was the number of employees when the case was filed? | 154 |
| 27. What is the number of employees as of the date of this monthly report? | 101 |

### 6. Professional Fees

| | |
|---|---|
| 28. How much have you paid this month in professional fees related to this bankruptcy case? | $ 174,000.00 |
| 29. How much have you paid in professional fees related to this bankruptcy case since the case was filed? | $ 174,000.00 |
| 30. How much have you paid this month in other professional fees? | $ 174,000.00 |
| 31. How much have you paid in total other professional fees since filing the case? | $ 174,000.00 |

### 7. Projections

Compare your actual cash receipts and disbursements to what you projected in the previous month. Projected figures in the first month should match those provided at the initial debtor interview, if any.

| | Column A | | Column B | | Column C |
|---|---|---|---|---|---|
| | Projected | − | Actual | = | Difference |
| | Copy lines 35-37 from the previous month's report. | | Copy lines 20-22 of this report. | | Subtract Column B from Column A. |
| 32. Cash receipts | $ 1,162,769.0 | − | $ 944,696.00 | = | $ 218,073.00 |
| 33. Cash disbursements | $ 1,066,967.0 | − | $ 1,037,045.4 | = | $ 29,922.00 |
| 34. Net cash flow | $ 95,801.00 | − | $ 17,360.00 | = | $ 78,441.00 |

| | | |
|---|---|---|
| 35. Total projected cash receipts for the next month: | | $ 660,000.00 |
| 36. Total projected cash disbursements for the next month: | − | $ 660,000.00 |
| 37. Total projected net cash flow for the next month: | = | $ 0.00 |

Exhibit A

Debtor Name  Williamson Memorial Hospita, LLC _____    Case number 19-20469 _____

## 8. Additional Information

If available, check the box to the left and attach copies of the following documents.

☑ 38.  Bank statements for each open account (redact all but the last 4 digits of account numbers).

☑ 39.  Bank reconciliation reports for each account.

☑ 40.  Financial reports such as an income statement (profit & loss) and/or balance sheet.

☑ 41.  Budget, projection, or forecast reports.

☑ 42.  Project, job costing, or work-in-progress reports.

Exhibit A

```
                                        Date  12/31/19        Page    20

BASIC BUSINESS CHECKING                      (Continued)

                              Withdrawals
Date    Description                          Amount
12/02   ACH PROC FILE FEE                       .40
12/02   REG SALARY WILLIAMSON MEMO         6,168.31
        02-0550433        12/02/19
        ID #-
        TRACE #-000000000000001
12/05   ACH FILE PROC FEE                     70.00
12/05   USATAXPYMT IRS                     58,951.52
        3387702000        12/05/19
        ID #-270973900866453
        TRACE #-061036010009668
12/05   REG SALARY WILLIAMSON MEMO       155,806.08
        55-0592845        12/05/19
        ID #-
        TRACE #-000000000000001
12/09   ACH DEBIT   JOHN HANCOCK            954.13
        9406915392        12/09/19
        ID #-0140720
        TRACE #-028000083157160
12/20   ACH FILE ORIGINATION FEE              .05
12/20   ACH PROC FILE FEE                   10.00
12/20   ACH PROC FILE FEE                   10.00
12/20   ACH FILE ORIGINATION FEE            79.00
12/20   REG SALARY WILLIAMSON MEMO         200.00
        02-0550433        12/20/19
        ID #-
        TRACE #-000000000000001
12/20   REG SALARY WILLIAMSON MEMO       154,375.70
        55-0592845        12/20/19
        ID #-
        TRACE #-000000000000001
12/27   ACH DEBIT   JOHN HANCOCK             30.35
        9406915392        12/27/19
        ID #-0140720
        TRACE #-028000083551345
12/31   NET SERVICE CHARGE                   5.00
12/31   MAINTENANCE FEE                     15.00-
12/31     DR ITEM FEES IN S/C                .80-
12/31     BALANCE CREDIT/ADJ. IN S/C       10.80-

------------------------------------------------------------------------------

                    Summary By Check Number
Date    Check No.         Amount   Date    Check No.          Amount
12/10                   1,877.84   12/02      25            1,235.89
12/13                   8,000.00   12/11      25*           3,500.93
12/16                   1,100.30   12/23     124*             205.73
12/30                   1,332.00   12/06     146*             579.22
12/10        24*        3,555.91   12/03     150*           1,504.46
        *Indicates Break In Check Number Sequence
```

Exhibit A

Case 2:19-bk-20469    Doc 354    Filed 04/21/20    Entered 04/21/20 12:02:41    Desc Main
59

---

**Fill in this information to identify the case:**

Debtor Name  Williamson Memorial Hospital, LLC

United States Bankruptcy Court for the: Southern District of West Virginia

Case number:  19-20469

☑ Check if this is an amended filing

---

## Official Form 425C

## Monthly Operating Report for Small Business Under Chapter 11                    12/17

Month:  January

Line of business:  Hospital

Date report filed:  04/21/2020
MM / DD / YYYY

NAISC code: _____

In accordance with title 28, section 1746, of the United States Code, I declare under penalty of perjury that I have examined the following small business monthly operating report and the accompanying attachments and, to the best of my knowledge, these documents are true, correct, and complete.

Responsible party:  Interim CEO of Williamson Memorial Hospita

Original signature of responsible party  *Harold Preston*

Printed name of responsible party  Harold E. Preston, Jr.

### 1. Questionnaire

Answer all questions on behalf of the debtor for the period covered by this report, unless otherwise indicated.

|  |  | Yes | No | N/A |
|---|---|---|---|---|
| **If you answer *No* to any of the questions in lines 1-9, attach an explanation and label it *Exhibit A.*** | | | | |
| 1. | Did the business operate during the entire reporting period? | ☑ | ☐ | ☐ |
| 2. | Do you plan to continue to operate the business next month? | ☑ | ☐ | ☐ |
| 3. | Have you paid all of your bills on time? | | X | ☐ |
| 4. | Did you pay your employees on time? | ☑ | ☐ | ☐ |
| 5. | Have you deposited all the receipts for your business into debtor in possession (DIP) accounts? | ☐ | ☑ | ☐ |
| 6. | Have you timely filed your tax returns and paid all of your taxes? | ☐ | ☑ | ☐ |
| 7. | Have you timely filed all other required government filings? | ☐ | ☑ | ☐ |
| 8. | Are you current on your quarterly fee payments to the U.S. Trustee or Bankruptcy Administrator? | ☐ | ☑ | ☐ |
| 9. | Have you timely paid all of your insurance premiums? | ☑ | ☐ | ☐ |
| **If you answer *Yes* to any of the questions in lines 10-18, attach an explanation and label it *Exhibit B.*** | | | | |
| 10. | Do you have any bank accounts open other than the DIP accounts? | ☐ | ☑ | ☐ |
| 11. | Have you sold any assets other than inventory? | ☐ | ☑ | ☐ |
| 12. | Have you sold or transferred any assets or provided services to anyone related to the DIP in any way? | ☐ | ☑ | ☐ |
| 13. | Did any insurance company cancel your policy? | ☐ | ☑ | ☐ |
| 14. | Did you have any unusual or significant unanticipated expenses? | ☑ | ☐ | ☐ |
| 15. | Have you borrowed money from anyone or has anyone made any payments on your behalf? | ☑ | ☐ | ☐ |
| 16. | Has anyone made an investment in your business? | ☐ | ☑ | ☐ |

Official Form 425C                    Monthly Operating Report for Small Business Under Chapter 11                    page 1

Exhibit A

Debtor Name  Williamson Memorial Hospital, LLC        Case number  19-20469

17. Have you paid any bills you owed before you filed bankruptcy?     ☐ ☑ ☐

18. Have you allowed any checks to clear the bank that were issued before you filed bankruptcy?     ☐ ☑ ☐

## 2. Summary of Cash Activity for All Accounts

19. **Total opening balance of all accounts**

This amount must equal what you reported as the cash on hand at the end of the month in the previous month. If this is your first report, report the total cash on hand as of the date of the filing of this case.     $ 17,360.73

20. **Total cash receipts**

Attach a listing of all cash received for the month and label it *Exhibit C*. Include all cash received even if you have not deposited it at the bank, collections on receivables, credit card deposits, cash received from other parties, or loans, gifts, or payments made by other parties on your behalf. Do not attach bank statements in lieu of *Exhibit C*.

Report the total from *Exhibit C* here.     $ 786,106.63

21. **Total cash disbursements**

Attach a listing of all payments you made in the month and label it *Exhibit D*. List the date paid, payee, purpose, and amount. Include all cash payments, debit card transactions, checks issued even if they have not cleared the bank, outstanding checks issued before the bankruptcy was filed that were allowed to clear this month, and payments made by other parties on your behalf. Do not attach bank statements in lieu of *Exhibit D*.

Report the total from *Exhibit D* here.     – $ 638,905.75

22. **Net cash flow**

Subtract line 21 from line 20 and report the result here.
This amount may be different from what you may have calculated as *net profit*.     + $ 147,200.88

23. **Cash on hand at the end of the month**

Add line 22 + line 19. Report the result here.

Report this figure as the *cash on hand at the beginning of the month* on your next operating report.     = $ 164,561.71

This amount may not match your bank account balance because you may have outstanding checks that have not cleared the bank or deposits in transit.

## 3. Unpaid Bills

Attach a list of all debts (including taxes) which you have incurred since the date you filed bankruptcy but have not paid. Label it *Exhibit E*. Include the date the debt was incurred, who is owed the money, the purpose of the debt, and when the debt is due. Report the total from *Exhibit E* here.

24. **Total payables**     $ 571,494.60

*(Exhibit E)*

Exhibit A

Debtor Name  Williamson Memorial Hospital, LLC                    Case number  19-20469

---

### 4. Money Owed to You

Attach a list of all amounts owed to you by your customers for work you have done or merchandise you
have sold. Include amounts owed to you both before, and after you filed bankruptcy.  Label it *Exhibit F*.
Identify who owes you money, how much is owed, and when payment is due. Report the total from
*Exhibit F* here.

25.  **Total receivables**                                                                     $  4,945,000.0

    *(Exhibit F)*

---

### 5. Employees

26.  What was the number of employees when the case was filed?                                      154

27.  What is the number of employees as of the date of this monthly report?                         101

---

### 6. Professional Fees

28.  How much have you paid this month in professional fees related to this bankruptcy case?    $  50,000.00

29.  How much have you paid in professional fees related to this bankruptcy case since the case was filed?  $  50,000.00

30.  How much have you paid this month in other professional fees?                              $  0.00

31.  How much have you paid in total other professional fees since filing the case?            $  0.00

---

### 7. Projections

Compare your actual cash receipts and disbursements to what you projected in the previous month.
Projected figures in the first month should match those provided at the initial debtor interview, if any.

| | Column A | | Column B | | Column C |
|---|---|---|---|---|---|
| | Projected | – | Actual | = | Difference |
| | Copy lines 35-37 from the previous month's report. | | Copy lines 20-22 of this report. | | Subtract Column B from Column A. |
| 32. Cash receipts | $ 944,696.00 | – | $ 786,106.63 | = | $ 158,589.37 |
| 33. Cash disbursements | $ 1,037,045.0 | – | $ 638,905.75 | = | $ 535,112.00 |
| 34. Net cash flow | $ -17,360.00 | – | $ 147,200.88 | = | $ 164,560.88 |

35.  Total projected cash receipts for the next month:                             $  1,500,000.0

36.  Total projected cash disbursements for the next month:                      –  $  1,042,000.0

37.  Total projected net cash flow for the next month:                           = $  458,000.00

---

Exhibit A

Debtor Name  Williamson Memorial Hospital, LLC _____     Case number 19-20469 _____

### 8. Additional Information

If available, check the box to the left and attach copies of the following documents.

☑ 38. Bank statements for each open account (redact all but the last 4 digits of account numbers).

☑ 39. Bank reconciliation reports for each account.

☑ 40. Financial reports such as an income statement (profit & loss) and/or balance sheet.

☑ 41. Budget, projection, or forecast reports.

☐ 42. Project, job costing, or work-in-progress reports.

Exhibit A

## EXHIBIT A

Debtor receipts were inefficient to pay all amounts owed when they came due.

Debtor has retained an accounting firm to assist with tax filings.

Case 2:19-bk-20469    Doc 354    Filed 04/21/20    Entered 04/21/20 12:02:41    Desc Main
Document      Exhibit    Page 6 of 59

WILLIAMSON MEMORIAL HOSPITAL
Case No. 2:19-bk-20469

| | 10/24/2019 | 11/14/2019 | 11/18/2019 | 12/13/2019 | 1/2/2020 | 1/3/2020 | 1/21/2020 | 1/27/2020 | TOTAL* |
|---|---|---|---|---|---|---|---|---|---|
| Partners | 330,000.00 | 75,000.00 | 75,000.00 | 22,000.00 | 100,000.00 | 1,000.00 | 100,000.00 | 7,000.00 | 710,000.00 |
| Total Cash | 330,000.00 | 75,000.00 | 75,000.00 | 22,000.00 | 100,000.00 | 1,000.00 | 100,000.00 | 7,000.00 | 710,000.00 |

*During month of January, principals in Mingo Partners contributed the following additional sums to debtor, without obtaining any court approval: 1/21/2020 (150,000); 1/27/2020 (73,000) and 1/31/2020 (145,000)

Exhibit A

**Fill in this information to identify the case:**

Debtor Name __Williamson Memorial Hospital, LLC__

United States Bankruptcy Court for the: Northern District of West Virginia

Case number: __19-20469__

☐ Check if this is an amended filing

---

Official Form 425C

## Monthly Operating Report for Small Business Under Chapter 11    12/17

| | |
|---|---|
| Month: __February__ | Date report filed: __03/30/2020__ MM / DD / YYYY |
| Line of business: __Hospital__ | NAISC code: _____ |

In accordance with title 28, section 1746, of the United States Code, I declare under penalty of perjury that I have examined the following small business monthly operating report and the accompanying attachments and, to the best of my knowledge, these documents are true, correct, and complete.

Responsible party:    __Interim CEO Williamson Memorial Hospital__

Original signature of responsible party    _Harold Preston_

Printed name of responsible party    __Harold E. Preston, Jr.__

### 1. Questionnaire

Answer all questions on behalf of the debtor for the period covered by this report, unless otherwise indicated.

**If you answer *No* to any of the questions in lines 1-9, attach an explanation and label it *Exhibit A.***

| | | Yes | No | N/A |
|---|---|:---:|:---:|:---:|
| 1. | Did the business operate during the entire reporting period? | ☑ | ☐ | ☐ |
| 2. | Do you plan to continue to operate the business next month? | ☑ | ☐ | ☐ |
| 3. | Have you paid all of your bills on time? | ☑ | ☐ | ☐ |
| 4. | Did you pay your employees on time? | ☑ | ☐ | ☐ |
| 5. | Have you deposited all the receipts for your business into debtor in possession (DIP) accounts? | ☑ | ☐ | ☐ |
| 6. | Have you timely filed your tax returns and paid all of your taxes? | ☐ | ☑ | ☐ |
| 7. | Have you timely filed all other required government filings? | ☑ | ☐ | ☐ |
| 8. | Are you current on your quarterly fee payments to the U.S. Trustee or Bankruptcy Administrator? | ☐ | ☑ | ☐ |
| 9. | Have you timely paid all of your insurance premiums? | ☑ | ☐ | ☐ |

**If you answer *Yes* to any of the questions in lines 10-18, attach an explanation and label it *Exhibit B.***

| | | Yes | No | N/A |
|---|---|:---:|:---:|:---:|
| 10. | Do you have any bank accounts open other than the DIP accounts? | ☐ | ☑ | ☐ |
| 11. | Have you sold any assets other than inventory? | ☐ | ☑ | ☐ |
| 12. | Have you sold or transferred any assets or provided services to anyone related to the DIP in any way? | ☐ | ☑ | ☐ |
| 13. | Did any insurance company cancel your policy? | ☐ | ☑ | ☐ |
| 14. | Did you have any unusual or significant unanticipated expenses? | ☐ | ☑ | ☐ |
| 15. | Have you borrowed money from anyone or has anyone made any payments on your behalf? | ☑ | ☐ | ☐ |
| 16. | Has anyone made an investment in your business? | ☐ | ☑ | ☐ |

Exhibit A

Debtor Name  Williamson Memorial Hospital, LLC                                    Case number  19-20469

17. Have you paid any bills you owed before you filed bankruptcy?    ☐  ☑  ☐
18. Have you allowed any checks to clear the bank that were issued before you filed bankruptcy?    ☐  ☑  ☐

## 2. Summary of Cash Activity for All Accounts

19. **Total opening balance of all accounts**
    This amount must equal what you reported as the cash on hand at the end of the month in the previous month. If this is your first report, report the total cash on hand as of the date of the filing of this case.    $ 164,561.61

20. **Total cash receipts**
    Attach a listing of all cash received for the month and label it *Exhibit C*. Include all cash received even if you have not deposited it at the bank, collections on receivables, credit card deposits, cash received from other parties, or loans, gifts, or payments made by other parties on your behalf. Do not attach bank statements in lieu of *Exhibit C*.

    Report the total from *Exhibit C* here.    $ 1,629,019.9

21. **Total cash disbursements**
    Attach a listing of all payments you made in the month and label it *Exhibit D*. List the date paid, payee, purpose, and amount. Include all cash payments, debit card transactions, checks issued even if they have not cleared the bank, outstanding checks issued before the bankruptcy was filed that were allowed to clear this month, and payments made by other parties on your behalf. Do not attach bank statements in lieu of *Exhibit D*.

    Report the total from *Exhibit D* here.    − $ 303,829.10

22. **Net cash flow**
    Subtract line 21 from line 20 and report the result here.
    This amount may be different from what you may have calculated as *net profit*.    + $ 1,325,190.8

23. **Cash on hand at the end of the month**
    Add line 22 + line 19. Report the result here.

    Report this figure as the *cash on hand at the beginning of the month* on your next operating report.    = $ 1,489,752.4

    This amount may not match your bank account balance because you may have outstanding checks that have not cleared the bank or deposits in transit.

## 3. Unpaid Bills

Attach a list of all debts (including taxes) which you have incurred since the date you filed bankruptcy but have not paid. Label it *Exhibit E*. Include the date the debt was incurred, who is owed the money, the purpose of the debt, and when the debt is due. Report the total from *Exhibit E* here.

24. **Total payables**    $ 1,030,688.9
    *(Exhibit E)*

Exhibit A

Case 2:19-bk-20469    Doc 310    Filed 03/30/20    Entered 03/30/20 15:24:49    Desc Main
Document      Page 3 of 35

Debtor Name  Williamson Memorial Hospital, LLC _____     Case number 19-20469 _____

### 4. Money Owed to You

Attach a list of all amounts owed to you by your customers for work you have done or merchandise you
have sold. Include amounts owed to you both before, and after you filed bankruptcy. Label it *Exhibit F*.
Identify who owes you money, how much is owed, and when payment is due. Report the total from
*Exhibit F* here.

25. Total receivables                                                                       $ 4,959,688

    *(Exhibit F)*

### 5. Employees

26. What was the number of employees when the case was filed?                                      157
27. What is the number of employees as of the date of this monthly report?                          101

### 6. Professional Fees

28. How much have you paid this month in professional fees related to this bankruptcy case?    $  50,000.00
29. How much have you paid in professional fees related to this bankruptcy case since the case was filed?    $  50,000.00
30. How much have you paid this month in other professional fees?                             $ _____
31. How much have you paid in total other professional fees since filing the case?            $ _____

### 7. Projections

Compare your actual cash receipts and disbursements to what you projected in the previous month.
Projected figures in the first month should match those provided at the initial debtor interview, if any.

|  | Column A | | Column B | | Column C |
|---|---|---|---|---|---|
|  | **Projected** | − | **Actual** | = | **Difference** |
|  | Copy lines 35-37 from the previous month's report. | | Copy lines 20-22 of this report. | | Subtract Column B from Column A. |
| 32. Cash receipts | $ 1,500,000.0 | − | $ 1,629,019.0 | = | $ 129,019.00 |
| 33. Cash disbursements | $ 1,042,000.0 | − | $ 303,829.10 | = | $ 738,171.00 |
| 34. Net cash flow | $ 458,000.00 | − | $ 1,325,190.8 | = | $ 867,190.00 |

35. Total projected cash receipts for the next month:                       $ 489,000.00
36. Total projected cash disbursements for the next month:                 − $ 489,000.00
37. Total projected net cash flow for the next month:                      = $     0.00

Exhibit A

Debtor Name  Williamson Memorial Hospital, LLC                              Case number  19-20469

---

### 8. Additional Information

If available, check the box to the left and attach copies of the following documents.

- ☑ 38.  Bank statements for each open account (redact all but the last 4 digits of account numbers).

- ☑ 39.  Bank reconciliation reports for each account.

- ☑ 40.  Financial reports such as an income statement (profit & loss) and/or balance sheet.

- ☑ 41.  Budget, projection, or forecast reports.

- ☐ 42.  Project, job costing, or work-in-progress reports.

Exhibit A

EXHIBIT A

In order to have the funds necessary to continue operations at the hospital, Debtor has not been able to pay all of its taxes and US Trustee fees as they become due.  Debtor anticipates receiving funds from the collection of its receivables sufficient to pay these sums in the near future.

EXHIBIT B

In February 2020, the Debtor obtained an order from the Court authorizing it to obtain additional post-petition financing from Pikeville Medical Center.  In February, the Debtor borrowed $1,500,000 from Pikeville Medical Center.

**Fill In this Information to Identify the case:**

Debtor Name  Williamson Memorial Hospital, LLC

United States Bankruptcy Court for the: Southern District of West Virginia

Case number:  19-20463

☐ Check if this is an amended filing

## Official Form 425C

## Monthly Operating Report for Small Business Under Chapter 11                    12/17

Month:        March

Line of business:  Hospital

Date report filed:  04/21/2020
                    MM / DD / YYYY

NAISC code:  _____

In accordance with title 28, section 1746, of the United States Code, I declare under penalty of perjury that I have examined the following small business monthly operating report and the accompanying attachments and, to the best of my knowledge, these documents are true, correct, and complete.

Responsible party:                Interim CEO Williamson Memorial Hospital

Original signature of responsible party    *Harold E Preston Jr*

Printed name of responsible party    Harold E. Preston, Jr.

### ■  1. Questionnaire

Answer all questions on behalf of the debtor for the period covered by this report, unless otherwise indicated.

| | | Yes | No | N/A |
|---|---|:---:|:---:|:---:|
| | **If you answer *No* to any of the questions in lines 1-9, attach an explanation and label it *Exhibit A*.** | | | |
| 1. | Did the business operate during the entire reporting period? | ☑ | ☐ | ☐ |
| 2. | Do you plan to continue to operate the business next month? | ☐ | ☑ | ☐ |
| 3. | Have you paid all of your bills on time? | ☐ | ☑ | ☐ |
| 4. | Did you pay your employees on time? | ☑ | ☐ | ☐ |
| 5. | Have you deposited all the receipts for your business into debtor in possession (DIP) accounts? | ☑ | ☐ | ☐ |
| 6. | Have you timely filed your tax returns and paid all of your taxes? | ☐ | ☑ | ☐ |
| 7. | Have you timely filed all other required government filings? | ☑ | ☐ | ☐ |
| 8. | Are you current on your quarterly fee payments to the U.S. Trustee or Bankruptcy Administrator? | ☑ | ☐ | ☐ |
| 9. | Have you timely paid all of your insurance premiums? | ☑ | ☐ | ☐ |
| | **If you answer *Yes* to any of the questions in lines 10-18, attach an explanation and label it *Exhibit B*.** | | | |
| 10. | Do you have any bank accounts open other than the DIP accounts? | ☐ | ☑ | ☐ |
| 11. | Have you sold any assets other than inventory? | ☐ | ☑ | ☐ |
| 12. | Have you sold or transferred any assets or provided services to anyone related to the DIP in any way? | ☐ | ☑ | ☐ |
| 13. | Did any insurance company cancel your policy? | ☐ | ☑ | ☐ |
| 14. | Did you have any unusual or significant unanticipated expenses? | ☐ | ☑ | ☐ |
| 15. | Have you borrowed money from anyone or has anyone made any payments on your behalf? | ☑ | ☐ | ☐ |
| 16. | Has anyone made an investment in your business? | ☐ | ☑ | ☐ |

Exhibit A

Case 2:19-bk-20469    Doc 355    Filed 04/21/20    Entered 04/21/20 12:03:59    Desc Main
Document    Page 2 of 56

Debtor Name  Williamson Memorial Hospital, LLC          Case number  19-20463

| | | | |
|---|---|---|---|
| 17. Have you paid any bills you owed before you filed bankruptcy? | ☐ | ☑ | ☐ |
| 18. Have you allowed any checks to clear the bank that were issued before you filed bankruptcy? | ☐ | ☑ | ☐ |

## 2. Summary of Cash Activity for All Accounts

19. **Total opening balance of all accounts**

   This amount must equal what you reported as the cash on hand at the end of the month in the previous month. If this is your first report, report the total cash on hand as of the date of the filing of this case.

   $ 1,489,752.0

20. **Total cash receipts**

   Attach a listing of all cash received for the month and label it *Exhibit C*. Include all cash received even if you have not deposited it at the bank, collections on receivables, credit card deposits, cash received from other parties, or loans, gifts, or payments made by other parties on your behalf. Do not attach bank statements in lieu of *Exhibit C*.

   Report the total from *Exhibit C* here.

   $ 795,914.37

21. **Total cash disbursements**

   Attach a listing of all payments you made in the month and label it *Exhibit D*. List the date paid, payee, purpose, and amount. Include all cash payments, debit card transactions, checks issued even if they have not cleared the bank, outstanding checks issued before the bankruptcy was filed that were allowed to clear this month, and payments made by other parties on your behalf. Do not attach bank statements in lieu of *Exhibit D*.

   Report the total from *Exhibit D* here.

   – $ 1,803,182.8

22. **Net cash flow**

   Subtract line 21 from line 20 and report the result here.
   This amount may be different from what you may have calculated as *net profit*.

   + $ -1,007,268.

23. **Cash on hand at the end of the month**

   Add line 22 + line 19. Report the result here.

   Report this figure as the *cash on hand at the beginning of the month* on your next operating report.

   = $ 482,484.29

   This amount may not match your bank account balance because you may have outstanding checks that have not cleared the bank or deposits in transit.

## 3. Unpaid Bills

Attach a list of all debts (including taxes) which you have incurred since the date you filed bankruptcy but have not paid. Label it *Exhibit E*. Include the date the debt was incurred, who is owed the money, the purpose of the debt, and when the debt is due. Report the total from *Exhibit E* here.

24. **Total payables**

   *(Exhibit E)*

   $ 502,454.68

Exhibit A

Debtor Name  Williamson Memorial Hospital, LLC                                    Case number  19-20463

## 4. Money Owed to You

Attach a list of all amounts owed to you by your customers for work you have done or merchandise you
have sold. Include amounts owed to you both before, and after you filed bankruptcy.  Label it *Exhibit F*.
Identify who owes you money, how much is owed, and when payment is due. Report the total from
*Exhibit F* here.

25.  **Total receivables**                                                              $  5,408,236.0

     *(Exhibit F)*

## 5. Employees

26.  What was the number of employees when the case was filed?                           157

27.  What is the number of employees as of the date of this monthly report?             101

## 6. Professional Fees

28.  How much have you paid this month in professional fees related to this bankruptcy case?   $ __35,000.00

29.  How much have you paid in professional fees related to this bankruptcy case since the case was filed?   $  85,000.00

30.  How much have you paid this month in other professional fees?                       $ _____

31.  How much have you paid in total other professional fees since filing the case?      $ _____

## 7. Projections

Compare your actual cash receipts and disbursements to what you projected in the previous month.
Projected figures in the first month should match those provided at the initial debtor interview, if any.

| | Column A | Column B | Column C |
|---|---|---|---|
| | **Projected** — | **Actual** = | **Difference** |
| | Copy lines 35-37 from the previous month's report. | Copy lines 20-22 of this report. | Subtract Column B from Column A. |
| 32.  **Cash receipts** | $ 489,000.00  — | $ 795,914.00  = | $ 306,914.00 |
| 33.  **Cash disbursements** | $ 489,000.00  — | $ 1,803,382.8  = | $ 795,915.00 |
| 34.  **Net cash flow** | $ 0.00  — | $ 1,007,268.0  = | $ -1,007,268. |

35.  Total projected cash receipts for the next month:                                  $ 528,000.00

36.  Total projected cash disbursements for the next month:                           - $ 327,000.00

37.  Total projected net cash flow for the next month:                                = $ 201,000.00

Exhibit A

Debtor Name  Williamson Memorial Hospital, LLC _____      Case number  19-20463 _____

███ **8. Additional Information**

If available, check the box to the left and attach copies of the following documents.

☑ 38.  Bank statements for each open account (redact all but the last 4 digits of account numbers).

☑ 39.  Bank reconciliation reports for each account.

☑ 40.  Financial reports such as an income statement (profit & loss) and/or balance sheet.

☑ 41.  Budget, projection, or forecast reports.

☐ 42.  Project, job costing, or work-in-progress reports.

Exhibit A

# Exhibit A

Questions

3.  We have not paid several vendors on time as services will be terminating on April 21st with the hospital closure.

6.  Sales & Use taxes have not been filed or paid.  Currently, working with external CPA firm on completing.

SAME FACTS AS
PERIOD 9/2019. WHICH
WAS DETERMINED
TO BE NO PERSONAL
LIABILITY

Exhibit A

CERTIFIED MAIL

| Form **843** | Claim for Refund and Request for Abatement | |
|---|---|---|
| (Rev. August 2011)<br>Department of the Treasury<br>Internal Revenue Service | ▶ See separate instructions. | OMB No. 1545-0024 |

Use Form 843 if your claim or request involves:
- (a) a refund of one of the taxes (other than income taxes or an employer's claim for FICA tax, RRTA tax, or income tax withholding) or a fee, shown on line 3,
- (b) an abatement of FUTA tax or certain excise taxes, or
- (c) a refund or abatement of interest, penalties, or additions to tax for one of the reasons shown on line 5a.

Do not use Form 843 if your claim or request involves:
- (a) an overpayment of income taxes or an employer's claim for FICA tax, RRTA tax, or income tax withholding (use the appropriate amended tax return),
- (b) a refund of excise taxes based on the nontaxable use or sale of fuels, or
- (c) an overpayment of excise taxes reported on Form(s) 11-C, 720, 730, or 2290.

| Name(s)<br>SAM & ▮▮▮▮ KAPOURALES | Your social security number |
|---|---|
| Address (number, street, and room or suite no.) | Spouse's social security number |
| City or town, state, and ZIP code | Employer identification number (EIN) |
| Name and address shown on return if different from above | Daytime telephone number |

| 1 | **Period.** Prepare a separate Form 843 for each tax period or fee year.<br>From JANUARY 1, 2020 to MARCH 31, 2020 | 2 | **Amount to be refunded or abated:**<br>$ 211,251.62 |
|---|---|---|---|

**3** **Type of tax or fee.** Indicate the type of tax or fee to be refunded or abated or to which the interest, penalty, or addition to tax is related.

☒ Employment ☐ Estate ☐ Gift ☐ Excise ☐ Income ☐ Fee

**4** **Type of penalty.** If the claim or request involves a penalty, enter the Internal Revenue Code section on which the penalty is based (see instructions). IRC section: 6672

**5a** **Interest, penalties, and additions to tax.** Check the box that indicates your reason for the request for refund or abatement. (If none apply, go to line 6.)

☐ Interest was assessed as a result of IRS errors or delays.

☐ A penalty or addition to tax was the result of erroneous written advice from the IRS.

☒ Reasonable cause or other reason allowed under the law (other than erroneous written advice) can be shown for not assessing a penalty or addition to tax.

**b** Date(s) of payment(s) ▶ DECEMBER 11, 2023

**6** **Original return.** Indicate the type of fee or return, if any, filed to which the tax, interest, penalty, or addition to tax relates.

☐ 706 ☐ 709 ☐ 940 ☒ 941 ☐ 943 ☐ 945
☐ 990-PF ☐ 1040 ☐ 1120 ☐ 4720 ☐ Other (specify) ▶

**7** **Explanation.** Explain why you believe this claim or request should be allowed and show the computation of the amount shown on line 2. If you need more space, attach additional sheets.

SEE ATTACHED SCHEDULES

**Signature.** If you are filing Form 843 to request a refund or abatement relating to a joint return, both you and your spouse must sign the claim. Claims filed by corporations must be signed by a corporate officer authorized to sign, and the officer's title must be shown.

Under penalties of perjury, I declare that I have examined this claim, including accompanying schedules and statements, and, to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| Signature (Title, if applicable. Claims by corporations must be signed by an officer.) | 10-29-2024<br>Date |
|---|---|
| Signature (spouse, if joint return) | 10-29-2024<br>Date |

| Paid<br>Preparer<br>Use Only | Print/Type preparer's name<br>JULIUS G. JESSIE | Preparer's signature | Date<br>10-29-2024 | Check ☐ if<br>self-employed | PTIN |
|---|---|---|---|---|---|
| | Firm's name ▶ JESSIE & JESSIE, A.C. | | | Firm's EIN ▶ | |
| | Firm's address ▶ | | | Phone no. ▶ | |

ISA For Privacy Act and Paperwork Reduction Act Notice, see separate instructions. Form **843** (Rev. 8-2011)

Sam Kapourales

████████████████

Form 843 Line 7 Explanation For Claim
Period January 1, 2020 To March 31, 2020

The taxpayer is filing this claim based on the following facts:

The Internal Revenue Service on November 9, 2023 assessed a Trust Fund Recovery Penalty on the taxpayer for the period ending March 31, 2020.

The Internal Revenue Service applied $211,251.62 of the taxpayer's 2021 income tax Form 1040 overpayment to the Trust Fund Recovery Penalty on December 11, 2023.

The taxpayer is filing the Form 843 for the period ending March 31, 2020  within two (2) years from the date the Trust Fund Penalty was paid.

The Taxpayer filed a protest with the Internal Revenue Service with arguments and evidence against the Trust Fund Recovery Penalty. The protest included the periods ending September 30, 2019, December 31, 2019, March 31, 2020. ( We have attached a copy of the protest).

The facts stated in the appeals protest:
Sworn testimony from the accounting manager for Williamson Memorial Hospital LLC confirmed CEO Charles Hatfield had sole discretion as to who to pay, what to pay, and when to pay and the taxpayer never told her which invoices to pay.

Exhibit A

The taxpayer made multiple advances or loans from his personal funds to Williamson Memorial Hospital LLC specifically to cover payroll and make sure employees were paid. The taxpayer's understanding was the advances or loans were for the gross payroll amount. The taxpayer did not have the responsibility to sign every check he did have the authority to do so. The taxpayer's signature stamp was available for the convenience of office staff in the rare situation when management was not available to sign the check. Please note, the signature stamp was present during the period the Internal Revenue Service did not find the taxpayer a responsible party.

On October 21, 2019, a new interim CEO was appointed, and he took over the management of Williamson Memorial Hospital LLC which included the payment of the payroll including the payment of the payroll taxes. The new CEO was also responsible for the financial reporting to the United States Bankruptcy Court. The appointment of the new CEO removed the taxpayer of almost all of his management responsibilities. The taxpayer now had less involvement in the management of the company compared to the period ended September 30, 2019 which the taxpayer was determined to not be a responsible party. The taxpayer also made loans to Williamson Memorial Hospital LLC during the period ending December 31, 2019 for the gross payroll to be paid for the amount of $510,000.00. This transaction was documented on the Official Form 425C Monthly Operating Report for Small Business Under Chapter 11. The report was signed by the appointed CEO. The taxpayer did not sign the report as a result of his responsibilities being limited after the new CEO appointment.

The Internal Revenue Service agreed with the facts in the taxpayer's arguments and evidence stated in the protest and determined the taxpayer should not be held personally liable for the non-payment of The Trust Fund Recovery Penalty for the period ending September 30, 2019.

The Internal Revenue Service did not reach the same conclusion for the period ending March 31, 2020 and held the taxpayer personally liable for that period even though the facts support the taxpayer's involvement in the company's management was considerably limited after the new CEO was appointed.

The Internal Revenue Service stated in Notice 5124 dated October 27, 2023, the taxpayer should **NOT** be held personally liable for the non-payment of the trust fund liabilities for the tax period ending September 30, 2019 based on the evidence and arguments reviewed by them in the taxpayer's protest. However, the Internal Revenue Service proceeded to hold the taxpayer personally liable for the trust fund liabilities for the period ending March 31, 2020.

The taxpayer's duties and responsibilities were less demanding and less involved for that period as they were for the period ending September 30, 2019. The taxpayer has not been provided an explanation as to why the Internal Revenue Service concluded different results for the period ending March 31, 2020.

More importantly, the taxpayer has not been provided additional evidence and arguments by the Internal Revenue Service to support the varying conclusions in the tax period ending March 31,2020 from their conclusion reached for the tax period ending September 30,2019.

Exhibit A

The taxpayer's Claim for Refund (Form 843) is based on facts and evidence supported and presented in the taxpayer's protest. The protest includes court cases and language in Code Section 6672 that supports the taxpayer's argument for not being a responsible party. The taxpayer's determination of being a responsible party under Code Section 6672 has already been determined by the Internal Revenue Service.

In the Internal Revenue Service's Letter Number 5124 dated October 27, 2023 (Copy Attached) which stated, we considered your protest along with your evidence and arguments against the Trust Fund Recovery Penalty (TFRP) assessment. We determined that the IRS should **NOT** hold you personally liable for the non-payment of the trust fund liabilities for the tax period shown above (09/2019). The same facts considered in the IRS's decision for the period 09/2019 never changed in the period 03/20 except the taxpayer's responsibilities became less involved as a result of the appointment of the new CEO. Thus the taxpayer is not personally liable for the period ending 03/31/20 based on the Internal Revenue Service's own reasoning for the period ending 09/2019.

We respectfully request the taxpayer's claim for refund be approved based on the above facts.

Sam Kapourales

███████████

Form 843
Attachments

Articles Of Organization Mingo Health Partners, LLC naming Charles W. Hatfield as the Manager Member.

Page from deposition of the accounting manager for Williamson Memorial Hospital sworn testimony the taxpayer never told her which invoices to pay. Charlie Hatfield was the only one who told her which invoices to pay.

Letter 1153 IRS proposing assessments for the Trust Fund Recovery Penalty for periods 09/30/2019-12/31/2019-03/31/2020

Form 425C Operating Report prepared by the interim CEO for the bankruptcy court reporting employees were paid on time and all taxes were paid for the period ending December 31, 2019. The report also reported loans to Williamson Memorial Hospital LLC in the amount of $510,000.00 from the taxpayer for the purpose of paying the gross amount of payroll during the period ending December 31, 2019.

Letter 5124 Taxpayer determined to not be held personally liable for period 09/2019.

Letter 1536  Taxpayer determined to be held personally liable Periods 12/2019 and 03/2020.

Form 2749 IRS Notice of Tax Due period ended 12/31/2019 for $175,074.19.

Form 2749 IRS Notice of Tax Due period ended 03/31/2020 for $ 211,251.62.

IRS Notice CP49 Taxpayer's income tax overpayment used to pay other tax liability.

Copy of Taxpayer's protest (Which the Internal Revenue Service agreed with for the Period 09/30/2019)

Exhibit A

04/12/2018 THU 11:38  FAX 304 522 9162 Farrell, White & Legg    ☒003/011

RECEIVED

18 APR 12 AM 11:  West Virginia Secretary of State
                  Business & Licensing Division
                  Tel: (304)558-8000
                  Fax: (304)558-8381
                  Website: www.wvsos.gov

**WEST VIRGINIA
ARTICLES OF ORGANIZATION
OF LIMITED LIABILITY COMPANY**
Form LLD-1
Rev. 12/2017

FILED
APR 12 2018
IN THE OFFICE OF
WV SECRETARY OF STATE

SECRETARY OF STATE
STATE OF WV

**FILE ONE ORIGINAL**
(Two if you want a filed stamped
copy returned to you.)

**FILING FEE: $100**
* Fee Waived for Veteran-owned organization

Control # **9ALWM**

* * * * We acting as organizers according to West Virginia Code §31B-2-202, adopt the following * * * *
Articles of Organization for a West Virginia Limited Liability Company.

1. The name of the West Virginia limited liability company
   shall be: [The name must contain one of the required terms such as "limited liability company" or abbreviation such as "LLC" or "PLLC" - see instructions for a list of acceptable terms.]

   Mingo Health Partners, LLC

   ☒ CHECK BOX to indicate you've included one of the REQUIRED CORPORATE NAME ENDINGS (See instructions for name endings)

2. The company    ☒ LLC    ☐ Professional LLC* for the profession of: _____
   will be a:                (See Section 2. of the attached instructions for list of accepted professions.)

                    ☐ Professional business organizations: CHECK BOX indicating you have attached the state licensing board Verification of Eligibility (Form VOE) to these Articles if your profession meets the requirements as defined by Chapter 30 of WV Code. Your application will be rejected if the VOE is not attached.

3. The address of the principal office    Street: 52 West 2nd Avenue
   of the company will be:
                                           City: Williamson    State: WV    Zip Code: 25661

   Located in the County of (required):    County: Mingo

   The mailing address of the above        Street:
   location, if different, will be:
                                           City:    State:    Zip Code:

4. The address of the initial designated   Street: 52 West 2nd Avenue
   (physical) office of the company in
   West Virginia, if any, will be:         City: Williamson    State: WV    Zip Code: 25661

   Located in the County of:               County: Mingo

   The mailing address of the above        Street:
   location, if different, will be:
                                           City:    State:    Zip Code:

5. The name and address of the person      Name: Charles W. Hatfield
   (agent) to whom notice of process
   may be sent, if any, will be:           Street: 52 West 2nd Avenue

                                           City: Williamson    State: WV    Zip Code: 25661

460712
S

Exhibit A

04/12/2018 THU 11:35  FAX 304 522 9162 Farrell, White & Legg                    ☒004/011

WEST VIRGINIA ARTICLES OF ORGANIZATION OF LIMITED LIABILITY COMPANY                    Page 2

6. E-mail address where business correspondence may be received: charleshatfield@suddenlinkmail.com

7. Website address of the business, if any (ex: yourdomainname.com): n/a

8. Do you own or operate more than one business in West Virginia?    ☐ Yes * Answer a. and b. below.    ☐ No    ☒ Decline to answer
   If "Yes"... a.  How many businesses? _____    b. Located in how many West Virginia counties? _____

9. The name(s) and address(es) of the organizer(s) is (You must list at least ONE organizer.):

| Name | No. & Street Address | City | State | Zip Code |
|------|----------------------|------|-------|----------|
| Charles W. Hatfield | ███████████████ | | | |

10. The company will be:    ☒ an AT-WILL company, conducting business for an indefinite period.
    (required)    ☐ a TERM company, conducting business for the term of _____ years.

11. a. List the name(s) and address(es) of the MEMBER(S) of the company (required; Note: The application will be rejected if member information is not provided below. Attach additional pages if necessary):

| Member Name | No. & Street Address | City | State | Zip Code |
|-------------|----------------------|------|-------|----------|
| Charles W. Hatfield | ███████████████ | | | |
| Sam Kapourales | | | | |
| Doug Reynolds | | | | |

b. The company will be –    ☒ MEMBER-MANAGED [All member information must be entered under 11a. above.]
   CHECK ONE (required):    ☐ MANAGER-MANAGED [All manager information must be entered in the spaces below
                                   if selecting this management structure. Attach additional pages if necessary.]

| Manager Name | No. & Street Address | City | State | Zip Code |
|--------------|----------------------|------|-------|----------|
| Charles W. Hatfield | ███████████████ | | | |

12. All or specified members of a limited liability    ☒ No – All debts, obligations and liabilities are those of the company.
    company are liable in their capacity as
    members for all or specified debts, obliga-    ☐ Yes – Those persons who are liable in their capacity as members for all debts,
    tions or liabilities of the company (required):         obligations or liability of the company have consented in writing to the
                                                            adoption of the provision or to be bound by the provision.

13. The purpose(s) for which this limited liability company is formed is as follows:
    [Describe the type(s) of business activity which will be conducted, for example, "real estate", "construction of residential and commercial buildings," "commercial painting," "professional practice of law" (see Section 2. for acceptable "professional" business activities). Purpose may conclude with words "...including the transaction of any or all lawful business for which corporations may be incorporated in West Virginia."]

    To operate health care entity(ies) including but not limited to hospital/hospital services and all transactions and/or

    lawful business purposes which a LLC may be organized and incorporated in West Virginia

Exhibit A

04/12/2018 THU 11:39  FAX 304 522 9162 Farrell, White & Legg                    @005/011

WEST VIRGINIA ARTICLES OF ORGANIZATION OF LIMITED LIABILITY COMPANY            Page 3

14. Is the business a Scrap Metal Dealer?

☐ Yes (If "Yes," you must complete the Scrap Metal Dealer Registration Form (Form SMD-1) and proceed to Section 15.)

☒ No (Proceed to Section 15.)

15. Other provisions which may be set forth in the operating agreement or which are not inconsistent with the law:
(See instructions for further information; use extra pages if necessary.)

16. The number of pages attached and included in these Articles is:  0

17. The requested effective date is:
(If requested date is none and is a or later, then filing any
later than 90 days after filing is not allowed.)

☐ the date and time of filing in the Secretary of State's Office.

☐ the following date: _____ and time _____

18. Is the organization a "veteran-owned" organization?

Effective JULY 1, 2016, to meet the requirements for a "veteran-owned" organization, the entity filing the registration must meet the full criteria per West Virginia Code §59-1-2a:

1. A "veteran" must be honorably discharged or under honorable conditions and;
2. A "veteran-owned business" means a business that meets one of the following criteria:
   o is at least fifty-one percent (51%) unconditionally owned by one or more veterans; or
   o in the case of a publicly owned business, at least fifty-one percent (51%) of the stock is unconditionally owned by one or more veterans.

☐ Yes (If "Yes," attach Form DD214)  ➡  ☐ CHECK BOX indicating you have an attached Veterans Affairs Form DD214

You may obtain a copy of your Veterans Affairs Form DD214 by contacting:

National Personnel Records Center
Military Personnel Records
1 Archives Drive
St. Louis, MO 63138
Toll free: 1-86-NARA-NARA or 1-866-272-6272
Phone: 314-801-0800
www.archives.gov/veterans/military-service-records

☒ No

For WV Code 59-1-2(f) effective July 1, 2016, the registration fee is waived for entities that meet the requirements as a "veteran-owned" organization. Any attached instruments to determine if the organization qualifies for this waiver. In addition, a "veteran-owned" entity will have to submit a current year of Annual Report for mutual AFTER the organization's initial formation (see WV Code 59-1-2a(e)).

19. Contact and Signature Information * (See below for current Legal Notice Regarding Signature):

a. Contact person to reach in case there is a problem with filing: Tamela J. White, counsel    Phone: +1 (304) 522-9100

b. Print or type name of signer: Charles W. Hatfield        Title/Capacity of Signer: Organizer and Managing Member

c. Signature: _Charles W. Hatfield_        Date: 4/12/18

*Important Legal Notice Regarding Signature: Per West Virginia Code §11-B-4-201, liability for false statement is fixed record. If a record individual or required to be filed under this chapter contains a false statement, and who suffers loss by reliance on the statement may recover damages for the loss from a person who signed the record or caused another to sign it on the person's behalf and knew the statement to be false when the record was signed.

Important Note: This form is a public document. Please do NOT provide any personal identifiable information on this form such as social security numbers, bank account numbers, credit card numbers, the identification or driver's license numbers.

[ Reset Form ]    [ Print Form ]

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DEPOSITION ACCOUNTING MANAGER
Williamson Memorial Hospital

DIANE VARNEY
07/13/2022

Page 89

1    Q.  Which ones could you not make payments from?
2    A.  I didn't -- I didn't do the payments.  I mean,
3  the schedule was done knowing there was money in the
4  bank to do those payments.
5    Q.  Okay.  Well, which accounts did you actually
6  have authority to make transactions is what I meant?
7    A.  I don't make -- I don't move money in the bank
8  accounts.  I had no authority to do anything in the bank
9  accounts.
10    Q.  Okay.  But you could view them, you just
11  couldn't make any transactions.
12    A.  Right.  Right.
13    Q.  Okay.  Thanks for clarifying that.
14        Did you meet with Sam Kapourales
15  routinely to review aged accounts receivable?
16    A.  Not receivables.  Payables.
17    Q.  Payables.  Right.
18    A.  I recall three different times that there
19  was -- actually he wanted to look at them at the
20  accounts payable aging to see what was owed.
21    Q.  Do you remember when those times were, what
22  dates?
23    A.  No.
24    Q.  And you were asked a lot about employee

Page 90

1  payroll and net versus gross, and I understand that net
2  payments were made for a period.
3        Were the gross payments ever made up
4  like in the previous week or payroll period, or only net
5  payments made for the period that Charlie Hatfield was
6  CEO?
7    A.  He said we had ADP up until April of 2019, and
8  when we went to MEDITECH that's when the net amount of
9  the payroll was funded.
10    Q.  Okay.  And I think you testified earlier you
11  didn't have any issues with the net or gross when ADP
12  took over -- or when ADP was in charge; right?
13    A.  Right.
14    Q.  So Charlie was CEO from -- well, his last day
15  was sometime in October 2019; right?
16    A.  Yes.
17    Q.  Do you remember when he started?
18    A.  Not the exact date, no.
19    Q.  But the bottom line from when he started to
20  April 2019, there were no issues with the net or gross
21  payments; right?
22    A.  Correct.
23    Q.  Okay.  So it would have been only been from
24  May 2019 through October 2019 when he left Williamson

Page 91

1  Memorial Hospital?
2    A.  It may have started in April, because in the
3  transition from going into MEDITECH -- leaving ADP and
4  going into MEDITECH was during that time period.  It was
5  the month of April.
6    Q.  And, again, apologies for skipping around here
7  but a follow-up on Sam Kapourales and when you-all
8  reviewed the accounts payable.
9        Did Sam ever tell you which invoices to
10  pay?
11    A.  Not -- not not specifically, no.
12    Q.  So your testimony is that Charlie Hatfield was
13  the only one who told you which invoices to pay and not
14  to pay?
15    A.  Yes.
16    Q.  I know you've testified earlier about the Mid
17  Mountain payments.  Do you have any evidence that the
18  payments made to Mid Mountain were not somehow related
19  to reimbursements for Williamson Memorial Hospital?
20    A.  There were some when they used their credit
21  card, the Mid Mountain credit card, yes, we reimbursed
22  them.
23    Q.  Okay.  Do you have any evidence of
24  reimbursements to Charlie or Sabrina Hatfield that were

Page 92

1  not related to Williamson Memorial Hospital?
2    A.  Those were the ones I couldn't identify.  I
3  had no backup for.
4    Q.  Do you remember how many charges or the amount
5  of those charges, what they would have been?
6    A.  There was -- I remember a check for almost
7  $26,000 to a vendor I never heard of.
8    Q.  Do you remember the name of the vendor?
9    A.  No.
10    Q.  Was there anything submitted related to that
11  payment?
12    A.  No.
13    Q.  And I wanted to talk to you about the monthly
14  closing of the books.  You testified earlier that you
15  gave Charlie some financial documents at the end of
16  every month; right?
17    A.  Yes.
18    Q.  How did you deliver those documents to him?
19  Were they hand delivered or emailed?
20    A.  Hand delivered.
21    Q.  So hard copies?
22    A.  Yes.
23    Q.  Did you ever email those to Charlie or anyone
24  else?

Exhibit A

**Department of the Treasury**
**Internal Revenue Service**
**[Operating Division / Program Name]**
1100 MAIN ST - STE 103
WHEELING, WV 26003

Date: Jul 9, 2022

**Taxpayer ID number (last 4 digits):**

**Business name and address:**
WILLIAMSON MEMORIAL HOSPITAL LLC
% HEALTH MANAGEMENT ASSOC INC MBR
859 ALDERSON ST
WILLIAMSON, WV 25661-3215-595

**Person to contact:**
NICHOLAS BALAKOS

**Employee ID number:**

**Contact numbers:**
Telephone: (304) 238-2946
Fax: (304) 232-9438

SAM KAPOURALES

Dear: MR SAM KAPOURALES,

**Why we're sending you this letter**
We're proposing to assess a Trust Fund Recovery Penalty against you as a personal liability because we haven't received full payment of the federal employment or excise tax liability due from the business shown above.

You're required to collect, account for, and pay withheld trust fund taxes for the business, which include:
- Employment taxes you withheld (or should have withheld) from the employees' wages.
- Excise taxes you collected (or should have collected) from customers.

We listed the proposed penalties, equal to the unpaid trust fund taxes the business still owes, at the end of this letter for your review.

**If you agree with the proposed assessment**
If you agree with the amounts shown, sign and return Part 1 of the enclosed Form 2751, Proposed Assessment of Trust Fund Recovery Penalty.

**If you don't agree with the proposed assessment**
If you don't agree with the amounts shown, you can contact the person shown above to try to resolve the matter informally or you can appeal the proposed assessment.

**If you want to try to resolve the matter informally**
If you have additional information to support your case and want to try to resolve the matter informally, contact the person shown above within 10 days from the date of this letter. Contacting us won't extend the deadline for your appeal rights. You can ask if your case is eligible for Fast Track Mediation. See Publication 3605, Fast Track Mediation - A Process for Prompt Resolution of Tax Issues.

**If you want to appeal this determination**
You have the right to appeal this action by filing a written protest, which may be forwarded to the IRS Independent Office of Appeals (Appeals). To keep your appeal rights, you need to provide your **written appeal within 60 days** from the date of this letter (75 days if this letter is addressed to you outside the U.S.). **Send your written appeal to the attention of the contact person shown at the top of this letter.** The proposed penalty amounts you're protesting determine how you should file your appeal.

Letter 1153 (Rev. 12-2021)
Catalog Number 40545C

Exhibit A

| For each period you're protesting, if the proposed penalty amount is: | You should: |
|---|---|
| $25,000 or less | Send a small case request |
| More than $25,000 | Send a formal written protest |

You can send one small case request or protest for all the periods listed on the Form 2751, but if the penalty for any one period is more than $25,000, you must file a formal written protest. Include any information you want the settlement or Appeals officer to consider. Providing more information will help us process your request quickly.

A small case request must include:
- A copy of this letter, or your name, address, taxpayer identification number, and any information that will help us identify your file.
- A statement that you want an Appeals conference.
- A list of the penalties you disagree with and an explanation of why you disagree. Your explanation should address responsibility and willfulness in paying the trust fund taxes. Willfulness means an action was intentional, deliberate, or voluntary and not an accident or mistake. Therefore, you should explain your duties and responsibilities, including your duty and authority to collect, account for, and pay the trust fund taxes. If you disagree with how we calculated the penalty, you should list the dates and amounts of payments you believe we didn't consider or any computation errors you believe we made.

A formal written protest must include:
- Your name, address, and taxpayer identification number.
- A statement that you want an Appeals conference.
- A copy of this letter, or the date and number of this letter.
- The tax periods involved (see Form 2751).
- A list of the penalties you disagree with.
- Facts signed under penalties of perjury explaining why you disagree.
  - Include specific dates, names, amounts, and locations that support your position. Your explanation should address responsibility and willfulness in paying the trust fund taxes. Willfulness means an action was intentional, deliberate, or voluntary and not an accident or mistake. Therefore, you should explain your duties and responsibilities, including your duty and authority to collect, account for, and pay the trust fund taxes. If you disagree with how we calculated the penalty, you should list the dates and amounts of payments you believe we didn't consider or any computation errors you believe we made.
  - If you rely on a law or other authority to support your arguments, explain what it is and how it applies.
  - Add the following declaration to your statement and sign it: "Under penalties of perjury, I declare that I have examined the facts presented in this statement and any accompanying information, and, to the best of my knowledge and belief, they are true, correct, and complete."

Representation
You can represent yourself at your Appeals conference or have someone qualified to practice before us represent you, such as an attorney, certified public accountant, or enrolled agent. If your representative attends a conference without you, we must have a completed Form 2848, Power of Attorney and Declaration of . Representative, for them to receive confidential tax information, or Form 8821, Tax Information Authorization, for them to inspect confidential tax information.

Letter 1153 (Rev. 12-2021)
Catalog Number 40545C

<span style="color:red">Exhibit A</span>

If your representative prepares and signs the protest for you, they must substitute a declaration statement stating that:

- They submitted the protest and accompanying documents.
- They know personally that the facts stated in the protest and accompanying documents are true and correct.

**Consideration by the courts**
If your appeal doesn't result in your favor, we'll send you a bill. If you still disagree with us, you may then take your case to the United States Court of Federal Claims or to the appropriate United States District Court by following the procedures below. These courts have no connection with the IRS. Before you can file a claim with these courts, you must pay a portion of the tax liability and file a claim for refund, as described below.

**Special bond to delay collection actions for any period as soon as you file a claim for refund**
To ask that we delay collection of the penalty for any period, when you file a claim for refund for that period, you must do the following **within 30 days** from the date of the official notice of assessment and demand (the first bill) for that period:

- Pay the tax for one employee for each period of liability that you want to contest (if we based the penalty on unpaid employment taxes) or pay the tax for one transaction for each period that you want to contest (if we based the penalty on unpaid excise tax).
- File a claim for a refund of the amounts you paid using Forms 843, Claim for Refund and Request for Abatement.
- Post a bond with the IRS for one and one-half times the amount of the remaining penalty after you've made the required payments listed in the first item. Visit **www.irs.gov/irm/part5/irm_05-006-001** for information regarding collateral agreements.

If the IRS denies your claim when you post this bond, you have **30 days** to file suit in the appropriate U.S. District Court or the U.S. Court of Federal Claims before the IRS can apply the bond to your penalty and the accrued interest.

**Claim for refund with no special bond**
If you don't file a special bond as described above, you can still file a claim for refund following the same steps, except you don't have to take the actions within 30 days after the date of the official notice of assessment and demand for the period.

If we don't act on your refund claim within 6 months from the date you filed it, you can file a suit for refund. You can also file a suit for refund within 2 years after we disallow your claim.

If we find that the collection of this penalty is in jeopardy, we can take immediate action to collect it without regard to the 60-day period for sending a protest.

For more information about filing a suit, you can contact the Clerk of the appropriate local District Court or:

> Clerk of the United States Court of Federal Claims
> 717 Madison Place NW
> Washington, D.C. 20439

**If we don't hear from you**
If we don't hear from you **within 60 days** from the date of this letter (or 75 days if this letter is addressed to you outside the U.S.), we'll assess the penalty and begin collection action.

Letter 1153 (Rev. 12-2021)
Catalog Number 40545C

Exhibit A

**Taxpayer Advocate Service**
The Taxpayer Advocate Service (TAS) is an independent organization within the IRS that helps taxpayers and protect taxpayers' rights. TAS can offer you help if your tax problem is causing a financial difficulty, you've tried but been unable to resolve your issue with the IRS, or you believe an IRS system, process, or procedures isn't working as it should. If you qualify for TAS assistance, which is always free, TAS will do everything possible to help you. To learn more, visit www.taxpayeradvocate.irs.gov or call 877-777-4778.

**Additional information**
- You can reply to this letter by mail, fax or telephone using the contact information shown at the top of this letter. If you send a written response, include a copy of this letter or information to identify your account, your telephone number and the best hours to reach you. If you fax a response, you can use a fax machine or online fax service. Several online fax services use the internet to send files from your computer or smart device to a fax number.
- Find tax forms and publications by visiting www.irs.gov/forms or calling 800-TAX-FORM (800-829-3676).
- Keep this letter for your records.

If you have questions, you can call the contact person shown above.

Sincerely,

NICHOLAS BALAKOS
Revenue Officer

Enclosures:
Publication 1
Form 2751
Envelope

| Form / Tax period ending | Trust fund penalty | Form / Tax period ending | Trust fund penalty |
|---|---|---|---|
| 941 / 09-30-2019 | $302,178.33 | 941 / 12-31-2019 | $175,074.19 |
| 941 / 03-31-2020 | $211,251.62 | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Letter 1153 (Rev. 12-2021)
Catalog Number 40545C

Exhibit A

| Form / Tax period ending | Trust fund penalty | Form / Tax period ending | Trust fund penalty |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**Letter 1153 (Rev. 12-2021)**
Catalog Number 40545C

Exhibit A

Case 2:19-bk-20469    Doc 354    Filed 04/21/20    Entered 04/21/20 12:02:41    Desc Main
59

**Fill in this information to identify the case:**

Debtor Name __Williamson Memorial Hospital, LLC__

United States Bankruptcy Court for the: Southern District of West Virginia

Case number: __19-20469__

☑ Check if this is an amended filing

---

Official Form 425C

---

## Monthly Operating Report for Small Business Under Chapter 11                    12/17

Month:    January

Line of business: __Hospital__

Date report filed: __04/21/2020__
MM / DD / YYYY

NAISC code: _____

In accordance with title 28, section 1746, of the United States Code, I declare under penalty of perjury that I have examined the following small business monthly operating report and the accompanying attachments and, to the best of my knowledge, these documents are true, correct, and complete.

Responsible party:    __Interim CEO of Williamson Memorial Hospital__

Original signature of responsible party    *Harold Preston*

Printed name of responsible party    Harold E. Preston, Jr.

### 1. Questionnaire

Answer all questions on behalf of the debtor for the period covered by this report, unless otherwise indicated.

| | Yes | No | N/A |
|---|:---:|:---:|:---:|
| If you answer *No* to any of the questions in lines 1-9, attach an explanation and label it *Exhibit A.* | | | |
| 1. Did the business operate during the entire reporting period? | ☑ | ☐ | ☐ |
| 2. Do you plan to continue to operate the business next month? | ☑ | ☐ | ☐ |
| 3. Have you paid all of your bills on time? | | X | ☐ |
| 4. Did you pay your employees on time? | ☑ | ☐ | ☐ |
| 5. Have you deposited all the receipts for your business into debtor in possession (DIP) accounts? | ☑ | ☐ | ☐ |
| 6. Have you timely filed your tax returns and paid all of your taxes? | ☐ | ☑ | ☐ |
| 7. Have you timely filed all other required government filings? | ☐ | ☑ | ☐ |
| 8. Are you current on your quarterly fee payments to the U.S. Trustee or Bankruptcy Administrator? | ☐ | ☑ | ☐ |
| 9. Have you timely paid all of your insurance premiums? | ☑ | ☐ | ☐ |
| If you answer *Yes* to any of the questions in lines 10-18, attach an explanation and label it *Exhibit B.* | | | |
| 10. Do you have any bank accounts open other than the DIP accounts? | ☐ | ☑ | ☐ |
| 11. Have you sold any assets other than inventory? | ☐ | ☑ | ☐ |
| 12. Have you sold or transferred any assets or provided services to anyone related to the DIP in any way? | ☐ | ☑ | ☐ |
| 13. Did any insurance company cancel your policy? | ☐ | ☑ | ☐ |
| 14. Did you have any unusual or significant unanticipated expenses? | ☐ | ☑ | ☐ |
| 15. Have you borrowed money from anyone or has anyone made any payments on your behalf? | ☑ | ☐ | ☐ |
| 16. Has anyone made an investment in your business? | ☐ | ☑ | ☐ |

Exhibit A

Debtor Name  Williamson Memorial Hospital, LLC                              Case number  19-20469

17. Have you paid any bills you owed before you filed bankruptcy?          ☐  ☑  ☐
18. Have you allowed any checks to clear the bank that were issued before you filed bankruptcy?  ☐  ☑  ☐

## 2. Summary of Cash Activity for All Accounts

19. **Total opening balance of all accounts**

This amount must equal what you reported as the cash on hand at the end of the month in the previous
month. If this is your first report, report the total cash on hand as of the date of the filing of this case.          $  17,360.73

20. **Total cash receipts**

Attach a listing of all cash received for the month and label it *Exhibit C*. Include all
cash received even if you have not deposited it at the bank, collections on
receivables, credit card deposits, cash received from other parties, or loans, gifts, or
payments made by other parties on your behalf. Do not attach bank statements in
lieu of *Exhibit C*.

Report the total from *Exhibit C* here.          $  786,106.63

21. **Total cash disbursements**

Attach a listing of all payments you made in the month and label it *Exhibit D*. List the
date paid, payee, purpose, and amount. Include all cash payments, debit card
transactions, checks issued even if they have not cleared the bank, outstanding
checks issued before the bankruptcy was filed that were allowed to clear this month,
and payments made by other parties on your behalf. Do not attach bank statements
in lieu of *Exhibit D*.

Report the total from *Exhibit D* here.          – $  638,905.75

22. **Net cash flow**

Subtract line 21 from line 20 and report the result here.
This amount may be different from what you may have calculated as *net profit*.          + $  147,200.88

23. **Cash on hand at the end of the month**

Add line 22 + line 19. Report the result here.          = $  164,561.71

Report this figure as the *cash on hand at the beginning of the month* on your next operating report.

This amount may not match your bank account balance because you may have outstanding checks that
have not cleared the bank or deposits in transit.

## 3. Unpaid Bills

Attach a list of all debts (including taxes) which you have incurred since the date you filed bankruptcy but
have not paid. Label it *Exhibit E*. Include the date the debt was incurred, who is owed the money, the
purpose of the debt, and when the debt is due. Report the total from *Exhibit E* here.

24. **Total payables**          $  571,494.60

 *(Exhibit E)*

<span style="color:red">Exhibit A</span>

Case 2:19-bk-20469    Doc 354    Filed 04/21/20    Entered 04/21/20 12:02:41    Desc Main
Document    Page 3 of 59

Debtor Name  Williamson Memorial Hospital, LLC                                Case number  19-20469

 **4. Money Owed to You**

Attach a list of all amounts owed to you by your customers for work you have done or merchandise you have sold. Include amounts owed to you both before, and after you filed bankruptcy.  Label it *Exhibit F*. Identify who owes you money, how much is owed, and when payment is due. Report the total from *Exhibit F* here.

25.  **Total receivables**                                                    $  4,945,000.0

*(Exhibit F)*

 **5. Employees**

26.  What was the number of employees when the case was filed?                            154

27.  What is the number of employees as of the date of this monthly report?                   101

**6. Professional Fees**

28.  How much have you paid this month in professional fees related to this bankruptcy case?      $  50,000.00

29.  How much have you paid in professional fees related to this bankruptcy case since the case was filed?  $  50,000.00

30.  How much have you paid this month in other professional fees?                       $  0.00

31.  How much have you paid in total other professional fees since filing the case?           $  0.00

**7. Projections**

Compare your actual cash receipts and disbursements to what you projected in the previous month. Projected figures in the first month should match those provided at the initial debtor interview, if any.

| | Column A | | Column B | | Column C |
|---|---|---|---|---|---|
| | **Projected** | — | **Actual** | = | **Difference** |
| | Copy lines 35-37 from the previous month's report. | | Copy lines 20-22 of this report. | | Subtract Column B from Column A. |
| 32.  **Cash receipts** | $ 944,696.00 | — | $ 786,106.63 | = | $ 158,589.37 |
| 33.  **Cash disbursements** | $ 1,037,045.0 | — | $ 638,905.75 | = | $ 535,112.00 |
| 34.  **Net cash flow** | $ -17,360.00 | — | $ 147,200.88 | = | $ 164,560.88 |

35.  Total projected cash receipts for the next month:                         $  1,500,000.0

36.  Total projected cash disbursements for the next month:                   - $  1,042,000.0

37.  Total projected net cash flow for the next month:                        = $  458,000.00

Exhibit A

Debtor Name  Williamson Memorial Hospital, LLC _____          Case number 19-20469 _____

 **8. Additional Information**

If available, check the box to the left and attach copies of the following documents.

☑  38.  Bank statements for each open account (redact all but the last 4 digits of account numbers).

☑  39.  Bank reconciliation reports for each account.

☑  40.  Financial reports such as an income statement (profit & loss) and/or balance sheet.

☑  41.  Budget, projection, or forecast reports.

☐  42.  Project, job costing, or work-in-progress reports.

Exhibit A

## EXHIBIT A

Debtor receipts were inefficient to pay all amounts owed when they came due.

Debtor has retained an accounting firm to assist with tax filings.

Exhibit A

Case 2:19-bk-20469   Doc 354   Filed 04/21/20   Entered 04/21/20 12:02:41   Desc Main
Document    Page 6 of 59

EXHIBIT

WILLIAMSON MEMORIAL HOSPITAL
Case No. 2:19-bk-20469

| | 10/24/2019 | 11/14/2019 | 11/18/2019 | 12/13/2019 | 1/2/2020 | 1/3/2020 | 1/21/2020 | 1/27/2020 | TOTAL* |
|---|---|---|---|---|---|---|---|---|---|
| Partners | 330,000.00 | 75,000.00 | 75,000.00 | 22,000.00 | 100,000.00 | 1,000.00 | 100,000.00 | 7,000.00 | 710,000.00 |
| Total Cash | 330,000.00 | 75,000.00 | 75,000.00 | 22,000.00 | 100,000.00 | 1,000.00 | 100,000.00 | 7,000.00 | 710,000.00 |

*During month of January, principals in Mingo Partners contributed the following additional sums to debtor, without obtaining any court approval: 1/21/2020 (150,000); 1/27/2020 (73,000)
and 1/31/2020 (145,000)

Exhibit A

**Fill in this information to identify the case:**

Debtor Name  Williamson Memorial Hospital, LLC

United States Bankruptcy Court for the: Northern District of West Virginia

Case number:  19-20469

☐ Check if this is an
amended filing

Official Form 425C

## Monthly Operating Report for Small Business Under Chapter 11                          12/17

Month:          February                                    Date report filed:  03/30/2020
                                                                                MM / DD / YYYY
Line of business:  Hospital                                  NAISC code:  _____

In accordance with title 28, section 1746, of the United States Code, I declare under penalty of perjury
that I have examined the following small business monthly operating report and the accompanying
attachments and, to the best of my knowledge, these documents are true, correct, and complete.

Responsible party:          Interim CEO Williamson Memorial Hospital

Original signature of responsible party    *Harold Preston*

Printed name of responsible party    Harold E. Preston, Jr.

### 1. Questionnaire

Answer all questions on behalf of the debtor for the period covered by this report, unless otherwise indicated.

| | | Yes | No | N/A |
|---|---|:---:|:---:|:---:|
| | **If you answer *No* to any of the questions in lines 1-9, attach an explanation and label it *Exhibit A.*** | | | |
| 1. | Did the business operate during the entire reporting period? | ☑ | ☐ | ☐ |
| 2. | Do you plan to continue to operate the business next month? | ☑ | ☐ | ☐ |
| 3. | Have you paid all of your bills on time? | ☑ | ☐ | ☐ |
| 4. | Did you pay your employees on time? | ☑ | ☐ | ☐ |
| 5. | Have you deposited all the receipts for your business into debtor in possession (DIP) accounts? | ☑ | ☐ | ☐ |
| 6. | Have you timely filed your tax returns and paid all of your taxes? | ☐ | ☑ | ☐ |
| 7. | Have you timely filed all other required government filings? | ☑ | ☐ | ☐ |
| 8. | Are you current on your quarterly fee payments to the U.S. Trustee or Bankruptcy Administrator? | ☐ | ☑ | ☐ |
| 9. | Have you timely paid all of your insurance premiums? | ☑ | ☐ | ☐ |
| | **If you answer *Yes* to any of the questions in lines 10-18, attach an explanation and label it *Exhibit B.*** | | | |
| 10. | Do you have any bank accounts open other than the DIP accounts? | ☐ | ☑ | ☐ |
| 11. | Have you sold any assets other than inventory? | ☐ | ☑ | ☐ |
| 12. | Have you sold or transferred any assets or provided services to anyone related to the DIP in any way? | ☐ | ☑ | ☐ |
| 13. | Did any insurance company cancel your policy? | ☐ | ☑ | ☐ |
| 14. | Did you have any unusual or significant unanticipated expenses? | ☐ | ☑ | ☐ |
| 15. | Have you borrowed money from anyone or has anyone made any payments on your behalf? | ☑ | ☐ | ☐ |
| 16. | Has anyone made an investment in your business? | ☐ | ☑ | ☐ |

Exhibit A

Case 2:19-bk-20469    Doc 310    Filed 03/30/20    Entered 03/30/20 15:24:49    Desc Main
Document    Page 2 of 35

Debtor Name  Williamson Memorial Hospital, LLC                    Case number 19-20469

17. Have you paid any bills you owed before you filed bankruptcy?  ☐ ☑ ☐

18. Have you allowed any checks to clear the bank that were issued before you filed bankruptcy?  ☐ ☑ ☐

## 2. Summary of Cash Activity for All Accounts

19. **Total opening balance of all accounts**

This amount must equal what you reported as the cash on hand at the end of the month in the previous month. If this is your first report, report the total cash on hand as of the date of the filing of this case.

$ 164,561.61

20. **Total cash receipts**

Attach a listing of all cash received for the month and label it *Exhibit C*. Include all cash received even if you have not deposited it at the bank, collections on receivables, credit card deposits, cash received from other parties, or loans, gifts, or payments made by other parties on your behalf. Do not attach bank statements in lieu of *Exhibit C*.

Report the total from *Exhibit C* here.

$ 1,629,019.8

21. **Total cash disbursements**

Attach a listing of all payments you made in the month and label it *Exhibit D*. List the date paid, payee, purpose, and amount. Include all cash payments, debit card transactions, checks issued even if they have not cleared the bank, outstanding checks issued before the bankruptcy was filed that were allowed to clear this month, and payments made by other parties on your behalf. Do not attach bank statements in lieu of *Exhibit D*.

Report the total from *Exhibit D* here.

– $ 303,829.10

22. **Net cash flow**

Subtract line 21 from line 20 and report the result here.
This amount may be different from what you may have calculated as *net profit*.

+ $ 1,325,190.8

23. **Cash on hand at the end of the month**

Add line 22 + line 19. Report the result here.

Report this figure as the *cash on hand at the beginning of the month* on your next operating report.

This amount may not match your bank account balance because you may have outstanding checks that have not cleared the bank or deposits in transit.

= $ 1,489,752.4

## 3. Unpaid Bills

Attach a list of all debts (including taxes) which you have incurred since the date you filed bankruptcy but have not paid. Label it *Exhibit E*. Include the date the debt was incurred, who is owed the money, the purpose of the debt, and when the debt is due. Report the total from *Exhibit E* here.

24. **Total payables**

$ 1,030,688.9

*(Exhibit E)*

Exhibit A

Case 2:19-bk-20469    Doc 310    Filed 03/30/20    Entered 03/30/20 15:24:49    Desc Main
Document    Page 3 of 35

Debtor Name  Williamson Memorial Hospital, LLC                          Case number  19-20469

### 4. Money Owed to You

Attach a list of all amounts owed to you by your customers for work you have done or merchandise you
have sold. Include amounts owed to you both before, and after you filed bankruptcy.  Label it *Exhibit F*.
Identify who owes you money, how much is owed, and when payment is due. Report the total from
*Exhibit F* here.

25. **Total receivables**                                                                    $ 4,959,688
    *(Exhibit F)*

### 5. Employees

26. What was the number of employees when the case was filed?                                        157
27. What is the number of employees as of the date of this monthly report?                           101

### 6. Professional Fees

28. How much have you paid this month in professional fees related to this bankruptcy case?      $  50,000.00
29. How much have you paid in professional fees related to this bankruptcy case since the case was filed?  $  50,000.00
30. How much have you paid this month in other professional fees?                                $ _____
31. How much have you paid in total other professional fees since filing the case?              $ _____

### 7. Projections

Compare your actual cash receipts and disbursements to what you projected in the previous month.
Projected figures in the first month should match those provided at the initial debtor interview, if any.

| | *Column A*<br>**Projected** | | *Column B*<br>**Actual** | | *Column C*<br>**Difference** |
|---|---|---|---|---|---|
| | Copy lines 35-37 from the previous month's report. | − | Copy lines 20-22 of this report. | = | Subtract Column B from Column A. |
| 32. **Cash receipts** | $ 1,500,000.0 | − | $ 1,629,019.0 | = | $ 129,019.00 |
| 33. **Cash disbursements** | $ 1,042,000.0 | − | $ 303,829.10 | = | $ 738,171.00 |
| 34. **Net cash flow** | $ 458,000.00 | − | $ 1,325,190.8 | = | $ 867,190.00 |

35. Total projected cash receipts for the next month:                                          $  489,000.00
36. Total projected cash disbursements for the next month:                                   − $  489,000.00
37. Total projected net cash flow for the next month:                                        = $      0.00

Exhibit A

Debtor Name  Williamson Memorial Hospital, LLC                           Case number  19-20469

---

### 8. Additional Information

If available, check the box to the left and attach copies of the following documents.

☑ 38.  Bank statements for each open account (redact all but the last 4 digits of account numbers).

☑ 39.  Bank reconciliation reports for each account.

☑ 40.  Financial reports such as an income statement (profit & loss) and/or balance sheet.

☑ 41.  Budget, projection, or forecast reports.

☐ 42.  Project, job costing, or work-in-progress reports.

Exhibit A

## EXHIBIT A

In order to have the funds necessary to continue operations at the hospital, Debtor has not been able to pay all of its taxes and US Trustee fees as they become due. Debtor anticipates receiving funds from the collection of its receivables sufficient to pay these sums in the near future.

## EXHIBIT B

In February 2020, the Debtor obtained an order from the Court authorizing it to obtain additional post-petition financing from Pikeville Medical Center. In February, the Debtor borrowed $1,500,000 from Pikeville Medical Center.

Exhibit A

Case 2:19-bk-20469    Doc 355    Filed 04/21/20    Entered 04/21/20 12:03:59    Desc Main
56

| Fill in this information to identify the case: | |
|---|---|
| Debtor Name | Williamson Memorial Hospital, LLC |
| United States Bankruptcy Court for the: | Southern District of West Virginia |
| Case number: | 19-20463 |

☐ Check if this is an amended filing

Official Form 425C

## Monthly Operating Report for Small Business Under Chapter 11

12/17

Month: __March__

Line of business: __Hospital__

Date report filed: __04/21/2020__
MM / DD / YYYY

NAISC code: _____

In accordance with title 28, section 1746, of the United States Code, I declare under penalty of perjury that I have examined the following small business monthly operating report and the accompanying attachments and, to the best of my knowledge, these documents are true, correct, and complete.

Responsible party: __Interim CEO Williamson Memorial Hospital__

Original signature of responsible party __Harold E Preston Jr__

Printed name of responsible party __Harold E. Preston, Jr.__

### ■ 1. Questionnaire

Answer all questions on behalf of the debtor for the period covered by this report, unless otherwise indicated.

| | | Yes | No | N/A |
|---|---|:---:|:---:|:---:|
| | **If you answer *No* to any of the questions in lines 1-9, attach an explanation and label it *Exhibit A.*** | | | |
| 1. | Did the business operate during the entire reporting period? | ☑ | ☐ | ☐ |
| 2. | Do you plan to continue to operate the business next month? | ☐ | ☑ | ☐ |
| 3. | Have you paid all of your bills on time? | ☐ | ☑ | ☐ |
| 4. | Did you pay your employees on time? | ☑ | ☐ | ☐ |
| 5. | Have you deposited all the receipts for your business into debtor in possession (DIP) accounts? | ☑ | ☐ | ☐ |
| 6. | Have you timely filed your tax returns and paid all of your taxes? | ☐ | ☑ | ☐ |
| 7. | Have you timely filed all other required government filings? | ☑ | ☐ | ☐ |
| 8. | Are you current on your quarterly fee payments to the U.S. Trustee or Bankruptcy Administrator? | ☑ | ☐ | ☐ |
| 9. | Have you timely paid all of your insurance premiums? | ☑ | ☐ | ☐ |
| | **If you answer *Yes* to any of the questions in lines 10-18, attach an explanation and label it *Exhibit B.*** | | | |
| 10. | Do you have any bank accounts open other than the DIP accounts? | ☐ | ☑ | ☐ |
| 11. | Have you sold any assets other than inventory? | ☐ | ☑ | ☐ |
| 12. | Have you sold or transferred any assets or provided services to anyone related to the DIP in any way? | ☐ | ☑ | ☐ |
| 13. | Did any insurance company cancel your policy? | ☐ | ☑ | ☐ |
| 14. | Did you have any unusual or significant unanticipated expenses? | ☐ | ☑ | ☐ |
| 15. | Have you borrowed money from anyone or has anyone made any payments on your behalf? | ☑ | ☐ | ☐ |
| 16. | Has anyone made an investment in your business? | ☐ | ☑ | ☐ |

Exhibit A

Debtor Name  Williamson Memorial Hospital, LLC                                    Case number  19-20463

17. Have you paid any bills you owed before you filed bankruptcy?                ☐  ☑  ☐

18. Have you allowed any checks to clear the bank that were issued before you filed bankruptcy?    ☐  ☑  ☐

---

## 2. Summary of Cash Activity for All Accounts

19. **Total opening balance of all accounts**

    This amount must equal what you reported as the cash on hand at the end of the month in the previous month. If this is your first report, report the total cash on hand as of the date of the filing of this case.                                    $ 1,489,752.0

20. **Total cash receipts**

    Attach a listing of all cash received for the month and label it *Exhibit C*. Include all cash received even if you have not deposited it at the bank, collections on receivables, credit card deposits, cash received from other parties, or loans, gifts, or payments made by other parties on your behalf. Do not attach bank statements in lieu of *Exhibit C*.

    Report the total from *Exhibit C* here.                                    $ 795,914.37

21. **Total cash disbursements**

    Attach a listing of all payments you made in the month and label it *Exhibit D*. List the date paid, payee, purpose, and amount. Include all cash payments, debit card transactions, checks issued even if they have not cleared the bank, outstanding checks issued before the bankruptcy was filed that were allowed to clear this month, and payments made by other parties on your behalf. Do not attach bank statements in lieu of *Exhibit D*.

    Report the total from *Exhibit D* here.                                  – $ 1,803,182.5

22. **Net cash flow**

    Subtract line 21 from line 20 and report the result here.
    This amount may be different from what you may have calculated as *net profit*.        + $ -1,007,268.

23. **Cash on hand at the end of the month**

    Add line 22 + line 19. Report the result here.

    Report this figure as the *cash on hand at the beginning of the month* on your next operating report.    = $ 482,484.29

    This amount may not match your bank account balance because you may have outstanding checks that have not cleared the bank or deposits in transit.

---

## 3. Unpaid Bills

Attach a list of all debts (including taxes) which you have incurred since the date you filed bankruptcy but have not paid. Label it *Exhibit E*. Include the date the debt was incurred, who is owed the money, the purpose of the debt, and when the debt is due. Report the total from *Exhibit E* here.

24. **Total payables**                                                         $ 502,454.68

    *(Exhibit E)*

---

Exhibit A

Case 2:19-bk-20469     Doc 355     Filed 04/21/20     Entered 04/21/20 12:03:59     Desc Main
Document     Page 3 of 56

Debtor Name  Williamson Memorial Hospital, LLC                          Case number  19-20463

### 4. Money Owed to You

Attach a list of all amounts owed to you by your customers for work you have done or merchandise you
have sold. Include amounts owed to you both before, and after you filed bankruptcy.  Label it *Exhibit F*.
Identify who owes you money, how much is owed, and when payment is due. Report the total from
*Exhibit F* here.

25. **Total receivables**                                                                    $  5,408,236.0

    *(Exhibit F)*

### 5. Employees

26. What was the number of employees when the case was filed?                                       157
27. What is the number of employees as of the date of this monthly report?                          101

### 6. Professional Fees

28. How much have you paid this month in professional fees related to this bankruptcy case?    $  35,000.00
29. How much have you paid in professional fees related to this bankruptcy case since the case was filed?    $  85,000.00
30. How much have you paid this month in other professional fees?                             $ _____
31. How much have you paid in total other professional fees since filing the case?            $ _____

### 7. Projections

Compare your actual cash receipts and disbursements to what you projected in the previous month.
Projected figures in the first month should match those provided at the initial debtor interview, if any.

|  | Column A | | Column B | | Column C |
|---|---|---|---|---|---|
|  | **Projected** | | **Actual** | = | **Difference** |
|  | Copy lines 35-37 from the previous month's report. | | Copy lines 20-22 of this report. | | Subtract Column B from Column A. |
| 32. **Cash receipts** | $ 489,000.00 | − | $ 795,914.00 | = | $ 306,914.00 |
| 33. **Cash disbursements** | $ 489,000.00 | − | $ 1,803,382.5 | = | $ 795,915.00 |
| 34. **Net cash flow** | $ 0.00 | − | $ 1,007,268.0 | = | $ -1,007,268. |

35. Total projected cash receipts for the next month:                                   $ 528,000.00
36. Total projected cash disbursements for the next month:                            - $ 327,000.00
37. Total projected net cash flow for the next month:                                 = $ 201,000.00

Exhibit A

Debtor Name  Williamson Memorial Hospital, LLC                    Case number 19-20463

## 8. Additional Information

If available, check the box to the left and attach copies of the following documents.

☑ 38.  Bank statements for each open account (redact all but the last 4 digits of account numbers).

☑ 39.  Bank reconciliation reports for each account.

☑ 40.  Financial reports such as an income statement (profit & loss) and/or balance sheet.

☑ 41.  Budget, projection, or forecast reports.

☐ 42.  Project, job costing, or work-in-progress reports.

Exhibit A

# Exhibit A

Questions

3.  We have not paid several vendors on time as services will be terminating on April 21st with the hospital closure.

6.  Sales & Use taxes have not been filed or paid.  Currently, working with external CPA firm on completing.

**Department of the Treasury**
**Internal Revenue Service**
**Independent Office of Appeals**
**IRS** 150 Court Street, Room 312
New Haven, CT 06510-2022

Date: 10/27/2023

Person to contact:
Name: Kellie R Ranaudo
Employee ID Number: █████████
Phone: 203-492-8695
Fax: 866-921-8562
Hours: 7:00-3:30
Re:
Trust Fund Recovery Penalty
Tax periods ended:
09/2019
For trust funds due from:
WILLIAMSON MEMORIAL
HOSPITAL LLC
Employer ID number:
██████████

SAM KAPOURALES

███████████████████

Dear Sam Kapourales:

We considered your protest along with your evidence and arguments against the Trust Fund Recovery Penalty (TFRP) assessment.

We determined that the IRS should not hold you personally liable for the non-payment of the trust fund liabilities for the tax periods shown above. We are returning your case file to Collection with a non-assertion determination.

Please note, the Department of Justice can reopen this case before the assessment limitation period expires if it decides to join all potentially responsible persons in a refund suit.

If you have questions, you can call me at the phone number above.

Thank you for your cooperation.

Sincerely,

Eric S Feinman
Appeals Team Manager

Enclosures:
IRS Appeals Survey

cc: John D Hoblitzell III Esq

Letter 5124 (Rev. 10-2021)
Catalog Number 60932V

Exhibit A



**Department of the Treasury**
**Internal Revenue Service**
**Independent Office of Appeals**
150 Court Street, Room 312
New Haven, CT 06510-2022

Date: 10/27/2023

Person to contact:
Name: Kellie R Ranaudo
Employee ID Number: █████
Phone: 203-492-8695
Fax: 866-921-8562
Hours: 7:00-3:30
Employer ID number:
█████
For trust funds due from:
WILLIAMSON MEMORIAL
HOSPITAL LLC
Tax periods ended:
12/2019 03/2020
Re:
Trust Fund Recovery Penalty

SAM KAPOURALES
████████████████

Dear Sam Kapourales:

We're sorry that we couldn't reach an agreement with you about the proposed assessment of the Trust Fund Recovery Penalty. We're returning your case to the Collection function for assessment of the liability. At this point, you have the following options:

**Pay the full amount due now to avoid interest charges.**
  • Make your check payable to the United States Treasury.
  • Indicate that the payment is for trust fund only and the amount to app
  • Provide the name and Employer Identification Number (EIN) of the c

If you don't pay the full amount due now, we will bill you.

*Same Facts as Period 9/2019 which was Determined to Be No Personal Liability*

**Pay some of the amount due and file a claim for refund.**
  • Pay the tax for one employee for each period (quarter) of liability that
    the amount of the penalty on unpaid employment taxes; OR pay the ta
    that you wish to contest, if we've based the amount of the penalty on u
  • File a claim for a refund of the amounts you paid using Forms 843, *C
    for Abatement.*

**Pay some of the amount due, file a claim for refund, and post a bond**
  • Pay the tax for one employee for each period (quarter) of liability that
    based the amount of the penalty on unpaid employment taxes; OR pay
    period that you wish to contest, if we've based the amount of the penalty on unpaid excise tax.
  • File a claim for a refund of the amounts you paid using Forms 843, *Claim for Refund and Request
    for Abatement.*
  • Post a bond with us for one and one half times the amount of the remaining penalty after you have made
    the partial payment. You must post the bond within 30 days of receiving your bill.

If you post a bond with us, we will not take collection action while the Appeals Office considers your claim.

**Letter 1536 (Rev. 10-2021)**
Catalog Number 27412G

<span style="color:red">Exhibit A</span>

**Consideration by the Courts**
You can take your case to the United States Court of Federal Claims or to the United States District Court. These courts have no connection with the IRS.

If we deny your claim when you've posted the bond, you'll have 30 days to file suit before we can apply the bond to your trust fund recovery penalty and the interest accruing on this debt.

If we haven't acted on a claim for refund within 6 months from the date you filed it, you can file a suit for refund. You can also file a suit for refund within 2 years after we disallow your claim.

For any unpaid section 6672 liabilities (Trust Fund Recovery Penalty) that arise from periods beginning or transactions occurring after December 31, 1998, we must stop most of our collection activities if you file a proper lawsuit seeking a refund of your disallowed claim. While we cannot collect the unpaid portion of your liability by levy, the filing of a lawsuit extends the time we have to collect this liability under sections 6331(i)(5) and 6672(c)(4).

For further information about filing a suit, you can contact the Clerk of your District Court or the Clerk of the United States Court of Federal Claims, 717 Madison Place, N.W., Washington, D.C. 20005.

Sincerely,

Eric S Feinman
Appeals Team Manager

Enclosures:
IRS Appeals Survey

cc: John D Hoblitzell III
Esq.

Letter 1536 (Rev. 10-2021)
Catalog Number 27412G

<span style="color:red">Exhibit A</span>

**Department of the Treasury**
**Internal Revenue Service**
**Director**

1973 N. Rulon White Blvd.
Ogden, UT  84201

Document Locator Number

84251-313-11008-23

| MFT | Tax Period | Assessment Date | Trans Code |
|-----|-----------|-----------------|-----------|
| 55 | 201912 | 11/09/2023 | 370 |

Taxpayer

SAM KAPOURALES

IDRS Number:
Notice Date: 11/09/2023
Name Control: KAPO

Taxpayer
Identifying
Number

Form Number: 2749

Plan/Report Number:

Tax Period Ended: 12/31/2019

**Notice of Tax Due on Federal Tax Return**

This is a notice of tax due on your tax return identified above. Please pay the amount shown as Balance Due when you receive this notice. Make your check payable to the **United States Treasury** and send it with a copy of this notice to the address shown above. If the balance due as shown below is incorrect because you made a recent payment, please send us the amount you believe you owe and an explanation of the difference.

**The balance due may include penalty and interest. If you have any questions concerning the balance due or penalty and interest computation call us at 800-829-0115 (Business filers) or 800-829-8374 (Individual filers).**

| 31. Reference | 32. TC | 33. Assessment | 34. Adjustment or Credit | 35. Balance Due |
|---------------|--------|----------------|--------------------------|-----------------|
| 11/09/2023 ADD'L TAX | 290 | | 0.00 | |

| 36. Reference Code: see enclosed notice | | | | |
|---|---|---|---|---|
| 960 | | 175,074.19 | | 175,074.19 |

see enclosed notice

**Please return this copy with your payment to the address shown above**

Form **3552** (Rev. 11-2022)(Part 3)
Catalog Number 49356T

Exhibit A



**Department of the Treasury**
**Internal Revenue Service**
**Director**

1973 N. Rulon White Blvd.
Ogden, UT 84201

Document Locator Number

84251-313-11009-23

IDRS Number:

Notice Date: 11/09/2023

Name Control: KAPO

Taxpayer
Identifying
Number

| MFT | Tax Period | Assessment Date | Trans Code |
|-----|-----------|-----------------|------------|
| 55 | 202003 | 11/09/2023 | 370 |

Taxpayer

SAM KAPOURALES

Form Number: 2749

Plan/Report Number:

Tax Period Ended: 03/31/2020

### Notice of Tax Due on Federal Tax Return

This is a notice of tax due on your tax return identified above. Please pay the amount shown as Balance Due when you receive this notice. Make your check payable to the **United States Treasury** and send it with a copy of this notice to the address shown above. If the balance due as shown below is incorrect because you made a recent payment, please send us the amount you believe you owe and an explanation of the difference.

The balance due may include penalty and interest. If you have any questions concerning the balance due or penalty and interest computation call us at 800-829-0115 (Business filers) or 800-829-8374 (Individual filers).

| 31. Reference | 32. TC | 33. Assessment | 34. Adjustment or Credit | 35. Balance Due |
|---------------|--------|----------------|--------------------------|-----------------|
| 11/09/2023 ADD'L TAX | 290 | | 0.00 | |

| 36. Reference Code; see enclosed notice | | | | |
|---|---|---|---|---|
| 560 | | 211,251.62 | | 211,251.62 |

see enclosed notice

**Please return this copy with your payment to the address shown above**

Form **3552** (Rev. 11-2022)(Part 3)
Catalog Number 49356T

<span style="color:red">Exhibit A</span>



**Department of the Treasury**
Internal Revenue Service
Cincinnati, OH 45999-0025



| Notice | CP49 |
|---|---|
| Tax Year | 2021 |
| Notice date | December 11, 2023 |
| Social Security number | |
| To contact us | 800-829-8374 |
| Your Caller ID | 560627 |
| Page 1 of 1 | 9H |

021111.546004.510200.12354 1 AB 0.537 372







SAM KAPOURALES

021111

## We applied $386,325.81 of your 2021 overpayment to an unpaid balance
# Refund due: $23,796.97

We applied your 2021 Form 1040 overpayment
to an amount owed for other tax years.

As a result, your refund has been reduced
to $23,796.97.

| Summary | |
|---|---|
| Overpayment for 2021 | -$410,055.08 |
| Interest we owe you | -67.70 |
| Amount applied to civil penalty owed for December 31, 2019 | 175,074.19 |
| Amount applied to civil penalty owed for March 31, 2020 | 211,251.62 |
| **Refund due** | **$23,796.97** |

## What you need to do

### Your refund

- If you haven't already received a refund check for $23,796.97, you should receive it within 2-3 weeks as long as you don't owe other tax or debt we're required to collect.

## Additional information

- Visit www.irs.gov/cp49
- For tax forms, instructions, and publications, visit www.irs.gov/forms-pubs or call 800-TAX-FORM (800-829-3676).
- You can contact us by mail at the address at the top of this notice. Be sure to include your Social Security number, the tax year, and the form number you are writing about.
- Keep this notice for your records.

We're required to send a copy of this notice to both you and your spouse. Each copy contains the information you are authorized to receive. **Please note:** Only one refund will be issued.

If you need assistance, please don't hesitate to contact us.

Exhibit A

3042351258 3042351258 >>

P 2/3



Department of the Treasury
Internal Revenue Service
Cincinnati, OH 45999-0025

| Notice | CP49 |
|---|---|
| Tax Year | 2021 |
| Notice date | December 11, 2023 |
| Social Security number | ████ |
| To contact us | 800-829-8374 |
| Page 1 of 2 | 9H |

021110.546004.510200.12354 1 AB 0.537 372





DESPINA KAPOURALES
████████

021110

## We applied $386,325.81 of your 2021 overpayment to an unpaid balance

# Refund due: $23,796.97

We applied your 2021 Form 1040 overpayment
to an amount owed for other tax years.

As a result, your refund has been reduced
to $23,796.97.

### Summary

| | |
|---|---|
| Overpayment for 2021 | |
| Interest we owe you | -$410,055.08 |
| Amount applied to civil penalty owed for December 31, 2019 | -67.70 |
| Amount applied to civil penalty owed for March 31, 2020 | 175,074.19 |
| Refund due | 211,251.62 |
| | $23,796.97 |

## What you need to do

**Your refund**

- If you haven't already received a refund check for $23,796.97, you should receive it within 2-3 weeks as long as you don't owe other tax or debt we're required to collect.

## Protection from your spouse's debt

When you file a joint tax return, you may be able to prevent some or all of your overpayment from paying liabilities for which your spouse (or former spouse) is responsible. For example, if some or all of your overpayment from a joint return has been (or will be) applied to pay your spouse's past-due income taxes, health coverage shared responsibility payment, or other debt (child support, spousal support, student loans), you may be entitled to relief as an injured spouse. If you're eligible, you may be entitled to a refund for your share of an overpayment that's been (or will be) applied to your spouse's debt. For more information, or to submit a claim, go to www.irs.gov and download the Injured Spouse Allocation (Form 8379) or call 800-829-3676 to request a copy.

## Additional information

- Visit www.irs.gov/cp49
- For tax forms, instructions, and publications, visit www.irs.gov/forms-pubs or call 800-TAX-FORM (800-829-3676).

Continued on back... Exhibit 1A

Same Facts As
Period 9/2019 Which
Was Determined To
Be No Personal
Liability

Exhibit A



1500 Chase Tower • 707 Virginia Street East • Charleston, WV 25301
Mailing Address: P.O. Box 2031 • Charleston, WV 25327
Telephone (304) 345-8900 • Fax (304) 345-8909
*www.kaycasto.com*

Email: jdhoblitzell@kaycasto.com
Direct Dial No. (304) 391-8803

August 5, 2022

**Via facsimile and regular mail: (304) 232-9438**
Nicholas Balakos
Contact ID ███████
Department of the Treasury
Internal Revenue Service
1100 Main Street, Suite 103
Wheeling, WV 26003

            Re:    **Sam Kapourales**
                   ████████████████
                   **Williamson Memorial Hospital, LLC**
                   **Formal Written Protest**

Dear Mr. Balakos:

    This firm represents Sam Kapourales in connection with the Proposed Assessment of Trust Fund Recovery Penalty set forth in your letter of June 9, 2022 ("Proposed Assessment"). A Form 2848 Power of Attorney and Declaration of Representative is enclosed herewith designating Craig M. Kay and me as Mr. Kapourales' attorneys.

    Mr. Kapourales is formally protesting the Proposed Assessment of $688,504.14 set forth in the Proposed Assessment for the following tax periods and hereby formally requests an Appeals Conference:

| Form Number | Period Ending | Proposed Penalty |
|---|---|---|
| 941 | 9/30/2019 | $302,178.33 |
| 941 | 12/31/2019 | $175,074.19 |
| 941 | 3/31/2020 | $211,251.62 |

    The Williamson Memorial Hospital was a small, rural access, acute care hospital in Mingo County, West Virginia. It was the only hospital in the County. At times relevant to this matter, the parent company of Williamson Memorial Hospital, LLC was Mingo Health Partners, LLC, ("MHP") of which Mr. Kapourales was a member. MHP was organized on April 12, 2018. Charles Hatfield was the managing

Exhibit A

Sam Kapourales
████████████
Williamson Memorial Hospital, LLC
Formal Written Protest



**KAY CASTO & CHANEY**
PLLC
*Attorneys at Law*

member of MHP.[1]   MHP completed the acquisition of the hospital on or about June 1, 2018.   While Mr. Kapourales was a member of the Hospital Board, he was not an officer or executive.

At the times relevant to this matter, Mr. Kapourales, had no control over payroll. The Hospital's CEO was Charles Hatfield, and its CFO was his wife, Sabrina Hatfield.   Several weeks ago, in the case if *Robert Johns v. Charles Hatfield, individually and as administrator of the Estate of Sabrina Hatfield*, Civil Action No. 21-C-105, pending in the Circuit Court of Mingo County, West Virginia, Diane Varney was deposed. Ms. Varney was the accounting manager for Williamson Memorial Hospital and was in charge of payroll and the accounts payable function.   Her testimony confirms that Mr. Hatfield had sole discretion as to who to pay, what to pay, and when to pay.   Relevant testimony includes:[2]

- Pg. 12:   Mr. and Mrs. Hatfield become CEO and CFO, respectively, of the hospital, in September or October, 2018.
- Pg. 14:   Within six to seven months of the Hatfields taking over responsibility for management of the hospital, the cash flow decreased.
- Pg. 17:   When there were insufficient funds available to pay vendors, Ms. Varney would discuss that with Charlie Hatfield.
- Pg. 18-20: When there was not enough money to cover payroll, Mr. Hatfield would ask Mr. Kapourales to "help fund it."  Mr. Hatfield was asking for funds to cover net payroll.
- Pg. 22:   Mr. and Ms. Hatfield were aware that quarterlies were not paid.
- Pg. 23:   Charlie Hatfield decided who got paid and when they got paid.
- Pg. 28:   Ms. Varney never discussed the net versus gross payroll issue with Mr. Kapourales when he was asked to make help cover payroll.  She never discussed the matter with him and does not know if he knew that Mr. Hatfield was only paying net payroll.
- Pg. 57:   Ms. Varney testifies multiple times that Mr. Hatfield had sole decision-making authority over what to pay and when.
- Pg. 57-58: Mr. Hatfield decided to shift payroll handling from ADP to in-house.
- Pg. 71:   Mr. Hatfield had sole decision making over who to pay and when: (Question: "Is there any bill that we've talked about that wasn't paid for any other reason than Mr. Hatfield said not to pay it and he made that decision and you didn't otherwise have the money or the authority to pay it or override it?" Answer: "That's correct.")
- Pg. 98-90: Payroll was funded through April of 2019 when the hospital utilized ADP. After that, the hospital went to Meditech and Mr. Hatfield decided to fund only net payroll.

---

[1] *See* MHP Articles of Organization, enclosed.
[2] *See* Transcript of Varney Deposition, enclosed.

Exhibit A

Sam Kapourales

Williamson Memorial Hospital, LLC
Formal Written Protest



**KAY
CASTO
&CHANEY** PLLC

*Attorneys at Law*

- Pg. 91:    Mr. Hatfield was the only person that told her what invoices to pay and what not to pay.

Mr. Kapourlaes made multiple advances or loans of his personal funds specifically to cover payroll and make sure employees were paid.  He believed that, in making these advances, that they included funds specifically to cover payroll withholding and tax obligations. *See* IRS Form 4180 Report of Interview, pg. 4; "Charley [sic] Hatfield, CEO of the Hospital told me that . . . we didn't have enough to make the payroll, that we should be getting a check in any day.  I would ask him how much we needed.  He would give me a figure and I would send him a check.  *I was convinced that included the payroll taxes. . .*" (Italics added). According to Ms. Varney's testimony, no one told Mr. Kapourales that Mr. Hatfield was only asking for the net payroll and she was unaware whether he knew this.  Even after the filing of the Hospital's bankruptcy, Mr. Kapourales was loaning money to the Hospital specifically to ensure payroll was made. The January 2020 Monthly Operating Report filed in the Hospital's bankruptcy states that between October 2019 and January 27, 2020, the members of Mingo Health Partners contributed over $1,000,000 in cash to the continued operations of the Hospital.[3]

Shortly after the Hospital filed bankruptcy on October 21, 2019, a new Interim CEO was appointed, and he took over management responsibilities – including payment of payroll. In that capacity, he submitted monthly operating reports to the bankruptcy court, which all stated that all employees were timely paid and that all tax returns were timely filed and taxes paid.  Bank records also show payment of taxes during this period. (October – December).  The reports indicate that taxes were not timely filed in January, February, and March (specifically sales and use tax).[4]

To impose liability under Section 6672 one must both be a responsible party and much have willfully failed to ensure withholding taxes were paid. *See Johnson v. U.S.*, 833 F.Supp. 579 (S.D. W.Va. 1993). Factors to consider include participating in day-to-day management, control over payroll, authority to disburse corporate funds, check signing authority, drawing of corporate salary, holding of corporate officer or directorship, stock ownership, signing of corporate tax returns, business training, and power to hire and fire. *Id.* (citing *O'Connor v. U.S.*, 956 F.2d 48, 51 (4th Cir. 1992).  Titular authority is insufficient to presume responsible person status.  *See Gillam v. U.S.*, 1996 WL 627408, *4 (S.D. W. Va. 1996).  Further, signing checks alone does not indicate one is a responsible party, especially in this case as the checks provided by the IRS in its July 14, 2022 fax appear to have been "signed" using a stamp. *See Wright v. United States*, 809 F.2d 4215, 428 (7th Cir. 1987) ("We emphasize that merely because a corporate officer has check-signing

---

[3] *See* Jan. 1, 2020, 4th Emergency Motion of Debtor for Order Authorizing Debtor to Obtain Post Petition Financing, enclosed, along with January 2020 Monthly Operating Report.
[4] *See* select portions of Monthly Operating Reports from October 2019 through March 2020.

Exhibit A

Sam Kapourales

Williamson Memorial Hospital, LLC
Formal Written Protest



KAY
CASTO
&CHANEY
PLLC
*Attorneys at Law*

responsibilities and his corporation is in financial trouble, it does not follow that he can be held liable for any and all failure to pay withholding taxes.")

Additionally, the responsible party must have acted willfully. "Generally, willfully means a voluntary, conscious and intentional decision to prefer other creditors over the Government." *Gillam*, *7. A personal acts willfully when they pay creditors other than the government and "either knows or recklessly disregards the fact that taxes are due to the government." *Id.* In *Gillam*, unlike here, the responsible party knowingly and intentionally paid other creditors when he knew taxes were due the government.

The evidence from the sworn, under oath deposition testimony of the Hospital's accounts payable/payroll manager is that Mr. Hatfield had sole decision-making authority over who got paid and when. Further, Mr. Kapourales made multiple loans specifically to cover payroll and believed that the amounts he provided were for gross payroll. Hospital management never advised him they were seeking only the net payroll and not then remitting quarterly payments to the government. While he co-signed checks, the evidence indicates that the decision to issue the checks were made by Mr. Hatfield and his wife in their roles as CEO and CFO and also that he had no knowledge or reason to know that withholdings were not being paid as he believed his loans to cover payroll included withholdings.

Based on the foregoing, Mr. Kapourales should not be considered a responsible person who willfully failed to ensure withholding taxes were paid. Mr. Kapourales, therefore, protests the Proposed Assessment and requests an appeals conference.

Thank you for your attention to this request. If you have any additional questions or concerns or if you need additional information, please do not hesitate to contact us.

Very Truly Yours,

John D. Hoblitzell III

JDH/
enclosures
Cc (w/enclosures)
    Sam Kapourales (via email)
                    **[Declaration on Following Page]**

Exhibit A

Sam Kapourales

███████████

Williamson Memorial Hospital, LLC
Formal Written Protest



KAY
CASTO
&CHANEY
PLLC
*Attorneys at Law*

Under penalties of perjury, I declare that I have examined the facts presented in this statement and any accompanying information, and, to the best of my knowledge and belief, they are true, correct, and accurate.

_____     8/3/2024
Sam Kapourales                       Date

Exhibit A



**Department of the Treasury
Internal Revenue Service
[Operating Division / Program Name]**
1100 MAIN ST - STE 103
WHEELING, WV 26003

Date: July 9, 2022

Taxpayer ID number (last 4 digits):
▮▮▮▮

Business name and address:
WILLIAMSON MEMORIAL HOSPITAL LLC
% HEALTH MANAGEMENT ASSOC INC MBR
859 ALDERSON ST
WILLIAMSON, WV 25661-3215-595

Person to contact:
NICHOLAS BALAKOS

Employee ID number:
▮▮▮▮▮▮

Contact numbers:
Telephone: (304) 238-2946
Fax: (304) 232-9438

SAM KAPOURALES

Dear: MR SAM KAPOURALES,

**Why we're sending you this letter**
We're proposing to assess a Trust Fund Recovery Penalty against you as a personal liability because we haven't received full payment of the federal employment or excise tax liability due from the business shown above.

You're required to collect, account for, and pay withheld trust fund taxes for the business, which include:
- Employment taxes you withheld (or should have withheld) from the employees' wages.
- Excise taxes you collected (or should have collected) from customers.

We listed the proposed penalties, equal to the unpaid trust fund taxes the business still owes, at the end of this letter for your review.

**If you agree with the proposed assessment**
If you agree with the amounts shown, sign and return Part 1 of the enclosed Form 2751, Proposed Assessment of Trust Fund Recovery Penalty.

**If you don't agree with the proposed assessment**
If you don't agree with the amounts shown, you can contact the person shown above to try to resolve the matter informally or you can appeal the proposed assessment.

**If you want to try to resolve the matter informally**
If you have additional information to support your case and want to try to resolve the matter informally, contact the person shown above within 10 days from the date of this letter. Contacting us won't extend the deadline for your appeal rights. You can ask if your case is eligible for Fast Track Mediation. See Publication 3605, Fast Track Mediation - A Process for Prompt Resolution of Tax Issues.

**If you want to appeal this determination**
You have the right to appeal this action by filing a written protest, which may be forwarded to the IRS Independent Office of Appeals (Appeals). To keep your appeal rights, you need to provide your **written appeal within 60 days from the date of this letter (75 days if this letter is addressed to you outside the U.S.). Send your written appeal to the attention of the contact person shown at the top of this letter.** The proposed penalty amounts you're protesting determine how you should file your appeal.

Letter 1153 (Rev. 12-2021)
Catalog Number 40545C

Exhibit A

| For each period you're protesting, if the proposed penalty amount is: | You should: |
|---|---|
| $25,000 or less | Send a small case request |
| More than $25,000 | Send a formal written protest |

You can send one small case request or protest for all the periods listed on the Form 2751, but if the penalty for any one period is more than $25,000, you must file a formal written protest. Include any information you want the settlement or Appeals officer to consider. Providing more information will help us process your request quickly.

**A small case request must include:**

- A copy of this letter, or your name, address, taxpayer identification number, and any information that will help us identify your file.
- A statement that you want an Appeals conference.
- A list of the penalties you disagree with and an explanation of why you disagree. Your explanation should address responsibility and willfulness in paying the trust fund taxes. Willfulness means an action was intentional, deliberate, or voluntary and not an accident or mistake. Therefore, you should explain your duties and responsibilities, including your duty and authority to collect, account for, and pay the trust fund taxes. If you disagree with how we calculated the penalty, you should list the dates and amounts of payments you believe we didn't consider or any computation errors you believe we made.

**A formal written protest must include:**

- Your name, address, and taxpayer identification number.
- A statement that you want an Appeals conference.
- A copy of this letter, or the date and number of this letter.
- The tax periods involved (see Form 2751).
- A list of the penalties you disagree with.
- Facts **signed under penalties of perjury** explaining why you disagree.
  - o Include specific dates, names, amounts, and locations that support your position. Your explanation should address responsibility and willfulness in paying the trust fund taxes. Willfulness means an action was intentional, deliberate, or voluntary and not an accident or mistake. Therefore, you should explain your duties and responsibilities, including your duty and authority to collect, account for, and pay the trust fund taxes. If you disagree with how we calculated the penalty, you should list the dates and amounts of payments you believe we didn't consider or any computation errors you believe we made.
  - o If you rely on a law or other authority to support your arguments, explain what it is and how it applies.
  - o **Add the following declaration to your statement and sign it:** "Under penalties of perjury, I declare that I have examined the facts presented in this statement and any accompanying information, and, to the best of my knowledge and belief, they are true, correct, and complete."

**Representation**

You can represent yourself at your Appeals conference or have someone qualified to practice before us represent you, such as an attorney, certified public accountant, or enrolled agent. If your representative attends a conference without you, we must have a completed Form 2848, Power of Attorney and Declaration of Representative, for them to receive confidential tax information, or Form 8821, Tax Information Authorization, for them to inspect confidential tax information.

Letter 1153 (Rev. 12-2021)
Catalog Number 40545C

Exhibit A

If your representative prepares and signs the protest for you, they must substitute a declaration statement stating that:
- They submitted the protest and accompanying documents.
- They know personally that the facts stated in the protest and accompanying documents are true and correct.

**Consideration by the courts**
If your appeal doesn't result in your favor, we'll send you a bill. If you still disagree with us, you may then take your case to the United States Court of Federal Claims or to the appropriate United States District Court by following the procedures below. These courts have no connection with the IRS. Before you can file a claim with these courts, you must pay a portion of the tax liability and file a claim for refund, as described below.

**Special bond to delay collection actions for any period as soon as you file a claim for refund**
To ask that we delay collection of the penalty for any period, when you file a claim for refund for that period, you must do the following **within 30 days** from the date of the official notice of assessment and demand (the first bill) for that period:
- Pay the tax for one employee for each period of liability that you want to contest (if we based the penalty on unpaid employment taxes) or pay the tax for one transaction for each period that you want to contest (if we based the penalty on unpaid excise tax).
- File a claim for a refund of the amounts you paid using Forms 843, Claim for Refund and Request for Abatement.
- Post a bond with the IRS for one and one-half times the amount of the remaining penalty after you've made the required payments listed in the first item. Visit **www.irs.gov/irm/part5/irm_05-006-001** for information regarding collateral agreements.

If the IRS denies your claim when you post this bond, you have **30 days** to file suit in the appropriate U.S. District Court or the U.S. Court of Federal Claims before the IRS can apply the bond to your penalty and the accrued interest.

**Claim for refund with no special bond**
If you don't file a special bond as described above, you can still file a claim for refund following the same steps, except you don't have to take the actions within 30 days after the date of the official notice of assessment and demand for the period.

If we don't act on your refund claim within 6 months from the date you filed it, you can file a suit for refund. You can also file a suit for refund within 2 years after we disallow your claim.

If we find that the collection of this penalty is in jeopardy, we can take immediate action to collect it without regard to the 60-day period for sending a protest.

For more information about filing a suit, you can contact the Clerk of the appropriate local District Court or:

Clerk of the United States Court of Federal Claims
717 Madison Place NW
Washington, D.C. 20439

**If we don't hear from you**
If we don't hear from you **within 60 days** from the date of this letter (or 75 days if this letter is addressed to you outside the U.S.), we'll assess the penalty and begin collection action.

Letter 1153 (Rev. 12-2021)
Catalog Number 40545C

Exhibit A

**Taxpayer Advocate Service**
The Taxpayer Advocate Service (TAS) is an independent organization within the IRS that helps taxpayers and protect taxpayers' rights. TAS can offer you help if your tax problem is causing a financial difficulty, you've tried but been unable to resolve your issue with the IRS, or you believe an IRS system, process, or procedures isn't working as it should. If you qualify for TAS assistance, which is always free, TAS will do everything possible to help you. To learn more, visit **www.taxpayeradvocate.irs.gov** or call 877-777-4778.

**Additional information**
- You can reply to this letter by mail, fax or telephone using the contact information shown at the top of this letter. If you send a written response, include a copy of this letter or information to identify your account, your telephone number and the best hours to reach you. If you fax a response, you can use a fax machine or online fax service. Several online fax services use the internet to send files from your computer or smart device to a fax number.
- Find tax forms and publications by visiting **www.irs.gov/forms** or calling 800-TAX-FORM (800-829-3676).
- Keep this letter for your records.

If you have questions, you can call the contact person shown above.

Sincerely,

NICHOLAS BALAKOS
Revenue Officer

Enclosures:
Publication 1
Form 2751
Envelope

| Form / Tax period ending | Trust fund penalty | Form / Tax period ending | Trust fund penalty |
|---|---|---|---|
| 941 / 09-30-2019 | $302,178.33 | 941 / 12-31-2019 | $175,074.19 |
| 941 / 03-31-2020 | $211,251.62 | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Letter 1153 (Rev. 12-2021)
Catalog Number 40545C

Exhibit A

| Form / Tax period ending | Trust fund penalty | Form / Tax period ending | Trust fund penalty |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**Letter 1153 (Rev. 12-2021)**
Catalog Number 40545C

Exhibit A

| Form **2751** (April 2021) | | Department of the Treasury - Internal Revenue Service **Proposed Assessment of Trust Fund Recovery Penalty** (Sec. 6672, Internal Revenue Code, or corresponding provisions of prior internal revenue laws) | | | | | |

**Report of Business Taxpayer's Unpaid Tax Liability**

Name and address of business

WILLIAMSON MEMORIAL HOSPITAL LLC
% HEALTH MANAGEMENT ASSOC INC MBR
859 ALDERSON ST
WILLIAMSON, WV 25661-3215-595

| Tax Return Form Number | Tax Period Ended | Date Return Filed | Date Tax Assessed | Identifying Number | Amount Outstanding | Penalty |
|---|---|---|---|---|---|---|
| 941 | 09/30/2019 | 05/18/2020 | 09/07/2020 | ■■■■ | $621,329.75 | $302,178.33 |
| 941 | 12/31/2019 | 05/18/2020 | 09/07/2020 | | $250,839.01 | $175,074.19 |
| 941 | 03/31/2020 | 05/18/2020 | 09/07/2020 | | $265,010.82 | $211,251.62 |
| Totals | | | | | $1,137,179.58 | $688,504.14 |

**Agreement to Assessment and Collection of Trust Fund Recovery Penalty**

Name, address, and taxpayer identification number of responsible party
SAM KAPOURALES

I consent to the assessment and collection of the penalty shown for each period, which is equal either to the amount of federal employment taxes withheld from employees' wages or to the amount of federal excise taxes collected from patrons or members, and which was not paid over to the Government by the business named above. Signing this form does not extinguish my right to appeal the proposed assessment.

| Signature of responsible party | Date |
|---|---|
| | |

Catalog Number 21955U                    www.irs.gov                    Form **2751** (Rev. 4-2021)

Part 1—Sign and return this copy to Internal Revenue Service

Exhibit A

| Form **2751**<br>(April 2021) | Department of the Treasury - Internal Revenue Service<br>**Proposed Assessment of Trust Fund Recovery Penalty**<br>(Sec. 6672, Internal Revenue Code, or corresponding provisions of prior internal revenue laws) |
|---|---|

**Report of Business Taxpayer's Unpaid Tax Liability**

Name and address of business

WILLIAMSON MEMORIAL HOSPITAL LLC
% HEALTH MANAGEMENT ASSOC INC MBR
859 ALDERSON ST
WILLIAMSON, WV 25661-3215-595

| Tax Return<br>Form Number | Tax Period<br>Ended | Date Return<br>Filed | Date Tax<br>Assessed | Identifying<br>Number | Amount<br>Outstanding | Penalty |
|---|---|---|---|---|---|---|
| 941 | 09/30/2019 | 05/18/2020 | 09/07/2020 | xx-xxx2845 | $621,329.75 | $302,178.33 |
| 941 | 12/31/2019 | 05/18/2020 | 09/07/2020 | ██████ | $250,839.01 | $175,074.19 |
| 941 | 03/31/2020 | 05/18/2020 | 09/07/2020 | | $265,010.82 | $211,251.62 |
| Totals | | | | | $1,137,179.58 | $688,504.14 |

**Agreement to Assessment and Collection of Trust Fund Recovery Penalty**

Name, address, and taxpayer identification number of responsible party
SAM KAPOURALES

██████████████████

I consent to the assessment and collection of the penalty shown for each period, which is equal either to the amount of federal employment taxes withheld from employees' wages or to the amount of federal excise taxes collected from patrons or members, and which was not paid over to the Government by the business named above. Signing this form does not extinguish my right to appeal the proposed assessment.

| Signature of responsible party | Date |
|---|---|
| | |

Catalog Number 21955U
Part 2—Keep this copy for your records

www.irs.gov

Form **2751** (Rev. 4-2021)

Exhibit A



# Your Rights as a Taxpayer

**Publication 1**

This publication explains your rights as a taxpayer and the processes for examination, appeal, collection, and refunds. Also available in Spanish.

# The Taxpayer Bill of Rights

## 1. The Right to Be Informed

Taxpayers have the right to know what they need to do to comply with the tax laws. They are entitled to clear explanations of the laws and IRS procedures in all tax forms, instructions, publications, notices, and correspondence. They have the right to be informed of IRS decisions about their tax accounts and to receive clear explanations of the outcomes.

## 2. The Right to Quality Service

Taxpayers have the right to receive prompt, courteous, and professional assistance in their dealings with the IRS, to be spoken to in a way they can easily understand, to receive clear and easily understandable communications from the IRS, and to speak to a supervisor about inadequate service.

## 3. The Right to Pay No More than the Correct Amount of Tax

Taxpayers have the right to pay only the amount of tax legally due, including interest and penalties, and to have the IRS apply all tax payments properly.

## 4. The Right to Challenge the IRS's Position and Be Heard

Taxpayers have the right to raise objections and provide additional documentation in response to formal IRS actions or proposed actions, to expect that the IRS will consider their timely objections and documentation promptly and fairly, and to receive a response if the IRS does not agree with their position.

## 5. The Right to Appeal an IRS Decision in an Independent Forum

Taxpayers are entitled to a fair and impartial administrative appeal of most IRS decisions, including many penalties, and have the right to receive a written response regarding the Office of Appeals' decision. Taxpayers generally have the right to take their cases to court.

## 6. The Right to Finality

Taxpayers have the right to know the maximum amount of time they have to challenge the IRS's position as well as the maximum amount of time the IRS has to audit a particular tax year or collect a tax debt. Taxpayers have the right to know when the IRS has finished an audit.

## 7. The Right to Privacy

Taxpayers have the right to expect that any IRS inquiry, examination, or enforcement action will comply with the law and be no more intrusive than necessary, and will respect all due process rights, including search and seizure protections, and will provide, where applicable, a collection due process hearing.

## 8. The Right to Confidentiality

Taxpayers have the right to expect that any information they provide to the IRS will not be disclosed unless authorized by the taxpayer or by law. Taxpayers have the right to expect appropriate action will be taken against employees, return preparers, and others who wrongfully use or disclose taxpayer return information.

## 9. The Right to Retain Representation

Taxpayers have the right to retain an authorized representative of their choice to represent them in their dealings with the IRS. Taxpayers have the right to seek assistance from a Low Income Taxpayer Clinic if they cannot afford representation.

## 10. The Right to a Fair and Just Tax System

Taxpayers have the right to expect the tax system to consider facts and circumstances that might affect their underlying liabilities, ability to pay, or ability to provide information timely. Taxpayers have the right to receive assistance from the Taxpayer Advocate Service if they are experiencing financial difficulty or if the IRS has not resolved their tax issues properly and timely through its normal channels.

**The IRS Mission** | Provide America's taxpayers top-quality service by helping them understand and meet their tax responsibilities and enforce the law with integrity and fairness to all.

Publication 1 (Rev. 9-2017) Catalog Number 64731W Department of the Treasury Internal Revenue Service www.irs.gov

Exhibit A

Form **2848**
(Rev. January 2021)
Department of the Treasury
Internal Revenue Service

## Power of Attorney
## and Declaration of Representative

▶ Go to *www.irs.gov/Form2848* for instructions and the latest information.

OMB No. 1545-0150

For IRS Use Only
Received by:
Name _____
Telephone _____
Function _____
Date ____ / ____ / ____

### Part I   Power of Attorney

**Caution:** A separate Form 2848 must be completed for each taxpayer. Form 2848 will not be honored for any purpose other than representation before the IRS.

**1   Taxpayer Information.** Taxpayer must sign and date this form on page 2, line 7.

| Taxpayer name and address | Taxpayer Identification number(s) |
|---|---|
| Sam Kapourales ███████████████ | ███████████ |
| | Daytime telephone number ████████ | Plan number (if applicable) |

hereby appoints the following representative(s) as attorney(s)-in-fact:

**2   Representative(s)** must sign and date this form on page 2, Part II.

| Name and address | |
|---|---|
| Craig M. Kay, Esquire | CAF No. ████████ |
| | PTIN ----------------- |
| PO Box 2031 | Telephone No. (304) 345-8900 |
| Charleston, WV 25327 | Fax No. (304) 345-8909 |
| Check if to be sent copies of notices and communications ☑ | Check if new: Address ☐ Telephone No. ☐ Fax No. ☐ |

| Name and address | |
|---|---|
| John D. Hoblitzell III, Esquire | CAF No. ██████████ |
| | PTIN ----------------- |
| PO Box 2031 | Telephone No. (304) 345-8900 |
| Charleston, WV 25327 | Fax No. (304) 345-8909 |
| Check if to be sent copies of notices and communications ☑ | Check if new: Address ☐ Telephone No. ☐ Fax No. ☐ |

| Name and address | |
|---|---|
| | CAF No. ----------------- |
| | PTIN ----------------- |
| | Telephone No. ----------------- |
| | Fax No. ----------------- |
| (Note: IRS sends notices and communications to only two representatives.) | Check if new: Address ☐ Telephone No. ☐ Fax No. ☐ |

| Name and address | |
|---|---|
| | CAF No. ----------------- |
| | PTIN ----------------- |
| | Telephone No. ----------------- |
| | Fax No. ----------------- |
| (Note: IRS sends notices and communications to only two representatives.) | Check if new: Address ☐ Telephone No. ☐ Fax No. ☐ |

to represent the taxpayer before the Internal Revenue Service and perform the following acts:

**3   Acts authorized (you are required to complete line 3).** Except for the acts described in line 5b, I authorize my representative(s) to receive and inspect my confidential tax information and to perform acts I can perform with respect to the tax matters described below. For example, my representative(s) shall have the authority to sign any agreements, consents, or similar documents (see instructions for line 5a for authorizing a representative to sign a return).

| Description of Matter (Income, Employment, Payroll, Excise, Estate, Gift, Whistleblower, Practitioner Discipline, PLR, FOIA, Civil Penalty, Sec. 4980H Shared Responsibility Payment, etc.) (see instructions) | Tax Form Number (1040, 941, 720, etc.) (if applicable) | Year(s) or Period(s) (if applicable) (see instructions) |
|---|---|---|
| Trust Fund Recovery Penalty | 941 | 2019/09; 2019/12; 2022/03 |
| | | |
| | | |

**4   Specific use not recorded on the Centralized Authorization File (CAF).** If the power of attorney is for a specific use not recorded on CAF, check this box. See *Line 4. Specific Use Not Recorded on CAF* in the instructions  .  .  .  .  .  .  .  .  .  .  .  .  .  ▶ ☐

**5a   Additional acts authorized.** In addition to the acts listed on line 3 above, I authorize my representative(s) to perform the following acts (see instructions for line 5a for more information): ☐ Access my IRS records via an Intermediate Service Provider;
☐ Authorize disclosure to third parties;   ☐ Substitute or add representative(s);   ☐ Sign a return;
_____
_____
☐ Other acts authorized: _____

Exhibit A

Form 2848 (Rev. 1-2021)                                                                                     Page **2**

**b**  **Specific acts not authorized.** My representative(s) is (are) not authorized to endorse or otherwise negotiate any check (including directing or accepting payment by any means, electronic or otherwise, into an account owned or controlled by the representative(s) or any firm or other entity with whom the representative(s) is (are) associated) issued by the government in respect of a federal tax liability.

List any other specific deletions to the acts otherwise authorized in this power of attorney (see instructions for line 5b): ...................................

**6**  **Retention/revocation of prior power(s) of attorney.** The filing of this power of attorney automatically revokes all earlier power(s) of attorney on file with the Internal Revenue Service for the same matters and years or periods covered by this form. If you do not want to revoke a prior power of attorney, check here . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

**YOU MUST ATTACH A COPY OF ANY POWER OF ATTORNEY YOU WANT TO REMAIN IN EFFECT.**

**7**  **Taxpayer declaration and signature.** If a tax matter concerns a year in which a joint return was filed, each spouse must file a separate power of attorney even if they are appointing the same representative(s). If signed by a corporate officer, partner, guardian, tax matters partner, partnership representative (or designated individual, if applicable), executor, receiver, administrator, trustee, or individual other than the taxpayer, I certify I have the legal authority to execute this form on behalf of the taxpayer.

▶ **IF NOT COMPLETED, SIGNED, AND DATED, THE IRS WILL RETURN THIS POWER OF ATTORNEY TO THE TAXPAYER.**

| | | |
|---|---|---|
| _(signature)_ | 7/29/22 | |
| Signature | Date | Title (if applicable) |

Sam Kapoura les
_____
Print name

Print name of taxpayer from line 1 if other than individual

### Part II    Declaration of Representative

Under penalties of perjury, by my signature below I declare that:

• I am not currently suspended or disbarred from practice, or ineligible for practice, before the Internal Revenue Service;
• I am subject to regulations in Circular 230 (31 CFR, Subtitle A, Part 10), as amended, governing practice before the Internal Revenue Service;
• I am authorized to represent the taxpayer identified in Part I for the matter(s) specified there; and
• I am one of the following:

**a** Attorney—a member in good standing of the bar of the highest court of the jurisdiction shown below.
**b** Certified Public Accountant—a holder of an active license to practice as a certified public accountant in the jurisdiction shown below.
**c** Enrolled Agent—enrolled as an agent by the IRS per the requirements of Circular 230.
**d** Officer—a bona fide officer of the taxpayer organization.
**e** Full-Time Employee—a full-time employee of the taxpayer.
**f** Family Member—a member of the taxpayer's immediate family (spouse, parent, child, grandparent, grandchild, step-parent, step-child, brother, or sister).
**g** Enrolled Actuary—enrolled as an actuary by the Joint Board for the Enrollment of Actuaries under 29 U.S.C. 1242 (the authority to practice before the IRS is limited by section 10.3(d) of Circular 230).
**h** Unenrolled Return Preparer—Authority to practice before the IRS is limited. An unenrolled return preparer may represent, provided the preparer (1) prepared and signed the return or claim for refund (or prepared if there is no signature space on the form); (2) was eligible to sign the return or claim for refund; (3) has a valid PTIN; and (4) possesses the required Annual Filing Season Program Record of Completion(s). *See Special Rules and Requirements for Unenrolled Return Preparers in the instructions for additional information.*
**k** Qualifying Student or Law Graduate—receives permission to represent taxpayers before the IRS by virtue of his/her status as a law, business, or accounting student, or law graduate working in a LITC or STCP. See instructions for Part II for additional information and requirements.
**r** Enrolled Retirement Plan Agent—enrolled as a retirement plan agent under the requirements of Circular 230 (the authority to practice before the Internal Revenue Service is limited by section 10.3(e)).

▶ **IF THIS DECLARATION OF REPRESENTATIVE IS NOT COMPLETED, SIGNED, AND DATED, THE IRS WILL RETURN THE POWER OF ATTORNEY. REPRESENTATIVES MUST SIGN IN THE ORDER LISTED IN PART I, LINE 2.**

Note: For designations d–f, enter your title, position, or relationship to the taxpayer in the "Licensing jurisdiction" column.

| Designation— Insert above letter (a–r) | Licensing jurisdiction (State) or other licensing authority (if applicable) | Bar, license, certification, registration, or enrollment number (if applicable) | Signature | Date |
|---|---|---|---|---|
| a | WV | 4695 | _(signature)_ | 7/29/22 |
| a | WV | 9346 | _(signature)_ | 7/29/22 |
| | | | | |

Form **2848** (Rev. 1-2021)

Exhibit A

04/12/2018 THU 11:36  FAX 304 522 9162 Farrell, White & Legg                    ☑002/011

# FARRELL, WHITE & LEGG PLLC

ATTORNEYS AND COUNSELLORS
914 FIFTH AVENUE
POST OFFICE BOX 6457
HUNTINGTON, WEST VIRGINIA 25772-6457
WWW.FARRELL3.COM

MICHAEL J. FARRELL  4,5
JOSEPH M. FARRELL, Jr. 1,5
TAMELA J. WHITE 4,5,5
ERIK W. LEGG 4,5,5
BERNARD S. VALLEJOS 1,5
MEGAN FARRELL WOODYARD 5
SAMANTHA THOMAS-BUSH 4,5
AUSTIN T. LEWIS 5
JAMES BEN SHEPARD 1,5

TELEPHONE (304) 522-9100
FACSIMILE (304) 522-9162

April 12, 2018

FILE #: 1324.000)

WV Secretary of State
Business & Licensing Division
1615 Washington Street East
Charleston, WV 25311
Fax: 304-558-8381

Re:   Mixgo Health Partners, LLC
      West Virginia Articles of Organization of LLC

To whom it may concern:

Enclosed please find the **West Virginia Articles of Organization of LLC** in regards to the above referenced matter.  Should you need anything else please contact our office.

Very truly yours,

Tamela J. White/vs

Tamela J. White

TJW/vls

Enclosures

(F17740011)

¹ Admitted in West Virginia · ² Admitted in Ohio · ³ Admitted in Kentucky



DEPOSITION
EXHIBIT 3
Hatfield
5/3/22

<span style="color:red">Exhibit A</span>

04/12/2019 THU 11:35  FAX 304 522 9162 Farrell, White & Legg    ☒009/011



West Virginia Secretary of State
Business & Licensing Division
Tel: (304)558-8000
Fax: (304)558-8381
Website: www.wvsos.gov
E-mail: sfilings@wvsos.gov
Rev. 11/2017

## Customer Order Request

### SUBMIT THIS COMPLETED FORM WITH YOUR FILING.

**Order Processing Requested*:    * * * Expedite Processing Requires Additional Fees * * ***

☐ Standard Processing**    ☐ 24-HOUR Expedite***    ☒ 2-HOUR Expedite    ☐ 1-HOUR Expedite
(Avg. processing turnaround   (Additional $25.00 fee included)   (additional $250.00 fee included)   (additional $500.00 fee included)
5-10 business days)

*"Processing" indicates the filing will be completed and registered in the Secretary of State registration database.
**Standard Processing applications received by E-MAIL or FAX must include the e-Payment Authorization form with credit card information.
***NOTE: Orders filed in person through any Secretary of State office location requesting the filing be processed will be assessed a 24-HOUR
Expedite fee of $25.00 per order.

Name of Entity:  Mingo Health Partners, LLC

Return filing to:
(Return Address)   Farrell, White & Legg, P.O. Box 6457, Huntington, WV 25772

Contact Name: Tamela J White                    Phone:    +1 (304) 522-9100

**Return Delivery Options**: Email or Fax options do not receive a copy via mail; must be ordered separately.

☒ Email to: tjw@farrell3.com                    ☐ Fax to: _____

☐ Hold for Pick Up      ☐ Mail to Return Address above    ☐ FedEx: Acct # _____

☐ Other (explain below):                        ☐ UPS: Acct # _____

Order Description (include items being ordered and fee breakdown):

Certified copy of Articles of Organization (2 hour expedited)

* PLEASE NOTE: Original paperwork is kept by this office. Include a copy of the original filing if
you want a file stamped copy returned to you at no extra charge. Certified copy requests are an
additional $15.00. Attach a copy being requested.       Total Amount: _____

**Payment Method:**

☐ Check/Money Order      ☒ Credit Card  (Must attach e-Payment Authorization request form including payment information.)
☐ Cash (Do Not mail cash)   ☐ Pre-paid Acct #: _____   Attach signed pre-paid slip.

Exhibit A

04/12/2018 THU 11:34   FAX 304 522 9162 Farrell, White & Legg                    @001/011

# FARRELL, WHITE & LEGG PLLC
### Attorneys and Counsellors
### 914 Fifth Avenue
### Post Office Box 6457
### Huntington, West Virginia 25772-6457

TELEPHONE: (304) 522-9100                                    FAX: (304) 522-9162

## *TELECOPY TRANSMITTAL SHEET

**DATE: April 12, 2018**

TO:    WV Secretary of State                    FAX NUMBER:   304-558-8381
       Business & Licensing Division

FROM:    Tamela J. White, Esq.

NO. OF PAGES (INCLUDING THIS PAGE):  ~ 11 ~

RE:   Mingo Health Partners, LLC

FILE NO.:    1324.0001

SPECIAL INSTRUCTIONS/COVER MESSAGE:  Please see attached correspondence.

HARD COPY:    ☐  WILL FOLLOW or  X WILL NOT FOLLOW
BY:           ☐MAIL     ☐OVERNIGHT    ☐OTHER

### IF YOU HAVE ANY PROBLEMS WITH THE
### RECEPTION OF THE FOLLOWING PAGES,
### PLEASE CALL VALERIE L. SCHEIDLER AT
### (304) 781-1812.

* This communication is intended for the sole use of the individual or entity
named above.  This fax may contain information subject to State and Federal
protections, including the protections of the Privacy Standards under the Health
Insurance Portability Act of 1996 ("HIPAA").  Any use, duplication or
publication of this communication by a person or entity other than as named
above is strictly prohibited.  If you received this communication by mistake,
please notify the sender immediately by telephone and return it by mail to Farrell,
White & Legg PLLC at the above address at our expense.

{F1371005.1 }

Exhibit A



# State of West Virginia

## Certificate

*I, Mac Warner, Secretary of State of the*
*State of West Virginia, hereby certify that*

**MINGO HEALTH PARTNERS, LLC**

**Control Number: 9ALWM**

has filed its "Articles of Organization" in my office according to the provisions of West Virginia
Code §§31B-2-203 and 206. I hereby declare the organization to be registered as a limited
liability company from its effective date of April 12, 2018 until the expiration of the term or
termination of the company.

Therefore, I hereby issue this

## CERTIFICATE OF A LIMITED LIABILITY COMPANY



*Given under my hand and the*
*Great Seal of the State of*
*West Virginia on this day of*
*April 12, 2018*

*Mac Warner*

**Secretary of State**

Exhibit A

04/12/2018 THU 11:35  FAX 304 522 9162 Farrell, White & Legg    ☑003/011

RECEIVED

18 APR 12 AM II:    West Virginia Secretary of State
                    Business & Licensing Division
                    Tel: (304)558-8000
                    Fax: (304)558-8381
                    Website: www.wvsos.gov



**WEST VIRGINIA**
**ARTICLES OF ORGANIZATION**
**OF LIMITED LIABILITY COMPANY**
Form LLD-1
Rev. 12/2017

**FILED**
APR 12 2018

IN THE OFFICE OF
WV SECRETARY OF STATE

**FILE ONE ORIGINAL**
(Two if you want a filed stamped
copy returned to you.)

**FILING FEE: $100**
    * Fee Waived for Veteran-owned organization

Control # *9ALWM*

* * * * * We acting as organizers according to West Virginia Code §31B-2-202, adopt the following * * * * *
**Articles of Organization for a West Virginia Limited Liability Company.**

1. The name of the West Virginia limited liability company
shall be: [The name must contain one of the required terms such as "limited
liability company" or abbreviation such as "LLC" or "PLLC" - see instructions
for a list of acceptable terms.]

Mingo Health Partners, LLC

☑ CHECK BOX to indicate you've included one of the REQUIRED CORPORATE NAME ENDINGS (See instructions for name endings).

2. The company
will be a:   ☑ LLC    ☐ Professional LLC* for the profession of: _____
                      (See Section 2. of the attached instructions for list of accepted professions.)

                      ☐ Professional business organization: CHECK BOX indicating you have attached the state licensing board
                        Verification of Eligibility (Form VOE) to these Articles if your profession meets the requirements as defined by
                        Chapter 30 of WV Code. Your application will be rejected if the VOE is not attached.

3. The address of the principal office
   of the company will be:

   Street: ████████████
   City: ████████████    State: WV    Zip Code: ████████

   Located in the County of (required):   County: ████████████

   The mailing address of the above
   location, if different, will be:

   Street: _____
   City: _____    State: _____    Zip Code: _____

4. The address of the initial designated
   (physical) office of the company in
   West Virginia, if any, will be:

   Street: ████████████████
   City: ████████████    State: WV    Zip Code: ████████

   Located in the County of:   County ████████████

   The mailing address of the above
   location, if different, will be:

   Street: _____
   City: _____    State: _____    Zip Code: _____

5. The name and address of the person
   (agent) to whom notice of process
   may be sent, if any, will be:

   Name: Charles W. Hatfield
   Street: ██████████████████
   City: ████████████    State: WV    Zip Code: ████████

460712₅

Exhibit A

04/12/2018 THU 11:35  FAX 304 522 9162 Farrell, White & Legg                    ☒006/011

**WEST VIRGINIA ARTICLES OF ORGANIZATION OF LIMITED LIABILITY COMPANY**                **Page 2**

6. E-mail address where business correspondence may be received: charliehatfield@suddenlinkmail.com

7. Website address of the business, if any (ex: yourdomainname.com): N/a

8. Do you own or operate **more than one business in West Virginia?**  ☐ Yes * Answer a. and b. below.  ☐ No  ☒ Decline to answer
   If "Yes", a. How many businesses? _____  b. Located in how many West Virginia counties? _____

9. The name(s) and address(es) of the organizer(s) is (You must list at least ONE organizer.):

| Name | No. & Street Address | City | State | Zip Code |
|------|----------------------|------|-------|----------|
| Charles W. Hatfield | ███████ | ███████ | WV | ███████ |

10. The company will be:  ☒ an AT-WILL company, conducting business for an indefinite period.
    (required)            ☐ a TERM company, conducting business for the term of _____ years.

11. a. List the name(s) and address(es) of the **MEMBER(S)** of the company (required; Note: The application will be rejected if member information is not provided below. Attach additional pages if necessary):

| Member Name | No. & Street Address | City | State | Zip Code |
|-------------|----------------------|------|-------|----------|
| Charles W. Hatfield | ███████ | ███████ | WV | ███████ |
| Sam Kapourales | | | WV | |
| Doug Reynolds | | | WV | |

b. The company will be –   ☒ MEMBER-MANAGED [All member information must be entered under 11a. above.]
   CHECK ONE (required):   ☐ MANAGER-MANAGED [All manager information must be entered in the spaces below if selecting this management structure. Attach additional pages if necessary.]

| Manager Name | No. & Street Address | City | State | Zip Code |
|--------------|----------------------|------|-------|----------|
| Charles W. Hatfield | ███████ | ███████ | WV | ███████ |

12. All or specified members of a limited liability company are liable in their capacity as members for all or specified debts, obligations or liabilities of the company (required):
☒ No - All debts, obligations and liabilities are those of the company.
☐ Yes - Those persons who are liable in their capacity as members for all debts, obligations or liability of the company have consented in writing to the adoption of the provision or to be bound by the provision.

13. The purpose(s) for which this limited liability company is formed is as follows:
[Describe the type(s) of business activity which will be conducted, for example, "real estate," "construction of residential and commercial buildings," "commercial painting," "professional practice of law" (see Section 2. for acceptable "professional" business activities). Purpose may conclude with words "...including the transaction of any or all lawful business for which corporations may be incorporated in West Virginia."]

To operate health care entity(ies) including but not limited to hospital/hospital services and all transactions and/or

lawful business purposes which a LLC may be organized and incorporated in West Virginia

Exhibit A

04/12/2018 THU 11:35   FAX 304 522 9162 Farrell, White & Legg                        @005/011

WEST VIRGINIA ARTICLES OF ORGANIZATION OF LIMITED LIABILITY COMPANY                    Page 3

14. Is the business a Scrap Metal Dealer?

☐ Yes (If "Yes," you must complete the Scrap Metal Dealer Registration Form (Form SMD-1) and proceed to Section 15.)

☒ No (Proceed to Section 15.)

15. Other provisions which may be set forth in the operating agreement or matters not inconsistent with law;
(See instructions for further information) (attach pages if necessary.)

16. The number of pages attached and included in these Articles is:  9

17. The requested effective date is
(Requested date is not and if it is for that, they may not be earlier than 90 days after filing is completed.)

☒ the date and time of filing in the Secretary of State's Office.

☐ the following date                            and time:

18. Is the organization a "veteran-owned" organization?

Effective JULY 1, 2018, to meet the requirements for a "veteran-owned" organization, the entity filing for registration must meet the following criteria per West Virginia Code §59-1-2a:

1. A "veteran" must be honorably discharged or under honorable conditions, and
2. A "veteran-owned business" means a business that meets one of the following criteria:
   a. is at least fifty-one percent (51%) unconditionally owned by one or more veterans; or
   b. in the case of a publicly owned business, at least fifty-one percent (51%) of the stock is unconditionally owned by one or more veterans.

☐ Yes (If "Yes," attach Form DD214)  ➡  ☐ CHECK BOX indicating you have attached Veterans Affairs Form DD214

☒ No

You may obtain a copy of your Veterans Affairs Form DD214 by contacting:

National Personnel Records Center
Military Personnel Records
1 Archives Drive
St. Louis, MO 63138
Toll free: 1-86-NARA-NARA or 1-866-272-6272
Phone: 314-801-0800
www.archives.gov/veterans/military-service-records

For WV Code 59-1-2(d) effective July 1, 2018, the registration fee is waived for entities that meet the requirements as a "veteran-owned" organization. In extended time there is to determine if the organization qualifies for this waiver. In addition, a "veteran-owned" entity will have thirty (30) days from years of Annual Report to be marked AFTER the organization's initial formation per WV Code §59-1-2a(e).

19. Contact and Signature Information * (See below for proper Legal Notice Regarding Signature)

a. Contact person to reach in case there is a problem with filing: Tamela J. White, counsel   Phone: +1 (804) 523-9100

b. Print or type name of signer: Charles W. Hatfield                   Title/Capacity of signer: Organizer and Managing Member

c. Signature: [signature] Charles W. Hatfield   Date: 4/12/18

*Important Legal Notice Regarding Signature: For West Virginia Code §11B-4-410, Liability for False statement is filed record. It is record authorized or required to be filed under this chapter constitutes false statement, one who suffers loss by reliance on the statement may recover damages for the loss from a person who signed the record or caused another to sign it on the person's behalf and knew the statement to be false at the time the record was signed.

Important Note: This form is a public document. Please do NOT provide any personal identifiable information on this form such as social security number, bank account number, credit card numbers, the identification or driver's license numbers.

[ Reset Form ]    [ Print Form ]

Exhibit A

*ROBERT L. JOHNS vs.*

*CHARLES HATFIELD*

*DIANE VARNEY*

*07/13/2022*



**Realtime Reporters**

*"Because your time matters"*

713 LeeStreet
Charleston, WV 25301

(304) 344-8463
schedulerealtime@gmail.com

Realtimereporters.net

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 1

```
1            IN THE CIRCUIT COURT OF MINGO COUNTY,
                       WEST VIRGINIA
2

3

4   ROBERT L. JOHNS, TRUSTEE,
5        Plaintiff,
6

7   v.                      CIVIL ACTION NO. 21-C-105
8

9

10  CHARLES HATFIELD, individually,
    and as administrator of the
11  ESTATE OF SABRINA HATFIELD,
12       Defendants.
13

14

15       The deposition of DIANE VARNEY, taken upon
    oral examination and pursuant to notice and pursuant to the
16  West Virginia Rules of Civil Procedure, before Jaime L.
    Centifanti, Registered Professional Reporter and Notary
17  Public in and for the State of West Virginia, on
    Wednesday, July 13, 2022, at 2:20 p.m., at the
18  Mountaineer Hotel conference room, located at 31 East
    Second Avenue, Williamson, West Virginia.
19

20

21            REALTIME REPORTERS, LLC
              Jaime L. Centifanti, RPR
22               713 Lee Street
              Charleston, WV 25301
23              (304) 344-8463
              www.realtimereporters.net
24
```

Page 2

```
1   APPEARANCES:
2   On behalf of the Plaintiff:
3        Shawn P. George, Esquire
         sgeorge@gandllaw.com
4        GEORGE & LORENSEN PLLC
         1526 Kanawha Boulevard, East
5        Charleston, West Virginia  25311
         304.343.5555
6

7

    On behalf of the Defendants:
8

         Colton C. Parsons, Esquire
9        colton.parsons@steptoe-johnson.com
         STEPTOE & JOHNSON, PLLC
10       707 Virginia Street, East, 17th Floor
         Post Office Box 1588
11       Charleston, West Virginia  25326
         304.353.8000
12

13

14

15

16

17

18

19

20

21

22

23

24
```

Page 3

```
1

2

3   DIANE VARNEY
4       BY MR. GEORGE . . . . . . . . . . . . . . .    5
        BY MR. PARSONS . . . . . . . . . . . . . .  86
5       RE BY MR. GEORGE . . . . . . . . . . . . .109
        RE BY MR. PARSONS . . . . . . . . . . . . 110
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

EXAMINATION INDEX

Page 4

EXHIBIT INDEX

```
1

2

3                                              MAR
    Deposition Exhibit Number
4   16   Email chain                           25
5   17   Email chain                           47
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Realtime Reporters, LLC
schedulerealtime@gmail.com 304-344-8463

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

Page 5

1  DIANE VARNEY,
2  was called as a witness by the Plaintiff, pursuant to
3  notice, and having been first duly sworn, testified as
4  follows:
5  EXAMINATION
6  BY MR. GEORGE:
7      Q.  Would you state your full name, please.
8      A.  It's Diane Varney.
9      Q.  Ms. Varney, first of all, thank you for your
10  patience.  We're sorry that we're delayed in getting
11  started with you and we appreciate you working with us.
12          We've got an air conditioner on in this
13  room, so if we can try each to keep our voices up so
14  that the court reporter can hear everything, that would
15  be terrific.
16          Have you ever been deposed before?
17      A.  Yes.
18      Q.  Okay.  A few ground rules, hopefully to make
19  this go faster, easier, smoother.
20          First, if you do not understand one of
21  my questions, please tell me that and I'll be more than
22  happy to repeat it or rephrase it until you understand
23  it and can answer it.
24          Will you agree to do that for me?

Page 6

1      A.  Yes.
2      Q.  Second, make sure, please, to make all of your
3  answers verbal so that the court reporter accurately
4  takes down -- because sometimes witnesses will nod or
5  shake their head, or they'll say, "Uh-huh" or "Huh-uh,"
6  and it's -- we want to make sure that the record is
7  completely accurate.
8          Would you do that for me?
9      A.  Yes.
10      Q.  The third thing is, is that if you answer one
11  of my questions, I'm going to assume that you both heard
12  it and understood it; is that fair?
13      A.  Yes.
14      Q.  All right.  And the fourth is, at any time for
15  any reason you need to take a break, please tell us and
16  we will accommodate you.
17      A.  Thank you.
18      Q.  You're welcome.
19          Can you give me a little bit of
20  information about your background?  Were you born in
21  Mingo County?
22      A.  No.  Actually, I was born in Allentown,
23  Pennsylvania.
24      Q.  Okay.  So when did you come to this part of

Page 7

1  the world?
2      A.  In 1981.
3      Q.  And what was the reason for --
4      A.  My husband was born and raised back here and
5  he wanted to come back home.
6      Q.  What is your educational level?
7      A.  I have a -- I did graduate from high school,
8  and I had just one accounting class in college and
9  that's all.
10      Q.  Did you complete college, or --
11      A.  No.
12      Q.  And can you just give us a summary of your
13  employment after high school?
14      A.  The majority of my jobs was either in payroll
15  or accounts payable.
16      Q.  And approximately when would you have started
17  in that line of work?
18      A.  In 1975.
19      Q.  And in terms of all of the employment that
20  you've had in payroll or accounts payable, what's the
21  highest level of job that you attained at any
22  organization?
23      A.  It would have been at Williamson Memorial
24  Hospital.  I was the accounting manager.

Page 8

1      Q.  Now, we took Mr. Hatfield's deposition, and he
2  referred to you as the controller.  Is that the same
3  thing in your mind as the accounts manager?
4      A.  No.  To me, no.
5      Q.  Tell me in your mind the difference between a
6  controller and an accounts manager.
7      A.  I think it's a higher level than what I was --
8  that I had the education for.
9      Q.  Okay.  So is it fair that a controller has a
10  broader scope of duties than you had as an accounts
11  manager?
12      A.  I would think so, yes.
13      Q.  And so the only portion of the accounting
14  function at Williamson Memorial that you were involved
15  in, as I understand it, is payroll and accounts payable?
16      A.  Those were the two positions that I took care
17  of and managed with the clerks.
18      Q.  Now, when did you start with -- employment at
19  Williamson Memorial?
20      A.  In 1983.
21      Q.  When did your employment there cease?
22      A.  It was December 31st, 2020.
23      Q.  And what was the reason it stopped then?
24      A.  Well, by that time, the hospital was closed

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

Page 9

1 and they had finished going through the closing process.
2    Q.   And in terms of the closing process, did you
3 work with either of the gentlemen who are seated here to
4 my left?
5    A.   With Gene a little bit, yes.
6    Q.   Have you ever discussed with Mr. Preston any
7 issues or problems - and we're going to get into certain
8 of those when I ask you further questions - that existed
9 before Mr. Hatfield and Mrs. Hatfield were no longer
10 employed at Williamson?
11    A.   Only if asked.  I didn't volunteer information
12 unless I was asked.
13    Q.   Did Mr. Preston ever ask you about the
14 performance of the jobs by either Mr. Hatfield or
15 Mrs. Hatfield?
16    A.   Yes.
17    Q.   What did he ask you?
18    A.   A lot of it had to do with checks being cut
19 that didn't make sense, had no backup for.  Things in
20 that area.
21    Q.   So was this something that Mr. Preston
22 discovered on reviewing the check register and asked you
23 about?
24    A.   I don't know how he knew about it.

Page 10

1    Q.   Did he ask you that to see if you knew
2 anything about it?
3    A.   I don't recall a specific conversation.  It's
4 just a lot of my conversations were with Loretta Simon.
5    Q.   Because she was the chief operating officer
6 during that portion of the hospital's life?
7    A.   Yes.
8    Q.   And we will get to those discussions in a
9 little bit.
10         Have you ever met or spoken to Bob
11 Johns, the bankruptcy trustee?
12    A.   I'm sure I have.  I don't really remember
13 names.
14    Q.   And you have spoken to me on one or two
15 occasions; correct?
16    A.   Yes.
17    Q.   And I called you to see whether you would be
18 willing to be deposed; right?
19    A.   Yes.
20    Q.   And I explained to you generally what this
21 litigation was about.
22    A.   Yes.
23    Q.   And in a nutshell, it's that I have been hired
24 by the bankruptcy trustee to pursue claims against

Page 11

1 Mr. and Mrs. Hatfield, her estate, for acts and failures
2 to act while they were the CFO, CEO, and board chair of
3 Williamson Memorial Hospital; correct?
4    A.   Yes.
5    Q.   Okay.  In any of our conversations, did I
6 suggest to you or did anyone from my office suggest to
7 you that you should say or not say anything?
8    A.   No.
9    Q.   Okay.  Did we attempt to pressure you in any
10 way, shape, or form to either be here or to give any
11 specific kinds of answers?
12    A.   No.
13    Q.   Are you here of your own free will, under oath
14 to tell what you know as it relates to your areas at
15 Williamson Memorial Hospital from June 1 of 2018 until
16 when your employment stopped as it relates to the
17 Hatfields, and then be able to address how the hospital
18 ran before Mingo Health Partners bought it?
19    A.   Yes.
20    Q.   Okay.  Now, to whom did you report?  When CHS
21 owned the hospital, who was your direct report?
22    A.   It was to the CFO.
23    Q.   And at that time was it Kevin Weeks?
24    A.   No. Yes.

Page 12

1    Q.   And he was an employee of CHS?
2    A.   Yes.
3    Q.   And did he stay on for a period of time after
4 Mingo Health Partners bought Williamson Memorial
5 Hospital?
6    A.   I'm not sure if he actually did stay for a
7 little while.  I really don't remember.
8    Q.   At some point soon after the sale, you don't
9 remember him there; is that fair?
10    A.   Yes.
11    Q.   And was there a period of time where there was
12 no CFO?
13    A.   You know, no.  There had to be somebody there.
14    Q.   You just don't recall who.
15    A.   I just don't recall who.
16    Q.   Do you recall that in September or October of
17 2018, Mr. Hatfield became the CEO of the hospital?
18    A.   Yes.
19    Q.   Do you recall that shortly after that, his
20 wife, Sabrina, became the CFO of the hospital?
21    A.   Yes.
22    Q.   And did you report directly to her?
23    A.   Not necessarily, no.
24    Q.   Why was your reporting relationship different

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 13

1 under the new ownership than it had been with CHS?
2    A.  Her focus was more on the patient side.
3    Q.  And was that the patient record side?
4    A.  More of the financials, of bills, and getting
5 out for the patients so that cash could be coming in.
6    Q.  Is that the revenue cycle part that we hear a
7 lot about?
8    A.  Yes.
9    Q.  And you were not involved in that?
10    A.  No.
11    Q.  But whether that function went well or didn't
12 go well, is it fair to say that that impacted the money
13 that you had available to pay accounts payable and to
14 meet your payroll obligations?
15    A.  Yes.
16    Q.  During the time in which CHS owned Williamson
17 Memorial Hospital, did it ever fail to meet a payroll?
18    A.  No.
19    Q.  Did it ever withhold monies from employees'
20 checks and fail to remit those to either the government
21 or to the various providers of services that were either
22 health care, retirement, life insurance, et cetera?
23    A.  No.
24    Q.  Were you, during the CHS ownership, provided

Page 14

1 the money and resources you needed to do your job?
2    A.  Yes.
3    Q.  Did that change after Mingo Health Partners
4 bought Williamson Memorial Hospital?
5    A.  Not at first.
6    Q.  When did it change?
7    A.  Probably within six, seven months.
8    Q.  Please describe the change.
9    A.  Cash flow became much less.  Vendors weren't
10 getting paid on time.
11    Q.  Let me break each one of those up, please.
12        When CHS owned the hospital, was there a
13 usual range of cash flow that was made available to you
14 to meet the obligations on a monthly basis?
15    A.  What they would do with accounts payable is on
16 a daily basis as checks were presented to the bank, they
17 would fund that bank account to match that dollar
18 amount, and then it would wash out and always be zero at
19 the end of the day.
20    Q.  Is it fair for me to conclude that you had
21 access to that account?
22    A.  No.
23    Q.  Who had access to it?
24    A.  With CHS?

Page 15

1    Q.  Yes.
2    A.  The corporate office did all of the
3 transactions.
4    Q.  How were you made aware of what money you had
5 available to do your job?
6    A.  I -- I had access to look at the accounts but
7 that's all.
8    Q.  That's what I meant.  I mean, I don't mean
9 that you could write from it, but you could see if you
10 had money.
11    A.  Right.
12    Q.  And that was a CHS account, as you've
13 described, and you could at least look at it and see on
14 a daily basis what it had in it.
15    A.  Yes.
16    Q.  Okay.  And then once you were satisfied that
17 it had enough money in it in the prior day to meet your
18 obligations, how is it that you got access, if you did,
19 to the checkbook to write the checks that met the
20 obligations?
21    A.  CHS had a schedule they kept according to
22 which vendors got paid in which week, the types of
23 vendors whether it was utilities or contracts, and we
24 would be given a schedule from the corporate office to

Page 16

1 use that schedule and whatever was on our accounts
2 payable aging, that's how we requested checks.
3    Q.  Did you also -- were you also aware of a
4 budget?
5    A.  Yes.  There was always a budget.
6    Q.  And I would assume that the schedule that you
7 just described kind of fits into and works in
8 conjunction with the budget?
9    A.  Pretty much so, yes.
10    Q.  Purpose of which is you can have an orderly
11 administration of the office.
12    A.  Yes.
13    Q.  Try to avoid surprises.
14    A.  Yes.
15    Q.  Be prepared for the needs to be met, meet the
16 accounts payable, and the funding obligations for the
17 employees; correct?
18    A.  No, never failed.
19    Q.  And as I've heard you describe it, it worked
20 very well and never failed.
21    A.  No, never failed.
22    Q.  So within the first six months after Mingo
23 Health Partners buys Williamson Memorial Hospital,
24 you're having problems with getting access to sufficient

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 17

1  cash to pay vendors and employees; correct?
2      A.  Yes.
3      Q.  What did you do when that situation first
4  arose?
5      A.  I would ask Charlie to move funds from the
6  general account which is where all the payments from
7  insurance companies would come in, to move enough money
8  over to cover checks that we intended to cut.
9      Q.  And did you still have visual access to the
10  general account to see what monies were there?
11      A.  Yes.
12      Q.  And when you looked at that general account
13  during this time period, was there enough money there to
14  pay the payroll and the accounts payable?
15      A.  Not always.
16      Q.  So when the money wasn't there, what did you
17  then do?
18      A.  Couldn't cut checks.
19      Q.  So did you get calls from vendors?
20      A.  Yes.  The accounts payable clerk got many
21  calls.
22      Q.  And they reported those calls to you?
23      A.  No.  She would tell me about it, and then I
24  would discuss with Charlie.

Page 18

1      Q.  Did you lose vendors for nonpayment?
2      A.  Yes.  Some of the smaller vendors, yes.
3      Q.  And did -- were you able to make arrangements
4  with the larger vendors always?
5      A.  We would -- my accounts payable clerk would
6  get a dollar amount that they were asking for, and she
7  would email Charlie, and most of the time she would copy
8  me on the emails.
9      Q.  Okay.  The name of that person, please.
10      A.  Annette Chafin.
11      Q.  And would you describe with what regularity
12  these kinds of communications took place once the
13  problems began?
14      A.  Every day.
15      Q.  And was Mr. Hatfield able to address them
16  every day?
17      A.  Sometimes yes.
18      Q.  Sometimes no?
19      A.  Sometimes no.
20      Q.  What about employee payroll?
21      A.  Payroll was -- we were told to process
22  payroll, and if the money wasn't there, then Charlie
23  would get with Sam Kapourales to help fund it.
24      Q.  In the same time frame that we're talking

Page 19

1  about, within the first six months after the
2  transaction, were there such problems with payroll?
3      A.  Yes.
4      Q.  Now, I want to focus a little bit on what it
5  means to process payroll.
6          Would you describe in your own words
7  what that means?
8      A.  Take the hours of the employees, run it
9  through the system to have all their deductions taken
10  out, and come up with a net amount for each employee.
11      Q.  What about the gross amounts, the difference
12  between what the employee actually received and what was
13  payable either to the State or federal government for
14  withholding, for unemployment, for pension
15  contributions, life insurance, health care, how was that
16  funded or not funded?
17      A.  It wasn't.
18      Q.  All right.  So let me make sure I understand.
19  And, again, I'm not here to put any words in your mouth,
20  but when Mr. Hatfield would go to Mr. Kapourales to ask
21  for money so that the payroll could be processed, was he
22  asking for the net amount - only the amount the employee
23  would get - or their gross amount so that it would
24  reflect all of the other monies that needed to be paid?

Page 20

1      A.  It was only the net amount.
2      Q.  Did that concern you?
3      A.  Yes.
4      Q.  How did you express that concern?
5      A.  All I could do was -- I mean, my payroll clerk
6  would email Charlie the net amount of the payroll, plus
7  what was to be the amount for the 401(k) every pay
8  period, but only the net amount was supplied.
9      Q.  Is there any question in your mind that
10  Charlie Hatfield understood when he was quote/unquote
11  funding the payroll that he was not funding anything
12  more than the net amount that went to the employees?
13          MR. PARSONS:  Object to form.
14  Foundation.
15      Q.  Based on the communications that you had with
16  Annette and that she had with Mr. Hatfield -- and we'll
17  get to the ones you had with him later, but is there any
18  doubt in your mind he knew he was only funding the net?
19          MR. PARSONS:  Same objection.  You can
20  answer.
21          I'll object.  Might be your first one,
22  but you can answer.
23      A.  Okay.  Mitzi Stanley was my payroll clerk, and
24  she would copy me on emails stating how much was needed

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 21

1  for the payroll and the 401(k).
2      Q.  So would she give the gross amount?
3      A.  No, it was the net amount.
4      Q.  Okay.  But in addition -- what I'm trying to
5  figure out is, are you aware of any basis that
6  Mr. Hatfield could truthfully claim he didn't know that
7  he needed to fund more than the net amount?
8      A.  There's no way he wouldn't have known due to
9  the deductions that were taken out of the employees'
10  paychecks.
11      Q.  And would you detail what those deductions
12  were for the record?
13      A.  Health insurance is one of them.  401(k).
14  There's all kinds of other insurances.  Life insurance.
15      Q.  When it came time to pay what I'm going to
16  call quarterlies, did you have any responsibility for
17  that as the accounts payable person?
18      A.  The payroll clerk, which is Mitzi, would be
19  the one that would pull that together, but I've never
20  had -- until later filed those reports.
21      Q.  When do you recall first filing those reports?
22      A.  It was after the hospital closed.
23      Q.  So during the time that the Hatfields were
24  there in their positions, Ms. Stanley did that?

Page 22

1      A.  She would have been the person to do that,
2  yes.
3      Q.  Okay.  Now, did she have the authority to
4  submit those without approval from the CFO or
5  Mr. Hatfield?
6      A.  She should have had approval, yes.
7      Q.  From both of them?
8      A.  Either one.
9      Q.  And, to your knowledge, did she ever file them
10  without such approval?
11      A.  They never got filed.
12      Q.  They never even filed them.
13      A.  No.
14      Q.  And why weren't they filed?
15      A.  There was no funding for it.
16      Q.  So am I hearing you correctly that the
17  quarterlies were never filed, so there was no approval
18  to go get because there wasn't any money to pay them?
19      A.  Right.
20      Q.  And Mr. and Mrs. Hatfield were aware of this?
21      A.  They should have been.
22      Q.  From Mrs. Stanley?
23      A.  They should, yes.
24      Q.  So if you didn't have a budget, how did you

Page 23

1  manage?
2      A.  Just day by day.
3      Q.  And if you didn't have money, how did you
4  manage?
5      A.  There came a point where Charlie decided who
6  got paid and when they got paid.
7      Q.  So he took over your function of -- in that
8  regard?
9      A.  Yes.
10      Q.  Approximately when was that?
11      A.  I don't have an exact date.  It's probably
12  maybe March of 2019.  It could have been earlier.
13      Q.  Do you have any understanding about whether
14  there was an event or a specific reason that he did that
15  at that time?
16      A.  It's just where so many vendors were calling
17  asking for money, and maybe he felt like he could handle
18  a little better being the CEO, that he could bargain
19  with them to maybe give them a little more time to pay.
20      Q.  So in your role then, did you essentially keep
21  him informed of vendors, the status of their payments or
22  nonpayment, and periodically give him that information
23  so he could decide who he was going to pay?
24      A.  My accounts payable clerk sent emails to him

Page 24

1  all the time telling who she had -- who had contacted
2  her and what was owed and I had some -- some of that
3  contact, too.
4      Q.  And then did Mr. Hatfield, either by email or
5  in person say, "This is who we're going to pay," or did
6  you not hear back from him; he simply took care of the
7  payment function himself?
8      A.  As long as we were able to cut checks from our
9  system, things were okay.  But once those checks started
10  bouncing, then vendors refused our checks and either
11  wanted a cashier's check or a wire.
12      Q.  Do you recall approximately when that
13  occurred?
14      A.  Not long after he started taking over when
15  payments were going to be made.
16      Q.  And as I understand your testimony, he took
17  over that function, you believe, no later than March of
18  '19.
19      A.  Somewhere around there, yes.
20      Q.  And so by May 1, vendors were not accepting
21  Williamson Memorial checks.  They needed to be bank
22  checks or immediately available wired funds.
23          MR. PARSONS:  Object to form and
24  foundation.  You can answer.

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 25

1    Q.  Is that right?

2    A.  I'm sorry, can you repeat that?

3    Q.  Sure.

4        What I heard you say was shortly after
5  Mr. Hatfield took over the accounts payable function,
6  vendors refused to take a Williamson Memorial Hospital
7  check because they were bouncing; is that correct?

8    A.  Yes.

9    Q.  And then the vendors demanded either payment
10 of a bank check, a certified check drawn that the funds
11 are there, or by a wire; is that correct?

12   A.  Yes.

13   Q.  And you were aware of that as was Mr. Hatfield
14 at that time; correct?

15   A.  Yes.

16   Q.  You had discussions with him about those
17 events; correct?

18   A.  Yes.

19   Q.  So was there -- do you know the source of the
20 funding that was being used to pay the vendors?

21   A.  It was from the patients' insurance payments.

22        VARNEY DEPOSITION EXHIBIT NO. 16

23        (Email chain was marked for

24        identification as Varney Deposition

Page 26

1        Exhibit No. 16.)

2    Q.  I'm going to show you an exhibit that's been
3  marked for identification as 16, and ask you if you're
4  familiar with that.  It's a series of emails, and I'm
5  most interested in the one that's in the middle of the
6  page that's from you to Mr. Hatfield.

7        Do you see that, September 27 of '18?

8    A.  Yes.

9    Q.  Okay.  So you're writing to him at that time
10 because he was the CEO?

11   A.  Yes.

12   Q.  And you're telling him that only $43,331.77
13 has been wire transferred into the account at Williamson
14 Memorial; correct?  And then it looks like a frowny
15 face.

16   A.  Uh-huh.

17   Q.  If that's a "yes," you need to say "Yes."

18   A.  Yes.

19   Q.  Okay.  All right.  How much money was
20 expected?

21   A.  We're not sure.

22   Q.  Okay.  Is it true or not true that the amounts
23 received by Williamson Memorial in payment for services
24 rendered rarely matched the needs the hospital had to

Page 27

1  continue operating on a daily basis?

2    A.  Yes.

3    Q.  Mr. Hatfield would tell you that a certain
4  amount of money was going to be coming in, and you would
5  be on the lookout for that money; correct?

6    A.  I didn't always know exactly how much.  The
7  transfers did come from CHS were patient money that came
8  in, and they would transfer it to our general account.

9    Q.  And is it fair to say that on a routine basis,
10 those amounts for CHS were less than Mr. Hatfield
11 represented to the people in your office that Williamson
12 should be expecting?

13   A.  I don't know how he would know exactly how
14 much we are expecting except for CHS telling him.

15   Q.  Okay.  Do you know what conversations
16 Mr. Hatfield may have had with members of the board in
17 terms of what money was supposed to be coming in?

18   A.  No.

19   Q.  You were not a member of the board, nor in a
20 position at the hospital where you attended board
21 meetings; correct?

22   A.  I did not attend board meetings.

23   Q.  Did you ever have discussions with either
24 Mr. Kapourales or Mr. Reynolds or anybody else on the

Page 28

1  board other than Mr. Hatfield, about the problems that
2  you were confronted with trying to do your job as the
3  accounts payable and payroll manager?

4    A.  Sam Kapourales would come up to the hospital
5  periodically and ask to see the accounts payable aging,
6  and he would look over it and ask, you know, "Certain
7  vendors what do they, you know, do for us, are they a
8  supply vendor, are they a contractor, whatever," and
9  then he would look at some of the smaller amounts, and
10 he said -- he would say, "Why don't you pay these small
11 ones?  Why don't you pay these?  Why are there so many
12 small ones on here, why don't you pay those?"

13        I would not reply.  I would just kind of
14 glance over at Charlie because he was there, and he
15 would look at it and then that would be the end of the
16 meeting and I would just go back to my office.

17   Q.  In those meetings, or at any other times, did
18 Mr. Kapourales know, to your knowledge, that the gross
19 amount of the payroll, the difference between the net
20 and the gross, was not being escrowed and was not being
21 paid?

22   A.  I don't know if he knew.

23   Q.  You never discussed that with him?

24   A.  No.

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 29

1    Q.   You never heard him discuss that in your
2  presence, nor Mr. Hatfield discuss it with him in your
3  presence?
4    A.   No.
5    Q.   Now, going back to Exhibit 16.  After you
6  write on September 27th, 2018 to Mr. Hatfield that only
7  $43,331.77 came in, he then writes back; correct?  A
8  message.  Do you see that?  "This is unacceptable"?
9    A.   Oh, yes.
10   Q.   Okay.  Read that into the record, if you
11  would, please.
12   A.   "This is unacceptable.  No way can I operate
13  this hospital on such low rate of return."
14   Q.   Did you have any disagreement with that
15  statement?
16   A.   No.
17   Q.   Did you respond to it in any way?
18   A.   No.
19   Q.   It didn't really require a response from you,
20  did it?
21   A.   No.
22   Q.   And then the email goes to Mr. Kapourales to
23  tell him that the collection was only -- or the payment
24  was only $43,331.77, and his response as read here is

Page 30

1  what?
2    A.   "That's awful."
3    Q.   So can you tell me from any source what the
4  plan was at Williamson Memorial Hospital to deal with
5  this awful situation?
6    A.   No.
7    Q.   So you've got a situation where you have no
8  budget; correct?
9    A.   Correct.
10   Q.   Insufficient money in the revenue cycle to pay
11  your expenses; correct?
12   A.   Correct.
13   Q.   And you have federal, state, and employee
14  obligations that are being taken from employee checks
15  but not being funded.
16   A.   Correct.
17   Q.   Did that concern you?
18   A.   Yes.
19   Q.   Who, if anybody, did you speak to about it, or
20  was it simply you just went to your office, put your
21  head down, tried to do your job because there was wasn't
22  anything you could do about it?
23   A.   It's basically what I did.  I did what I could
24  with what I had to work with.

Page 31

1    Q.   Now, did there -- did there come a time during
2  which Mr. Hatfield was in charge of the accounts
3  payable, that he wrote checks on payables that you
4  didn't have paperwork for?
5    A.   Yes.
6    Q.   And do you remember when the earliest of those
7  occasions occurred approximately?
8    A.   Maybe June or July.  Could have been earlier.
9    Q.   And that would have been of '19?
10   A.   Of '19, yes.
11   Q.   And what, if anything, did you do or say when
12  you saw that he had written such a check?
13   A.   I would ask if he could give me backup so that
14  we could process it through our accounts payable system
15  and get it off our aging if necessary.
16   Q.   And did he provide that paperwork?
17   A.   Not always, no.
18   Q.   So you, in effect, had transactions on your
19  register that you had no backup for and could not
20  explain.
21   A.   Yes.
22   Q.   And did you look behind in any of those
23  instances to whom the checks were payable?
24   A.   There were made to Mid Mountain Properties.

Page 32

1    Q.   Do you have any understanding as to who Mid
2  Mountain Properties is or was?
3    A.   It's Charlie's personal property.  Personal
4  company, I'm sorry.
5    Q.   Is it in the business of real estate?
6    A.   Yes.
7    Q.   Did you get at any time any explanation from
8  Mr. Hatfield why he wrote those checks?
9    A.   There were times where our clinics had to have
10  utilities paid or phone bills because they were going to
11  be shut down for nonpayment and we needed to keep the
12  clinics going, and they would use the Mid Mountain
13  Property credit card to make those payments on
14  occasions.
15   Q.   So what would have been the difficulty, then,
16  if you know, of simply providing you the utility bills,
17  the credit card statements so that you could reconcile?
18   A.   I didn't see a problem.
19   Q.   But that never happened?
20   A.   No.
21   Q.   Are you certain that's what the money was used
22  for?
23   A.   Not always, no.
24   Q.   Were there other transactions of a similar

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 33

1  kind involving what you could characterize as personal
2  interests of Mr. Hatfield where checks were written from
3  funds that were Williamson Memorial Hospital funds?
4      A.  Yes.
5      Q.  Can you give us examples of those?
6      A.  Reed's Painting.
7      Q.  And is that a local -- I'm not familiar with
8  that.  Is that --
9      A.  It's a local vendor.
10     Q.  And was any support or backup supplied to you
11  that connected that invoice, that bill, that service
12  with something for Williamson Memorial Hospital?
13     A.  My accounts payable clerk couldn't match up
14  the dollar amount to what we had on our aging for Reed's
15  Painting, and she called the company to ask for
16  invoices.  And at first they were not willing to give
17  them to us.  They said they're not for the hospital.
18  They're for Mid Mountain Properties.
19     Q.  And so you were never able to connect that
20  work with anything that was done for the benefit of
21  Williamson Memorial Hospital; is that correct?
22     A.  That's correct.
23     Q.  Now, when you say the amounts were different,
24  can you give me any order of magnitude?

Page 34

1      A.  It's just the grand total, we could not tie
2  that to anything we had on our aging, and it's one lump
3  sum so we didn't know what invoices would have been paid
4  for the hospital to make things tie back to what the
5  check is for.
6      Q.  Okay.  Did you ever have any discussions with
7  Sabrina Hatfield about these things as the CFO?  I know
8  you said she was focused on the patient side, the
9  revenue cycle side, but did you have any discussions
10  with her about this?
11     A.  The only time I've talked to her about
12  anything was getting -- trying to get back up for the
13  credit card they used to pay at the clinics to keep them
14  going.
15     Q.  And were you successful or unsuccessful
16  getting that?
17     A.  Most of the time unsuccessful.
18     Q.  Now, do you know a gentleman by the name of
19  Greg Gibbs?
20     A.  Yes.
21     Q.  Do you understand him to be an independent
22  CPA/accountant out of Charleston, West Virginia?
23     A.  Yes.
24     Q.  Did you -- did you have any interaction with

Page 35

1  Mr. Gibbs at any point with respect to Williamson
2  Memorial Hospital?
3      A.  Not a whole lot that I -- I really don't
4  recall a whole lot with him.
5      Q.  So -- and you just maybe can help me with this
6  because I'm not familiar with it.
7          If somebody wanted the general ledger
8  for Williamson Memorial Hospital in the spring of 2019,
9  where would they go to get it and who would they ask
10  for?
11     A.  They could get that from me.
12     Q.  Did Mr. Gibbs ever ask you for the general
13  ledger?
14     A.  I don't recall.
15     Q.  Do you know whether Mr. Gibbs ever received
16  the general ledger?
17     A.  I don't know.
18     Q.  Do you know whether -- do you know what
19  Mr. Gibbs was asked to do?
20     A.  No.
21     Q.  Do you know whether Mr. Gibbs was able to do
22  what he was asked to do?
23     A.  I don't know.
24     Q.  Did you ever see monthly financial statements

Page 36

1  for the hospital after the transaction?
2      A.  Yes.
3      Q.  Okay.  Who prepared those?
4      A.  I was the one that would close the books and
5  then run financials.
6      Q.  Just so we're clear, when you ran financials,
7  would it be month end or quarter end?
8      A.  Month end.
9      Q.  And what financials would you create then?
10  Would you do a P and L?
11     A.  I'd do a P and L.  I'd do a balance sheet, and
12  run the general ledger.
13     Q.  Did you do any specific aging reports?
14     A.  Only if they asked, but most of the time, no.
15     Q.  So from June 1 of '18 through the end of
16  October of '19, which is when the Hatfields' employment
17  ceased, in October of '19, did you prepare these
18  financial reports monthly?
19     A.  I did.  When we switched to MEDITECH, there
20  was a problem getting the general ledger beginning
21  balances correct.
22     Q.  When do you recall the MEDITECH switch?
23     A.  It was May of 2019.
24     Q.  Because it had to be effective June 1.

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 37

1    A.  Yes.  We had to be off CHS's systems by June 1
2 of 2019.
3    Q.  And when you say there was a problem getting
4 the balances, can you describe that for me?
5    A.  For some reason, there was a process that
6 MEDITECH would take CHS's general ledger ending balances
7 and try to load them up into MEDITECH, and I don't know
8 why it was such a problem, but they -- it took a long
9 time.
10    Q.  Were they able to solve it before the end of
11 October of '19?
12    A.  I'm not sure if they even had it solved then.
13    Q.  Was the problem, as you understood it, with
14 MEDITECH and its programming, or the information
15 MEDITECH was or was not getting from Williamson
16 Memorial?
17    A.  No, it was just MEDITECH's -- how they were
18 going to load it.
19    Q.  So you don't recall a situation where you or
20 anybody else at the hospital was asked for additional
21 information so that they could load it.
22    A.  No.
23    Q.  Did the revenue cycle problems and the
24 receipts that we've talked about with Williamson

Page 38

1 Memorial, did that improve at all during the time that
2 the Hatfields were there?
3    A.  No.
4    Q.  Constant ongoing problems; fair?
5    A.  Yes.
6    Q.  Mrs. Hatfield was unable to do anything about
7 it; is that right?
8    A.  I guess.
9    Q.  You're unaware -- even though she was working
10 on that side of it, it didn't change?
11    A.  No, it did not change.
12    Q.  Now, you have an accounts payable, payroll
13 experience going on almost 40 years; right?
14    A.  Yes.
15    Q.  You've been around a lot of CFOs in your life.
16    A.  Yes.
17    Q.  Was Mrs. Hatfield qualified, in your view, in
18 any way, shape, or form to be the CFO of Williamson
19 Memorial Hospital?
20    A.  I have no idea what her background was.
21    Q.  Okay.  In terms of how she performed her work,
22 do you have any information about whether she was able
23 to do her job?
24    A.  As far as hospital background, I didn't think

Page 39

1 she had any.  I just assumed that she thought that she
2 could do it because of her business background.
3    Q.  Did that turn out to be true?
4    A.  She wasn't -- I don't -- hospital accounting
5 is totally different from any accounting I've ever done.
6    Q.  Explain that, please.
7    A.  There's a lot of rules and regulations with
8 State and federal.  It's just -- the basics are there,
9 but there's a little more to it.
10    Q.  It's kind of an art and science of its own.
11    A.  Yes.
12    Q.  And she never had any of that prior experience
13 to your knowledge.
14    A.  To my knowledge, I don't think so.
15    Q.  Did you ever question why she was the CFO?
16    A.  No.
17    Q.  Privately to yourself?
18    A.  No.
19    Q.  Okay.  You just figured that's what the owners
20 wanted.
21    A.  Yes.
22    Q.  Did you ever question Mr. Hatfield's
23 qualifications or capability as the CEO to yourself?
24    A.  No.

Page 40

1    Q.  You just figured he was one of the owners
2 along with Mr. Reynolds and Mr. Kapourales, they own the
3 hospital, that was their decision.
4    A.  Correct.
5    Q.  And it wasn't your place to challenge or
6 question that.
7    A.  Correct.
8    Q.  Just kind of went to your office.
9    A.  Correct.
10    Q.  Kept your head down, did your work, and went
11 home.
12    A.  Yes.  Yes.
13    Q.  Took care of your husband.
14    A.  Yes.
15    Q.  So I want to go back to the monthly closing of
16 the books that you say that you were able to do until
17 you ran into that little bit of that problem with the
18 MEDITECH, no prior balances.
19    A.  Correct.
20    Q.  To whom did you give those records?
21    A.  They would go to Charlie.
22    Q.  Do you know what he did with them?
23    A.  No.
24    Q.  Do you know whether the folks on the board

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 41

1  ever were what you did?
2      A.   I don't know.
3      Q.   Okay.  I can tell you that while I do not have
4  every single minute of every single meeting, the minutes
5  that I do have do not contain a P and L, a balance
6  sheet, a general ledger, a schedule of accounts payable,
7  an aging, or the things that you described that you did
8  monthly.
9           Do you know of anybody who got those
10 other than Mr. Hatfield?
11     A.   No.
12     Q.   In any of your conversations or communications
13 with Mr. Hatfield, did he ever tell you he gave those to
14 somebody else?
15     A.   No.
16     Q.   Do you still have what you created?
17     A.   Personally, no.
18     Q.   Okay.  If I -- if you wanted to find it, where
19 would you go to find it?
20     A.   To the hospital.
21     Q.   Okay.  Where do you think it would be in
22 whatever records exist for what's now closed?
23     A.   Wherever they put them in storage.
24     Q.   Okay.  In your work, did you deal with Sandy

Page 42

1  Runyon?
2      A.   Yes.
3      Q.   What was your interface with her?
4      A.   When we were trying to get contracts with the
5  insurance companies, patient insurance companies, and
6  trying to gather information, she would ask me, "Okay,
7  did this money come through with this name, this
8  insurance name," and I would research it and try to help
9  her out that way.
10          She was over the clinics, so if she had
11 any questions about, you know, "How much do we owe,
12 they're going to shut down the telephones if we don't
13 get them paid," you know, "Can you help me out," things
14 like that.
15     Q.   So was she the one that you dealt with on
16 those occasions that you described earlier where the
17 clinics would be unable to continue unless money
18 appeared to pay what they owed the certain suppliers and
19 vendors?
20     A.   Yes.
21     Q.   Now, did there come a time where she went over
22 to the hospital side?
23     A.   I believe so.
24     Q.   Do you have an idea about when that would have

Page 43

1  been?
2      A.   I'm not sure of the exact time, no.
3      Q.   Do you have an understanding of what she came
4  in to do?
5      A.   I was thinking she would help out Sabrina with
6  trying to get MEDITECH going.
7      Q.   On the clinic side before Ms. Runyon came
8  over, was she involved in the billing over there?
9      A.   I'm not sure if she actually did any of the
10 billing.
11     Q.   Do you know anything about her work,
12 knowledge, experience, education, training to do that
13 kind of work?
14     A.   I don't know her total background, no.
15     Q.   And were you able to tell me approximately
16 when you think she came over?
17     A.   I really don't remember.
18     Q.   Was she able to help Mrs. Hatfield?
19     A.   I don't know.
20     Q.   Did the result that you saw in terms of cash
21 in the account change after she came over?
22     A.   No.
23     Q.   Now, did you hear from any source that there
24 was revenue that the hospital should have been received,

Page 44

1  should have been paid, should have collected, that was
2  either never billed, never billed correctly, never
3  billed timely so that it was never collected?
4      A.   I'm sure that's happened.
5      Q.   Okay.  Did anybody attempt to quantify how
6  much money was lost in any of those ways?
7      A.   No.  I wasn't involved in that.
8      Q.   Okay.  What you do know is that the comparison
9  between when CHS operated the hospital and when Mingo
10 Health Partners operated the hospital was very, very
11 different and very stark.
12     A.   Yes.
13     Q.   You had all the money and resources you needed
14 when CHS owned it to do your job and your work
15 completely and correctly; right?
16     A.   Yes.
17     Q.   And you didn't have any of those things to do
18 it when Mingo Health Partners took over; right?
19     A.   Not all the time.
20     Q.   All right.  And then it was that ongoing
21 problem that you described.
22     A.   Yes.
23     Q.   Do you have -- and I'm going to give you --
24 because you would have dealt with this, and we're going

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

**Page 45**

1  to go to some of the exhibits, but I asked you earlier
2  about vendors who ceased providing services for
3  nonpayment.  Do you remember that?
4      A.  Yes.
5      Q.  CHS was one such vendor; correct?
6      A.  Yes.
7      Q.  And approximately when did they leave?  In the
8  fall of 2018?
9      A.  No.  It wasn't till May of -- I think May of
10  '19.
11      Q.  Okay.  Do you know how much they were owed?
12      A.  I don't remember the exact.  I know it was a
13  lot.
14      Q.  There's some proofs of claim that are in the
15  stack of documents in front of you that we'll get to in
16  a moment.
17          The next revenue recognition firm that
18  was hired that I understand came to work for maybe two
19  months, if that, was an outfit called HRG, Health
20  Resources Group or something similar to that.
21          Are you familiar with that name?
22      A.  Yes.
23      Q.  Okay.  Do you know why they stopped providing
24  services?

**Page 46**

1      A.  Because they didn't get paid their fees.
2      Q.  And if you had the money, you would have paid
3  the fee; correct?
4      A.  Yes.
5      Q.  But that was money that you didn't have and
6  that was money that otherwise Mr. Hatfield didn't say
7  should be paid to them; correct?
8      A.  Yes.
9      Q.  The next revenue cycle firm was called
10  Ensemble.  Do you remember them?
11      A.  Yes.
12      Q.  And they would have provided work for
13  approximately, plus or minus, four months.  Does that
14  sound right?
15      A.  Yes.
16      Q.  And why did they stop work?
17      A.  Same reason.
18      Q.  Would the same reason be nonpayment of funds
19  for services rendered?
20      A.  Yes.
21      Q.  And, again, Mr. Hatfield controlled whether
22  they got paid or not, and he decided not to pay them.
23      A.  Correct.
24      Q.  And then the next group that came in was AVEC.

**Page 47**

1      Q.  Do you remember them?
2      A.  I barely remember them.
3      Q.  Okay.  Do you know what happened with them?
4      A.  Not really.
5      Q.  All right.  And then the group that came in
6  after them was Accordias.  Do you remember them?
7      A.  I remember Accordias.
8      Q.  Do you remember why AVEC left?
9      A.  Probably the same reason.  For nonpayment.
10      Q.  And every time that you get a new revenue
11  cycle vendor in, is there a lag then in terms of how
12  things can be done and processed?
13      A.  Yes.
14      Q.  And how does that impact cash flow?
15      A.  You have no cash flow.
16      Q.  So it makes the bad situation that you
17  described worse.
18      A.  Yes.
19      Q.  And as I'm going through this, there were CHS,
20  1; HRG, 2; Ensemble, 3; AVEC, 4; to Accordias 5 in
21  approximately 18 months.
22      A.  Yes.
23          VARNEY DEPOSITION EXHIBIT NO. 17
24          (Email chain was marked for

**Page 48**

1          identification as Varney Deposition
2          Exhibit No. 17.)
3      Q.  I want to show you another exhibit that I've
4  had marked as 17, and ask you if you can identify that.
5  Do you see your email?
6      A.  Yes.
7      Q.  And that's to Mr. Hatfield and then to Brandon
8  Barker?
9      A.  Yes.
10      Q.  Was Mr. Barker in the information technology
11  department at the hospital?
12      A.  Yes.
13      Q.  Why did you send this email to those two
14  gentlemen?
15          And for the record, this is dated June
16  6th of 2019; is that correct?
17      A.  Yes.
18      Q.  Okay.
19      A.  This was during the time that MEDITECH was
20  taking over.
21      Q.  All right.  Okay.  Did you get what you
22  requested?
23      A.  I don't remember.  I probably did, but I don't
24  remember.

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 49

1    Q.   Okay.  And were these reports that you could
2  see but you couldn't print; is that right?  "I have
3  access to the CHS general ledger."  I'm assuming the GL
4  is general ledger.  If it's not, correct me.
5    A.   That is correct.
6    Q.   "But cannot print at this time."
7         Then you say, "I need to know that if I
8  use it, the system will process the information."
9    A.   Okay.
10   Q.   Do you remember this?
11   A.   Yes.
12   Q.   What can you tell us about it?
13   A.   At this time, it -- CHS was shutting down the
14 system and not letting us close.  May.  And that is
15 during the transition from MEDITECH, but I needed the
16 information from CHS to have a complete closing so that
17 the general ledger balances could be loaded up into
18 MEDITECH to start fresh with MEDITECH.
19   Q.   Did you get it, the information?
20   A.   Not right away, no.
21   Q.   Do you know when, if ever, you got it?
22   A.   I think eventually I did get it because by --
23 I'm thinking I was able to finish the closing.
24   Q.   Do you know how delayed it was?

Page 50

1    A.   A lot longer than what normal was.
2    Q.   Okay.  Did you view what CHS was doing was
3  kind of trying to hold the information hostage so that
4  they would be paid some of the money they were owed?
5    A.   I believe that's what was happening.
6    Q.   Did they get any money --
7    A.   They --
8    Q.   -- to your knowledge?
9    A.   -- they did get a couple payments, but at this
10 time, no.
11   Q.   Okay.  On a monthly basis -- I understand this
12 is not going to be precise.  I'm not asking for a
13 precise number, but how much per month were your
14 accounts payable growing month after month when you
15 didn't have the money to pay the bills?
16   A.   More than $100,000.
17   Q.   Does that include or exclude the monies that
18 were never remitted or paid that were withheld from the
19 employee checks?
20   A.   Now, that would exclude.
21   Q.   So payroll was biweekly?
22   A.   Yes.
23   Q.   So there were two pay periods normally a
24 month?

Page 51

1    A.   Yes.
2    Q.   What was the size of the payroll each --
3  roughly each payroll period?
4    A.   Only the net amounts come to mind and that's
5  like $200,000.
6    Q.   And is the gross amount -- would you gross it
7  up another 25 percent to cover all the rest of it?
8    A.   At least.
9    Q.   I don't want to overstate it.  I don't want
10 anybody to claim that I'm exaggerating here.
11        So at least $50,000 every two weeks
12 wasn't being paid but was being taken from the employee
13 paychecks.
14   A.   Yes.
15   Q.   So in the course of a year, you've got 24 pay
16 periods which will be a $1,200,000.
17   A.   Yeah.
18   Q.   For just that amount; correct?
19   A.   Yes.
20   Q.   Did anybody tell the employees this was
21 happening?
22   A.   I did not tell the employees.
23   Q.   Is there a reason you didn't tell anybody, any
24 of the employees?

Page 52

1    A.   I think the HR department knew about it, and I
2  don't know if my payroll clerks said anything, but it
3  seemed word got out.
4    Q.   Who was in charge of HR?
5    A.   Billie Whitt.  It's a female.
6    Q.   I-E?
7    A.   I-E.
8    Q.   W-H-I-T-T?
9    A.   Yes.
10   Q.   Did you have specific discussion with her, or
11 are you confident your payroll clerk had those
12 discussions?
13   A.   I'm not sure my payroll clerk talked to Billie
14 Whitt about it, but employees were complaining to HR.
15   Q.   And what was the nature of those complaints?
16   A.   A lot of it had to do with their health
17 insurance not being covered.
18   Q.   So they understood that maybe they needed some
19 kind of a prescription filled or something and they went
20 to do it and they were told "You don't have coverage for
21 this"?
22   A.   That's correct.
23   Q.   As a part of the month end financials that you
24 described to me doing every month, how did you reflect

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 53

1 this growing employee related nonpayment?
2    A.  Well, the process of the payroll, everything
3 goes through the general ledger so there were liability
4 accounts building and never relieved.
5    Q.  So if one were to look at the general ledger,
6 one would be able to see those liability accounts and go
7 on the one that relates to the employee gross-up, if you
8 will, and see that balance increasing every two weeks.
9    A.  Yes.
10    Q.  And you gave those to Mr. Hatfield.
11    A.  If he asked for them, yes.
12    Q.  Well, was there ever a month that you can
13 remember doing them and not giving them to anybody?
14    A.  Not necessarily, no.
15    Q.  As the CEO of the hospital, did you expect him
16 to want to know the financial condition of the
17 institution?
18    A.  As a CEO, I would think he would want them,
19 yes.
20    Q.  And in order to meet his obligation as the CEO
21 to the board, he would need that information; would he
22 not?
23    A.  I would think so, yes.
24    Q.  But your testimony is you have no idea, other

Page 54

1 than Mr. Hatfield, who oversaw those reports.
2    A.  No.
3    Q.  Correct?
4    A.  That's correct.
5    Q.  Did you process payroll for Mr. Hatfield and
6 Mrs. Hatfield?
7    A.  Yes, they were on our payroll.
8    Q.  Did they get paid?
9    A.  Yes.
10    Q.  Did they get paid the same way as everyone
11 else got paid?
12    A.  Yes.
13    Q.  Was there any difference about any of their
14 withholding or benefits?
15    A.  No, no difference between them or any other
16 employee.
17    Q.  So everybody got paid their net salary,
18 including the CFO and CEO, the Hatfields, but in terms
19 of the gross, everybody was treated the same.
20    A.  Yes.
21    Q.  Now, did there come a time when you learned
22 that the hospital was going to file for protection under
23 the bankruptcy laws?
24    A.  Yes.

Page 55

1    Q.  Do you remember how you found that out?
2    A.  I'm not sure exactly who told me.
3    Q.  Okay.  You continued to work during the
4 bankruptcy proceeding?
5    A.  Yes.
6    Q.  After the Hatfields were gone?
7    A.  Yes.
8    Q.  Did you work with Mr. Preston as we talked
9 about earlier?
10    A.  Yes.
11    Q.  Did you ever see any of the claims register
12 that was filed in the bankruptcy court that set forth
13 the amount of claims that were being asserted against
14 Williamson Memorial Hospital in bankruptcy?
15    A.  Did I see the claims?
16    Q.  Claims register.
17    A.  Claims register?
18    Q.  Right.
19    A.  I'm not sure.
20    Q.  Okay.  I'm going to show you what was marked
21 earlier as Exhibit 1 for identification, which is -- the
22 front, first page and the last page of the claims
23 register that I printed off a day or two ago that shows
24 approximately 133 claims that total in excess of 15

Page 56

1 million dollars.  If you'll go to the next page in the
2 middle of it, you'll see the figures that I'm referring
3 to.
4    A.  Okay.
5    Q.  Do you see those?
6    A.  Yes.
7    Q.  Okay.  Now, did anybody tell you at any time
8 that that was the magnitude of claims that were filed
9 against Williamson Memorial Hospital by various
10 governmental agencies, private companies, individuals,
11 et cetera?
12    A.  I did not actually see this list.
13    Q.  Can you recall roughly what your general
14 ledger with your liability accounts showed at the end of
15 October of 2019 were the liabilities that were owed and
16 unpaid by the hospital?
17    A.  I don't know the exact amount.
18    Q.  Can you give me a ballpark?
19    A.  I would be afraid to even guess.
20    Q.  Okay.  I mean, was it in excess of 10 million
21 dollars?
22    A.  Being what has not been paid, yes, I would say
23 at least.
24    Q.  So the next thing that I want to show you was

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 57

1 marked as Exhibit 2 earlier, and I want to take you to
2 the last page of it because it's from the IRS, and it's
3 an assessment for almost $605,000 for unpaid FICA and
4 FUTA. Do you see that?
5     A. Yes.
6     Q. All right. Now, I understand that there are
7 dates there that post date times that the Hatfields were
8 there. All right?
9     A. Yes.
10     Q. So I'm not asking you about those, but I am
11 curious because earlier what I thought I heard you say
12 is they never paid the quarterlies.
13     A. The -- we were with a company, ADP, in the
14 beginning, and we were with ADP up until it was time for
15 MEDITECH to take over. And during that time, taxes were
16 paid and filed by ADP.
17     Q. So let me stop you there, see if this is a
18 fair statement. My understanding of ADP is you have to
19 prefund everything with them in their account before
20 they'll cut the checks and release them.
21     A. Yes.
22     Q. And so the employees couldn't get even their
23 net pay unless ADP had also been paid all of the
24 gross-up.

Page 58

1     A. That's correct.
2     Q. Whose decision was it to leave ADP?
3     A. I guess Charlie's. I don't know.
4     Q. It wasn't your decision?
5     A. No.
6     Q. Okay. Nobody ever came to you with a
7 complaint about ADP, did they?
8     A. No.
9     Q. Did you have any complaints about ADP?
10     A. No.
11     Q. Did they do a good job?
12     A. Absolutely.
13     Q. But it's fair to say that if ADP had
14 continued, the entire amount, the grossed-up amount,
15 would have had to have been paid to ADP before any
16 employee could have gotten its net check.
17     A. It's correct.
18     Q. So ADP then paid the balance to whether it was
19 the federal government, whether it was to the health
20 insurer, whether it was to the pension, or 401(k),
21 whatever, life insurance, whatever it was.
22     A. ADP made sure that all of the federal and
23 State taxes were paid. They were in charge of the
24 taxes. As far as the insurances, that was up to the

Page 59

1 owners.
2     Q. Okay. So the gross-up, then, for ADP wouldn't
3 even reflect the money that the owners held back from
4 the employees for anything other than the federal tax
5 and State taxes.
6     A. That's correct.
7     Q. Was that ever disclosed to anybody, to your
8 knowledge?
9     A. I mean, as far as like who?
10     Q. Like any employee who was having their check
11 deducted for the amounts that were not being paid for
12 that purpose.
13     A. We had no problem with ADP ever.
14     Q. Right. Because they didn't handle that part
15 of it; right?
16     A. Right.
17     Q. Okay. So what I'm saying is you had no
18 problem with ADP because their function wasn't to
19 address the personal benefits side of the employee
20 checks.
21     A. Correct.
22     Q. It was just to deal with the net amount and
23 paying the difference that was owed in taxes to the
24 federal and State authorities.

Page 60

1     A. Yes.
2     Q. I'm going to show you what's been marked as
3 Exhibit 3, which relates to ERISA's Proof of Claim, and
4 this is in the amount of over $703,000, and I want to
5 ask you: Do you have a recollection that that amount of
6 money was owed to the various employee plans that had
7 been withheld but not paid?
8     A. Yes.
9     Q. Okay. Is that one of your what I will call
10 liability portions of the general ledger?
11     A. Yes.
12     Q. Okay. And was that ledger likewise available
13 to Mrs. Hatfield and Mr. Hatfield?
14     A. Yes.
15     Q. And from time to time, to your knowledge, did
16 they, in fact, access it?
17     A. I don't know if they ever accessed the actual
18 general ledger, but they could get a detailed of the P
19 and L which would show it also.
20     Q. Exhibit 4, again, just shows unpaid State
21 taxes. I understand it's a different period than when
22 the Hatfields were there.
23         My question to you is: Do you know, as
24 of the time that they left, approximately how much was

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 61

1 unpaid to the State of West Virginia?
2          And it sounds to me like it would have
3 been from when MEDITECH took over until the end of
4 October?
5     A.  That would be correct.  To come up with a
6 dollar amount, I'm not sure.
7     Q.  Do you have a sense about what the percentage
8 was roughly that the State of West Virginia got on the
9 employee payroll?
10    A.  I don't know that.
11    Q.  And there's a $608,000 plus claim for the U.S.
12 Department of Health and Human Services.  It's Exhibit
13 5.  Do you know what that's for?
14    A.  No, I don't know what this is for.
15    Q.  Okay.  I want you to go, if you would, to page
16 2 of it, number 8, okay, and see what it says on the
17 line there.
18    A.  Medicare overpayments.
19    Q.  What does that mean to you?
20    A.  Just means we owe back Medicare for funds that
21 they had paid on employees -- employees, I'm sorry --
22 patients that needed to be refunded.
23    Q.  In other words, in summary money that
24 Williamson Memorial was not entitled to keep but had

Page 62

1 been paid.
2     A.  Correct.
3     Q.  Did you have a ledger for that?
4     A.  I don't know if this was on the books.
5     Q.  Are you familiar with a vendor OVP Health,
6 Inc.?
7     A.  Yes.
8     Q.  Tell me what you know about them, please.
9     A.  I don't remember their exact function.  I know
10 they deal with -- right now with drug abuse, trying to
11 help patients get over drug abuse.
12    Q.  Okay.  I'll represent to you that Ms. Simon
13 said that they provided services in the Williamson
14 Memorial ER under a contract.  Does that ring any bells,
15 refresh your recollection at all?
16    A.  I don't know exactly what they did.
17    Q.  Okay.  Well, here's as Exhibit 7 is the Proof
18 of Claim that they filed for a $1,575,000 for
19 professional services provided that were not paid.
20          Were they part of your ledger system?
21    A.  They should have been.  If they invoiced us,
22 yes, they would be part of the accounts payable.
23    Q.  Okay.  You're just not sure what invoicing you
24 can recollect.

Page 63

1     A.  It's just not coming to me.
2     Q.  That's fine.
3          I would like you to look at Exhibit 8,
4 which I'm going to hand you now, and that's a Proof of
5 Claim from the Cleveland Clinic for over 1.9 million
6 dollars for unpaid medical bills for an individual whose
7 initials are RH, allegedly for -- and if you go to the
8 end of the last two pages of this, it's for medical
9 expenses and related costs to charges for a lung
10 transplant -- or a double lung transplant.
11          Are you familiar with this?
12    A.  I remember an employee's spouse having to have
13 it -- have a procedure done, I remember, but I don't
14 remember the name of the --
15    Q.  And I don't want --
16    A.  -- the individual.
17    Q.  And to be clear, I am not interested in the
18 name of the individual at this point, but what I am
19 interested in is:  Did you get, as the accounts payable
20 clerk, mailings, notices - however defined - from the
21 health insurance carrier about cancellation of coverage
22 for the employees and their dependents for failure to
23 pay premiums?
24    A.  Yes, I did get -- we did get notices of

Page 64

1 nonpayment and phone calls.
2     Q.  Do you recall in what period these began?
3     A.  There were different times where our coverage
4 was canceled.  For some reason, August of 2019 sticks in
5 my head about that.  There was another time in maybe
6 October of 2019 that it was completely gone.
7     Q.  So when you received -- did you receive these
8 notices, or were you -- did they come into your office?
9     A.  We would get -- I'm not sure if they came by
10 email or if they came by mail, but we were -- my
11 department was contacted asking for payment.
12    Q.  And when you received those notifications,
13 however they came, what did you do with them?
14    A.  Well, Charlie was informed that we had them,
15 and -- either by email or actually taking the invoices
16 to him.
17    Q.  Immediately?
18    A.  Yes.
19    Q.  Because, again, this is a serious problem for
20 employees and their dependents if they don't have health
21 coverage; right?
22    A.  Right.
23    Q.  And do you have anything to dispute the
24 insurance company's position that "There is no coverage

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 65

1 for this procedure because of failure to pay premium on
2 a canceled policy"?
3      A.  Well, at the time -- like I said, there was
4 different time periods where the insurance would be no
5 good, and then with a payment, maybe not all of the
6 payment, it would get reinstated.
7      Q.  But from a certain date; correct?
8      A.  Yes.
9      Q.  So do you know who the health care insurer
10 was?
11      A.  We had different onces.  EBSO was the one -- I
12 believe is what we had.
13      Q.  At this time?
14      A.  Yes.
15      Q.  Can you recall any others?
16      A.  It started out with Blue Cross at first, but
17 they were extremely high, and I know they looked for
18 cheaper coverage, you know, for what we needed for the
19 number of employees we had.
20      Q.  Okay.  And just so we're clear, is the "they"
21 Mr. Hatfield for Mingo Health Partners or was this
22 somebody else?
23      A.  I think in the beginning it was -- I'm
24 thinking Charlie did have the Blue Cross, but then

Page 66

1 changed due to the premiums being so high.
2      Q.  Did the coverage change; do you know?
3      A.  It didn't change that much, no.
4      Q.  So Mr. Hatfield changed the carriers from Blue
5 Cross, as you understand it, to this EBSO?
6      A.  Yeah.  Yes.
7      Q.  Do you remember any other carrier, health
8 insurance carrier?
9      A.  No.
10      Q.  And you believe it would have been EBSO who
11 was the carrier in this time frame.
12      A.  It could have been, yes.
13      Q.  Now, to your knowledge, was this amount or any
14 amount ever paid to the Cleveland Clinic in satisfaction
15 with this claim?
16      A.  Not that I'm aware of.
17      Q.  So as far as you know, it is still a liability
18 of the hospital in the Chapter 7 liquidation proceeding.
19      A.  I would think so, yes.
20      Q.  I am going to show you what was marked as
21 Exhibit 9 earlier today which is a Proof of Claim of the
22 Metropolitan Life Insurance Company for $129,300.13 for
23 unpaid group life insurance premiums.  Do you see that?
24      A.  Yes.

Page 67

1      Q.  Was this part of your ledger liability system?
2      A.  It would have been, yes.
3      Q.  And did this follow the same group and not get
4 paid for the same reasons as the other individual
5 employee benefits for which the funds were withheld but
6 not paid?
7      A.  Yes.
8      Q.  And do you know whether there were any
9 cancellations of this coverage?
10      A.  Yes.
11      Q.  Okay.  And the reason I say that, if you would
12 be kind enough to go to page 4 of that exhibit, you can
13 see about a little more than half of the way from left
14 to right, there's a Payment column and a Date Payment
15 Received column.
16      A.  Yes.
17      Q.  And then you can see that there's a billing
18 date for the premium, and then a date that the payment
19 is received, and then you can match up the amount billed
20 with the amount paid; right?
21      A.  Yes.
22      Q.  And then after you go down, more than ten
23 lines, you'll see as of February 15th of '19, there's
24 $3,709.63 that's billed that is not paid.

Page 68

1      A.  Yes.
2      Q.  Correct?
3           And then there's other monthly amounts
4 not in the right orders, but it goes from February to
5 April, back to March, then forward to June and back to
6 April, June then to May, but none of those get paid down
7 through August the 15th of 2019; correct?
8      A.  Yes.
9      Q.  All right.  So do you know whether this
10 insurance for employees was canceled any time between
11 March of '19 and August of '19 when at least this
12 document reflects continued billings but no payments?
13           And I should say February of '19 to
14 August of '19.  I'm sorry.
15      A.  Yes, it was canceled.
16      Q.  Okay.  And was it subsequently reinstated?
17      A.  I'm not sure if this one was.
18      Q.  Do you know whether there were any claims that
19 should have been paid during this six to seven-month
20 period that were not paid because it was canceled?
21      A.  I was not aware of any.
22      Q.  If there were, you're not aware of them.
23      A.  No, I'm not aware.
24      Q.  And then you can see that effective -- it

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 69

1 actually goes back, it changes out just so you know, and
2 I just want you to explain this to me because it came up
3 earlier.
4         All of those look to be EE paid.  Do you
5 see that as employee paid?
6     A.  Yes.
7     Q.  And then it starts after that to a
8 significantly greater amount in the first entry,
9 September 26th of 18, $11,459.72 billed as the employer
10 amount; correct?
11     A.  Yes.
12     Q.  All right.  So it's not an increase in
13 premiums.  It's simply an allocation between what the
14 employee should pay and what the employer should pay.
15     A.  Yes.
16     Q.  And that's how it was billed differently.
17     A.  Yes.
18     Q.  And then you see for the employer portion the
19 same kind of hollow space, if you will, different dates
20 involved, from -- beginning in December 12 of '18 going
21 all the way down, again, through June -- excuse me,
22 August the 15 of '19, and no payment of any kind until
23 the end of September; right?
24     A.  Yes, that's correct.

Page 70

1     Q.  Which not completely but roughly corresponds
2 to what we've got above.
3     A.  Yes.
4     Q.  I'm going to show you what's been marked as
5 Exhibit 10 for identification which is a Proof of Claim
6 of the Pikeville Medical Center for medical services
7 provided to people for whom Williamson Memorial Hospital
8 was responsible, and this runs from November of 2018 to
9 October of 2019 in the amount of $218,788.52.  Do you
10 recall this one?
11     A.  No.
12     Q.  Would this be in your ledger or should it be?
13     A.  The employees' bills that were on the ledger
14 were small.  They were not any significant size like
15 this.
16     Q.  Would you go to page 4 of the exhibit, please,
17 and then to page 5.
18         So page 5, last second -- third column
19 from the right shows total charges; correct?
20     A.  Yes.
21     Q.  And that aggregates to 219,000 and change;
22 correct?
23     A.  Yes.
24     Q.  And I agree with you there are some small

Page 71

1 ones, but there's one for over 49,000, another one for
2 13,000 plus, another one for 25,000 plus, and another
3 one for 107,000 plus; right?
4     A.  Yes.
5     Q.  Okay.  Do you have any question or reason to
6 dispute that those were charges that were legitimate and
7 should have been paid?
8     A.  I have no dispute.
9     Q.  Okay.  Then if you go to the prior page, it
10 shows you the allocation of those between the hospital
11 and the physician and then DME.  Do you see that?
12     A.  Yes.
13     Q.  Okay.  Were these bills unpaid for the same
14 reasons that you talked about with respect to the other
15 bills?
16     A.  Yes.
17     Q.  Is there any bill that we've talked about that
18 wasn't paid for any reason other than Mr. Hatfield said
19 not to pay it and he made that decision and you didn't
20 otherwise have the money or the authority to pay it or
21 override it?
22     A.  That's correct.
23     Q.  I want to show you -- I mentioned to you some
24 bills from CHS.  I'll show you what was marked earlier

Page 72

1 as Exhibit 11 for identification, which is a CHS bill
2 for $775,406.39 for managed care directed payment
3 program.  Do you see that?
4     A.  Yes.
5     Q.  Is this part of your liability ledger system?
6     A.  Yes.
7     Q.  Did you understand that this money was owed
8 for what period of time?
9     A.  From June 1st of 2018.  Should have been gone
10 through June 1st of 2019.
11     Q.  Under that TSA agreement.
12     A.  Yes.
13     Q.  And was this not paid for the same reasons?
14     A.  Yes.
15     Q.  Mr. Hatfield controlled this as well?
16     A.  Yes.
17     Q.  You had no authority to do anything about it?
18     A.  No.
19     Q.  And you have no idea whether the board of
20 directors was ever aware of this either.
21     A.  No.  I have no idea.
22     Q.  I'll take you to Exhibit 12 for
23 identification.
24         This is another CHS bill, but it's a

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 73

1 different entity Proof of Claim. CHSPSC, LLC. Are you
2 familiar with that outfit?
3      A. I've seen the initials before.
4      Q. Okay. This one is for $670,463.91 for
5 quote/unquote transition services. Do you see that?
6      A. Yes.
7      Q. And this was the contract of June 1, 2018 to
8 June 1 of 2019; correct?
9      A. Yes.
10      Q. This was part of your liability ledger system?
11      A. Yes.
12      Q. Okay. You were unable to pay this because you
13 didn't have the money, nor did you have the authority;
14 correct?
15      A. Correct.
16      Q. That, again, was all controlled by
17 Mr. Hatfield and he made the decision not to pay.
18      A. Yes.
19      Q. Any reason for you to question or challenge
20 the legitimacy of this bill?
21      A. No.
22      Q. Any reason for you to question or challenge
23 the legitimacy of any of the other bills that I've shown
24 you so far in the exhibits?

Page 74

1      A. No.
2      Q. Next I'm going to show you what was marked as
3 Exhibit 13 for identification. Remember we spoke
4 earlier about HRG?
5      A. Yes.
6      Q. Do you see this is a Proof of Claim for
7 Healthcare Resource Group, Inc. Do you understand that
8 to be HRG?
9      A. Yes.
10      Q. This Proof of Claim is for contract services
11 for revenue recognition for $135,834.01; right?
12      A. Yes.
13      Q. Okay. Do you have any reason to question the
14 legitimacy of this charge or bill?
15      A. No.
16      Q. Do you believe it was owed?
17      A. Yes.
18      Q. You didn't have the money to pay it; correct?
19      A. Correct.
20      Q. You didn't have the authority to pay it.
21      A. That's correct.
22      Q. That, again, resided solely and completely
23 with Mr. Hatfield and he made the decision not to pay
24 it.

Page 75

1      A. Yes.
2      Q. Now, HRG, as I understand it, provided their
3 services in the fall of 2018; correct?
4      A. Yes.
5      Q. So this was something that was outstanding,
6 essentially, throughout the entirety -- except for the
7 first month or two, the entirety of the Mingo Health
8 Partners ownership of hospital?
9      A. Yes.
10      Q. And do you believe that it's this nonpayment
11 that resulted in HRG saying, "We're unwilling to
12 continue to provide services"?
13      A. Yes.
14      Q. And you received by email, phone call, U.S.
15 mail, whatever, multiple notifications of them
16 requesting payment, demands for payment, and you just
17 gave those to Mr. Hatfield.
18      A. Yes.
19      Q. Next is Exhibit 14. This is a Proof of Claim
20 for AVEC. It's for contract services in the amount of
21 $83,846.08.
22          Do you recognize this consistent with
23 what we just talked about with HRG, that it's for a
24 different time period for revenue recognition cycling

Page 76

1 activities?
2      A. Yes.
3      Q. If I asked you the identical questions about
4 it that I've asked you for the earlier ones, would your
5 answers be the same?
6      A. Yes.
7      Q. I'm going to show you Exhibit 15. This is a
8 Proof of Claim filed by MEDITECH for nonpayment of
9 contract services. It's $251,532.26. The invoices
10 referenced are from May through October of 2019. Do you
11 see that?
12      A. Yes.
13      Q. And then it makes reference to software access
14 and services performed per contractual agreement. Did I
15 read that correctly?
16      A. Yes.
17      Q. So if I asked you the same questions about
18 this one that I asked you about the other ones, would
19 your answers be the same?
20      A. Yes.
21      Q. Okay. Notwithstanding this nonpayment of
22 these amounts beginning in May of 2019, which is before
23 the go hard quote/unquote for the MEDITECH system, did
24 MEDITECH ever refuse to provide their service?

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 77

1    A.  I had a problem with the person that I dealt
2  with setting up the GL getting back to me.  I don't know
3  if anybody else had the same problem.
4    Q.  And do you know whether this $250,000 plus
5  amount that was owed for nonpayment over the contract,
6  whether that impacted MEDITECH's willingness to continue
7  to provide the services that Williamson needed?
8    A.  I'm not sure if that's the reason why I didn't
9  get the callbacks that I needed.
10    Q.  Okay.  But it's in this same time frame; is it
11  not?
12    A.  Yes.
13    Q.  We looked at the earlier emails where you're
14  writing on June the 6th of 2019 saying, "Hey, I've got
15  to have these general ledger balances and these other
16  things so I can get this set up right"; correct?
17    A.  Correct.
18    Q.  And now you've got MEDITECH, their May bill
19  hadn't been paid; right?
20    A.  Right.
21    Q.  Not a very long walk from one to the other, is
22  it?
23    A.  No.
24    Q.  Do you recall telling -- strike that.  Let me

Page 78

1  ask it this different way.  Foundational question.
2         From time to time when the Hatfields
3  were in charge of the hospital as CFO and CEO, did you
4  have discussions with Loretta Simon or anybody else
5  regarding your concerns with their management?
6    A.  With Loretta, yes.
7    Q.  Okay.  Do you remember telling Loretta at any
8  time that when patient billing was not happening, that
9  you knew Mrs. Hatfield didn't know the hospital
10  business?
11    A.  Correct.
12    Q.  Was it a true statement when you made it?
13    A.  Yes.
14    Q.  Is it a true statement today?
15    A.  Yes.
16    Q.  When I say a "charge master list," do you know
17  what that is?
18    A.  It's a list of charges for medical procedures
19  and supplies used when a patient comes to the hospital.
20    Q.  Is it possible to bill correctly without a
21  complete charge master list?
22    A.  It's very hard.
23    Q.  And Medicare and Medicaid pay particular
24  attention to those codes; do they not?

Page 79

1    A.  Yes, they do.
2    Q.  And those codes are oftentimes the source of
3  claims or challenges to claims by CMS.
4    A.  Yes.
5    Q.  Right?
6    A.  Yes.
7    Q.  So you better have a complete, accurate list,
8  and they better be completely and accurately applied;
9  right?
10    A.  Correct.
11    Q.  Or the consequences are significant.
12    A.  Yes.
13    Q.  So at any time before the Hatfields were no
14  longer affiliated with Williamson Memorial Hospital, was
15  there a complete charge master list, to your knowledge?
16    A.  Not to my knowledge, no.
17    Q.  And did that impact the billing?
18    A.  Yes.
19    Q.  Significantly?
20    A.  I would say yes.
21    Q.  Okay.  And just describe how so briefly in
22  your own words.
23    A.  Well, if you don't know how to charge for the
24  supplies and procedures that were done and used, then

Page 80

1  you can't send out a clean bill to be processed.
2    Q.  And the person in charge of that charge master
3  function was the CFO, Mrs. Hatfield; correct?
4    A.  Yes.
5    Q.  Now, I am not interested in asking you legal
6  conclusions, okay, but I'm going to ask you some basic
7  factual questions that relate to the claims that have
8  been made in the lawsuit.  All right?
9    A.  Okay.
10    Q.  Among the claims that are made in the lawsuit
11  is that Mr. Hatfield and Mrs. Hatfield were not
12  qualified to be the CFO and the CEO of Williamson
13  Memorial Hospital.  Do you have any information to
14  dispute that?
15    A.  No.
16    Q.  Do you agree with those statements?
17    A.  I do agree with that.
18    Q.  The next is, is that as the CFO and the CEO,
19  each of them had duties and obligations to the hospital,
20  its patients, its employees, and staff.  Do you have any
21  basis to dispute that?
22    A.  No.
23    Q.  Is it consistent in your mind with such an
24  obligation for Mrs. Hatfield to fail to get the complete

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 81

1  charge master list?
2      A.  I'm sorry, say that again.
3      Q.  Yeah.
4          Is it consistent with that duty for
5  Mrs. Hatfield to fail to get the complete charge master
6  list?
7      A.  Yes.
8          MR. PARSONS:  Object to form.
9          MR. GEORGE:  I'm sorry?
10         MR. PARSONS:  I'm not sure that the
11  court reporter heard your answer over the objection.
12         THE WITNESS:  I said yes.
13     Q.  Okay.  Anybody performing that duty in your
14  view would have made sure that charge master list was
15  complete because of how vital it was to the billing
16  function; correct?
17     A.  Correct.
18     Q.  And if you can't bill, you can't collect, can
19  you?
20     A.  No.
21     Q.  And if you don't bill timely, sometimes you
22  can't collect at all, can you?
23     A.  That's correct.
24     Q.  And sitting here at any time, did you ever

Page 82

1  attempt to calculate how much money was lost because of
2  an incomplete charge master list and a failure to timely
3  bill?
4      A.  No, I did not.
5      Q.  One of the other things that's alleged in the
6  lawsuit is that Mr. and Mrs. Hatfield breached their
7  fiduciary duty, and in layman's terms that means they
8  owed their highest duty of loyalty - that's what
9  fiduciary duty is - to Williamson Memorial Hospital, and
10  that includes the patients, the employees, and the
11  staff.
12         Is Mr. Hatfield taking charge of the
13  accounts payable and not paying the employee amounts for
14  their benefits consistent with such a duty in your mind?
15     A.  Yes.
16     Q.  Okay.  So what I'm trying to say is, did he
17  violate that duty by failing to pay those amounts?
18     A.  Yes.
19         MR. PARSONS:  Objection.  Asked and
20  answered.
21     Q.  Any doubt in your mind about that?
22     A.  No.
23     Q.  There's also what's known as a duty of
24  loyalty.  Same question with respect to Mr. Hatfield

Page 83

1  withholding that money, taking it from the employee
2  paychecks, and failing to pay it to those benefit
3  providers.  Is that consistent with a duty of loyalty to
4  you?
5      A.  Yes.
6      Q.  So do you believe that doing -- that
7  Mr. Hatfield was correct in doing that?
8      A.  No.
9      Q.  He never should have done that, should he?
10     A.  No.
11     Q.  And, further, he should have disclosed to
12  people that he was jeopardizing their benefits and their
13  coverages; correct?
14     A.  Correct.
15     Q.  And, to your knowledge, he didn't do that
16  either.
17     A.  No.
18     Q.  Nor did the CFO, Mrs. Hatfield.
19     A.  No.
20     Q.  The employees, if they found out at all, had
21  to find out when they tried to access their benefits and
22  were denied.
23     A.  Correct.
24     Q.  With respect to Mr. Hatfield submitting to you

Page 84

1  a ledger or register that showed he had written checks
2  on the account without any backup, is that appropriate?
3      A.  No.
4      Q.  Is that good faith?
5      A.  No.
6      Q.  Does that meet a duty of loyalty?
7      A.  No.
8      Q.  Does that meet a duty -- a fiduciary duty to
9  the institution, the patients?
10     A.  No.
11         MR. PARSONS:  Object to a legal
12  conclusion.
13     Q.  Have you ever been involved in any legitimate
14  enterprise that would do such a thing?
15     A.  No.
16     Q.  And when you asked for the backup for it and
17  it wasn't provided, did you have an even greater
18  heightened level of concern?
19     A.  Yes.
20     Q.  But you couldn't do anything about it based on
21  the position that you were in; right?
22     A.  Correct.
23     Q.  So are you aware of any excuse for these acts
24  and failures to act by Mrs. Hatfield and Mr. Hatfield?

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 85

1    A.  No.
2        Q.  Is there any doubt in your mind that the
3    things that we've talked about that they did, they
4    shouldn't have done?
5            MR. PARSONS:  Object to form.
6        Q.  Any doubt about that they shouldn't have done
7    them?
8    A.  It shouldn't have been done.
9            MR. PARSONS:  Objection.
10       Q.  Any doubt in your mind that the things they
11   didn't do, like paying the benefit holders, the other
12   things that we've talked about - I'm not going to go
13   through them all - what they didn't do, they should have
14   done?  They should have paid those things?
15   A.  Yes.
16       Q.  They should have provided you the receipts.
17   A.  Yes.
18       Q.  They shouldn't have used Williamson money to
19   pay either Williamson people to do Mountain -- whatever
20   the real estate company is -- what are they called, Mid
21   Mountain?
22   A.  Yes.
23       Q.  All right.  Or to take Williamson money and to
24   pay it to Mid Mountain; correct?

Page 86

1    A.  Yes.
2            MR. GEORGE:  Hold on.  Let me see if
3    I've got any other questions.
4            (A recess was taken after which the
5            following proceedings continued as
6            follows.)
7            EXAMINATION
8    BY MR. PARSONS:
9        Q.  Ms. Varney, my name is Colton Parsons.  I
10   represent Defendant Hatfield and the estate of Sabrina
11   Hatfield in this matter.  I'm going to unfortunately
12   have to jump around a lot with you following up on the
13   questions you were asked by Mr. George.
14           I understand you worked for Williamson
15   Memorial Hospital while CHS owned the hospital; right?
16   A.  Yes.
17       Q.  And they sold the hospital around June 2018;
18   correct?
19   A.  Yes.
20       Q.  And Mingo Health Partners bought the hospital;
21   right?
22   A.  Yes.
23       Q.  When CHS sold the hospital, was it well known
24   in the community that CHS was in -- that Williamson

Page 87

1    Memorial Hospital was in financial distress?
2    A.  Yes.
3        Q.  How long had it been in financial distress?
4    A.  Many years.
5        Q.  And you testified earlier about some of the
6    payments that were made from corporate by CHS.  Do you
7    remember that?
8    A.  Yes.
9        Q.  Do you know in your role if the income from
10   Williamson Memorial Hospital alone was sufficient to
11   support the hospital when CHS owned it?
12   A.  No.
13       Q.  Okay.  So --
14           MR. GEORGE:  May I have a clarification?
15   Is that "No, it wasn't," or "No, you don't know" based
16   on the way you phrased the question?
17   A.  I don't think that the hospital would have a
18   profit.
19       Q.  Yeah, and that's what I'm getting at and I do
20   appreciate the clarification.
21           What I'm getting at is whether it was a
22   viable, standalone entity if CHS wasn't propping it up
23   with corporate money.
24   A.  Correct.

Page 88

1        Q.  Do you think it was a viable entity without
2    CHS propping it up?
3    A.  No.
4        Q.  So your testimony is that when Charlie
5    Hatfield took over the hospital when Mingo Health
6    Partners bought it, it was not a viable entity on its
7    own.
8    A.  I would say not.
9        Q.  And I want to make one clarification, and this
10   just may be my confusion from earlier.
11           Did you have access to all the bank
12   accounts at Williamson Memorial Hospital?
13   A.  I only could see them.  I could not do
14   transactions.
15       Q.  But you could see all the transactions and all
16   accounts; right?
17   A.  Yes.
18       Q.  Which accounts did you not do transactions
19   with?
20   A.  There was the general account, there was a
21   payroll account, and accounts payable, and those are the
22   only three, and those were the ones I had access to.
23       Q.  Okay.
24   A.  To look at only.

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 89

1    Q.  Which ones could you not make payments from?
2    A.  I didn't -- I didn't do the payments.  I mean,
3  the schedule was done knowing there was money in the
4  bank to do those payments.
5    Q.  Okay.  Well, which accounts did you actually
6  have authority to make transactions is what I meant?
7    A.  I don't make -- I don't move money in the bank
8  accounts.  I had no authority to do anything in the bank
9  accounts.
10    Q.  Okay.  But you could view them, you just
11  couldn't make any transactions.
12    A.  Right.  Right.
13    Q.  Okay.  Thanks for clarifying that.
14        Did you meet with Sam Kapourales
15  routinely to review aged accounts receivable?
16    A.  Not receivables.  Payables.
17    Q.  Payables.  Right.
18    A.  I recall three different times that there
19  was -- actually he wanted to look at them at the
20  accounts payable aging to see what was owed.
21    Q.  Do you remember when those times were, what
22  dates?
23    A.  No.
24    Q.  And you were asked a lot about employee

Page 90

1  payroll and net versus gross, and I understand that net
2  payments were made for a period.
3        Were the gross payments ever made up
4  like in the previous week or payroll period, or only net
5  payments made for the period that Charlie Hatfield was
6  CEO?
7    A.  He said we had ADP up until April of 2019, and
8  when we went to MEDITECH that's when the net amount of
9  the payroll was funded.
10    Q.  Okay.  And I think you testified earlier you
11  didn't have any issues with the net or gross when ADP
12  took over -- or when ADP was in charge; right?
13    A.  Right.
14    Q.  So Charlie was CEO from -- well, his last day
15  was sometime in October 2019; right?
16    A.  Yes.
17    Q.  Do you remember when he started?
18    A.  Not the exact date, no.
19    Q.  But the bottom line from when he started to
20  April 2019, there were no issues with the net or gross
21  payments; right?
22    A.  Correct.
23    Q.  Okay.  So it would have been only been from
24  May 2019 through October 2019 when he left Williamson

Page 91

1  Memorial Hospital?
2    A.  It may have started in April, because in the
3  transition from going into MEDITECH -- leaving ADP and
4  going into MEDITECH was during that time period.  It was
5  the month of April.
6    Q.  And, again, apologies for skipping around here
7  but a follow-up on Sam Kapourales and when you-all
8  reviewed the accounts payable.
9        Did Sam ever tell you which invoices to
10  pay?
11    A.  Not -- no, not specifically, no.
12    Q.  So your testimony is that Charlie Hatfield was
13  the only one who told you which invoices to pay and not
14  to pay?
15    A.  Yes.
16    Q.  I know you've testified earlier about the Mid
17  Mountain payments.  Do you have any evidence that the
18  payments made to Mid Mountain were not somehow related
19  to reimbursements for Williamson Memorial Hospital?
20    A.  There were some when they used their credit
21  card, the Mid Mountain credit card, yes, we reimbursed
22  them.
23    Q.  Okay.  Do you have any evidence of
24  reimbursements to Charlie or Sabrina Hatfield that were

Page 92

1  not related to Williamson Memorial Hospital?
2    A.  Those were the ones I couldn't identify.  I
3  had no backup for.
4    Q.  Do you remember how many charges or the amount
5  of those charges, what they would have been?
6    A.  There was -- I remember a check for almost
7  $26,000 to a vendor I never heard of.
8    Q.  Do you remember the name of the vendor?
9    A.  No.
10    Q.  Was there anything submitted related to that
11  payment?
12    A.  No.
13    Q.  And I wanted to talk to you about the monthly
14  closing of the books.  You testified earlier that you
15  gave Charlie some financial documents at the end of
16  every month; right?
17    A.  Yes.
18    Q.  How did you deliver those documents to him?
19  Were they hand delivered or emailed?
20    A.  Hand delivered.
21    Q.  So hard copies?
22    A.  Yes.
23    Q.  Did you ever email those to Charlie or anyone
24  else?

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

---

Page 93

1    A.  I don't recall e-mailing them, no, unless it
2 was just a one page.  Could have been emailed.
3    Q.  When you created those documents, where did
4 you save them?
5    A.  It was part of the system we were using.
6    Q.  Some kind of document management system?
7    A.  Yeah.  It's -- you can recall any document you
8 want for any time period with the system -- CHS's system
9 or with MEDITECH.
10   Q.  Okay.  So those documents would have been
11 created on one of those --
12   A.  Yes.
13   Q.  -- softwares?
14   A.  Yes.
15   Q.  Were you ever instructed not to provide those
16 financial documents at the end of every month to anyone
17 else?
18   A.  No.
19   Q.  Did anyone ever come to you and request those
20 financial documents at the end of the month?
21   A.  Only after Charlie left and Gene came on the
22 scene.
23   Q.  Well, and what I'm getting at is:  Did Charlie
24 ever instruct you not to provide those financial records

---

Page 94

1 to anyone?
2    A.  No.
3    Q.  Do you remember the billing arrangement with
4 CHS?  And what I mean by that is, how was CHS paid?
5 Were they paid hourly or were they paid based on
6 collections?
7    A.  I think there was a flat amount that was due
8 every month.  I don't know it was -- I'm not sure
9 exactly how the contract read, but the -- each monthly
10 payment was similar.
11   Q.  Okay.  So that would seem to indicate it was a
12 flat fee; right?
13   A.  Yes.
14   Q.  What about HRG, same question with them.  How
15 were they paid?
16   A.  I believe that was based on either collections
17 or it could have been a flat amount plus collections.  I
18 don't know.  I don't remember the contract detail.
19   Q.  And I'm not asking you to speculate.  Just to
20 the extent you can remember.
21        Same question with Ensemble.  How were
22 they paid?
23   A.  They would have been paid basically the same
24 thing as HRG.

---

Page 95

1    Q.  Would you have any reason to dispute that
2 Ensemble was paid based on their collection amount?
3    A.  Like I said, I don't remember the exact
4 content of the contract.
5    Q.  What about AVEC, how were they paid?
6    A.  AVEC I barely remember.
7    Q.  Oh, yeah.  I forgot about that.
8        Accordias you remember.  How were they
9 paid?
10   A.  Probably the same way as the rest of them.
11   Q.  Yeah.
12   A.  They all -- most of those companies are
13 usually based either on a fee plus collections -- a
14 certain percentage of collections.
15   Q.  I remember you testified a little about how
16 CHS withheld some information you needed to finish
17 closing some financials.
18       Where did the information ultimately
19 come from that allowed you to complete the closing?
20   A.  They eventually released it.  CHS.
21   Q.  Did Charlie Hatfield get them to release that
22 information?
23   A.  I don't know.
24   Q.  Okay.  You don't know.  You just got the

---

Page 96

1 information --
2    A.  Right.
3    Q.  And we talked a lot -- well, Mr. George
4 questioned you on the general ledger and a lot of things
5 associated with that.
6        You estimated that there were in excess
7 of ten thousand -- or ten million dollars of invoices on
8 that -- or, yeah, on that ledger.
9        Do you know what percentage of those
10 charges would have been incurred during Charlie
11 Hatfield's tenure as CEO?
12   A.  I don't know.  I would say when payments were
13 less and less and when cash was not available, then it
14 would grow.
15   Q.  Okay.
16   A.  The liabilities.
17   Q.  Do you think all -- the entire ten million was
18 attributable to invoices not paid while Charlie was CEO?
19   A.  I would say during the time when bills for
20 patients did not get processed so that we could have
21 incoming cash, that's what attributed to it.  So, yes,
22 it would have been during their time.
23   Q.  Okay.  So your testimony is that there's no
24 invoices on that ledger that were before -- or incurred

---

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 97

1  by Williamson Memorial Hospital before or after Charlie
2  Hatfield's tenure?
3      A.  I mean, I can't tell you exact dates, but once
4  the CHS was in charge, things got paid on time.  And
5  when they bought -- when Charlie's company bought the
6  hospital, they incurred whatever was left on the
7  accounts payable system.
8      Q.  So there was probably something --
9      A.  There was some, yes.
10     Q.  And that's what I was getting at.  I figured
11 there had to be at least something left over.
12     A.  Yes.
13     Q.  Do you remember how much that was?
14     A.  No.
15     Q.  What about after Charlie left in October 2019,
16 were there invoices that did not get paid after October
17 2019?
18     A.  Many.
19     Q.  Many.
20         So that -- some of that ten million is
21 attributable to after Charlie Hatfield's tenure?
22     A.  Yes.
23     Q.  Do you -- and I'm asking the same question.
24 You probably don't remember how much of the ten million

Page 98

1  would have occurred after October 2019?
2      A.  No, I have no idea.
3      Q.  There was some testimony earlier about
4  switching health insurance carriers from Blue Cross to
5  EVSO (sic)?
6      A.  I can't remember if --
7      Q.  Sorry EBSO.
8      A.  Yes, EBSO.
9          There were different brokers that he was
10 dealing with, I believe, trying to get good prices, and
11 there could have been something in between that, but
12 EBSO was the one.
13     Q.  Do you remember the date of that switch?
14     A.  No, I don't know.
15     Q.  As I understand it, the Blue Cross premiums
16 were pretty substantial.  Were they in the neighborhood
17 of $700,000?
18     A.  They were, I remember, at least $300,000 a
19 month.
20     Q.  300,000 a month?
21     A.  Uh-huh.
22     Q.  Wow.  Okay.
23         And was EBSO a cheaper alternative to
24 Blue Cross?

Page 99

1      A.  Yes.
2      Q.  And I know maybe you might not know the
3  specifics of the policies, but did EBSO provide similar
4  coverage?
5      A.  I would say similar.
6      Q.  Was it as good?
7      A.  I never had a problem with it.
8      Q.  Okay.  There were also questions related to
9  the charge master.  And forgive my ignorance again with
10 the charge master.
11         Was there a charge master in place with
12 CHS?
13     A.  Yes.
14     Q.  Okay.  The charge master worked with CHS;
15 right?
16     A.  Yes.
17     Q.  And how long did you-all continue to use CHS's
18 charge master after the sale?
19     A.  I would say up until we transitioned over to
20 MEDITECH which would have been by May 2019.
21     Q.  So it's kind of the same timeline we were
22 talking about earlier with ADP, in that there were no
23 issues with the charge master until the MEDITECH switch;
24 right?

Page 100

1      A.  Right.
2      Q.  And let me back up and talk to you again after
3  Charlie Hatfield departed in October 2019.
4          Did the hospital become a viable entity
5  on its own?
6      A.  No.
7      Q.  It was still losing money every month?
8      A.  Yes.
9      Q.  So when Charlie left, do you remember how much
10 money that Williamson Memorial was losing every month?
11     A.  I don't recall.
12     Q.  Was it a similar amount after Charlie left?
13     A.  It probably was, yes.
14     Q.  And it was a similar amount after he left even
15 though Williamson Memorial Hospital had bankruptcy
16 protections from creditors?
17     A.  I would say, you know, as time went on, it
18 probably grew because nothing was being paid.  Vendors
19 were still being used.
20     Q.  Nothing was being paid during the Chapter 11
21 bankruptcy?
22     A.  What they would allow us to pay.
23     Q.  And who was in charge of payments when
24 Williamson Memorial Hospital was in Chapter 11

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 101

1  bankruptcy?
2      A.  I would consult with Loretta and Loretta would
3  consult with the lawyers, bankruptcy lawyers.
4      Q.  So it wasn't Gene Preston who approved or
5  disproved invoices?
6      A.  No.  No.
7      Q.  And the hospital eventually had to convert to
8  a Chapter 7; correct?
9      A.  Yes.
10     Q.  Do you understand what a Chapter 7 bankruptcy
11 is?
12     A.  Not really.
13     Q.  Yeah, that's completely fair.  So Chapter 7 is
14 typically referred to as a liquidation.
15         When did Williamson Memorial actually
16 shut down and close its doors?
17     A.  It was either April the 20th or 21st of 2020.
18     Q.  And you stayed on with Williamson Memorial
19 Hospital until when?
20     A.  December 31st of 2020.
21     Q.  So you were present at Williamson Memorial
22 Hospital during the Chapter 11 bankruptcy when
23 Williamson Memorial Hospital received some -- I'm going
24 to say an influx of cash from basically loans from

Page 102

1  outside entities?
2      A.  I was there.
3      Q.  Did you --
4      A.  If that happened.  I don't understand
5  exactly --
6      Q.  Okay, yeah.
7          Well, I understand that there was
8  some -- and I'm trying to avoid some of the bankruptcy
9  terminology, but I understand there was - even during
10 the bankruptcy - some cash that was provided by the
11 owners of Williamson Memorial Hospital to keep it
12 afloat.  Do you remember any of that?
13     A.  Not really.  I really don't.
14     Q.  So even with that extra cash, even with the --
15 you know, the creditors being basically subdued for a
16 while, Williamson Memorial Hospital continued to lose
17 money every month and the ledger continued to accrue
18 unpaid invoices; correct?
19     A.  Yes.
20     Q.  Do you think Charlie Hatfield and Sabrina
21 Hatfield worked hard while they were CFO and CEO of the
22 hospital?
23     A.  They did work hard.
24     Q.  Do you think they gave it their best effort?

Page 103

1      A.  I do believe that.
2      Q.  Your testimony earlier was maybe that they
3  didn't make some of the best business judgments, but do
4  you think there was any malice or malfeasance by either
5  Hatfield?
6          MR. GEORGE:  Note my objection to form,
7  including legal terms here.  Her testimony speaks for
8  itself.  Go ahead and answer if you know.
9      A.  I believe that once they -- that they could
10 see the hospital wasn't doing well, and then with the
11 inconsistency of not giving me information for checks
12 that were cut, I think they were getting to a point of
13 desperation to try to keep things going to the best they
14 knew how.
15     Q.  Yeah.
16         They ultimately wanted the hospital to
17 succeed and remain a pillar of the community, though;
18 right?
19     A.  Yes.
20     Q.  And when Charlie and the other Mingo Health
21 Partners took over the hospital, you understand that was
22 an attempt to save the hospital, right, from closure?
23     A.  Yes.
24     Q.  I just want to confirm.  You did not attend

Page 104

1  any of the board of directors meetings for Williamson
2  Memorial Hospital, did you?
3      A.  No, I did not attend any of them.
4      Q.  Okay.  When CHS was an entity that owned the
5  hospital, did you attend any of the board meetings?
6      A.  No.
7      Q.  Let me back up to another question about HRG,
8  one of the billers and coders.
9          Do you think they did a good job on the
10 billing and coding?
11     A.  I wouldn't know.  The only thing I would see
12 for their efforts would be cash coming in.
13     Q.  Right.
14         So you didn't have any direct
15 involvement with billing and coding necessarily?
16     A.  No.  No.
17     Q.  Your focus was more on the accounts payable
18 side, not what was coming in?
19     A.  I kept track of what was coming in only
20 because I had access to view the bank accounts to know
21 whether or not payments could be made.
22     Q.  Do you believe that Williamson Memorial
23 Hospital was adequately staffed in the financial
24 departments of the hospital?

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 105

1    A.  I believe they should have had an outside
2  person to oversee some things, just to make sure things
3  were being done properly.
4    Q.  Was Greg Gibbs supposed to be overseeing some
5  things from an accounting standpoint?
6    A.  He may have been.  I mean, he pretty much did
7  it from afar.
8    Q.  Yeah.
9        But he was supposed to be doing that?
10   A.  I don't know if that's what his main objective
11  was, but ...
12   Q.  And I understand your testimony earlier, there
13  were -- you know, you kind of minded your own business,
14  you went to work, put your head down, and you didn't
15  stir the pot on anything.  I can tell that about you
16  already.
17        But did -- you know, throughout the
18  hospital, did you hear from any other employees or
19  specifically department heads that Sabrina Hatfield and
20  Charlie Hatfield were mismanaging the hospital?
21   A.  Not so much mismanaging.  It's that they --
22  they didn't have the background to run a hospital.
23   Q.  Okay.  You didn't hear anything specific on
24  mismanagement?

Page 106

1    A.  Not specifically mismanagement.
2    Q.  Sorry I keep having to jump around.
3        Did Ensemble ultimately help you-all
4  create a charge master after MEDITECH had taken -- the
5  MEDITECH software had been switched to?
6    A.  I don't know.  Something had to be created so
7  they could create bills.  So whether they were the ones
8  that actually did that, I'm not sure.
9    Q.  So your testimony is at some point, the charge
10  master was completed; right?
11   A.  I don't know that.
12   Q.  You don't know that for sure.
13   A.  No.
14   Q.  But you're assuming that since you started
15  using the MEDITECH software.
16   A.  I couldn't assume that because I wasn't part
17  of that.
18   Q.  Okay.  You didn't have any involvement on the
19  charge master.
20   A.  No.
21   Q.  Okay.  What kind of education and experience
22  do you think that Charlie Hatfield should have had to be
23  CEO?
24   A.  Well, it would have been good if he actually

Page 107

1  had worked in a hospital setting in finance.
2    Q.  Do you think -- what about Sabrina Hatfield,
3  what kind of education and experience do you think she
4  was lacking?
5    A.  I didn't work a lot with Sabrina.  Most of my
6  involvement was with Charlie.
7    Q.  Okay.  Well, I just want to clarify then what
8  we talked about earlier.  You testified that Sabrina was
9  lacking in education and experience.  What did you base
10  that on?
11   A.  Just the knowledge that came with being a CFO
12  of a hospital.  Understanding all the contracts,
13  insurance contracts.
14   Q.  So you weren't basing that opinion on your own
15  interactions with her, or were you basing that on
16  interactions -- let me ask you that first.
17        Were you basing that opinion on your own
18  interactions with her?
19   A.  Like I said, most of my interaction was with
20  Charlie.  It was from the fact that when MEDITECH took
21  over and being able to pull together the accounts
22  receivable piece of it, you know, the billing, the
23  patient billing piece of it, that's where I think some
24  of the knowledge was lacking.

Page 108

1    Q.  What specific instances can you recall where
2  Sabrina Hatfield's education and experience were
3  lacking?
4    A.  Well, someone said that she looked on the
5  internet to figure out how to code a bill for a patient.
6  That's something you go to school for.
7    Q.  Anything else you can think of?  Any other
8  specifics?
9    A.  That's the only one that stands out.
10   Q.  What about specifics on Charlie Hatfield, what
11  about -- what instances/specifics can you give that
12  Charlie did not have the education or experience
13  necessary to be CEO?
14   A.  Well, just his own acknowledgement that
15  hospitals -- running a hospital is hard.
16   Q.  Yeah.
17        And, yeah, I think that's not disputed
18  that running a hospital is hard.  I mean, CHS runs many
19  hospitals and they weren't profitable with Williamson
20  Memorial Hospital, were they?
21   A.  No, they weren't.
22   Q.  You understand CHS was a hospital conglomerate
23  group that owns many hospitals; right?
24   A.  That's correct.

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 109

1   Q.   And they couldn't even turn a profit with
2   Williamson Memorial Hospital?
3   A.   That's correct.
4   Q.   And Gene Preston, when he took over, he
5   couldn't turn a profit with Williamson Memorial
6   Hospital, could he?
7   A.   No.
8   Q.   The hospital ultimately had to close its doors
9   because the ledger continued to increase and invoices
10  continued to pile up; right?
11  A.   Yes.
12       MR. PARSONS:  That's all the questions I
13  have.  I appreciate your time and patience with us.
14       MR. GEORGE:  I just have one.  I'll come
15  around.  Stay right where you are.
16            RE-EXAMINATION
17  BY MR. GEORGE:
18  Q.   When we were talking about ADP, my
19  recollection is that you said they were never involved
20  on the employee benefits part of the payment, only on
21  the governmental part of the taxes; is that right?
22  A.   Yes.
23  Q.   So follow up to that.  When Mr. Parsons asked
24  you about there were no issues when ADP was paying

Page 110

1   payroll, that was only in reference to making sure that
2   the federal and State taxes were paid on the gross
3   amount, not the employee benefits part; correct?
4   A.   Correct.
5        MR. GEORGE:  That's all I have.
6        MR. PARSONS:  I'm sorry.  One follow-up.
7   I just want to try to get you nailed down on a date.
8            RE-EXAMINATION
9   BY MR. PARSONS:
10  Q.   When do you think the issues of withholding
11  started with Mr. Hatfield?
12  A.   I believe it was when MEDITECH took over and
13  that we transitioned during the month of April of 2019.
14  Q.   So it would have been in line with when the
15  ADP situation and the -- yeah, the ADP situation; right?
16  A.   Yes.
17  Q.   Okay.
18       MR. PARSONS:  That's all I have.
19       MR. GEORGE:  Okay.  Let me -- this
20  doesn't need to be on the record.
21       THE WITNESS:  I'm okay with what I said.
22       MR. GEORGE:  Okay.  So you will waive
23  the signature?
24       THE WITNESS:  Yes.

Page 111

1        COURT REPORTER:  Did you both want an
2   e-tran?
3        MR. PARSONS:  E-tran is fine with us.
4        MR. GEORGE:  That's fine with me.
5        (Deposition concluded at 4:51 p.m.)
6        (Having indicated she would like to read
7   her deposition before filing, further
8   this deponent saith not.)
9
10            --oOo--
11
12
13
14
15
16
17

Page 112

1   STATE OF WEST VIRGINIA
2   COUNTY OF CABELL, to wit;
3
4        I, Jaime L. Centifanti, a Notary Public within and
    for the County and State aforesaid, duly commissioned
5   and qualified, do hereby certify that the foregoing
    deposition of DIANE VARNEY, was duly taken by me and
6   before me at the time and place and for the purpose
    specified in the caption hereof, the said witness having
7   been by me first duly sworn.
8        I do further certify that the said deposition
    was correctly taken by me in shorthand notes, and that
9   the same were accurately written out in full and reduced
10  to typewriting to the best of my ability, and that the
    witness did request to read her transcript.
11
12       I further certify that I am neither attorney or
    counsel for, nor related to or employed by, any of the
13  parties to the action in which this deposition is taken,
    and further I am not a relative or employee of any
14  attorney or counsel employed by the parties, or
    financially interested in the action, and that the
15  attached transcript meets the requirements set forth
    within article twenty-seven, chapter forty-seven of the
16  West Virginia Code.
17
    My commission expires February 19, 2023.
18
19  Given under my hand and seal this _____ day
20
21
22
23  Jaime L. Centifanti, RPR, Notary Public
24

Exhibit A

ROBERT L. JOHNS vs.
CHARLES HATFIELD

DIANE VARNEY
07/13/2022

Page 113

```
 1              ERRATA SHEET
 2
            I, DIANE VARNEY, do hereby certify that the
 3   foregoing is a true and correct transcript of my
     deposition with the exception of the following
 4   corrections:
 5   PAGE  LINE  CORRECTION
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15
16              _____
                   DEPONENT'S SIGNATURE
17   STATE OF _____,
     COUNTY OF _____,
18
19        Sworn to before me, _____,
     Notary Public, this ____ day of _____, 2022.
20
21              _____
                   NOTARY PUBLIC
22
23
24
```

Exhibit A

*Frank W. Volk*
Frank W. Volk
United States District Judge

**Dated: April 24th, 2020**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

In re:

    Williamson Memorial Hospital, LLC,

                      **Debtor in Possession**

**Case No. 19-20469**
**Chapter 11**
**Judge Frank Volk**

**FINAL ORDER GRANTING 4th EMERGENCY MOTION OF DEBTOR-IN-POSSESSION FOR FINAL ORDERS AUTHORIZING DEBTOR TO (A) OBTAIN SECURED PRIMING POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364; (B) AUTHORIZE TO USE CASH COLLATERAL AND OTHER COLLATERAL PURSUANT TO 11 U.S.C. §§ 105, 361, 362 AND 363; (C) SCHEDULING FINAL HEARING, PURSUANT TO RULES 4001(b), 4001(c) AND 9014; AND (D) GRANTING RELATED RELIEF**

        Based upon the foregoing, and upon the record made before this Court at the final hearing, and good and sufficient cause appearing therefore, it is hereby ordered and adjudged that:

        1.    Motion Granted. The *4th Emergency Motion Of Debtor-In-Possession For Final Orders Authorizing Debtor To (A) Obtain Secured Priming Post-Petition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364; (B) Authorize To Use Cash Collateral And Other Collateral Pursuant To 11 U.S.C. §§ 105, 361, 362 and 363; (C) Scheduling Final Hearing, Pursuant To Rules 4001(B), 4001(C) and 9014; and (D) Granting Related Relief* [DN# 151] (the "Motion") is granted on a final basis to the extent provided in this Order.  No party voiced any objections to the relief sought in the Motion or the entry of this Order.

        2.    Authorization to enter into Debtor-In-Possession Financing.   The Debtor is authorized to borrow up to the aggregate amount of $200,000.00 (the "DIP Loan") pursuant to this

Exhibit A

Order from Doug Reynolds, Sam Kapourales and Charles Hatfield (collectively the "DIP Lender").

3. The Debtor is authorized and directed to perform all acts as the DIP Lender may reasonably require as evidence of and for the protection of the obligations arising under the DIP Loan and/or this Order (collectively, the "DIP Loan Obligations") or which may be otherwise deemed necessary by the DIP Lender to effectuate the terms and conditions of this Order.

4. DIP Liens. The DIP Loan shall be secured by the liens (the "DIP Liens"), effective upon entry of this Order without any further action required, on all the accounts receivable of the Debtor (the "DIP Collateral").

5. DIP Lender's Superpriority Claim. Pursuant to Section 364(c)(1), the DIP Loan shall constitute an allowed claim ("Superpriority DIP Claim") against the Debtor, with priority over any and all administrative expenses, diminution claims, adequate protection claims and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including all administrative expenses of the kind specified in Sections 364, 503(b) and 507(b), and over any and all administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113, or 1114, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, and which Superpriority DIP Claim shall be payable from and have recourse to all pre- and post-petition property of the Debtor and all proceeds thereof. The Superpriority DIP Claim and the DIP Liens shall continue even if Debtor's Chapter 11 case is converted to a case under Chapter 7 of the Bankruptcy Code, and shall maintain their priority as provided in this Order until all DIP Loan Obligations have been indefeasibly paid, in full, in cash, or otherwise satisfied with the consent of the DIP Lender.  Notwithstanding the foregoing, the rights of the DIP Lender hereunder are

Exhibit A

subordinate to the liens and rights of Pikeville Medical Center, Inc., as lender to Debtor pursuant to the terms set forth in the *Final Order granting the 6th Motion of Debtor-in-Possession for an Order Authorizing Debtor to (A) Obtain Secured Priming Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364; (B) Authorize Debtor to Use Cash Collateral and Grant Protection to Secured Lenders Pursuant to 11 U.S.C. §§ 105, 361, 362 and 363; (C) Schedule Final Hearing Pursuant to Rules 4001(b), 4001(c) and 9014; and (D) Grant Related Relief*.

6.     The terms for the use of the DIP Collateral, respectively, set forth in this Order are fair and reasonable, reflect the Debtor's prudent exercise of business judgment and constitutes reasonably equivalent value and fair consideration for the use of such collateral, subject to the restrictions set forth in this Order. No creditor has sought, or is entitled to, any adequate protection as a result of the Court's grant of the Motion.

7.     No Additional Filings Required for Perfection. All DIP Liens and any other liens in favor of the DIP Lender pursuant to this Order are valid, enforceable, and perfected, effective as of the Petition Date, and (notwithstanding any provisions of any agreement, lease, instrument, document, the Uniform Commercial Code, or any other relevant law or regulation of any jurisdiction) no further notice, filing, or other act shall be required to effect such perfection, and all DIP Liens on any deposit accounts or securities accounts shall pursuant to this Order be, and they hereby are, deemed to confer "control" for purposes of Sections 46-8-106, 9-104, and 9-106 of the Uniform Commercial Code in the various states that are the respective "jurisdictions" (as that term is used in respect of "control" in Articles 8 and 9 of the Uniform Commercial Code) of the depositary banks or securities intermediaries applicable thereto as in effect as of the date hereof in favor of the DIP Lender. A certified copy of this Order may, in the discretion of the DIP Lender,

Exhibit A

be filed with or recorded in any filing or recording office and all filing offices are hereby authorized

and directed to accept such certified copy of this Order for filing and recording.

8.    Jurisdiction. The Court shall retain exclusive jurisdiction to interpret and enforce

this Order and the terms of the DIP Loan.

9.    The provisions of this Order are effective as of the date and time of the conclusion

of the final hearing upon the relief sought by the Motion.

10.    The DIP Lender must file a motion seeking relief from the automatic stay with this

Court prior to seeking to enforce the DIP Liens.

Approved for Entry:

 /s/ Joe M. Supple
Joe M. Supple
Supple Law Office PLLC
801 Viand Street
Point Pleasant, WV 25550
304-675-6249
Joe.Supple@supplelawoffice.com

        and

 /s/ Glenn B. Rose
Glenn B. Rose, TN Bar No. 10598
Bass, Berry & Sims PLC
150 Third Avenue South, Suite 2800
Nashville, TN 37201
Telephone (615) 742-6273
Facsimile (615) 742-6293
grose@bassberry.com

*Counsel for Debtor*

Exhibit A

## Notice Recipients

| | |
|---|---|
| District/Off: 0425−2 | User: jjr | Date Created: 4/27/2020 |
| Case: 2:19−bk−20469 | Form ID: pdf001 | Total: 47 |

**Recipients submitted to the BNC (Bankruptcy Noticing Center) without an address:**

| | |
|---|---|
| acc | Arnett Carbis Toothman LLP |
| consult | Steve Curnutte and Tortola Advisors |
| aty | Hunton Andrews Kurth LLP |
| aty | Hunton Andrews Kurth, LLP |

TOTAL: 4

**Recipients of Notice of Electronic Filing:**

| | | |
|---|---|---|
| ust | United States Trustee | ustpregion04.ct.ecf@usdoj.gov |
| aty | Arthur M. Standish | art.standish@steptoe−johnson.com |
| aty | Bert Ketchum | Bert@Greeneketchum.com |
| aty | Carrie Goodwin Fenwick | cgf@goodwingoodwin.com |
| aty | Colton Chase Parsons | colton.parsons@steptoe−johnson.com |
| aty | Elizabeth A Amandus | eamandus@jacksonkelly.com |
| aty | Eric M. Wilson | eric.m.wilson@wv.gov |
| aty | Gary O. Kinder | gary.o.kinder@usdoj.gov |
| aty | Glenn Benton Rose | grose@bassberry.com |
| aty | Joe M. Supple | info@supplelawoffice.com |
| aty | Joel Patrick Jones, Jr. | joeljones@campbellwoods.com |
| aty | Michael B. Hissam | mhissam@hfdrlaw.com |
| aty | Sarah Ellis | sarah.ellis@steptoe−johnson.com |
| aty | Sarah Ann Walling | saw@jenkinsfenstermaker.com |
| aty | Susan N. Goodman | sgoodman@pivothealthaz.com |
| aty | W. Bradley Sorrells | wbs@ramlaw.com |

TOTAL: 16

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**

| | | | |
|---|---|---|---|
| db | WILLIAMSON MEMORIAL HOSPITAL, LLC | 859 ALDERSON STREET | Williamson, WV 25661 |
| cr | West Virginia State Tax Department | Bankruptcy Unit    P.O. Box 766 | Charleston, WV 25323−0766 |
| cr | Trevor R. Pincock    Lukins & Annis, P.S.    1600 Washington Trust Financial Center    717 W. Sprague Ave    Spokane, WA 99201−2015 | | |
| cr | First National Bank of Williamson    Attn: David Robinette    P. O. Box 950    Williamson, WV 25661 | | |
| crcm | Official Committee of Unsecured Creditors    Goodwin & Goodwin, LLP    300 Summer Street    Suite 1500    Charleston, WV 25301 UNITED STATES | | |
| intp | Charles W. Hatfield    P.O. Box 1315    Williamson, WV 25661 | | |
| intp | NFS Leasing, Inc.    900 Cummings Center    Suite 226−U    Beverly, MA 01915 | | |
| ombh | Susan N. Goodman    Pivot Health Law, LLC    PO Box 69734    Oro Valley, AZ 85737 | | |
| cr | Heather Lynn Pope    Greene, Ketchum, Bailey & Tweel LLP    P.O. Box 2389    Huntington, WV 25724 | | |
| intp | Pikeville Medical Center    PO Box 2917    Pikeville, KY 41502 | | |
| aty | Bass, Berry & Sims PLC    150 Third Avenue South, Suite 2800    Nashville, TN 37201 | | |
| aty | Goodwin & Goodwin    P.O. Box 2107    Charleston, WV 25328 | | |
| aty | Supple Law Office, PLLC    801 Viand Street    Pt. Pleasant, WV 25550 | | |
| aty | Christine E. Devine    Mirick, O'Connell, DeMallie & Lougee, LL    100 Front Street    Worcester, MA 01608−1477 | | |
| aty | David L. Bissett    U.S. Trustees Office    300 Virginia St. East    Room 2025    Charleston, WV 25301 | | |
| aty | Henry P. Long, III    Hunton Andrews Kurth LLP    951 East Byrd Street    Richmond, VA 23219 | | |
| aty | Jason W. Harbour    Hunton Andrews Kurth LLP    951 East Byrd Street    Richmond, VA 23219 | | |
| aty | John F. Leaberry    Law Office of John Leaberry    167 Patrick Street    Lewisburg, WV 24901 | | |
| aty | John M. Craig    Law Firm of Russell R. Johnson III, PLC    2258 Wheatlands Drive    Manakin−Sabot, VA 23103 | | |
| aty | Larry A. Bailey    419 Eleventh Street    Post Office Box 2389    Huntington, WV 25724 | | |
| aty | Max Gottlieb    HISSAM FORMAN DONOVAN RITCHIE PLLC    Charleston, WV 25309 | | |
| aty | Paul W. Carey    Mirick, O'Connell, DeMallie & Lougee, LL    100 Front Street    Worcester, MA 01608−1488 | | |
| aty | Russell R. Johnson, III    Law Firm of Russell R. Johnson III, PLC    2258 Wheatlands Drive    Manakin−Sabot, VA 23103 | | |
| aty | Ryan McCune Donovan    HISSAM FORMAN DONOVAN RITCHIE PLLC    P.O. Box 3983    Charleston, WV 25309 | | |
| aty | Stephen L. Thompson    Barth & Thompson    PO Box 129    Charleston, WV 25321 | | |
| smg | United States Attorney    Southern District WV    P.O. Box 1713    Charleston, WV 25326−1713 | | |
| smg | WV Department of Tax & Revenue    Bankruptcy Unit    P.O. Box 766    Charleston, WV 25323−0766 | | |

TOTAL: 27

Exhibit A

Case 2:19-bk-20469    Doc 165    Filed 01/10/20    Entered 01/10/20 09:55:09    Desc Main
Document    Page 1 of 98

**Fill in this information to identify the case:**

Debtor Name  Williamson Memorial Hospital, LLC

United States Bankruptcy Court for the: Southern District of West Virginia

Case number: 19-20469

☐ Check if this is an
amended filing

---

Official Form 425C

## Monthly Operating Report for Small Business Under Chapter 11                     12/17

Month:  Oct November

Line of business: Hospital

Date report filed: 01/09/2020
MM / DD / YYYY

NAISC code: _____

In accordance with title 28, section 1746, of the United States Code, I declare under penalty of perjury that I have examined the following small business monthly operating report and the accompanying attachments and, to the best of my knowledge, these documents are true, correct, and complete.

Responsible party:  Harold E. Preston Jr

Original signature of responsible party  *Gene Preston*

Printed name of responsible party  Harold E. Preston Jr

### 1. Questionnaire

Answer all questions on behalf of the debtor for the period covered by this report, unless otherwise indicated.

| | | Yes | No | N/A |
|---|---|---|---|---|
| | **If you answer *No* to any of the questions in lines 1-9, attach an explanation and label it *Exhibit A*.** | | | |
| 1 | Did the business operate during the entire reporting period? | ☑ | ☐ | ☐ |
| 2. | Do you plan to continue to operate the business next month? | ☑ | ☐ | ☐ |
| 3. | Have you paid all of your bills on time? | ☑ | ☐ | ☐ |
| 4. | Did you pay your employees on time? | ☑ | ☐ | ☐ |
| 5. | Have you deposited all the receipts for your business into debtor in possession (DIP) accounts? | ☑ | ☐ | ☐ |
| 6. | Have you timely filed your tax returns and paid all of your taxes? | ☑ | ☐ | ☐ |
| 7. | Have you timely filed all other required government filings? | ☑ | ☐ | ☐ |
| 8. | Are you current on your quarterly fee payments to the U.S. Trustee or Bankruptcy Administrator? | ☑ | ☐ | ☐ |
| 9. | Have you timely paid all of your insurance premiums? | ☑ | ☐ | ☐ |
| | **If you answer *Yes* to any of the questions in lines 10-18, attach an explanation and label it *Exhibit B*.** | | | |
| 10. | Do you have any bank accounts open other than the DIP accounts? | ☐ | ☑ | ☐ |
| 11. | Have you sold any assets other than inventory? | ☐ | ☑ | ☐ |
| 12. | Have you sold or transferred any assets or provided services to anyone related to the DIP in any way? | ☐ | ☑ | ☐ |
| 13. | Did any insurance company cancel your policy? | ☐ | ☑ | ☐ |
| 14. | Did you have any unusual or significant unanticipated expenses? | ☐ | ☑ | ☐ |
| 15. | Have you borrowed money from anyone or has anyone made any payments on your behalf? | ☑ | ☐ | ☐ |
| 16. | Has anyone made an investment in your business? | ☐ | ☑ | ☐ |

Exhibit A

Debtor Name  Williamson Memorial Hospital, LLC _____    Case number 19-20469 _____

17. Have you paid any bills you owed before you filed bankruptcy?    ☑ ☐ ☐

18. Have you allowed any checks to clear the bank that were issued before you filed bankruptcy?    ☑ ☐ ☐

## 2. Summary of Cash Activity for All Accounts

19. **Total opening balance of all accounts**
   This amount must equal what you reported as the cash on hand at the end of the month in the previous month. If this is your first report, report the total cash on hand as of the date of the filing of this case.    $ 13,908.45

20. **Total cash receipts**
   Attach a listing of all cash received for the month and label it *Exhibit C*. Include all cash received even if you have not deposited it at the bank, collections on receivables, credit card deposits, cash received from other parties, or loans, gifts, or payments made by other parties on your behalf. Do not attach bank statements in lieu of *Exhibit C*.
   Report the total from *Exhibit C* here.    $ 1,162,769.0

21. **Total cash disbursements**
   Attach a listing of all payments you made in the month and label it *Exhibit D*. List the date paid, payee, purpose, and amount. Include all cash payments, debit card transactions, checks issued even if they have not cleared the bank, outstanding checks issued before the bankruptcy was filed that were allowed to clear this month, and payments made by other parties on your behalf. Do not attach bank statements in lieu of *Exhibit D*.
   Report the total from *Exhibit D* here.    – $ 1,066,967.6

22. **Net cash flow**
   Subtract line 21 from line 20 and report the result here.
   This amount may be different from what you may have calculated as *net profit*.    + $ 95,801.52

23. **Cash on hand at the end of the month**
   Add line 22 + line 19. Report the result here.
   Report this figure as the *cash on hand at the beginning of the month* on your next operating report.
   This amount may not match your bank account balance because you may have outstanding checks that have not cleared the bank or deposits in transit.    = $ 109,709.97

## 3. Unpaid Bills

Attach a list of all debts (including taxes) which you have incurred since the date you filed bankruptcy but have not paid. Label it *Exhibit E*. Include the date the debt was incurred, who is owed the money, the purpose of the debt, and when the debt is due. Report the total from *Exhibit E* here.

24. **Total payables**    $ 103,107.00
   *(Exhibit E)*

Exhibit A

Case 2:19-bk-20469    Doc 165    Filed 01/10/20    Entered 01/10/20 09:55:09    Desc Main
Document    Page 3 of 98

Debtor Name  Williamson Memorial Hospital, LLC _____    Case number  19-20469 _____

![icon] **4. Money Owed to You**

Attach a list of all amounts owed to you by your customers for work you have done or merchandise you have sold. Include amounts owed to you both before, and after you filed bankruptcy. Label it *Exhibit F*. Identify who owes you money, how much is owed, and when payment is due. Report the total from *Exhibit F* here.

25. Total receivables                                                                      $  4,905,127.0
    *(Exhibit F)*

![icon] **5. Employees**

26. What was the number of employees when the case was filed?                        154
27. What is the number of employees as of the date of this monthly report?           101

![icon] **6. Professional Fees**

28. How much have you paid this month in professional fees related to this bankruptcy case?              $  0.00
29. How much have you paid in professional fees related to this bankruptcy case since the case was filed?  $  0.00
30. How much have you paid this month in other professional fees?                                         $  0.00
31. How much have you paid in total other professional fees since filing the case?                        $  0.00

![icon] **7. Projections**

Compare your actual cash receipts and disbursements to what you projected in the previous month. Projected figures in the first month should match those provided at the initial debtor interview, if any.

| | Column A | | Column B | | Column C |
|---|---|---|---|---|---|
| | Projected | − | Actual | = | Difference |
| | Copy lines 35-37 from the previous month's report. | | Copy lines 20-22 of this report. | | Subtract Column B from Column A. |
| 32. Cash receipts | $ _____ | − | $ 1,162,769.0 | = | $ _____ |
| 33. Cash disbursements | $ _____ | − | $ 1,066,967.0 | = | $ _____ |
| 34. Net cash flow | $ _____ | − | $ 95,801.00 | = | $ _____ |

35. Total projected cash receipts for the next month:                          $  944,696.00
36. Total projected cash disbursements for the next month:                   −  $  1,037,045.0
37. Total projected net cash flow for the next month:                        =  $  -92,349.00

<span style="color:red">Exhibit A</span>

Debtor Name  Williamson Memorial Hospital, LLC _____        Case number  19-20469 _____

| | 8. Additional Information |
|---|---|

If available, check the box to the left and attach copies of the following documents.

☑ 38. Bank statements for each open account (redact all but the last 4 digits of account numbers).

☑ 39. Bank reconciliation reports for each account.

☑ 40. Financial reports such as an income statement (profit & loss) and/or balance sheet.

☑ 41. Budget, projection, or forecast reports.

☑ 42. Project, job costing, or work-in-progress reports.

Exhibit A

<u>Addendum to Question 15 of the October- November Monthly Operating Report</u>

1. On October 25 15, 2019 Debtor Borrowed $350,000 from the principals of its parent Mingo Health Partners LLC.

2. On November 15, 2019 Debtor Borrowed $160,000 from the principals of its parent Mingo Health Partners LLC.

Exhibit A

Date   10/31/19        Page      31

BASIC BUSINESS CHECKING                              (Continued)

## Deposits

| Date | Description | Amount |
|------|-------------|--------|
| 10/03 | DDA REGULAR DEPOSIT | 5,600.00 |
| 10/03 | DDA REGULAR DEPOSIT | 10,355.13 |
| 10/09 | DDA REGULAR DEPOSIT | 6,000.00 |
| 10/09 | DDA REGULAR DEPOSIT | 32,000.00 |
| 10/09 | DDA REGULAR DEPOSIT | 141,000.00 |
| 10/11 | DDA REGULAR DEPOSIT | 3,000.00 |
| 10/11 | DDA REGULAR DEPOSIT | 8,000.00 |
| 10/24 | DDA REGULAR DEPOSIT | 36,000.00 |
| 10/24 | DDA REGULAR DEPOSIT | 165,000.00 |
| 10/30 | DDA REGULAR DEPOSIT | 68,733.11 |

------------------------------------------------------------------------

## Withdrawals

| Date | Description | Amount |
|------|-------------|--------|
| 10/07 | ACH DEBIT   JOHN HANCOCK | 4,293.90 |
|  | 9406915392          10/07/19 | |
|  | ID #-0140720 | |
|  | TRACE #-028000086657088 | |
| 10/09 | ACH PROC FILE FEE | 7.50 |
| 10/09 | ACH PROC FILE FEE | 80.00 |
| 10/09 | REG SALARY WILLIAMSON MEMO | 12,152.23 |
|  | 02-0550433          10/09/19 | |
|  | ID #- | |
|  | TRACE #-000000000000001 | |
| 10/09 | REG SALARY WILLIAMSON MEMO | 170,291.49 |
|  | 55-0592845          10/09/19 | |
|  | ID #- | |
|  | TRACE #-000000000000001 | |
| 10/10 | ACH DEBIT   JOHN HANCOCK | 3,576.13 |
|  | 9406915392          10/10/19 | |
|  | ID #-0140720 | |
|  | TRACE #-028000080970756 | |
| 10/24 | ACH PROC FILE FEE | 7.00 |
| 10/24 | ACH FILE PROC FEE | 82.50 |
| 10/24 | REG SALARY WILLIAMSON MEMO | 10,741.85 |
|  | 02-0550433          10/24/19 | |
|  | ID #- | |
|  | TRACE #-000000000000001 | |
| 10/24 | REG SALARY WILLIAMSON MEMO | 183,005.78 |
|  | 55-0592845          10/24/19 | |
|  | ID #- | |
|  | TRACE #-000000000000001 | |
| 10/31 | USATAXPYMT IRS | 65,499.98 |
|  | 3387702000          10/31/19 | |
|  | ID #-270970450951542 | |
|  | TRACE #-061036010022445 | |
| 10/31 | NET SERVICE CHARGE | 5.00 |
| 10/31 | MAINTENANCE FEE | 15.00- |

Exhibit A

```
                                              Date  11/29/19      Page    26

BASIC BUSINESS CHECKING                    (Continued)
                               Withdrawals
                                                  Amount
Date      Description                             138,462.73
11/07     REG SALARY WILLIAMSON MEMO
          55-0592045           11/07/19
          ID #-
          TRACE #-000000000000001
11/13     ACH PROC FILE FEE                              .05
11/18     USATAXPYMT IRS                          61,408.71
          3387702000           11/18/19
          ID #-270972201071763
          TRACE #-061036010006844
11/21     ACH PROC FILE FEE                           65.00
11/21     REG SALARY WILLIAMSON MEMO             129,694.60
          55-0592845           11/21/19
          ID #-
          TRACE #-000000000000001
11/30     NET SERVICE CHARGE                         5.00
11/30     MAINTENANCE FEE                          15.00-
11/30      BALANCE CREDIT/ADJ. IN S/C             10.00-
```

```
----------------------------------------------------------------------
                        Summary By Check Number
Date      Check No.        Amount   Date    Check No.         Amount
11/15                      254.20   11/13   130            1,504.46
11/26                      917.42   11/14   131            3,326.54
11/22         8*           407.56   11/13   132            3,663.18
11/13        22*         2,584.28   11/14   134*           2,278.41
11/14        23          1,384.62   11/15   135            3,214.12
11/13        33*         1,726.34   11/13   136            2,533.57
11/12        38*         3,270.80   11/15   137            2,190.94
11/01       116*           689.29   11/13   139*           3,409.88
11/04       118*         1,631.38   11/13   140            1,892.28
11/15       121*           584.43   11/14   141            1,674.87
11/13       122          1,082.67   11/14   142            1,934.36
11/08       123          1,798.09   11/22   144*           1,798.09
11/19       125*            65.97   11/25   145              237.65
11/15       127*           560.70   11/22   147*           1,244.36
11/18       128          1,230.91   11/22   149*             214.13
11/08       129            439.57
     *Indicates Break In Check Number Sequence
```

```
----------------------------------------------------------------------
                      Daily Balance Information
Date      Balance       Date      Balance      Date        Balance
11/01     5,341.43      11/12     38,079.39    11/19     14,573.90
11/04     3,710.05      11/13     19,682.68    11/21      6,814.30
11/06    21,710.05      11/14     84,083.88    11/22      3,150.16
11/07     7,587.85      11/15     77,279.49    11/25      2,912.51
11/08    41,350.19      11/18     14,639.87    11/26      1,995.09
```

Exhibit A

Fill in this information to identify the case:

Debtor Name: Williamson Memorial Hospta, LLC

United States Bankruptcy Court for the: Southern District of West Virginia

Case number: 19-20469

☐ Check if this is an
amended filing

## Official Form 425C

### Monthly Operating Report for Small Business Under Chapter 11          12/17

Month: __December__

Line of business: __Hospital__

Date report filed: __01/09/2020__
MM / DD / YYYY

NAISC code: _____

In accordance with title 28, section 1746, of the United States Code, I declare under penalty of perjury that I have examined the following small business monthly operating report and the accompanying attachments and, to the best of my knowledge, these documents are true, correct, and complete.

Responsible party: __Harold E. Preston Jr__

Original signature of responsible party: *Gene Preston*

Printed name of responsible party: __Harold E. Preston Jr__

### 1. Questionnaire

Answer all questions on behalf of the debtor for the period covered by this report, unless otherwise indicated.

|  |  | Yes | No | N/A |
|---|---|:---:|:---:|:---:|
| | If you answer *No* to any of the questions in lines 1-9, attach an explanation and label it *Exhibit A.* | | | |
| 1. | Did the business operate during the entire reporting period? | ☑ | ☐ | ☐ |
| 2. | Do you plan to continue to operate the business next month? | ☑ | ☐ | ☐ |
| 3. | Have you paid all of your bills on time? | ☑ | ☐ | ☐ |
| 4. | Did you pay your employees on time? | ☑ | ☐ | ☐ |
| 5. | Have you deposited all the receipts for your business into debtor in possession (DIP) accounts? | ☑ | ☐ | ☐ |
| 6. | Have you timely filed your tax returns and paid all of your taxes? | ☑ | ☐ | ☐ |
| 7. | Have you timely filed all other required government filings? | ☑ | ☐ | ☐ |
| 8. | Are you current on your quarterly fee payments to the U.S. Trustee or Bankruptcy Administrator? | ☑ | ☐ | ☐ |
| 9. | Have you timely paid all of your insurance premiums? | ☑ | ☐ | ☐ |
| | If you answer *Yes* to any of the questions in lines 10-18, attach an explanation and label it *Exhibit B.* | | | |
| 10. | Do you have any bank accounts open other than the DIP accounts? | ☑ | ☐ | ☐ |
| 11. | Have you sold any assets other than inventory? | ☑ | ☐ | ☐ |
| 12. | Have you sold or transferred any assets or provided services to anyone related to the DIP in any way? | ☑ | ☐ | ☐ |
| 13. | Did any insurance company cancel your policy? | ☑ | ☐ | ☐ |
| 14. | Did you have any unusual or significant unanticipated expenses? | ☑ | ☐ | ☐ |
| 15. | Have you borrowed money from anyone or has anyone made any payments on your behalf? | ☑ | ☐ | ☐ |
| 16. | Has anyone made an investment in your business? | ☐ | ☑ | ☐ |

Exhibit A

Debtor Name  Williamson Memorial Hospital, LLC                    Case number  19-20469

17. Have you paid any bills you owed before you filed bankruptcy?                ☐ ☑ ☐

18. Have you allowed any checks to clear the bank that were issued before you filed bankruptcy?    ☐ ☑ ☐

## 2. Summary of Cash Activity for All Accounts

19. Total opening balance of all accounts

This amount must equal what you reported as the cash on hand at the end of the month in the previous
month. If this is your first report, report the total cash on hand as of the date of the filing of this case.                    $ 109,709.97

20. Total cash receipts

Attach a listing of all cash received for the month and label it *Exhibit C*. Include all
cash received even if you have not deposited it at the bank, collections on
receivables, credit card deposits, cash received from other parties, or loans, gifts, or
payments made by other parties on your behalf. Do not attach bank statements in
lieu of *Exhibit C*.

Report the total from *Exhibit C* here.                    $ 944,696.21

21. Total cash disbursements

Attach a listing of all payments you made in the month and label it *Exhibit D*. List the
date paid, payee, purpose, and amount. Include all cash payments, debit card
transactions, checks issued even if they have not cleared the bank, outstanding
checks issued before the bankruptcy was filed that were allowed to clear this month,
and payments made by other parties on your behalf. Do not attach bank statements
in lieu of *Exhibit D*.

Report the total from *Exhibit D* here.                    – $ 1,037,045.4

22. Net cash flow

Subtract line 21 from line 20 and report the result here.
This amount may be different from what you may have calculated as *net profit*.                    + $ -92,349.24

23. Cash on hand at the end of the month

Add line 22 + line 19. Report the result here.                    = $ 17,360.73

Report this figure as the *cash on hand at the beginning of the month* on your next operating report.

This amount may not match your bank account balance because you may have outstanding checks that
have not cleared the bank or deposits in transit.

## 3. Unpaid Bills

Attach a list of all debts (including taxes) which you have incurred since the date you filed bankruptcy but
have not paid. Label it *Exhibit E*. Include the date the debt was incurred, who is owed the money, the
purpose of the debt, and when the debt is due. Report the total from *Exhibit E* here.

24. Total payables                    $ 167,097.00

   *(Exhibit E)*

Exhibit A

Case 2:19-bk-20469    Doc 166    Filed 01/10/20    Entered 01/10/20 09:57:30    Desc Main
Document    Page 3 of 37

Debtor Name  Williamson Memorial Hospita, LLC                    Case number 19-20469

### 4. Money Owed to You

Attach a list of all amounts owed to you by your customers for work you have done or merchandise you
have sold. Include amounts owed to you both before, and after you filed bankruptcy. Label it *Exhibit F.*
Identify who owes you money, how much is owed, and when payment is due. Report the total from
*Exhibit F* here.

25. Total receivables                                                                    $ 4,905,127.0

    *(Exhibit F)*

### 5. Employees

26. What was the number of employees when the case was filed?                                    154

27. What is the number of employees as of the date of this monthly report?                       101

### 6. Professional Fees

28. How much have you paid this month in professional fees related to this bankruptcy case?      $ 174,000.00

29. How much have you paid in professional fees related to this bankruptcy case since the case was filed?  $ 174,000.00

30. How much have you paid this month in other professional fees?                                $ 174,000.00

31. How much have you paid in total other professional fees since filing the case?              $ 174,000.00

### 7. Projections

Compare your actual cash receipts and disbursements to what you projected in the previous month.
Projected figures in the first month should match those provided at the initial debtor interview, if any.

| | Column A | | Column B | | Column C |
|---|---|---|---|---|---|
| | Projected | − | Actual | = | Difference |
| | Copy lines 35-37 from the previous month's report. | | Copy lines 20-22 of this report. | | Subtract Column B from Column A. |
| 32. Cash receipts | $ 1,162,769.0 | − | $ 944,696.00 | = | $ 218,073.00 |
| 33. Cash disbursements | $ 1,066,987.0 | − | $ 1,037,045.4 | = | $ 29,922.00 |
| 34. Net cash flow | $ 95,801.00 | − | $ 17,360.00 | = | $ 78,441.00 |

35. Total projected cash receipts for the next month:                                    $ 660,000.00

36. Total projected cash disbursements for the next month:                              − $ 660,000.00

37. Total projected net cash flow for the next month:                                    = $      0.00

Exhibit A

Debtor Name  Williamson Memorial Hospita, LLC                        Case number 19-20469

## 8. Additional Information

If available, check the box to the left and attach copies of the following documents.

☑ 38.  Bank statements for each open account (redact all but the last 4 digits of account numbers).

☑ 39.  Bank reconciliation reports for each account.

☑ 40.  Financial reports such as an income statement (profit & loss) and/or balance sheet.

☑ 41.  Budget, projection, or forecast reports.

☑ 42.  Project, job costing, or work-in-progress reports.

Exhibit A

Date  12/31/19          Page    20

BASIC BUSINESS CHECKING                    (Continued)

Withdrawals

| Date | Description | Amount |
|------|-------------|--------|
| 12/02 | ACH PROC FILE FEE | .40 |
| 12/02 | REG SALARY WILLIAMSON MEMO | 6,168.31 |
| | 02-0550433        12/02/19 | |
| | ID #- | |
| | TRACE #-000000000000001 | |
| 12/05 | ACH FILE PROC FEE | 70.00 |
| 12/05 | USATAXPYMT IRS | 58,951.52 |
| | 3387702000        12/05/19 | |
| | ID #-270973900866453 | |
| | TRACE #-061036010009668 | |
| 12/05 | REG SALARY WILLIAMSON MEMO | 155,806.08 |
| | 55-0592845        12/05/19 | |
| | ID #- | |
| | TRACE #-000000000000001 | |
| 12/09 | ACH DEBIT   JOHN HANCOCK | 954.13 |
| | 9406915392        12/09/19 | |
| | ID #-0140720 | |
| | TRACE #-028000083157160 | |
| 12/20 | ACH FILE ORIGINATION FEE | .05 |
| 12/20 | ACH PROC FILE FEE | 10.00 |
| 12/20 | ACH PROC FILE FEE | 10.00 |
| 12/20 | ACH FILE ORIGINATION FEE | 79.00 |
| 12/20 | REG SALARY WILLIAMSON MEMO | 200.00 |
| | 02-0550433        12/20/19 | |
| | ID #- | |
| | TRACE #-000000000000001 | |
| 12/20 | REG SALARY WILLIAMSON MEMO | 154,375.70 |
| | 55-0592845        12/20/19 | |
| | ID #- | |
| | TRACE #-000000000000001 | |
| 12/27 | ACH DEBIT   JOHN HANCOCK | 30.35 |
| | 9406915392        12/27/19 | |
| | ID #-0140720 | |
| | TRACE #-028000083551345 | |
| 12/31 | NET SERVICE CHARGE | 5.00 |
| 12/31 | MAINTENANCE FEE | 15.00- |
| 12/31 | DR ITEM FEES IN S/C | .80- |
| 12/31 | BALANCE CREDIT/ADJ. IN S/C | 10.80- |

-----------------------------------------------------------------------------

Summary By Check Number

| Date | Check No. | Amount | Date | Check No. | Amount |
|------|-----------|--------|------|-----------|--------|
| 12/10 | | 1,877.84 | 12/02 | 25 | 1,235.89 |
| 12/13 | | 8,000.00 | 12/11 | 25* | 3,500.93 |
| 12/16 | | 1,100.30 | 12/23 | 124* | 205.73 |
| 12/30 | | 1,332.00 | 12/06 | 146* | 579.22 |
| 12/10 | 24* | 3,555.91 | 12/03 | 150* | 1,504.46 |

*Indicates Break In Check Number Sequence

Exhibit A

59

**Fill in this information to identify the case:**

Debtor Name  Williamson Memorial Hospital, LLC

United States Bankruptcy Court for the: Southern District of West Virginia

Case number:  19-20469

☑ Check if this is an amended filing

Official Form 425C

## Monthly Operating Report for Small Business Under Chapter 11          12/17

Month:        January

Line of business:  Hospital

Date report filed:  04/21/2020
MM / DD / YYYY

NAISC code:  _____

In accordance with title 28, section 1746, of the United States Code, I declare under penalty of perjury that I have examined the following small business monthly operating report and the accompanying attachments and, to the best of my knowledge, these documents are true, correct, and complete.

Responsible party:              Interim CEO of Williamson Memorial Hospita

Original signature of responsible party    *Harold Preston*

Printed name of responsible party    Harold E. Preston, Jr.

### 1. Questionnaire

Answer all questions on behalf of the debtor for the period covered by this report, unless otherwise indicated.

|  |  | Yes | No | N/A |
|---|---|:---:|:---:|:---:|
| | **If you answer *No* to any of the questions in lines 1-9, attach an explanation and label it *Exhibit A*.** | | | |
| 1. | Did the business operate during the entire reporting period? | ☑ | ☐ | ☐ |
| 2. | Do you plan to continue to operate the business next month? | ☑ | ☐ | ☐ |
| 3. | Have you paid all of your bills on time? | | X | ☐ |
| 4. | Did you pay your employees on time? | ☑ | ☐ | ☐ |
| 5. | Have you deposited all the receipts for your business into debtor in possession (DIP) accounts? | ☑ | ☐ | ☐ |
| 6. | Have you timely filed your tax returns and paid all of your taxes? | ☐ | ☑ | ☐ |
| 7. | Have you timely filed all other required government filings? | ☐ | ☑ | ☐ |
| 8. | Are you current on your quarterly fee payments to the U.S. Trustee or Bankruptcy Administrator? | ☐ | ☑ | ☐ |
| 9. | Have you timely paid all of your insurance premiums? | ☑ | ☐ | ☐ |
| | **If you answer *Yes* to any of the questions in lines 10-18, attach an explanation and label it *Exhibit B*.** | | | |
| 10. | Do you have any bank accounts open other than the DIP accounts? | ☐ | ☑ | ☐ |
| 11. | Have you sold any assets other than inventory? | ☐ | ☑ | ☐ |
| 12. | Have you sold or transferred any assets or provided services to anyone related to the DIP in any way? | ☐ | ☑ | ☐ |
| 13. | Did any insurance company cancel your policy? | ☐ | ☑ | ☐ |
| 14. | Did you have any unusual or significant unanticipated expenses? | ☐ | ☑ | ☐ |
| 15. | Have you borrowed money from anyone or has anyone made any payments on your behalf? | ☑ | ☐ | ☐ |
| 16. | Has anyone made an investment in your business? | ☐ | ☑ | ☐ |

Exhibit A

Debtor Name  Williamson Memorial Hospital, LLC                     Case number  19-20469

17. Have you paid any bills you owed before you filed bankruptcy?     ☐  ☑  ☐

18. Have you allowed any checks to clear the bank that were issued before you filed bankruptcy?     ☐  ☑  ☐

## 2. Summary of Cash Activity for All Accounts

19. **Total opening balance of all accounts**

   This amount must equal what you reported as the cash on hand at the end of the month in the previous month. If this is your first report, report the total cash on hand as of the date of the filing of this case.     $ 17,360.73

20. **Total cash receipts**

   Attach a listing of all cash received for the month and label it *Exhibit C*. Include all cash received even if you have not deposited it at the bank, collections on receivables, credit card deposits, cash received from other parties, or loans, gifts, or payments made by other parties on your behalf. Do not attach bank statements in lieu of *Exhibit C*.

   Report the total from *Exhibit C* here.     $ 786,106.63

21. **Total cash disbursements**

   Attach a listing of all payments you made in the month and label it *Exhibit D*. List the date paid, payee, purpose, and amount. Include all cash payments, debit card transactions, checks issued even if they have not cleared the bank, outstanding checks issued before the bankruptcy was filed that were allowed to clear this month, and payments made by other parties on your behalf. Do not attach bank statements in lieu of *Exhibit D*.

   Report the total from *Exhibit D* here.     – $ 638,905.75

22. **Net cash flow**

   Subtract line 21 from line 20 and report the result here.
   This amount may be different from what you may have calculated as *net profit*.     + $ 147,200.88

23. **Cash on hand at the end of the month**

   Add line 22 + line 19. Report the result here.

   Report this figure as the *cash on hand at the beginning of the month* on your next operating report.     = $ 164,561.71

   This amount may not match your bank account balance because you may have outstanding checks that have not cleared the bank or deposits in transit.

## 3. Unpaid Bills

   Attach a list of all debts (including taxes) which you have incurred since the date you filed bankruptcy but have not paid. Label it *Exhibit E*. Include the date the debt was incurred, who is owed the money, the purpose of the debt, and when the debt is due. Report the total from *Exhibit E* here.

24. **Total payables**     $ 571,494.60

   *(Exhibit E)*

Exhibit A

Case 2:19-bk-20469     Doc 354     Filed 04/21/20     Entered 04/21/20 12:02:41     Desc Main
Document     Page 3 of 59

Debtor Name  Williamson Memorial Hospital, LLC _____     Case number 19-20469 _____

### 4. Money Owed to You

Attach a list of all amounts owed to you by your customers for work you have done or merchandise you
have sold. Include amounts owed to you both before, and after you filed bankruptcy. Label it *Exhibit F*.
Identify who owes you money, how much is owed, and when payment is due. Report the total from
*Exhibit F* here.

25. **Total receivables**                                                                $ 4,945,000.0

   *(Exhibit F)*

### 5. Employees

26. What was the number of employees when the case was filed?                            154

27. What is the number of employees as of the date of this monthly report?               101

### 6. Professional Fees

28. How much have you paid this month in professional fees related to this bankruptcy case?      $ 50,000.00

29. How much have you paid in professional fees related to this bankruptcy case since the case was filed?   $ 50,000.00

30. How much have you paid this month in other professional fees?                        $ 0.00

31. How much have you paid in total other professional fees since filing the case?       $ 0.00

### 7. Projections

Compare your actual cash receipts and disbursements to what you projected in the previous month.
Projected figures in the first month should match those provided at the initial debtor interview, if any.

| | Column A | | Column B | | Column C |
|---|---|---|---|---|---|
| | **Projected** | − | **Actual** | = | **Difference** |
| | Copy lines 35-37 from the previous month's report. | | Copy lines 20-22 of this report. | | Subtract Column B from Column A. |
| 32. **Cash receipts** | $ 944,696.00 | − | $ 786,106.63 | = | $ 158,589.37 |
| 33. **Cash disbursements** | $ 1,037,045.0 | − | $ 638,905.75 | = | $ 535,112.00 |
| 34. **Net cash flow** | $ -17,360.00 | − | $ 147,200.88 | = | $ 164,560.88 |

35. Total projected cash receipts for the next month:                          $ 1,500,000.0

36. Total projected cash disbursements for the next month:                    − $ 1,042,000.0

37. Total projected net cash flow for the next month:                          = $ 458,000.00

Exhibit A

Debtor Name  Williamson Memorial Hospital, LLC                          Case number  19-20469

## 8. Additional Information

If available, check the box to the left and attach copies of the following documents.

☑  38.  Bank statements for each open account (redact all but the last 4 digits of account numbers).

☑  39.  Bank reconciliation reports for each account.

☑  40.  Financial reports such as an income statement (profit & loss) and/or balance sheet.

☑  41.  Budget, projection, or forecast reports.

☐  42.  Project, job costing, or work-in-progress reports.

Exhibit A

## EXHIBIT A

Debtor receipts were inefficient to pay all amounts owed when they came due.

Debtor has retained an accounting firm to assist with tax filings.

WILLIAMSON MEMORIAL HOSPITAL
Case No. 2:19-bk-20469

| | 10/24/2019 | 11/14/2019 | 11/18/2019 | 12/13/2019 | 1/2/2020 | 1/3/2020 | 1/21/2020 | 1/27/2020 | TOTAL* |
|---|---|---|---|---|---|---|---|---|---|
| Partners | 330,000.00 | 75,000.00 | 75,000.00 | 22,000.00 | 100,000.00 | 1,000.00 | 100,000.00 | 7,000.00 | 710,000.00 |
| Total Cash | 330,000.00 | 75,000.00 | 75,000.00 | 22,000.00 | 100,000.00 | 1,000.00 | 100,000.00 | 7,000.00 | 710,000.00 |

*During month of January, principals in Mingo Partners contributed the following additional sums to debtor, without obtaining any court approval: 1/21/2020 (150,000); 1/27/2020 (73,000) and 1/31/2020 (145,000)

Exhibit A

**Fill in this information to identify the case:**

Debtor Name  Williamson Memorial Hospital, LLC

United States Bankruptcy Court for the: Northern District of West Virginia

Case number:  19-20469

☐ Check if this is an
amended filing

## Official Form 425C

### Monthly Operating Report for Small Business Under Chapter 11                12/17

Month:  February

Line of business:  Hospital

Date report filed:  03/30/2020
MM / DD / YYYY

NAISC code:  _____

In accordance with title 28, section 1746, of the United States Code, I declare under penalty of perjury that I have examined the following small business monthly operating report and the accompanying attachments and, to the best of my knowledge, these documents are true, correct, and complete.

Responsible party:  Interim CEO Williamson Memorial Hospital

Original signature of responsible party  *Harold Preston*

Printed name of responsible party  Harold E. Preston, Jr.

### 1. Questionnaire

Answer all questions on behalf of the debtor for the period covered by this report, unless otherwise indicated.

If you answer *No* to any of the questions in lines 1-9, attach an explanation and label it *Exhibit A.*

| | | Yes | No | N/A |
|---|---|:---:|:---:|:---:|
| 1. | Did the business operate during the entire reporting period? | ☑ | ☐ | ☐ |
| 2. | Do you plan to continue to operate the business next month? | ☑ | ☐ | ☐ |
| 3. | Have you paid all of your bills on time? | ☑ | ☐ | ☐ |
| 4. | Did you pay your employees on time? | ☑ | ☐ | ☐ |
| 5. | Have you deposited all the receipts for your business into debtor in possession (DIP) accounts? | ☑ | ☐ | ☐ |
| 6. | Have you timely filed your tax returns and paid all of your taxes? | ☐ | ☑ | ☐ |
| 7. | Have you timely filed all other required government filings? | ☑ | ☐ | ☐ |
| 8. | Are you current on your quarterly fee payments to the U.S. Trustee or Bankruptcy Administrator? | ☐ | ☑ | ☐ |
| 9. | Have you timely paid all of your insurance premiums? | ☑ | ☐ | ☐ |

If you answer *Yes* to any of the questions in lines 10-18, attach an explanation and label it *Exhibit B.*

| | | Yes | No | N/A |
|---|---|:---:|:---:|:---:|
| 10. | Do you have any bank accounts open other than the DIP accounts? | ☐ | ☑ | ☐ |
| 11. | Have you sold any assets other than inventory? | ☐ | ☑ | ☐ |
| 12. | Have you sold or transferred any assets or provided services to anyone related to the DIP in any way? | ☐ | ☑ | ☐ |
| 13. | Did any insurance company cancel your policy? | ☐ | ☑ | ☐ |
| 14. | Did you have any unusual or significant unanticipated expenses? | ☐ | ☑ | ☐ |
| 15. | Have you borrowed money from anyone or has anyone made any payments on your behalf? | ☑ | ☐ | ☐ |
| 16. | Has anyone made an investment in your business? | ☐ | ☑ | ☐ |

Exhibit A

Debtor Name  Williamson Memorial Hospital, LLC _____        Case number 19-20469 _____

17. Have you paid any bills you owed before you filed bankruptcy?                    ☐  ☑  ☐
18. Have you allowed any checks to clear the bank that were issued before you filed bankruptcy?   ☐  ☑  ☐

## 2. Summary of Cash Activity for All Accounts

19. **Total opening balance of all accounts**

   This amount must equal what you reported as the cash on hand at the end of the month in the previous
   month. If this is your first report, report the total cash on hand as of the date of the filing of this case.   $ 164,561.61

20. **Total cash receipts**

   Attach a listing of all cash received for the month and label it *Exhibit C*. Include all
   cash received even if you have not deposited it at the bank, collections on
   receivables, credit card deposits, cash received from other parties, or loans, gifts, or
   payments made by other parties on your behalf. Do not attach bank statements in
   lieu of *Exhibit C*.

   Report the total from *Exhibit C* here.                                           $ 1,629,019.6

21. **Total cash disbursements**

   Attach a listing of all payments you made in the month and label it *Exhibit D*. List the
   date paid, payee, purpose, and amount. Include all cash payments, debit card
   transactions, checks issued even if they have not cleared the bank, outstanding
   checks issued before the bankruptcy was filed that were allowed to clear this month,
   and payments made by other parties on your behalf. Do not attach bank statements
   in lieu of *Exhibit D*.

   Report the total from *Exhibit D* here.                                           − $ 303,829.10

22. **Net cash flow**

   Subtract line 21 from line 20 and report the result here.                         + $ 1,325,190.6
   This amount may be different from what you may have calculated as *net profit*.

23. **Cash on hand at the end of the month**

   Add line 22 + line 19. Report the result here.                                    = $ 1,489,752.4

   Report this figure as the *cash on hand at the beginning of the month* on your next operating report.

   This amount may not match your bank account balance because you may have outstanding checks that
   have not cleared the bank or deposits in transit.

## 3. Unpaid Bills

Attach a list of all debts (including taxes) which you have incurred since the date you filed bankruptcy but
have not paid. Label it *Exhibit E*. Include the date the debt was incurred, who is owed the money, the
purpose of the debt, and when the debt is due. Report the total from *Exhibit E* here.

24. **Total payables**                                                               $ 1,030,688.9

   *(Exhibit E)*

Exhibit A

Debtor Name  Williamson Memorial Hospital, LLC                          Case number  19-20469

---

### 4. Money Owed to You

Attach a list of all amounts owed to you by your customers for work you have done or merchandise you
have sold. Include amounts owed to you both before, and after you filed bankruptcy.  Label it *Exhibit F*.
Identify who owes you money, how much is owed, and when payment is due. Report the total from
*Exhibit F* here.

25.  **Total receivables**                                                                    $ 4,959,688

   *(Exhibit F)*

---

### 5. Employees

26.  What was the number of employees when the case was filed?                                   157

27.  What is the number of employees as of the date of this monthly report?                      101

---

### 6. Professional Fees

28.  How much have you paid this month in professional fees related to this bankruptcy case?      $  50,000.00

29.  How much have you paid in professional fees related to this bankruptcy case since the case was filed?  $  50,000.00

30.  How much have you paid this month in other professional fees?                                $ _____

31.  How much have you paid in total other professional fees since filing the case?              $ _____

---

### 7. Projections

Compare your actual cash receipts and disbursements to what you projected in the previous month.
Projected figures in the first month should match those provided at the initial debtor interview, if any.

| | Column A<br>Projected | − | Column B<br>Actual | = | Column C<br>Difference |
|---|---|---|---|---|---|
| | Copy lines 35-37 from the previous month's report. | | Copy lines 20-22 of this report. | | Subtract Column B from Column A. |
| 32.  **Cash receipts** | $ 1,500,000.0 | − | $ 1,629,019.0 | = | $ 129,019.00 |
| 33.  **Cash disbursements** | $ 1,042,000.0 | − | $ 303,829.10 | = | $ 738,171.00 |
| 34.  **Net cash flow** | $ 458,000.00 | − | $ 1,325,190.8 | = | $ 867,190.00 |

35.  Total projected cash receipts for the next month:                                  $ 489,000.00

36.  Total projected cash disbursements for the next month:                           − $ 489,000.00

37.  Total projected net cash flow for the next month:                                 = $       0.00

---

Exhibit A

Debtor Name  Williamson Memorial Hospital, LLC                          Case number 19-20469

### 8. Additional Information

If available, check the box to the left and attach copies of the following documents.

☑ 38.  Bank statements for each open account (redact all but the last 4 digits of account numbers).

☑ 39.  Bank reconciliation reports for each account.

☑ 40.  Financial reports such as an income statement (profit & loss) and/or balance sheet.

☑ 41.  Budget, projection, or forecast reports.

☐ 42.  Project, job costing, or work-in-progress reports.

Exhibit A

EXHIBIT A

In order to have the funds necessary to continue operations at the hospital, Debtor has not been able to pay all of its taxes and US Trustee fees as they become due. Debtor anticipates receiving funds from the collection of its receivables sufficient to pay these sums in the near future.

EXHIBIT B

In February 2020, the Debtor obtained an order from the Court authorizing it to obtain additional post-petition financing from Pikeville Medical Center. In February, the Debtor borrowed $1,500,000 from Pikeville Medical Center.

Case 2:19-bk-20469    Doc 355    Filed 04/21/20    Entered 04/21/20 12:03:59    Desc Main
Document    Page 250 of 56

**Fill in this information to identify the case:**

Debtor Name    Williamson Memorial Hospital, LLC

United States Bankruptcy Court for the: Southern District of West Virginia

Case number: 19-20463

☐ Check if this is an
amended filing

## Official Form 425C

## Monthly Operating Report for Small Business Under Chapter 11    12/17

Month:    March    Date report filed:    04/21/2020
                                                              MM / DD / YYYY

Line of business:    Hospital    NAISC code:

In accordance with title 28, section 1746, of the United States Code, I declare under penalty of perjury
that I have examined the following small business monthly operating report and the accompanying
attachments and, to the best of my knowledge, these documents are true, correct, and complete.

Responsible party:    Interim CEO Williamson Memorial Hospital

Original signature of responsible party    *Harold E Preston Jr*

Printed name of responsible party    Harold E. Preston, Jr.

## █ 1. Questionnaire

Answer all questions on behalf of the debtor for the period covered by this report, unless otherwise indicated.

|  |  | Yes | No | N/A |
|---|---|:---:|:---:|:---:|
| | **If you answer *No* to any of the questions in lines 1-9, attach an explanation and label it *Exhibit A*.** | | | |
| 1. | Did the business operate during the entire reporting period? | ☑ | ☐ | ☐ |
| 2. | Do you plan to continue to operate the business next month? | ☐ | ☑ | ☐ |
| 3. | Have you paid all of your bills on time? | ☐ | ☑ | ☐ |
| 4. | Did you pay your employees on time? | ☑ | ☐ | ☐ |
| 5. | Have you deposited all the receipts for your business into debtor in possession (DIP) accounts? | ☑ | ☐ | ☐ |
| 6. | Have you timely filed your tax returns and paid all of your taxes? | ☐ | ☑ | ☐ |
| 7. | Have you timely filed all other required government filings? | ☑ | ☐ | ☐ |
| 8. | Are you current on your quarterly fee payments to the U.S. Trustee or Bankruptcy Administrator? | ☑ | ☐ | ☐ |
| 9. | Have you timely paid all of your insurance premiums? | ☑ | ☐ | ☐ |
| | **If you answer *Yes* to any of the questions in lines 10-18, attach an explanation and label it *Exhibit B*.** | | | |
| 10. | Do you have any bank accounts open other than the DIP accounts? | ☐ | ☑ | ☐ |
| 11. | Have you sold any assets other than inventory? | ☐ | ☑ | ☐ |
| 12. | Have you sold or transferred any assets or provided services to anyone related to the DIP in any way? | ☐ | ☑ | ☐ |
| 13. | Did any insurance company cancel your policy? | ☐ | ☑ | ☐ |
| 14. | Did you have any unusual or significant unanticipated expenses? | ☐ | ☑ | ☐ |
| 15. | Have you borrowed money from anyone or has anyone made any payments on your behalf? | ☑ | ☐ | ☐ |
| 16. | Has anyone made an investment in your business? | ☐ | ☑ | ☐ |

Exhibit A

Debtor Name  Williamson Memorial Hospital, LLC _____    Case number  19-20463 _____

| | | | |
|---|---|---|---|
| 17. Have you paid any bills you owed before you filed bankruptcy? | ☐ | ☑ | ☐ |
| 18. Have you allowed any checks to clear the bank that were issued before you filed bankruptcy? | ☐ | ☑ | ☐ |

## 2. Summary of Cash Activity for All Accounts

**19. Total opening balance of all accounts**

This amount must equal what you reported as the cash on hand at the end of the month in the previous month. If this is your first report, report the total cash on hand as of the date of the filing of this case.

$ 1,489,752.0

**20. Total cash receipts**

Attach a listing of all cash received for the month and label it *Exhibit C.* Include all cash received even if you have not deposited it at the bank, collections on receivables, credit card deposits, cash received from other parties, or loans, gifts, or payments made by other parties on your behalf. Do not attach bank statements in lieu of *Exhibit C.*

Report the total from *Exhibit C* here.

$ 795,914.37

**21. Total cash disbursements**

Attach a listing of all payments you made in the month and label it *Exhibit D.* List the date paid, payee, purpose, and amount. Include all cash payments, debit card transactions, checks issued even if they have not cleared the bank, outstanding checks issued before the bankruptcy was filed and that were allowed to clear this month, and payments made by other parties on your behalf. Do not attach bank statements in lieu of *Exhibit D.*

Report the total from *Exhibit D* here.

– $ 1,803,182.8

**22. Net cash flow**

Subtract line 21 from line 20 and report the result here.
This amount may be different from what you may have calculated as *net profit.*

+ $ -1,007,268.

**23. Cash on hand at the end of the month**

Add line 22 + line 19. Report the result here.

Report this figure as the *cash on hand at the beginning of the month* on your next operating report.

= $ 482,484.29

This amount may not match your bank account balance because you may have outstanding checks that have not cleared the bank or deposits in transit.

## 3. Unpaid Bills

Attach a list of all debts (including taxes) which you have incurred since the date you filed bankruptcy but have not paid. Label it *Exhibit E.* Include the date the debt was incurred, who is owed the money, the purpose of the debt, and when the debt is due. Report the total from *Exhibit E* here.

**24. Total payables**

$ 502,454.68

*(Exhibit E)*

Exhibit A

Case 2:19-bk-20469    Doc 355    Filed 04/21/20    Entered 04/21/20 12:03:59    Desc Main
Document    Page 3 of 56

Debtor Name  Williamson Memorial Hospital, LLC                    Case number 19-20463

### 4. Money Owed to You

Attach a list of all amounts owed to you by your customers for work you have done or merchandise you
have sold. Include amounts owed to you both before, and after you filed bankruptcy. Label it *Exhibit F*.
Identify who owes you money, how much is owed, and when payment is due. Report the total from
*Exhibit F* here.

25. **Total receivables**                                            $ 5,408,236.0

  *(Exhibit F)*

### 5. Employees

26. What was the number of employees when the case was filed?                        157

27. What is the number of employees as of the date of this monthly report?            101

### 6. Professional Fees

28. How much have you paid this month in professional fees related to this bankruptcy case?     $ __35,000.00

29. How much have you paid in professional fees related to this bankruptcy case since the case was filed?   $  85,000.00

30. How much have you paid this month in other professional fees?                          $ _____

31. How much have you paid in total other professional fees since filing the case?            $ _____

### 7. Projections

Compare your actual cash receipts and disbursements to what you projected in the previous month.
Projected figures in the first month should match those provided at the initial debtor interview, if any.

| | *Column A*<br>**Projected** | − | *Column B*<br>**Actual** | = | *Column C*<br>**Difference** |
|---|---|---|---|---|---|
| | Copy lines 35-37 from<br>the previous month's<br>report. | | Copy lines 20-22 of<br>this report. | | Subtract Column B<br>from Column A. |
| 32. **Cash receipts** | $ 489,000.00 | − | $ 795,914.00 | = | $ 306,914.00 |
| 33. **Cash disbursements** | $ 489,000.00 | − | $ 1,803,382.8 | = | $ 795,915.00 |
| 34. **Net cash flow** | $ 0.00 | | $ 1,007,268.0 | | $ -1,007,268. |

35. Total projected cash receipts for the next month:                       $ 528,000.00

36. Total projected cash disbursements for the next month:                  − $ 327,000.00

37. Total projected net cash flow for the next month:                       = $ 201,000.00

Exhibit A

Debtor Name  Williamson Memorial Hospital, LLC _____          Case number  19-20463 _____

## 8. Additional Information

If available, check the box to the left and attach copies of the following documents.

☑ 38.  Bank statements for each open account (redact all but the last 4 digits of account numbers).

☑ 39.  Bank reconciliation reports for each account.

☑ 40.  Financial reports such as an income statement (profit & loss) and/or balance sheet.

☑ 41.  Budget, projection, or forecast reports.

☐ 42.  Project, job costing, or work-in-progress reports.

Exhibit A

# Exhibit A

Questions

3.  We have not paid several vendors on time as services will be terminating on April 21st with the hospital closure.

6.  Sales & Use taxes have not been filed or paid.  Currently, working with external CPA firm on completing.